UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

——————————————————— x

CHAN KWOK SHING, Individually and on
Behalf of All Others Similarly Situated,

                             Plaintiff,

     vs.

ICON PLC, STEPHEN CUTLER, and
BRENDAN BRENNAN,

                        Defendants.

——————————————————— x

Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

Plaintiff Chan Kwok Shing ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of ICON plc ("ICON" or the "Company"), the Company's press releases, analyst reports, media reports, and other publicly disclosed information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all purchasers of ICON ordinary shares between July 27, 2023 and October 23, 2024, both dates inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act") against ICON and certain of the Company's executive officers.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

3.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), and §27 of the 1934 Act, because certain of the events or omissions giving rise to the claim occurred in this District, including the dissemination of the statements alleged to be materially false and misleading into this District, and ICON transacts significant business in this District, including through ICON Central Laboratories' global headquarters that is located in Farmingdale, New York.

4.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

5.    Plaintiff Chan Kwok Shing, as set forth in the certification attached hereto and incorporated by reference herein, purchased ICON ordinary shares during the Class Period and has been damaged thereby.

6.    Defendant ICON is a clinical research organization.  ICON ordinary shares are traded on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "ICLR."

7.    Defendant Stephen Cutler ("Cutler") has served as ICON's Chief Executive Officer ("CEO") since March 2017 and on ICON's Board of Directors (the "Board") since November 2015.  Prior to serving as CEO, defendant Cutler served as ICON's Chief Operating Officer ("COO").

8.    Defendant Brendan Brennan ("Brennan") served as ICON's Chief Financial Officer ("CFO") from February 2012 until his departure from the Company in October 2024.

9.    Defendants Cutler and Brennan are collectively referred to herein as the "Individual Defendants."

10.    Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, customers, and present and future business prospects, as alleged herein.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly

disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11.    As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the 1934 Act and trade on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, markets, competition, customers, and present and future business prospects.  In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of ICON ordinary shares would be based upon truthful and accurate information.  Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

**BACKGROUND**

13.    ICON is a clinical research organization ("CRO").  As a CRO, ICON provides a range of services that help pharmaceutical companies bring new drugs and medical devices to

market. These services principally include conducting all aspects of phase I to phase IV clinical trials.

14.     ICON generally offers its clinical trial services through two distinct operating models: (i) Full-Service Outsourcing ("FSO"); and (ii) Functional Service Provision ("FSP"). In FSO arrangements, ICON is responsible for conducting all aspects of a clinical trial, from initial site selection through post-approval monitoring. In FSP arrangements, customers choose to outsource certain discrete functions of a clinical trial to ICON while electing to perform certain other functions internally, which allows customers to retain a greater level of control over their research and development ("R&D") costs.

15.     ICON organizes its operations around two customer segments: (i) large pharmaceutical; and (ii) biotechnology companies. ICON defines its large pharmaceutical segment as customers within the top 60 in terms of largest annual R&D expenditures. ICON's biotechnology customers consist of emerging to small and midsized companies that annually expend less on R&D than the top 60 companies. Historically, ICON's large pharmaceutical customers have generally entered into FSO arrangements with the Company.

16.     ICON earns a majority of its revenues from its largest pharmaceutical customers. For example, in fiscal year 2023, ICON earned approximately 41% of its revenues from its top 10 customers, while approximately 63% of its revenues were earned from its top 25 customers. In that same year, ICON earned nearly 9% of its revenues from its largest customer, Pfizer, Inc. ("Pfizer").

17.     As a CRO, ICON's financial performance and future growth prospects are dependent on a steady inflow of new business. In general, ICON secures new business contracts based upon its responses to requests for proposals ("RFPs") that it receives from existing and

prospective clients. ICON's service agreements allow customers to cancel all or part of any services that remain outstanding under the contract.

18. Leading up to and during the Class Period, ICON's customers were seeking to dramatically reduce their R&D expenditures in response to a tightening capital and high interest rate environment. To reduce costs, many of ICON's large pharmaceutical customers implemented drastic cost reduction programs that sought to cut billions of dollars in annual R&D expenditures. For example, in the fall of 2023, Pfizer announced it was launching a "cost realignment program" that would cut $4 billion in annual costs by the end of 2024 with 70% of total reductions targeted specifically at R&D costs. To further rein in costs, ICON's large pharmaceutical customers also began to increasingly move away from costlier FSO arrangements in favor of "hybrid" models that utilized FSP offerings to conduct broader portions of their clinical trial work. The shift allowed customers to reduce fees paid to CROs by performing a greater portion of their clinical studies in-house.

19. ICON's smaller biotechnology customers, who are largely dependent on funding from outside investors, were also in the midst of an unfavorable funding environment, which limited their ability to engage CROs for clinical trial work.

20. During the Class Period, investors did not know how these market dynamics were specifically impacting ICON's business and prospects. ICON and its executives claimed that, notwithstanding wider industry trends, the Company was enjoying robust client demand and in fact *benefitting* from market shifts as it meant that ICON's clients were consolidating their CRO providers, with a bigger market share going to ICON. For example, during an October 2023 conference call, defendant Cutler highlighted the "scale" and "breadth" of ICON's service offerings and represented that, due to increasing demand for "blended" solutions, the Company's

- 5 -

competitive position within the industry had "never been better." Based upon these purported advantages, defendant Cutler represented to investors that ICON was "well placed to benefit" from the prevailing market challenges, as customers "were happy" to consolidate their overall R&D spend with the Company.

