1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------x
                                        25-CV-763(HG)
In Re:

ICON PLC Securities Litigation
                                   United States Courthouse
                                   Brooklyn, New York

                                   June 10, 2025
                                   11:00 a.m.
------------------------------x

            TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
              BEFORE THE HONORABLE HECTOR GONZALEZ
                  UNITED STATES DISTRICT JUDGE

APPEARANCES

For the Plaintiff:        KESSLER TOPAZ MELTZER & CHECK, LLP
                          BY:  NAUMON AMJED, ESQ.
                               MATTHEW MUSTOKOFF, ESQ.

                          BLEICHMAR FONTI & AULD, LLP
                          BY:  ROSS SHIKOWITZ, ESQ.
                               NANCY KULSEA, ESQ.


For the Movant:           BARRACK RODOS & BACINE
                          BY:  JEFFREY GOLAN, ESQ.
                               MICHAEL TOOMEY, ESQ.
                               ANDREW HEO, ESQ.

For the Defendant:        WHITE & CASE, LLP
                          BY:  KIMBERLY A. HAVLIN, ESQ.


(Via Telephone):          GARRETT S. MASCAGNI, ESQ.


Court Reporter:           Rivka Teich, CSR, RPR, RMR, FCRR
                          Phone:  718-613-2268
                          Email:  RivkaTeich@gmail.com

Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

(In open court.)

THE COURTROOM DEPUTY:  All rise.  Civil cause for a motion hearing, docket 25-CV-763, Shing vs. ICON PLC, et al.

Starting with the plaintiff, state your name.

MR. AMJED:  Good morning, your Honor. Naumon Amjed on behalf of Local 464A and Detroit.  With the Court's permission I'd like to introduce Mr. Richard Whalen, Secretary Treasurer of Local 464, and Ronald King general counsel to Detroit.  Thank you, your Honor.

THE COURT:  Thank you.

MR. SHIKOWITZ:  Good morning.  Ross Shikowitz on behalf of Detroit and 464.

MS. KULESA:  Good morning, your Honor.  Nancy Kulesa on behalf of Police and Fire Retirement System City of Detroit and 464A.

THE COURT:  And we got your pro hac done.

MR. MUSTOKOFF:  Matthew Mustokoff on behalf of plaintiffs.  Thank you.

THE COURT:  All right, let's go to the right side.

MR. GOLAN:  Good morning, your Honor.  Jeffrey Golan on behalf of the Public Employee Retirement System of Mississippi.  On the phone line I believe that there is one or two of the Special Assistant Attorney Generals in the consumer protection division of the Mississippi Attorney General's office, Garrett Mascagni for Laken Ryals.

3

And with me are my partner Michael Toomey and a colleague in the Philadelphia office, Andrew Heo.

THE COURT:  Very good.  At the end of today if you can give the reporter the spelling of the names of the folks who night be on the telephone.

MR. GOLAN:  I'll be happy to, your Honor.

THE COURT:  And then from defendants.

MS. HAVLIN:  Kim Havlin on behalf of the defendants.

THE COURT:  All right.  You're even sitting in the well.

MS. HAVLIN:  Just in case.

THE COURT:  Just in case.

So let's start with, I want to make sure there was a filing yesterday but let me walk through the filings that I have just to make sure I have everything that I should have.

I guess as an initial matter, for my own reference, I'll refer to Mississippi and I'll refer, with no insult intended, to Local 464 I'll refer to the Detroit Group.

MR. AMJED:  Thank you, your Honor.

THE COURT:  So I have Mississippi's motion, which is docketed at docket 19.  There is a memo at 20.  And an affidavit at 21.  And also their opposition to the Detroit application at docket 34.  And I've got the letter that was filed by Mississippi yesterday.  I actually don't have -- what is the docket number on that, do you have that?

4

MR. AMJED:  I believe it's 42, your Honor.

THE COURT:  Okay.  At 42.

Anything else from Mississippi?

MR. GOLAN:  Nothing, your Honor.

THE COURT:  Okay, all right.

From the Detroit Group, I've got the motion docketed at 27.  The supporting memo at 28.  The declaration from the two representatives from each member of the group at 29.  Then there is Detroit's opposition to the Mississippi application at number 32.  And there is an accompanying affidavit to that opposition docketed at 33.  Is there anything else?

MR. AMJED:  Nothing else.

THE COURT:  Let's take care of some of the easy stuff first.

So consolidation, I'm prepared to consolidate.  I'll make a record of how to consolidate.  Anything anyone needs to be heard on consolidation?

MR. AMJED:  I don't think so.  I think we're in agreement on consolidation.

THE COURT:  I agree with the application so I'm going to consolidate the cases, which clearly involve the same facts and parties under Rule 42.  So the two cases, the first case is the Shing case, which is at 25-CV-763, and the Detroit case which is at 25-CV-1807, those are the two cases that I'm going to consolidate into the case that will be captioned, In

Re: Icon PLC Securities Litigation, and for docketing purpose that will be under 25-CV-763.