21.    Unbeknownst to investors, however, ICON's business, operations, and prospects had significantly deteriorated during the Class Period due to customer cost reduction measures and other industry funding limitations. Contrary to defendants' representations, ICON's purported FSP and hybrid model offerings could not shield the Company from the adverse effects of an industry-wide slowdown. ICON's customers had canceled contracts, limited or reduced engagements, delayed clinical trial work, and/or failed to enter into new contracts with ICON for additional clinical trial work at historical rates once existing projects ended (or were scheduled to end) in 2024. Rather than consolidate more CRO business to ICON, the Company's two largest customers had actually diversified their CRO providers *away* from the Company. In addition, a material portion of RFPs that ICON had highlighted as indicative of actual client demand during the Class Period were in fact merely sent to the Company to gauge prevailing industry prices. As a result, ICON was not benefitting from market dynamics as defendants represented to investors during the Class Period, but rather was experiencing undisclosed adverse impacts as a result of the broader biotechnology funding slowdown.

22.    Then, on October 23, 2024, in connection with reporting its financial results for its third fiscal quarter of 2024, ICON revealed a surprise "revenue shortfall" that missed consensus analyst estimates by more than $100 million. ICON further revealed that several leading indicators of customer demand, including net new business awards and book-to-bill metrics, had materially deteriorated during the quarter. During the corresponding conference call, defendant Cutler

revealed that two of ICON's large pharmaceutical customers had significantly curtailed upcoming FSP trial work due to ongoing budgetary programs, which he stated would continue to negatively impact the Company's financial results going forward.  Defendant Cutler further disclosed that numerous other ICON clients had delayed or reduced the scope of ongoing studies, cancelled trial work, and/or delayed business awards for future engagements above historical norms, revealing that a broad market slowdown was indeed having a deeply negative impact on the Company's business operations contrary to defendants' Class Period statements.  As a result, ICON cut its annual revenue guidance for fiscal 2024 by $220 million at the midpoint.

23.    On October 25, 2024, analyst firm Truist Securities published a report summarizing discussions with ICON's management regarding the Company's recently reported financial results.  In the report, Truist Securities disclosed that ICON "knew that it had some studies finishing off over the course of the summer in its long-term contract base."  The report also revealed that ICON had known for a while that its two largest customers were diversifying CRO providers away from the Company, as management described the dynamic as "not a new development" and conceded that the influx of competitors "did not come as a surprise to ICON."

24.    As a result of these disclosures, the price of ICON ordinary shares declined more than 20% over a two-day trading period, from $280.76 per share on October 23, 2024 to $220.47 per share on October 25, 2024, inflicting hundreds of millions of dollars of financial losses and economic damages under the securities laws on Class members (defined below).

25.    Following the end of the Class Period, on November 21, 2024, ICON presented at an industry conference hosted by analysts at Jefferies.  During the conference call, defendant Cutler revealed that a material portion of RFPs ICON had received from its biotechnology customers had been issued only to obtain better pricing elsewhere, accounting for as much as 30% of total dollars

ICON had bid in response to RFPs. Defendant Cutler explained that ICON's biotechnology customers would cancel outstanding RFPs before reaching the contract phase, providing additional context for the delayed business awards that negatively impacted ICON's third quarter financial results.

26.     On January 14, 2025, ICON issued financial guidance for full year 2025 of expected revenue in the range of $8.05 billion to $8.65 billion and expected earnings per share ("EPS") in the range of $13 per share to $15 per share, a wider than normal range that came in significantly below analysts' expectations. During a related conference call, defendants confirmed that the disappointing guidance reflected a continuation of the adverse effects on the Company's financial performance as a result of softness in biotech clinical research.

27.     On this news, the price of ICON ordinary shares fell from $217.99 per share on January 13, 2025 to $200.24 per share on January 14, 2025, a decline of more than 8%, on above-average trading volume.

**MATERIALLY FALSE AND MISLEADING STATEMENTS
AND OMISSIONS ISSUED DURING THE CLASS PERIOD**

28.     The Class Period begins on July 27, 2023. After market close on July 26, 2023, ICON issued a press release reporting the Company's financial results for its second fiscal quarter ending June 30, 2023 ("2Q23 Release"). The 2Q23 Release stated that ICON generated $2.02 billion in quarterly revenues, representing a 4.4% increase from $1.94 billion in the prior year quarter. The 2Q23 Release further stated that ICON's adjusted EBITDA grew 17% year-over-year to $414 million, up from $354 million in the prior year quarter. The 2Q23 Release also stated that ICON's gross business wins during the quarter were $2.9 billion and cancellations were $441 million, resulting in net new business awards of $2.4 billion and a book-to-bill ratio of 1.2.

29.    The 2Q23 Release quoted defendant Cutler who represented that ICON was experiencing "'positive customer demand trends.'"

30.    On July 27, 2023, ICON held a conference call with analysts to discuss the Company's financial and operational results for its second fiscal quarter of 2023, which was hosted by defendants Cutler and Brennan.  During the call, an analyst asked about the potential for ICON's business to grow in light of the capital environment.  In response, defendant Cutler claimed that ICON had potentially "more of an opportunity" as a result of capital conditions, stating in pertinent part as follows:

> The conversations we have are really around how they're spending their money effectively and efficiently, and how we can help them get their drugs to market.  So, as I say when I get asked this question, Luke, even when R&D budgets are going up or they're spending more, we clearly have an opportunity.  *But even when they're not and even going down or staying flat, we have an opportunity*.  In fact, sometimes it's *more of an opportunity for organizations like ours when budgets are flat because they – the pharma companies look at how they're spending and try to optimize their spend*.  So it varies really depending upon the customer.