Anything else with respect to consolidation?

MR. AMJED:  Nothing, your Honor.

MR. GOLAN:  Nothing, your Honor.

THE COURT:  Then let's turn to the question of the notice issue with respect to the motion.  As I read the papers, the notice mechanism here seems to be no issue.  Is either movant making any issue with respect to notice?

MR. AMJED:  No, your Honor.

MR. GOLAN:  The notice is fine, your Honor.

THE COURT:  Like I said, I reviewed the notices and agree that they are appropriate.

Why don't we turn to the substance of today.  I think probably the best place to start is working backwards with the papers, and that is the letter that I received yesterday from Mississippi.  I'll give Detroit -- I know you haven't submitted anything, but the best place to start is to give you an opportunity to respond to that letter.

As I see it, just so people can address my concerns and Mississippi can be aware of my concerns, Mississippi's position seems to be a shifting sands theory here.  Your first basis out of the block was the total loss amount.  Then that shifted to the other Lax/Olsten factors.  And now, for the first time as least I read the papers, we're talking about the

aggregation and the grouping. I know in your letter you say that some of the cases you cited dealt with grouping, that's fine they did deal with grouping, but there was no issue raised before yesterday's letter on grouping. So that's how I sort of have cataloged the various positions.

Let me have Detroit address yesterday's letter specifically, I'll let Detroit do that first.

MR. AMJED: Thank you, your Honor.

The letter that came in yesterday, from our perspective, doesn't change anything at all. The Court is correct that Mississippi has made no argument in its initial application or its opposition brief against our movant's ability to function as a cohesive group. What the Court did in Late Stage is refuse to appoint three individuals, not institutions, who failed to establish their advocacy standard that Judge Morrera articulated several years ago, sort has been the bedrock for assessing whether a group can function cohesively, the only question that courts go through when assessing whether or not to appoint a group. The group there, as the Court pointed out in its opinion, did not establish its cohesiveness, there wasn't even evidence that they spoke to each other.

THE COURT: Let me interrupt you. That's the decision by Judge Henry.

MR. AMJED: That's the late stage decision in the

7

letter.  There is no discussion about them being a leading plaintiff like our clients.  There is no discussion of them being sophisticated in controlling billions of dollars like our clients.  There is no discussion of them recovering more than a billion dollars like Detroit has.  It's a completely different situation than what we have before the Court in terms of our group.

The fact that some groups are appropriate under Varghese and other groups are not is not controversial.  I'll admit we have a group of individuals who haven't spoken to each other or there is no evidence of them speaking to each other, no long relationship with counsel.  That's a very different type of group than the one that we have that is sophisticated, the institutions.  I think the opinions in Dentslply, Pay Safe and Top Hips from Judge Bianco which go into the application of the Varghese factors specific groups that are before the Court, really outlines the difference about what group is Varghese and what is inappropriate, and doesn't address the ultimate question the Court is looking for which is, is this a group that can control away from counsel and is this a group that can direct it without the attorneys being involved.  One case that addresses this specifically is Luckin, opinion from Judge Liman 2020 Westlaw 3127808.  In that opinion Judge Liman disbanded a group of individuals, which was much like the late stage group, and then appointed a

group of institutions that had a lower financial interest because they were more concrete, they had the attributes that our group has, extensive sophistication, experience, a long history with counsel, and put in evidence of their willingness and their ability to direct the litigation, like our groups have.

The other thing I'll point out, your Honor, in the Late Stage case and the other two cases that were cited in the letter yesterday, NIO and Alibaba, there was an actual argument by competing movants that the group was inadequate under Varghese. We just don't have that here.

To the Court's point initially about shifting position of Mississippi. There is still not an argument before the Court in any other of their papers or this letter suggesting that our group cannot meet the Varghese standard or unable to direct the litigation.

THE COURT: Let me ask you a question about a different decision by Judge Liman, in the May vs. Barclays case. It was a grouping issue. One of the factors that he lists in that case is the existence of a prelitigation relationship between group members.

I guess I couple of questions. One, how much weight should I give that in assessing, effectively, the bona fides of the group? And what do you understand that to mean? In this case, at least as I can tell from the papers, there isn't

a preexisting relationship, although in someway there is a preexisting relationship among the law firms but that is sort of counter to who is going to control the litigation.  Right.  So, clearly, here I think the declaration submitted by the two representatives from each part of the group I think is a, I'll let you know, is a strong declaration that gives me a comfort level in terms of their ability to coordinate and manage the litigation.

But just on the -- what is your understanding and sort of what weight should I give the prelitigation relationship factor that some courts look to?

MR. AMJED:  It's a factor under Varghese, but not the only factor.  And groups that don't have preexisting relationships like the one in Luckin, like the one in Dentsply, like the one in Play Safe and TopShips are still appointed because the other factors provide the type of evidence that the Court needs to have to assess whether or not the group can function.  And that's the ultimate question: Can the group function.