31.    During the call, defendant Cutler also emphasized that RFPs had continued to trend positively and that the purportedly high-level of business opportunities was "broad-based" across all customer segments, stating in pertinent part as follows:

> The opportunity though that we're seeing in the business are not just in the biotech, they're *really fairly broad-based across the business*.  So, really, I think we reported last quarter an increase in RFP on a sequential basis.  *That's continued in the second quarter.  And even as I said, early in July, we're seeing further opportunity.  So we're certainly cautiously optimistic of a strong business development performance in the back end of the year right across the various segments*.

32.    Defendant Cutler continued in pertinent part as follows:

> I think, as I said in the previous answer, the demand increase, *the RFP opportunities are really across the segments of the business*: in our large pharma group, in our biotech group, and in the more lab services, peri-clinical, early phase as well.  So it's, from that point of view, consistent, functional as well.  So, I'm pleased with the way that that's, as I said, broad-based.

- 9 -

33.    On July 28, 2023, ICON filed with the SEC a report on Form 6-K reporting the Company's financial results for its second fiscal quarter ending June 30, 2023, which was signed by defendant Brennan ("2Q23 Form 6-K").  The 2Q23 Form 6-K contained the same financial information regarding ICON's revenue and adjusted EBITDA reflected in the 2Q23 Release.

34.    On October 25, 2023, ICON issued a press release reporting the Company's financial results for its third fiscal quarter ending September 30, 2023 ("3Q23 Release").  The 3Q23 Release stated that ICON's quarterly revenues grew 5.8% year-over-year to $2.1 billion, compared to $1.9 billion in the prior year quarter.  The 3Q23 Release further stated that ICON's adjusted EBITDA in the quarter grew 14% year-over-year to $433 million, compared to $380 million in the prior year quarter.  The 3Q23 Release also stated that ICON's gross business wins during the quarter were $3.06 billion and that cancellations were $474 million, resulting in net new business wins of $2.6 billion and a book-to-bill ratio of 1.26.  The 3Q23 Release quoted defendant Cutler who highlighted ICON's new business awards and the purported "'healthy demand'" environment the Company was experiencing and claimed ICON remained "'well positioned'" to play a "'long-term role'" within its clients' portfolios, stating in pertinent part as follows:

> "Our net book to bill improved to 1.26x in the quarter, ***reflective of the healthy demand for our market-leading offering across the customer segments we serve. We remain well positioned as a critical partner with new and existing customers to play a long-term role in accelerating their development portfolios***."

35.    On October 26, 2023, ICON held a conference call with analysts to discuss the Company's financial and operational results for its third fiscal quarter of 2023.  During his prepared remarks, defendant Cutler highlighted the "scale" and "breadth" of ICON's service offerings and claimed that ICON's competitive position had "never been better" given the increased demand for hybrid solutions, stating in pertinent part as follows:

> Given the scale of the company and the range of our customer base, we are well diversified and embedded from a customer and service segment perspective,

*ensuring that the impact of any market changes can be managed effectively.  To that end, we are seeing a significant level of demand with customers seeking novel solutions to customize a development model that is built on flexibility and efficient delivery of services*.  As we've noted before, this often takes the shape of a blended model of development, incorporating elements of full service and functional solutions.  *Our competitive position has never been better in being able to address our customer needs in this regard*.  The *experience, depth and breadth of our capabilities* across full service and functional solutions is unmatched in the industry.

36.    Defendant Cutler further represented that demand was "healthy" and that business opportunities were "solid" across all customer segments, stating in pertinent part as follows:

*The industry demand environment in clinical development remains healthy, with a solid level of opportunities present across all customer segments.  Overall RFP activity continued to improve in quarter three*, with growth in the high single digits on a trailing 12-month basis.  Net bookings increased 10% year-over-year resulting in a good book to bill of 1.26 times revenue in the quarter. . . .  *We're encouraged by the positive trends we have seen across our business that have continued into the beginning of quarter four* and we remain cautiously optimistic that this trend will continue as we close out this year.

37.    During the call, an analyst inquired about the potential for a market slowdown.  In response, defendant Cutler assured analysts and investors that ICON was experiencing a "very solid" RFP and award environment across all customer segments and claimed the Company was "well placed" to accommodate clients' adoption of hybrid arrangements, stating in pertinent part as follows:

*We've seen a very solid environment RFP wise, award wise, right across the segments, be it large pharma, the biotech and more in the sort of ancillary services that we do*.  Labs have been strong for us recently in late phase, realworld evidence and our late phase group has also done well.  So, it's been fairly broad based.  I would say, I think we've called it out before, there's been a little bit of a move towards FSP and hybrid solutions in the large pharma market.  That's been certainly a feature and we feel we're well placed to be able to accommodate that and to put in place solutions that are more hybrid, I suppose, in terms of adding technology and adding opportunity to push on with margins in that space.  So – but, overall, again, it's, *I'd say, a broadbased positive environment*.  Biotech funding, of course, remains something of an overhang, but even that seems to be, to us, stabilizing.  And I think the last month or two, there's some green shoots there.  So, again, we're finding good science, getting funded.  So I won't say any more.  *I think, just a broad based, positive, constructive*.

- 11 -

38.     Defendant Cutler further stated that RFP growth had been "pretty broad based" across ICON's customer segments over the prior two quarters and claimed the Company was experiencing a "pretty constructive" market, stating in pertinent part as follows:

> Just to clarify, I think we've talked about RFP growth being in the last two quarters, so Q3 and Q2. I think that's what we've talked about some nice uptick on the RFPs. It's not on a trailing 12-month basis. It's more on a more recent basis than that Casey. ***In terms of the opportunities across this large or SMID, I mean it's been a key plan. It's been pretty broad based. SMID, biotech, large pharma again in the last two quarters in that sort of high single digit range and those opportunities have been solid. And we've seen decisions being made within a reasonable timeframe. So, it's – it is what it is. The market seems pretty constructive to us across the different segments, large, SMID and the biotech*** and – so I'm not sure I can say any more than that.