Just because you have two movants who met in a parking lot before filing their motion, they have a prelitigation relationship.  But if they haven't provided any other evidence of their ability to direct the litigation, sophistication, the relationship with counsel, which is one of the criteria that Judge Liman looked at when he said that a

10

long relationship with counsel creates trust, creates oversight, creates incentive to serve your clients well, all of that goes into the mix to address the ultimate question of whether or not you can function.

So I appreciate the Court's comments about the declaration that we put in, because it does establish the type of oversight and commitment and ability to direct the litigation. It's ongoing. The two representatives are here in the courtroom. They evidenced their commitment to stay active in the litigation. We are coordinating on our investigation. All of the indicia that courts look to under Varghese goes to the ultimate of question. It's not a check-the-box exercise, did you know each other, that's not necessarily sufficient. Are you giving the Court enough comfort to know that you're going to be a real litigant and direct your counsel and take this responsibility seriously.

THE COURT: Mr. Golan, let me turn to you. First, you're not asking me to make new law here and somehow challenge the bona fides of the fact that a group can be appointed as lead, right?

MR. GOLAN: Absolutely not, your Honor. In fact, I'll go through it a little later for your Honor, but Mississippi readily acknowledged in our answering brief, even before the other side put in their exhibit, they look like periodically both for lead plaintiffs status individually and

as part of a group, and in fact the joint declaration and what Detroit and Local 464A has done in terms of meeting together, we're not trying to create new law that groups of persons under the PSLRA cannot include a group like the Detroit here.

THE COURT:  Do you agree with the point that the ability to function cohesively is one of the key factors I should be looking at?

MR. GOLAN:  Absolutely, your Honor.  Except that we also think that where -- I can get into this now.

THE COURT:  Yes.

MR. GOLAN:  Where there is the Mississippi PERS fund that has so much larger of a financial interest in the case, both individually and combined, when you put the other group combined for the first three Lax factors, we think that the fact that only two of the three members are related and that the Detroit and the local funds do not have a preexisting relationship is something that is important.

My friend on the other side mentioned the San Antonio Fire And Police Fund vs. Sirona case.  In that case, first of all, the Bleichmar firm took the position on behalf of San Antonio that the Court should not combine the loss figures of members of the two competing groups.  But in that case, the Court found the Birmingham group members, all of whom were represented by the same law firm, that they were seeking to be appointed as the lead counsel, they had

12

preexisting contacts, including that they shared investment managers and they were all municipal pension funds.

THE COURT:  Let me interrupt.  I want to make sure, are you -- I thought I heard something.  Are you articulating a theory that there is a way to look at these types of motions when you have one group versus another group, and that there should be a different way to look at it when you have a group versus -- let's keep it simple.  A group of institutional investors, which there is no question that the Detroit Group is; and on the other side, a movant who is a stand-alone institutional investor.  Are you articulating some sort of distinction there?  Because it sounded like you were going there, then you didn't go there.  I just want to understand whether you're taking a position that somehow the fact that there is one institutional investor with the loss amount that you have up against an aggregate loss amount, but it's a combination of institutional investors, that somehow the analysis and the weighting should be done differently.

MR. GOLAN:  Your Honor, there are clearly decisions that hold that groups are fine.  But they've appointed groups generally when the group has a member who has the largest individual loss and the collective loss is greater than any other movant.  The position that --

THE COURT:  In that case, would there even be a -- I can't imagine there would be much motion practice in that

13

situation.  What you just described to me is a group where one member is the largest loss and then there are additional members to that group that will obviously aggregate and make the loss amount even larger; but that on a stand alone basis the one member of the group had the largest loss, I can't imagine there would be much motion practice around that set up.

MR. GOLAN:  Your Honor, there are lots of situations where there are two groups opposing each other on competing motions.  And both groups take the position that they can perform as a cohesive unit.  And most of the time the difference that the courts have seen, is whether there is a preexisting relationship within one group versus the other.  A lot of times the Court finds that that effectively they are in the same position.

The Detroit Group cited the Blue Apron case, which was with Judge Kuntz in this district, and the Court looked to see whether either of the groups had members with preexisting relationships but found that none of the plaintiffs claimed to have a relationship with one another beyond their participation as a litigation, much less a meaningful one; and, therefore, the Court looked at them as equivalent groups.

THE COURT:  But one of the problems with this whole area of the law, right, is that given the nature of this motion practice, we're looking at a lot of different district

court decisions and trying to sort of put together some standard. There are certainly -- I can't state whether it's an equal number, but there are certainly district court decisions, including in this district, where even if there is no prior relationship that the real question that the Court needs to look at is whether the group will be able to manage the litigation and do that effectively and represent the interest of the class, so the Rule 23 standards.

So while I appreciate the prior relationship point, and that's why I asked that question of Mr. Amjed, isn't really the thing that I have to get to is ability to function cohesively?

MR. GOLAN: Agreed, your Honor.