39.     During the call, defendant Cutler further emphasized that the business environment was "very constructive" and "very positive" and claimed ICON could "benefit" from prevailing industry challenges, stating in pertinent part as follows:

> Yeah, Justin, I mean, we've seen pretty constructive, positive RFP numbers certainly for the last two quarters over all the segments, across biotech, large pharma, in our more sort of ancillary services, labs, early phase, et cetera, et cetera and obviously, FSP as well. So, I talked about high-single digits as being a sort of across the landscape and it's fairly consistently across those segments. ***So, overall, we see a very constructive, a very positive sort of a business environment.*** Obviously, there are some challenges out there in the macroeconomic environment. We're very aware of that. But, I think we talked about cautiously optimistic as being our sort of watchwords for this present time. ***And there's nothing that we've seen, certainly from an RFP point of view or from an awards point of view that would change that. It's a constructive, solid, positive environment. We feel we're well placed to benefit from it.***

40.     In response to a question regarding the impact of Pfizer's cost reduction measures on ICON's business, defendant Cutler represented that ICON could benefit from the budgetary cuts as Pfizer was "happy" to "consolidate" its spending with the Company, stating in pertinent part as follows:

> Oh, no. These are relatively expected. We're in close contact with our partner customers on a regular basis. And we recognize the challenges that that particular customer has. We're working closely with them in terms of what they're looking

- 12 -

to do.  No, nothing has been decided at this point.  There's sometimes with these sort of things, ***some opportunity for us that they were happy to further consolidate their spending***, even though they were looking to take their overall spend down over the relatively short term.  ***So, these things aren't always negatives for us***, but we work closely with our partners to look at it, and we have that in the forecast here.

41.   Defendant Cutler continued by claiming that ICON could "come out of it fairly positively" by increasing its revenues as its customers gave the Company a larger share of their CRO budgets, stating in pertinent part as follows:

> One or two of course, as you well know, have got some specific challenges in the very short term, but we're their partners.  As I said, we believe we can provide some solutions for them.  ***We can help them to reduce some of their cost, but also not necessarily reduce our revenues because they can help us by consolidating some of their spend***.  And so, as I say, when these sort of things come out, ***it's not always bad news.  In fact, it's often we come out of it fairly positively.  So I'm optimistic that as we go into the budgeting season that we'll be able to maintain or even improve our share of wallet within some of our larger customers and be an even better partner to them in terms of helping them to be more efficient, irrespective of the model that they are prosecuting or the spend that they have to provide***.

42.   On October 27, 2023, ICON filed with the SEC a report on Form 6-K reporting the Company's financial results for its third fiscal quarter ending September 30, 2023, which was signed by defendant Brennan (the "3Q23 Form 6-K").  The 3Q23 Form 6-K contained the same financial information regarding ICON's revenue and adjusted EBITDA reflected in the 3Q23 Release.

43.   On January 9, 2024, ICON issued a release announcing the Company's financial guidance for its fiscal year 2024 ("January 2024 Release").  The January 2024 Release stated that ICON was on track to achieve revenue in fiscal 2024 in the range of $8.4 billion to $8.8 billion, representing 3.2% to 8.1% growth over ICON's fiscal 2023 revenue.  The January 2024 Release also stated that ICON was on track to achieve adjusted EPS in the range of $14.50 per share to $15.30 per share, representing 13.5% to 19.8% growth over ICON's fiscal 2023 adjusted EPS. The January 2024 Release quoted defendant Cutler who represented that ICON was experiencing

a "'positive demand environment'" despite the macroeconomic pressures impacting the Company's customers, stating in pertinent part as follows:

> "*Our outlook for 2024 indicates a positive demand environment across our segments, notwithstanding continuing macroeconomic pressures faced by our customers*, resulting in full year revenue guidance in the range of $8,400 - $8,800 million and adjusted earnings per share in the range of $14.50 - $15.30."

44.     On January 10, 2024, defendant Cutler presented about ICON at an industry conference hosted by JPMorgan. During his presentation, defendant Cutler represented that the cost containment actions undertaken by ICON's large pharmaceutical customers created "opportunities" for the Company to "improve [its] revenues," stating in pertinent part as follows:

> It's a relatively challenging environment. You're all aware there are one or two of the large pharma customers who are looking to reduce costs. And that's playing through a little bit with us. But on the other hand, *there are some opportunities for us as they recognize they need to spend more effectively, more efficiently, they consolidate spend*.

> And we're in a position as a scale player in the industry *to benefit from that consolidation* so that we can do it all. We have the ability, it's not as though there's only some things we can do. There are things – there's nothing really we can't take on if that's – and that helps us to provide them with more aggressive, I suppose, pricing and it helps them to save some money *but also helps us to improve our revenues*.

45.     On February 21, 2024, ICON issued a press release reporting the Company's financial results for its full year and fourth fiscal quarter ending December 31, 2023 ("4Q23 Release"). The 4Q23 Release stated that ICON's fourth quarter revenues grew 5.3% year-over-year to $2.1 billion, compared to $2 billion in the prior year quarter. The 4Q23 Release further stated that ICON's adjusted EBITDA in the quarter grew 22% year-over-year to $448 million, compared to $405 million in the prior year quarter. The 4Q23 Release also stated that ICON's gross business wins in the quarter were $3 billion and that cancellations were $461 million, resulting in net new business wins of $2.6 billion and a book-to-bill ratio of 1.22. The 4Q23 Release quoted defendant Cutler who represented that ICON was experiencing a "'positive'"

demand environment and reaffirmed the Company's previously issued financial guidance for fiscal 2024.