THE COURT: What is it about -- for example, is there something in the declaration that was put in that implies the inability to function cohesively? What should I be -- how should I be trying to get to that question.

Because I don't think there is any issue that there wasn't a prior relationship with respect to managing or being appointed as co-lead plaintiffs. So what we're looking at is function cohesively.

So at the end the day, that's what matters, right, and sometimes there has got to be a first time. So if I were to appoint Detroit, the Detroit Group, then the next time they make an application they will have this as a precedent. There

has got to be a first time.

In a situation like this where it is a first time, while I certainly consider that factor, the prior relationship or the lack of a prior relationship, how do I peel back the onion on the question of function cohesively?  What should give me doubt about their ability to function cohesively.

MR. GOLAN:  We're not taking a position that if plaintiff is appointed, the Detroit Group, would not be able to function cohesively; nor are we taking the position -- I know both law firms representing the group, I know them well, they are very good lawyers.  We're not taking a position that they would -- that the group or the law firms representing them would be inadequate in any way or not cohesive in any way.

What we are suggesting is that it shouldn't necessarily just be a binary question.  Because here you've got a competing lead plaintiff, which is the Mississippi Public Employee Retirement System, which demonstratively has a larger financial interest than any of the members of the group under the first three Lax factors.  It has a greater financial interest when compared to the combination of the group under the fourth factor, which as we said in our opening brief, is generally considered the most important.

But even when you look at the loss, the M.Pers has a loss that's over twice as large as the Detroit police and fire

16

fund.  And has a loss twice as much as one --

THE COURT:  But --

MR. GOLAN:  And so what I'm saying --

THE COURT:  I am interrupting on purpose.

MR. GOLAN:  I'm sorry, your Honor.  Under the PSLRA --

THE COURT:  Let me just, I need to interrupt there, just because we're either talking about the group or we're not talking about the group.

So it seems like there is no question about the bona fides of the group and the ability of the group to do the job that the lead plaintiff would need to do.

MR. GOLAN:  Correct.

THE COURT:  So once we're past that, to then try to -- then for looking at the lax factors, to disaggregate, that seems to be like an apples and oranges situation.  If the group issue is effectively settled in the sense that there is no question that there is nothing improper about the way the group came together, that there is no question about its ability to function cohesively, then when we look at the lax factors, we should just be looking at the group's numbers in an aggregate and the Mississippi numbers as a stand alone because there is no aggregate there.

So why would I care that Mississippi's total loss is more than twice what Detroit's stand alone's total loss is?

17

We're past that.

If we want to talk about the lax factors, we should talk about the lax factors in the context of the group versus Mississippi.  Or am I missing something in terms of that analysis?  Why, having gone through the steps of saying the group is bona fide, then step back into lax and start disaggregating?

MR. GOLAN:  I think, your Honor, the reason to do that here -- I'm not saying that you would do it necessarily in every case -- but the reason to do it here, is because when the PSLRA clearly allows groups or persons to join together as an applicant.  We don't know whether Congress meant related or not.  But the case law has evolved the way it has using the Varghese factors, and courts have clearly -- as Magistrate judge Henry said, there is a burden that is on the group to show that aggregation is appropriate.

But even getting past that, your Honor, you're asking investors to seek the lead position in a case in which they have the largest financial interest.  And I think that in, for example, in the Vladimir vs. Bioenvision case, which the Detroit Group cited, a competing group was appointed over an individual but there one of its members had a loss by itself that was greater than the individual plaintiffs-- the individual movant.

Here, the only basis that the loss of the group is

larger is because they joined together.  And I think in that situation, where there is no preexisting litigation, where there is no prelitigation relationship, this Court, and obviously it's the discretion; and quite frankly, I don't think the Court could go wrong appointing the Detroit Group or appointing the Mississippi group.  I think we're not casting aspersions on that.  But in this situation where Mississippi has so much of a larger loss than any member and has so much larger a loss, I think it's 32 percent larger than either when you put the two local funds together, there is about a 16 percent difference when you compare to the combined entity. But there have been cases that have said 16 percent is not an overwhelming amount, is not case determinative.

So when you have a Mississippi coming and Mississippi, just as Detroit has a nice track record, Mississippi has a tremendous track record in PSLRA cases going back to 2009 case when I was a co-lead counsel.  In this situation, your Honor, I think that where the PSLRA has encouraged, especially institutional funds to come to lead cases, and where the Mississippi fund has such a larger financial interest, I think that in this situation, even though the group may well -- even though your Honor would certainly be entitled to find that the group can be cohesive and can effectively oversee the litigation, I think that under the Gentiva analysis that Judge Spatt wrote about, under the

19

Tan vs. NIO analysis, under the Khunt vs. Alibaba Group analysis; and I understand there are difference, but also under the analysis of Magistrate Judge Henry in this Late Stage case, that your Honor should look beyond just simply checking the numbers of the loss and note the overwhelming larger financial interest that Mississippi has and respectfully appoint Mississippi as the lead plaintiff.  And there are cases that the defendants cited that actually would also support that.  And there are --

THE COURT:  You meant the other movant.