46.     On February 22, 2024, ICON held a conference call with analysts to discuss the Company's financial and operational results for its full year and fourth fiscal quarter of 2023, which was hosted by defendants Cutler and Brennan.  During the call, an analyst inquired regarding the growth potential of customers within ICON's large pharmaceutical segment.  In response, defendant Cutler claimed that the select customers who were reducing their overall spend could be a "significant benefit" to ICON, stating in pertinent part as follows:

> ***We feel we're in a good place with our top 10, top 20 customers***.  They're all – well, apart from one or two they are growing and the ones that aren't growing, ***it's more a mix shift change rather than anything else.  And then even so, we're seeing more of the business that they're wanting to go into, albeit it's a different revenue flow***.
>
> So overall, we feel good.  I've said it a number of times.  We've made progress on the strategic front with a couple of customers and even others in the large pharma space where we haven't necessarily become a strategic partner with them, we're talking to them about some significant opportunities.  Some of them are having some challenges as we all know.  And that has led to probably more strategic discussions around what we can do and how we can help them to get through some of the short or medium term pain that they have to endure.
>
> So I know we often think about when customers are having a hard time sort of financially that they necessarily cut costs or cut spending.  They can spend in different ways, in my experience, and some sometimes ***that can be a significant benefit for us*** in terms of what they do versus when they're running and growing and their revenues are going up as well.  ***So hard times produce opportunity for us and that's certainly proving the case in one or two areas on the significant large pharma space***.

47.     Defendant Cutler continued by stating that ICON saw increased business opportunities as more of its customers purportedly allocated R&D budgets to the Company, stating in pertinent part as follows:

> So I guess I keep saying it, but as their budgets become perhaps a little bit more constrained or they watch where they're spending their dollars, they do appear to be coming more open to outsourcing and outsourcing even more than they're

doing at the moment.  So, as I say, I can't add much in terms of what – where the budgets are and whether it's an increase or decrease?  We see – we read the same data you do in terms of modest increases in R&D spending over the medium to long term.  ***But it's how that money is allocated is really what's important for us.  And if anything, I think we're seeing more opportunity in terms of the dollars that are outsourced and the opportunity to penetrate further that market***.

48.    On February 23, 2024, ICON filed with the SEC its annual report on Form 20-F for its fiscal year ending December 31, 2023, which was signed by defendant Brennan ("4Q23 Form 20-F").  The 4Q23 Form 20-F contained the same financial information regarding ICON's revenue and adjusted EBITDA reflected in the 4Q23 Release.

49.    On March 5, 2024, defendant Brennan presented on ICON at an industry conference hosted by TD Cowen.  During the call, defendant Brennan represented that ICON's large customers were "going to increase spending" and that some had indicated that the fourth quarter was "probably a nadir" for their cost control measures, stating in pertinent part as follows:

So I do think that pharma really took 2023 to get their ducks in a row.  And I think what we feel now in 2024 is a bit more traction.  Like the thinking around what the model should look like has been done given some of the new selections of partners has been done and I think what I'd like to see now is more of a traction.  ***They're all saying that they're going to increase spending***, even some of the – I think some of the companies that have been more troubled over the last periods have even said in their own press releases over the last quarter ***that Q4 was probably a nadir point than they want to, continue to increase R&D spend as they go forward.  So, I do think we see a good traction there and I think it was really about them getting their structures right with an idea is to be able to really jump off and have a better 2024***.

50.    On April 24, 2024, ICON issued a press release reporting the Company's financial results for its first fiscal quarter ending March 31, 2024 ("1Q24 Release").  The 1Q24 Release stated that ICON's quarterly revenues grew 5.7% year-over-year to $2.1 billion, compared to $2.0 billion in the prior year quarter.  The 1Q24 Release further stated that ICON's adjusted EBITDA in the quarter grew 11% year-over-year to $444 million, compared to $399 million in the prior year quarter.  The 1Q24 Release also stated that ICON's gross business wins in the quarter were

$3.1 billion and that cancellations were $460 million, resulting in net new business wins of $2.7 billion and a book-to-bill ratio of 1.27. The 1Q24 Release quoted defendant Cutler who highlighted ICON's purportedly "strong" financial performance and claimed the results were reflective of the "favorable demand" environment the Company was experiencing, stating in pertinent part as follows:

> "ICON reported a strong start to the year in quarter one, with revenue growth of 6% year over year, and net bookings up 10% over quarter one 2023, resulting in a net book to bill ratio of 1.27 times. Adjusted earnings per share grew a robust 20% on a year over year basis, reflecting our efficient service delivery and strong cost control. *Our performance is reflective of the current favorable demand trends across our industry, as well as the further development of strategic customer partnerships*."

51.    On April 25, 2024, ICON filed with the SEC a report on Form 6-K reporting the Company's financial results for its first fiscal quarter ending March 31, 2024, which was signed by defendant Brennan (the "1Q24 Form 6-K"). The 1Q24 Form 6-K contained the same financial information regarding ICON's revenue and adjusted EBITDA reflected in the 1Q24 Release.

52.    On April 25, 2024, ICON held a conference call with analysts to discuss the Company's financial and operational results for its first fiscal quarter of 2024, which was hosted by defendants Cutler and Brennan. During his prepared remarks, defendant Cutler represented that underlying demand drivers for ICON's products and services were "incrementally more positive" in the first quarter and that RFP volume had increased, stating in pertinent part as follows:

> *Underlying demand drivers are incrementally more positive through quarter one*, with biotech funding increasing over 50% on a year-over-year basis in quarter one according to BioCentury and large pharma R&D spend figures indicating low-single digit growth for the full year, in line with previous expectations. *Proposal volumes are at healthy levels with overall RFP volume increasing low-double digits on a trailing 12-month basis*.