MR. GOLAN:  Yes, sorry, it's ingrained in my mind, your Honor.

THE COURT:  Can I interrupt you?  It seems that all of that that you just said was still premised by the statement that because of the no prior relationship; therefore, I should do A, B, C as you articulated.  But, again, I go back to the question I asked.  The no prior relationship, once there is a determination, and here there is not even a challenge to the ability of the group to function cohesively, the no prior relationship factor, is at least in my mind, irrelevant.  Because it is a relevance factor in determining whether the group can function cohesively.  But if there is no issue about the ability of the group functioning cohesively, then that factor washes out.  So why should I be thinking about the no prior relationship in the context of all of these other things

20

you articulated?  It seemed the way you articulated your position, that that was effectively a first principle to the argument.

MR. GOLAN:  I think the way I would put it, your Honor, is that there are clearly situations where no prior relationship doesn't disqualify.  It's one of five factors. As your Honor said, if you're looking to see whether the group can act cohesively, it's one of the things that you put into the hub to analyze.

But I think it goes beyond that here.  And mainly that's because of the way the numbers breakdown.  Even if the group as a unit might have a 16 percent larger loss than Mississippi -- I guess I have two arguments, I may be jumping ahead.

One, is that there are clearly courts that have said 70 percent, 40 percent larger loss is significant.  There are cases like Doral, and one of the cases cited in the Arcadia case that said that a lower amount is not case determinative.

THE COURT:  I want to make sure I understand.  So are you pointing me to a case that says that where you disaggregate for purposes of looking at the loss amount, that there is some threshold figure that becomes sufficiently compelling that you can ignore effectively the aggregation of losses?

MR. GOLAN:  I think I understand your question, your

21

Honor.  And the answer --

THE COURT:  As long as you do.

MR. GOLAN:  -- and the answer is yes.

THE COURT:  And what is that figure and what is that case, or cases?

MR. GOLAN:  The SafeNet  case says that 2 percent difference between competing applicants, the Court found to be minimal and should not be determinative.

THE COURT:  And 2 percent difference in what?  We're talking about a lot of different numbers.  So what you're telling me is in this case, Mississippi and -- let me ask Detroit.

I'm working with the table in Mississippi's opposition Table A on page five.  Do you have an issue with those numbers?  Or even if you do directionally, are you okay with me using that table for our discussion?

MR. AMJED:  We're okay with using that table.

THE COURT:  So what you're saying is that if Mississippi has a total loss of, we'll call it two, and Detroit has a total loss of a little bit over nine, 900,000; so 2 million versus 900,000, and just for ease of math, let's say that's either 50 percent or 100 percent, whichever direction you're looking at it, that that 50 percent delta is something that a Court has said it disaggregated the numbers, looked at that loss difference, and found that that was a

sufficient basis to look away from the group and look towards an individual institutional investor who had a larger loss.

MR. GOLAN: Yes. And I think the best case to look at for that, your Honor, is the Gentiva Securities litigation division of Judge Spatt in this district. There he had a group consisting of the Arkansas Teachers Retirement fund and a qualified employees fund for the Metropolitan Water Reclamation Districts of Greater Chicago. He found they had no preexisting relationship whatsoever. And the way he analyzed it, so there was that group versus the Los Angeles County Employees Retirement System, LACERS. And what he said is that he noted that the Arkansas Teachers' loss was only, I'll just put approximately, 1.29 million when disentangled from that of Metropolitan Water, meaning that LACERS' loss was approximately 40 percent greater. And that Metropolitan Water's loss was only 850,000, meaning that LACERS' loss was approximately 156 percent greater. When taken alone, neither comes close to the losses asserted by LACERS and thus lends further support to the presumption of LACERS as lead plaintiff.

Judge Spatt went on to note two further things in that decision. He looked at the fact that Arkansas Teachers had brought one of the consolidated actions in its own name adequately and without any assistance from Metropolitan Water. Your Honor, that's the same situation here where Detroit

23

brought a second complaint on its own without any assistance from the Local 464 funds.

He also noted that if one of the Arkansas group members had a greater loss than LACERS, that would make a huge difference in the analysis.

THE COURT:  That's almost saying the obvious.  If Arkansas had had a bigger loss than LA Retirement in that case, I doubt there would be much to talk about.

MR. GOLAN:  That's the point, your Honor, which is that I think the point is that if that is the situation, then the fact that he pointed that out in the decision shows that it's a meaningful possibility.  But without it, he decided that the LACERS application should be the one that's approved; and that the combined application of the Arkansas Group should be the one that is denied.

THE COURT:  And what was the LA Retirement loss figure in that case?  I can do the math.  If it was 156 percent of 850,000 --

MR. GOLAN:  I have it here.  LACERS loss was 2.176 million, Arkansas was 1.29 million, Metropolitan was 850,000.