- 17 -

53.    Defendant Cutler further represented that the RFP environment within the biotechnology segment was not only "very solid," but "on the uplift," stating in pertinent part as follows:

> In terms of the – we don't really split out too much the RFP data.  **But qualitatively, certainly large pharma continues to be strong and we've seen that. Biotech also has been solid, perhaps not quite as strong in it, but it does seem to be on the uplift.  So, if I look at sort of low-double digits, large pharma is well above that**.  But I'd say it's probably more in the mid-singles if I had to put a number on it.  **And it's, as I say, solid, strong, we're seeing some plenty of good opportunities in the biotech space.  We've been successful.  Our win rate in that biotech space has gone up over the last quarter or so.  So, we feel good about the solutions and the propositions we're putting in front of customers and their receptivity to those.  But as I say, overall, very solid, very constructive environment on the RFP front, and we feel good about where the market's heading overall**.

54.    Defendant Cutler further claimed that ICON was "seeing positive momentum" and an "increased win rate" from its biotechnology customers following a rebrand the Company had launched in the fourth quarter of 2023.

55.    During the call, an analyst asked how ICON had continued to see robust demand from its large pharmaceutical clients despite a recent announcement by Bristol Meyers Squibb (an important ICON customer) regarding cost reductions.  In response, defendant Cutler stated that demand in large pharma was "very stable" and "very strong" despite the "budget challenges" ICON's customers were experiencing, stating in pertinent part as follows:

> **Overall, we see a very stable and very strong demand in the large pharma**.  And I think I talked about sort of 3% to 4%.  **But we believe we're taking market share in that space**.  And a good part of that growth is due to our strong operational delivery in that space.  **And so, it's a strong and a continuing market for us**.  And we believe while there will be puts and calls and ups and downs and some customers will have greater budget challenges and many of them have some significant patent life challenges or loss of exclusivity issues coming up over the next, that's a relatively common theme.  **It's a constant thing that they deal with on a regular basis, means they have to do more R&D to bring new compounds through.  So, overall, we feel good about that space**.

- 18 -

56.     On July 24, 2024, ICON issued a press release reporting the Company's financial results for its second fiscal quarter ending June 30, 2024 ("2Q24 Release"). The 2Q24 Release stated that ICON's quarterly revenues grew 4.9% year-over-year to $2.1 billion, compared to $2.0 billion in the prior year quarter. The 2Q24 Release further stated that ICON's adjusted EBITDA in the quarter increased 8.7% year-over-year to $450 million, compared to $414 million in the prior year quarter. The 2Q24 Release also stated that ICON's gross business wins in the quarter were $3.1 billion and that cancellations were $493 million, resulting in net new business wins of $2.6 billion and a book-to-bill ratio of 1.22.

57.     On July 25, 2024, ICON filed with the SEC a report on Form 6-K reporting the Company's financial results for its fiscal quarter ending June 30, 2024, which was signed by defendant Brennan (the "2Q24 Form 6-K"). The 2Q24 Form 6-K contained the same financial information regarding ICON's revenue and adjusted EBITDA reflected in the 2Q24 Release.

58.     On July 25, 2024, ICON held a conference call with analysts to discuss the Company's financial and operational results for its second fiscal quarter of 2024, which was hosted by defendants Cutler and Brennan. During his prepared remarks, defendant Cutler highlighted ICON's purported "RFP flow" and claimed that demand for ICON's services was "increasing," stating in pertinent part as follows:

> Net business wins and backlog grew by 7% and 10% respectively year over year, as our leading scaled offering continues to resonate with our customers, ***uniquely positioning ICON to meet increasing demand for innovative and flexible solutions in clinical development***.
>
> ***We remain encouraged by the leading indicators in our market that support a solid demand environment, including continued growth in RFP flow and the overall consistent level of opportunities we are seeing across our customer segments***. While biotech funding levels attenuated slightly in quarter two from a robust start in quarter one, we see this market continuing to stabilize and have seen a modest uptick in RFPs on a trailing 12-month and sequential basis within this segment.

*Importantly, customer sentiment appears to be improving and we remain optimistic around the contribution to midterm growth, this important customer segment represents.*

59.     During the call, an analyst asked about the risks that ongoing customer budget challenges may present to ICON's business. In response, defendant Cutler claimed that ICON had an opportunity to "benefit" from its customers' cost reduction measures and represented that the Company was "pretty optimistic" about R&D expenditure growth from its large pharmaceutical customers, stating in pertinent part as follows:

> Yeah, that's always hard to tell. But I suspect we're into the middle [inning]. I'm thinking fourth, fifth, even sixth. I think we've seen a number of companies make fairly public announcement. Certainly, some of our top customers have been in that cohort.
>
> And so, I think – but I think we're seeing that starting to get through. And *we're pretty optimistic about large pharma growth in terms of R&D spend. And in terms of outsourcing growth going forward, that's what we see in our RFP numbers*.
>
> Certainly, on the trailing 12-month basis from large *pharma, we're in the low-double digits, even pushing up a little bit higher than that. And so, we're pretty optimistic around where large pharma is going*.
>
> *Sometimes, as I think I've said before on these calls, the cost cuts and the budgets*, while they do have an immediate impact, long-term they think more about how they spend their money. And *we can benefit from that*.