Your Honor, there is also something I believe in the Late Stage case with Magistrate Judge Henry, who concluded that the aggregation of the investor groups losses was not appropriate.  That actually didn't do their motion because the

Court found that one of the group members, Pitman, had stock purchases and losses that exceeded the individual plaintiffs stock purchases and losses.  And, therefore, Plaintiff Pitman as the lead plaintiff, finding that Pitman the investor member had the largest financial interest.

So that in this situation, that just doesn't apply. The Mississippi loss is so much greater than any of the members of the Detroit Group.  And therefore, I would submit that based on that, Mississippi has the largest financial interest and should be appointed.

THE COURT:  I'm just looking at your numbers, it doesn't seem to add up.  So you're saying it was 1.29 million --

MR. GOLAN:  Your Honor, I believe that Arkansas and Metropolitan did not quite match LACERS.

THE COURT:  So they were a little lower.

MR. GOLAN:  Lower.

THE COURT:  Here, we're 15 percent higher.

MR. GOLAN:  Yes.

THE COURT:  So I mean, that is a pretty -- given the importance of the loss amount, isn't that a pretty significant distinction between the Gentiva case and this case?

MR. GOLAN:  It's a clear difference, your Honor. But the language in Judge Spatt's decision --

THE COURT:  Sure, but language is affected by facts.

25

So it's hard to disaggregate whatever the decision the rationale was in that case when you're talking -- so do I have the math right?  In Gentiva the group had lower loss --

MR. GOLAN:  Yes, your Honor.

THE COURT:  -- than the individual?

MR. GOLAN:  It's the language that I was --

THE COURT:  So the language without the context is sort of not very helpful.  Right.  In that case it's a Court reaching a decision and giving as many factors as possible to support the decision, when theoretically in that case he could have gone with LACERS right out of the gate given that it had the higher loss amount.  That seems like a pretty big distinction to the facts here.

MR. GOLAN:  It's a difference, your Honor.  But the fact that he went through the language to compare them individually and to rebut the argument that the group was making that they were about the same and that you should look to the other factors, is still significant I would submit.

THE COURT:  Okay.  Mr. Amjed, let me give you an opportunity to respond.  I know you point to a lot of cases that any difference in loss no matter how small is controlling.  But you can speak more to the issue of the level where we are at here, about 15 percent, right, that's close enough.

MR. AMJED:  That's right, your Honor.  I don't

believe Mississippi has submitted any case showing that a 16 percent difference in losses is not outcome determinative. In fact, I think the cases that we submitted, Zillow 14 percent, Cheetah Mobile 17 percent are outcome determinative.

In terms of sort of the process and the sequencing here, once the group is determined to be a functioning group, the Court is right, the losses are the group versus the challenger that's it.  Diverting from that analysis violates the consequential process under the PSLRA, Gentiva.  And if we are, then the analysis is over.

In terms of looking at other factors.  The statute was drafted to say largest financial interest.  In Tenaris Judge Bulsara talks about this; and in that case he appointed a movant that had $27,000 more in losses over another movant that had the other factors.  He said, yeah, we can look at the Lax factors to assess the suitability of somebody, but loss is the benchmark, that's what determines financial interest.  The math is the math in terms of loss.  Here, there is no dispute that as a group we win on the math.

Mississippi has previously attempted to use non-loss Lax factors to say they should has been appointed when they don't have the largest loss.

A case we cite is Weiss vs. Friedman Southern District of New York before Judge Holwell, where Mississippi

argued a $121,000 loss was negligible so should the Lax factors should they prevail under.  Judge Holwell rejected that argument.  He said $121,000 difference is not a negligible number.  And he said like in many of the cases cited in our brief that the amount of claims losses is the most significant of the Lax elements.  There is a number of cases that make that point, including the Late Stage case.

So once we're past whether or not the group is appropriate, the vast, vast majority of the cases -- and they haven't provided a citation that says a $300,000 difference, a 16 percent difference, between the loss does not conclude the analysis.  I believe it does.

THE COURT:  Mr. Golan, anything else on this one?

MR. GOLAN:  Your Honor, I would only point out that in the Tenaris case, which was just referenced, the loss --

THE COURT:  So the parties should know, I was a representative individual officer in that case, actually the last litigation that I was involved in.  But I have nothing to say about the appointment of lead plaintiff.

MR. GOLAN:  The loss difference in that case was 33 percent, which is over double what it is here.  And in fact, in that decision the Court cited to a case called Juliar v. Sunopta, which is reported 2009 Westlaw 1955237, Southern District of New York 2009, which found in a slightly different context, found that a 30,000 loss between 210,000

28

and 240,000 of 14.6 percent difference was minimal.  So that was the case that was cited in Tenaris as perhaps the benchmark of what was, what should, what a Court should look at as significant, what a Court should look at as potentially less important.  So that was a 15 percent difference that was not viewed in the same way as the Court viewed the 33 percent loss in Tenaris.  And the Sunopta decision also cites to the Doral Financial case, where a loss differential of 17 percent was seen as roughly equal.