60.     Regarding the biotechnology segment, defendant Cutler stated that ICON had "very substantial" and "serious" opportunities reflected in its RFP pipeline, stating in pertinent part as follows:

> In terms of the activity [in our group], we're still seeing opportunities, something like 50% to 60% of the opportunities that we have in the pending pipeline.
>
> I'm talking about significantly to the top 25 are in the biotech space. And *these are very substantial opportunities*. So we feel there's plenty of opportunity, plenty of projects coming through.
>
> Interestingly, as we look at the cancellations in the biotech and the RFP area, we typically talk about biotech dollars coming through and not so much what

- 20 -

actually gets decided on. ***So we've seen actually in quarter two, a reduction in the number of cancels in the pending side of things***.

In other words, proposals that come to us, and we bid on, a proportion of those always get canceled never actually come to decision. ***We've seen a reduction in that. And that I think gives me some encouragement in terms of the rigor and the robustness of our pending pipeline***.

And as I said, of the top 25 opportunities, about half of them are in the biotech segment. So it really shows that the biotech are coming through. ***They're serious about offering us opportunities, and they are substantial opportunities***.

61.    The statements referenced in ¶¶28-60 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them as follows:

(a)    that ICON was suffering from a material loss of business due to customer cost reduction measures and other widespread funding limitations impacting the Company's client base;

(b)    that ICON's purported FSP and hybrid model offerings were insufficient to shield the Company from the adverse effects of a significant market downturn;

(c)    that the RFPs ICON received from its biotechnology customers during the Class Period were used in substantial part as price discovery tools, and thus were not indicative of underlying client demand;

(d)    that ICON's customers had canceled contracts, limited or reduced engagements, delayed clinical trial work, and/or failed to enter into new contracts with ICON for additional clinical trial work at historical rates once existing projects ended (or were scheduled to end) in 2024;

(e)    that ICON's two largest customers were diversifying their CRO providers away from the Company;

(f)    that as a result of (a)-(e) above, ICON's reported net new business awards and book-to-bill metrics materially misrepresented client demand for ICON's services; and

(g)    that as a result of (a)-(f) above, ICON was tracking materially below the 2024 revenue and EPS guidance issued during the Class Period and such guidance lacked a reasonable factual basis.

62.    Then, on October 23, 2024, ICON issued a press release reporting the Company's financial results for its third fiscal quarter ending September 30, 2024 ("3Q24 Release").  The 3Q24 Release disclosed that ICON had generated quarterly revenues of just $2.03 billion, revealing a surprise "revenue shortfall" that significantly missed consensus estimates of $2.13 billion by more than $100 million.  The 3Q24 Release also revealed that other leading indicators of underlying client demand had materially deteriorated.  Specifically, the 3Q24 Release revealed that ICON's quarterly net new business wins had declined sequentially to $2.3 billion during the quarter from $2.6 billion in the prior quarter and that the Company's book-to-bill ratio fell sequentially to 1.15, down from 1.22 in the prior quarter.

63.    During the corresponding conference call, defendants revealed a dramatic and sudden slowdown across ICON's customer base.  Defendant Cutler revealed that two of ICON's large pharmaceutical customers had materially curtailed upcoming FSP trial work due to ongoing cost containment measures, which he stated would continue to negatively impact the Company's financial performance going forward.  Defendant Cutler further revealed that numerous other customers had delayed or reduced the scope of ongoing studies, cancelled an "outsized" amount of vaccine-related clinical trial work, and delayed business awards for future engagements, revealing that a broad sector slowdown was indeed having a deeply negative impact on the Company's business and operations.  As a result, ICON cut its annual revenue guidance from a

range of $8.45 billion to $8.55 billion to a range of $8.26 billion to $8.3 billion, representing a reduction of $220 million at the mid-point.  ICON also cut its annual adjusted EPS guidance from a range of $15 per share to $15.20 per share to a range of $13.90 per share to $14.10 per share, representing a reduction of $1.10 per share at the mid-point.

64.    On October 25, 2024, analyst firm Truist Securities published a report summarizing discussions with ICON's management regarding the Company's recently reported financial results.  In the report, Truist Securities disclosed that ICON "knew that it had some studies finishing off over the course of the summer in its long-term contract base."  The report also revealed that ICON had known for a while that its two largest customers were diversifying CRO providers away from the Company, as management described the dynamic as "not a new development" and conceded that the influx of competitors "did not come as a surprise to ICON."

65.    On this news, the price of ICON ordinary shares fell from $280.76 per share on October 23, 2024 to $220.47 per share on October 25, 2024, a decline of more than 20% over a two-day trading period, on above-average trading volume.

66.    Following the end of the Class Period, on November 21, 2024, ICON presented at an industry conference hosted by analysts at Jefferies.  During the conference call, defendant Cutler revealed that a material portion of RFPs ICON had received from its biotechnology customers had been issued only to obtain better pricing elsewhere, accounting for as much as 30% of total dollars ICON had bid in response to RFPs.  Defendant Cutler explained that ICON's biotechnology customers would cancel outstanding RFPs before reaching the contract phase, providing additional context for the delayed business awards that negatively impacted ICON's third quarter results.

67.    On January 14, 2025, ICON issued financial guidance for full year 2025 of expected revenue in the range of $8.05 billion to $8.65 billion and expected EPS in the range of $13 per

share to $15 per share, a wider than normal range that came in significantly below analysts' expectations.  During a related conference call, defendants confirmed that the disappointing guidance reflected a continuation of the adverse effects on the Company's financial performance as a result of the softness in biotech clinical research.

68.    On this news, the price of ICON ordinary shares fell from $217.99 per share on January 13, 2025 to $200.24 per share on January 14, 2025, a decline of more than 8%, on above-average trading volume.