There are cases out there that look at the same kind of difference that we have here, and view them as not case determinative.  And that's what we submit should be done here. I won't go through the rest of the argument.

THE COURT:  I think I have enough on the Lax factors.

Let me just, again, I think another topic where I don't think there is any dispute are the Rule 23 requirements, both to typicality and adequacy.  I don't believe, regardless of whether I appoint the Group or Mississippi, I don't think either movant is challenging the Rule 23 requirements for the opponent.  Is that correct?

MR. AMJED:  We are not.  Mississippi is a fine representative.  We have no issue with the law firm, I know Mr. Golan's firm very well.

MR. GOLAN:  Agreed, your Honor.

29

THE COURT:  So anything else from the papers?  I think we can take a short break, maybe 15 minutes, I can come back and give you an oral ruling.

MR. GOLAN:  Your Honor, I don't want to take up too much of the Court's time.  I'm prepared to go through what was in Exhibits A and B to their declaration to give the Court some greater context of the cases in which Mississippi applied and was appointed as the lead plaintiff as a member of a group, if that's of any interest to the court.  If not --

THE COURT:  Unless there is something that goes to something specific that you want to point out that goes to the function cohesively element, then I think I've got enough information.

MR. GOLAN:  With the Court's permission, I'd like to present to the Court an annotated version of the exhibits.

THE COURT:  Sure.

MR. GOLAN:  Just take a minute or two to go through that.

THE COURT:  Okay.  Has counsel have a copy of that?

MR. GOLAN:  I'm about to give him, your Honor.

I have a few things to point out if I may, your Honor.

THE COURT:  Sure.

MR. GOLAN:  What we did is we took Exhibits A and B. The first two cases are cases that Mississippi applied as a

30

member of a group for lead since the filing of the motion in this case.

THE COURT:  So this is Exhibit A and B to what specifically?

MR. GOLAN:  To the declaration that was put in support of the Detroit Group's opposition to Mississippi's application --

THE COURT:  Okay.

MR. GOLAN:  -- on May 12.  And in the first two cases, in the Atkore case, Mississippi filed a non-opposition to the motion because it did not have the largest loss.  In the second case, Mississippi ended up as having a motion that was not opposed by the competing movants and it was appointed on June 4 as the lead in that case.  In the Seagate decision case --

THE COURT:  Tell me where -- I'm going to ask you to file this on the docket afterwards so we have a record of it, but where in the companion that you just sent, what page is that on?

MR. GOLAN:  On the first page.

THE COURT:  There are five cases -- Seagate, the third case.  Okay.  What is the context you want to give me?

MR. GOLAN:  The context, first of all where we've put unopposed motion, that is generally meant that others applied but ended up not opposing the Mississippi motion.

THE COURT:  Okay.

MR. GOLAN:  In the Seagate case on page one, there was a stipulation put in that included the whereas clause that is included here, whereas as only class member seeking appointment as lead plaintiff Mississippi, Arkansas, and Universal are not seeking to collaborate for the purpose of aggregating their losses to supplant a competing movant.  That was filed in 2023.

THE COURT:  I guess I'm missing the significance.  What is the significance of that to my decision?

MR. GOLAN:  The significance, your Honor, is that even in the case where Mississippi was appointed as lead, it would have been appointed as the lead, or at least one of its members would have been appointed as lead, because they had the largest loss so -- the combining did not have the effect of leapfrogging a movant that had a greater individual loss.

THE COURT:  The context that you're trying to give me is to put some color around Detroit's position that Mississippi has taken advantage -- and I don't mean that pejoratively -- taken advantage of grouping in order to become lead.

MR. GOLAN:  Correct, your Honor.

THE COURT:  All right.  Got it.

MR. GOLAN:  There are, on page two and page three, there are several cases where Mississippi was appointed as

lead. And we've put in, in the fourth column here, the circumstances where there was either an unopposed motion or a member of the group undisputedly had the largest loss as well as the group having the largest collective loss. And on the bottom of page three in the Ambac case, the Court opinion stated: These figures demonstrate that each individual member of the U.S. pension funds group has a greater financial interest in the litigation than Interlocal, which was the competing movant, and it goes on.

But there is a decision there that they are not displacing a movant with the largest loss by aggravating their loss.

The same point is made on page five in the Delfi case. The same point is made in the response of the group to the other lead motions. I don't need to read it into the record, but it has the same general distinction being made of a group seeking appointment where its members also have the largest loss. And it is not simply the combination, the aggregation of its loss figures and other Lax factors that they are seeking to go over another lead motion, motion a larger individualized loss.

THE COURT: Ms. Havlin, anything from defendants?

MS. HAVLIN: No, thank you, your Honor.

THE COURT: Very good. Why don't we come back at 20 after, if I need more time Mr. Neptune will come out and let

you know.

(Brief recess.)

THE COURT:  I'm prepared to give my ruling on the motions.