## CLASS ACTION ALLEGATIONS

69.    Plaintiff brings this action as a class action on behalf of a class consisting of all persons who purchased ICON ordinary shares during the Class Period (the "Class").  Excluded from the Class are defendants and their families, the officers, directors, and affiliates of defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

70.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, ICON ordinary shares were actively traded on the NASDAQ.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by ICON or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

71.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

- 24 -

72.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

73.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether defendants' statements during the Class Period were materially false and misleading;

(b)     whether defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

(c)     the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

74.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## ADDITIONAL SCIENTER ALLEGATIONS

75.     As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated during the Class Period to the investing public in the name of the Company, or in their own name, were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding ICON, and their control over and/or receipt and/or modification

- 25 -

of ICON's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

76.     Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  For example, ICON management admitted during a Q&A session held with analysts at Truist Securities that the Company had known that revenue from studies in ICON's long-term contract base were scheduled to end in the summer of 2024 and that replacement FSP work had not been secured.  According to Truist Securities, ICON and its management also knew that the Company's two largest customers had been diversifying their CRO providers away from ICON for a significant length of time.  Accordingly, the fraud described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

77.     The Individual Defendants, because of their positions with ICON, controlled the contents of ICON's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material, nonpublic information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, each of the defendants is responsible for the accuracy of ICON's corporate statements and is, therefore, responsible and liable for the representations contained therein.

78.    ICON's customer relationships, operating models, and underlying client demand were among the most important issues facing the Company and the focus of ICON's management, including the Individual Defendants.  The Individual Defendants repeatedly held themselves out as the persons most knowledgeable regarding the impact of client cost reduction initiatives and broader client demand.  For example, following Pfizer's fall 2023 cost reduction announcement, defendant Cutler acknowledged that he and other executives knew of Pfizer's plans and that ICON was in "close contact" with Pfizer regarding its cost reduction program and was "working closely" with Pfizer to implement its cost cutting measures to its clinical trial work.

79.    In addition, the Individual Defendants also had the motive and opportunity to defraud investors.  Taking advantage of the artificially inflated price of ICON ordinary shares, Company insiders collectively sold nearly $78 million worth of ICON stock during the Class Period.  Among these insider sales, defendant Brennan sold nearly $22 million in ICON shares at prices as high as $325 per share, while defendant Cutler sold approximately $17 million in ICON shares at prices as high as $335 per share.  These sales, which are significantly outside each of these defendants' historical trading patterns, were suspiciously timed to capitalize on the artificially inflated prices of ICON stock.

## LOSS CAUSATION

80.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of ICON ordinary shares and operated as a fraud or deceit on Class Period purchasers of ICON ordinary shares by failing to disclose and misrepresenting the adverse facts detailed herein.  When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of ICON ordinary shares declined significantly as the prior artificial inflation came out of the price of the stock, as detailed herein.  As result of their purchases of ICON ordinary shares

during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICATION OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

81.     At all relevant times, the market for ICON ordinary shares was an efficient market for the following reasons, among others:

(a)     ICON ordinary shares met the requirements for listing and were listed and actively traded on the NASDAQ, a highly efficient, national stock market;

(b)     as a regulated issuer, ICON filed periodic public reports with the SEC;

(c)     according to the Company's Form 20-F for the fiscal year ended December 31, 2023, ICON had approximately 82 million ordinary shares outstanding as of December 31, 2023;

(d)     ICON regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)     unexpected material news about ICON was rapidly reflected in and incorporated into prices for ICON ordinary shares during the Class Period.

82.     As a result of the foregoing, the market for ICON ordinary shares promptly digested current information regarding ICON from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of ICON ordinary shares during the Class Period suffered similar injury through their purchases of ICON ordinary shares at artificially inflated prices and a presumption of reliance applies.

83.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because

the Class's claims are, in large part, grounded on defendants' material misstatements and/or omissions. Because this action involves defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

84. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint. Many of the specific statements pled herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of ICON who knew that those statements were false when made.

## COUNT I

### For Violation of §10(b) of the 1934 Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

85.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

86.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

87.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of ICON ordinary shares during the Class Period.

88.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for ICON ordinary shares.  Plaintiff and the Class would not have purchased ICON ordinary shares at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

- 30 -

89.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of ICON ordinary shares during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

90.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

91.     During the Class Period, defendants acted as controlling persons of ICON within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about ICON, the Individual Defendants had the power and ability to control the actions of ICON and its employees.  ICON controlled the Individual Defendants and all of its other officers and employees.  Defendants were also culpable participants of the fraudulent scheme as detailed herein.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Designating plaintiff as Lead Plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  February 10, 2025

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN

s/ Samuel H. Rudman
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
BRIAN E. COCHRAN
FRANCISCO J. MEJIA
655 W. Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
bcochran@rgrdlaw.com
fmejia@rgrdlaw.com

JOHNSON FISTEL, LLP
RALPH M. STONE
620 Fifth Avenue, 2nd Floor
New York, NY  10020
Telephone:  212/292-5690
ralphs@johnsonfistel.com

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Chan Kwok Shing ("Plaintiff") declares:

1.　　Plaintiff has reviewed a complaint and authorized its filing.

2.　　Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.　　Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.　　Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:　*See* attached Schedule A.

5.　　Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:　None.

6.　　Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.　Executed this 20___ day of January, 2025.



Signed by:

Chan Kwok Shing
—————————————————————
Chan Kwok Shing

ICON

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date<br>Acquired | Amount of<br>Shares Acquired | Price |
|:---:|:---:|:---:|
| 10/18/2024 | 15 | $297.00 |

Prices listed are rounded up to two decimal places.