First, let me thank the movants for not only very well crafted papers but also very well argued presentations today.  I really appreciate it.

Before I begin, I just want to make sure that I reincorporate any relevant analysis from the prior discussion that we had, such as the satisfaction of the notice requirement so I'm not going to repeat those points here.

Clearly, the most important issue here is concerning financial loss.  It's undisputed that the Detroit Group in aggregate has the largest financial loss.  And I think it's fair to say that all Courts agree that it is the most important factor in making the determination that I need to make today.  So pursuant to Section 78(u), I'll read the entire section, nothing like citing from the PSLRA, Section 4(a)(3)(B)(iii)(I)(bb), I conclude that the Detroit Group has the largest financial interest in the relief sought by the class.  It's undisputed according to both groups, both movants' methodologies that Detroit experienced, that the group experienced the largest loss.

I disagree with Mississippi movants implied contention that the Detroit Group is artificial and

insufficiently cohesive. Under the intermediate approach favored in the Southern District of New York, unrelated plaintiffs may join together on a case by case basis so long as the grouping would best serve the class. To determine whether the group is proper, I need to assess, as the parties have addressed, the Varghese factors. As I made clear today, those factors are not really relevant here because they are meant to inform whether the group will be able to manage the litigation and effectively represent the other punitive class members.

Here, at the point where Mississippi concedes that the group is adequate, contrary to Judge Henry's decision in Late Stage, I don't need to continue to apply Varghese, and I treat the group as one unit. That means specifically, that the prior relationship factor is irrelevant since that just goes to cohesiveness, which like I said, is conceded.

Independently, the Detroit Group has satisfied its burden of showing that aggregation is appropriate. And there I'm looking to the joint declaration that was filed. It's unquestioned that the Detroit Group as a unit surpasses Mississippi on the fourth Lax/Olsten factor which is total loss. And everyone agrees, including Mississippi initially, that it is the most important factor; by initially, I meant in the initial papers.

I also disagree with Mississippi's related argument

that the non-loss factors should control here.  That position is inconsistent with the one it initially advanced and I have not heard a compelling reason to adopt it in this case.

As Detroit argues in its motion, I don't consider a factor like who owned the most shares to be particularly compelling here.

I'm not persuaded that the other Lax/Olsten factors make a difference here.  I'm not persuaded I should go out of order of operation and go back to the preexisting relationship factor under Varghese.

Now, in light of what I just said, that makes Detroit Group the presumptive lead plaintiffs.  Once the presumptive lead is identified, the status can only be rebutted if the Detroit Group will not fair lead and adequately protect the interests of the class or is subject to unique defenses that render it incapable of adequately representing the class.  I've heard nothing to rebut the Detroit Group's presumptive lead status.

And for the reasons explained in its papers, I find that the Detroit Group has made its prima facie Rule 23 showing.  I, therefore, I'm going to appoint the Detroit Group to be the lead plaintiff in this case.

Pursuant to Section 78u-4(a)(3)(B)(v), the Detroit Group shall select counsel.  There is a strong presumption in favor of approving a properly selected lead plaintiff's

36

decision as to counsel selection and counsel retention.  The Bleichmar and Kessler firms are highly experienced in securities class action litigation, I see no reason why they would not adequately represent the class.  So Detroit's motion to appoint those two firms as counsel is therefore granted.

Let me sum up.  Detroit Group's motion to consolidate for appointment as lead plaintiff and for the appointment of counsel is granted.  And Mississippi's competing motion is denied.

I'll enter a text order memorializing this and setting a schedule for the filing of a consolidated amended complaint; that is, unless the parties -- and here I'll turn to defendant as well -- unless the parties have or wish to submit a proposed schedule for the filing of the consolidated amended complaint, and to the extent there is motion practice, any related motion practice.

I assume you'll want to do that rather than me just arbitrarily --

MR. AMJED:  We're happy to confer with defense counsel and submit a proposed order.

THE COURT:  Why don't you do that by the 20th, so a week and a few days.

MR. AMJED:  No problem.  Thank you, your Honor.

MS. HAVLIN:  No problem.

THE COURT:  Assuming there is nothing crazy in it,

37

as much time as you need.  I'd rather get it done right the first time and not have to come back.

And then looking again to Detroit, unless you have a different view, my text order will also terminate the individual plaintiff, Mr. Shing, from the docket.

MR. AMJED:  That is fine, your Honor.

THE COURT:  I think that is all I needed to do on the motion.  Is there anything else from any party?

MR. AMJED:  Nothing from us, your Honor.

MR. GOLAN:  Nothing further.

THE COURT:  From the defendant.

MS. HAVLIN:  No, your Honor.  Thank you.

THE COURT:  Thank you all.  Have a good rest of the day.

(Whereupon, the matter was concluded.)

\*     \*     \*     \*     \*

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Rivka Teich*
Rivka Teich, CSR RPR RMR FCRR
Official Court Reporter
Eastern District of New York