**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE ICON PLC<br>SECURITIES LITIGATION | Case No. 2:25-cv-00763-HG<br><br><u>CLASS ACTION</u><br><br>**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS


I. INTRODUCTION ....................................................................................2

II. JURISDICTION AND VENUE ..............................................................18

III. PARTIES ..............................................................................................19

A. Plaintiffs ..............................................................................................19

B. Defendants ..........................................................................................20

IV. FACTUAL BACKGROUND ................................................................23

A. ICON's Business Model ......................................................................23

B. ICON's Large Pharma and Biotech Customer Segments ....................24

1. ICON's Critical Relationship with Its Largest Customer, Pfizer ..25

2. ICON's Other Largest Customers ..................................................26

C. Before the Class Period, ICON Temporarily Benefits from COVID-19 Work and Incurs Significant Debt in the Costly PRA Merger ..................27

1. ICON's Revenues Surge Due to COVID ......................................27

2. The PRA Merger ............................................................................27

D. The PRA Merger Proves to Be a Disaster ..........................................28

1. ICON Failed to Retain PRA's Biotech Customers ........................28

2. The PRA Merger Led to Overconcentration Among Large Customers ......................................................................................29

E. As COVID-Related Revenues Decline, Defendants Resort to Fraud........29

F. The Class Period Begins: Defendants Tout ICON's Purportedly Increasing RFPs and Strong Demand Across All Customer Segments.....31

G. In Reality, ICON's Business Was Slowing Significantly..........................33

1. Biotech Customer RFPs Continuously Declined ..........................33

2. Overall RFPs Significantly Declined ..............................................35

3. ICON's Claimed RFP Flow Was Significantly Inflated ................35

4. ICON's Biotech Cancellations Consistently Increased .................37

5. ICON's Business from Pfizer and Other Large Customers Was Collapsing ......................................................................................38

6. ICON's Business Wins, Book-to-Bill Ratio, and Backlog Were Materially Inflated and Cancellations Were Materially Understated ......................................................................................41

H. With ICON's Share Price Artificially Inflated, Cutler and Brennan Begin Their Insider Sales ........................................................................47

I. When Pfizer Spending Cuts Threaten ICON's Purported Turnaround, Defendants Double Down, While Continuing to Tout Increased RFPs ....47

J. Multiple Negative Developments Further Threaten ICON's Business .....50

K. In February 2024, ICON Reports Strong Earnings and Affirms Guidance ....................53

L. In February 2024, Cutler Internally Admits That ICON Is No Longer a Pfizer Preferred Partner....................56

M. In March and April 2024, Defendants Continue to Misrepresent ICON's Business Growth ....................57

N. Defendants Exploit ICON's Inflated Share Price to Offer New Securities and Refinance Its Costly Debt from the PRA Merger ....................62

O. Defendants Make Further Misstatements at ICON's May 2024 Investor Day....................62

P. In July 2024, ICON Reports Inflated Earnings....................63

Q. By Mid-2024, a Large Pfizer Vaccine Trial Fails, Further Crippling ICON's Pfizer Business ....................64

R. In Late August 2024, ICON's Deteriorating Biotech Performance Triggers a $100 Million "Revenue Sweep" ....................66

S. In September 2024, Defendants Affirm Guidance and Falsely Claim There Had Been "No Material Change" in ICON's Business ....................67

T. Defendants Violate GAAP Through Fraudulent Accounting Practices ....68

1. Percentage-of-Completion Revenue Recognition....................69

2. ICON Extended Reporting Periods to Inflate Billing, Cash Received, Revenue, and Profit....................70

3. ICON Used "Fake" Invoices to Pull Forward Revenue....................74

4. ICON Manipulated and Understated Project Costs to Prematurely Recognize Revenue and Inflate Margins....................77

a. ICON Omitted Project Costs to "Hold the Margins" ........78

b. Negative Management Reserves and Removing Project Costs ....................85

c. ICON Understated Pass-Through Costs ....................88

d. ICON's "Blue Sky" Forecasts Understated Total Project Costs ....................89

5. ICON Prematurely Recognized Revenue for Fake and Future Work ....................90

6. ICON Prematurely Recognized Revenue from Draft, Unsigned Change Orders ....................92

7. ICON's Structured Process for Financial Manipulation ................ 93
8. ICON Offshores Finance Personnel to Maintain Its Fraudulent Accounting Practices ................ 95

U. Clerkin Becomes CFO and Signs ICON's False 2024 Financial Statements ................ 96

V. ICON Secretly Commences an Internal Investigation While Defendants Falsely Deny Any Issues With Internal Controls ................ 96

W. ICON's Restatement Establishes That Its Financial Statements Were Materially False ................ 97

X. ICON's Admitted "Material Weaknesses" in Internal Controls and Ineffective Disclosure Controls Establish Material Falsity ................ 106

V. DEFENDANTS' FRAUD UNRAVELS ................ 110

VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................ 116

A. Misstatements about ICON's RFPs, Large Pharma and Biotech Businesses ................ 116

1. 2Q23 Earnings Call ................ 116
2. 3Q23 Earnings Call ................ 118
3. November 2023 Jefferies Conference ................ 120
4. November 2023 Evercore ISI Conference ................ 122
5. 4Q23 Earnings Call ................ 123
6. March 2024 TD Cowen Conference ................ 127
7. March 2024 Barclays Conference ................ 129
8. 1Q24 Earnings Call ................ 130
9. May 2024 Investor Day ................ 132
10. 2Q24 Earnings Call ................ 133
11. September 2024 Baird Conference ................ 135
12. 3Q24 Earnings Call ................ 137
13. November 2024 Jefferies Conference ................ 138
14. Materially Misleading Statements Concerning Risk Factors That Were a Known Certainty ................ 139

B. Misstatements about ICON's Book-to-Bill Ratio, Gross and Net Business Wins, Cancellations, and Backlog ................ 141

C. Misstatements about ICON's Purported GAAP Compliance, Revenue Recognition, and Accounting Methodology ................ 145

D. Misstatements about ICON's Internal Controls over Financial Reporting and Disclosure Controls and False SOX Certifications ................ 149

E. Misstatements about ICON's Financial Performance....153
1. 2Q23 Filings....153
2. 3Q23 Filings....155
3. 4Q23 and FY23 Filings....157
4. 1Q24 Filings....159
5. April 2024 Registration Statement....161
6. 2Q24 Filings....162
7. 3Q24 Filings....164
8. 4Q24 and FY24 Filings....166
9. False Attributions of Increased Revenue....168
10. Materially Misleading Statements Concerning Risk Factors That Were a Known Certainty....170
VII. DEFENDANT SHEEHAN'S FRAUDULENT SCHEME....171
VIII. SCIENTER....173
A. Over $79 Million in Unusual, Highly Profitable Insider Sales Support a Strong Inference of Scienter....174
B. Former Employee Allegations....182
1. FE-1....182
2. FE-2....187
3. FE-3....192
4. FE-4....196
5. FE-5....198
6. FE-6....200
7. FE-7....202
8. FE-8....203
9. FE-9....205
10. FE-10....207
11. FE-11....209
12. FE-12....212
13. FE-13....214
14. FE-14....216
15. FE-15....218
16. FE-16....219

17. FE-17 ..... 221

18. FE-18 ..... 223

19. FE-19 ..... 227

20. FE-20 ..... 228

21. FE-21 ..... 230

22. FE-22 ..... 231

23. FE-23 ..... 232

C. Defendants' Own Admissions Underscore Scienter ..... 233

D. The Individual Defendants' Access to Information Concerning ICON's RFPs, Backlog, and Relationships with Large Pharmaceutical Customers ..... 234

E. Defendants Claimed to Have Specific Personal Knowledge and Insight into ICON's Customer RFPs and Relationships with Large Pharma Customers ..... 239

F. Defendants' Knowledge and Recklessness as to ICON's GAAP Violations ..... 241

G. ICON's Improper Tone at the Top Reinforces Scienter ..... 248

H. Core Operations: Large Pharmaceutical Customers Were ICON's Most Significant Client Base and Revenue Source ..... 250

I. Additional Indicia of Scienter ..... 251

J. Corporate Scienter ..... 256

IX. LOSS CAUSATION ..... 257

A. October 23–24, 2024 ..... 258

B. January 14, 2025 ..... 259

C. October 22–23, 2025 ..... 260

D. January 7, 2026 ..... 261

E. February 12, 2026 ..... 261

X. A PRESUMPTION OF RELIANCE APPLIES ..... 263

XI. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY ..... 264

XII. CLASS ACTION ALLEGATIONS ..... 264

XIII. CAUSES OF ACTION ..... 267

XIV. PRAYER FOR RELIEF ..... 271

XV. JURY DEMAND ..... 271

Court-appointed Lead Plaintiffs Police and Fire Retirement System of the City of Detroit ("PFRSD"), The Trustees of the Local 464A United Food & Commercial Workers' Union Welfare Service Benefit Fund and the Trustees of the Welfare and Pension Funds of Local 464A-Pension Fund ("Local 464A"), and Named Plaintiffs Macomb County Retiree Health Care Fund ("MCRHC") and The Trustees of the Plumbers Local Union No. 690 Pension Fund ("Local 690") (collectively, "Plaintiffs"), by and through their counsel, bring this action individually and on behalf of all others similarly situated who purchased or otherwise acquired ICON plc ("ICON" or the "Company") ordinary shares between July 27, 2023 and February 11, 2026, both dates inclusive (the "Class Period"), and were injured thereby (the "Class"). This action is brought against defendants ICON and its former CEO Stephen Cutler ("Cutler"), former CFO Brendan Brennan ("Brennan"), current CEO Barry Balfe ("Balfe"), current CFO Nigel Clerkin ("Clerkin"), and Senior Vice President of Finance Alan Sheehan ("Sheehan"; together with Cutler, Brennan, Balfe, and Clerkin, the "Individual Defendants," and with ICON, "Defendants").

Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon, among other things, the ongoing investigation conducted by and through their attorneys. This investigation includes, but is not limited to, reviewing and analyzing: (i) documents that ICON filed with the United States Securities and Exchange Commission ("SEC"); (ii) securities analyst reports about ICON; (iii) transcripts of ICON investor conference calls and conference appearances; (iv) ICON press releases and publicly available slide presentations; (v) press and media reports, including online news sources; and (vi) interviews of former ICON employees ("Former Employees" or "FEs"). Plaintiffs believe substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# I. INTRODUCTION

1. This securities class action arises from Defendants' false and misleading statements about ICON's key business metrics and their issuance of materially false financial statements that ICON has now restated due to admitted "misstatements" and "material errors." These misstatements propped up ICON's share price, allowing Defendants Cutler (ICON's former CEO) and Brennan (ICON's former CFO) to enrich themselves with nearly $30 million from insider sales before Defendants' fraud collapsed.

2. ICON is a Clinical Research Organization ("CRO") that handles clinical trials for large pharmaceutical and biotech companies. ICON's financial performance depends on securing a stream of new business and maintaining and growing its relationships with existing customers.

3. Before the Class Period, ICON benefited from a temporary boost in COVID-19-related work, and in 2021, acquired one of its main competitors, PRA Health Sciences, Inc. ("PRA"), for a premium price. But the costly PRA acquisition was a failure: Customers began to leave due to ICON's low-quality work, poor culture, heavy offshoring to low-cost countries, and the risk of overconcentrating their CRO work at the combined entity.

4. Nonetheless, the PRA acquisition left ICON saddled with billions of dollars in debt and large interest payments. Further, the temporary boost from COVID-19 work began to fade.

5. By mid-2023, ICON's share price was well below its prior December 2021 peak, and ICON's credit rating sank to "junk."

6. With the pandemic boom fading, and the PRA acquisition failing to deliver, ICON and the Individual Defendants resorted to fraud. Notably, CEO Cutler had an internal goal of boosting ICON's stock price to $500 per share by 2025, a strategy called "***$500 by 2025***" that set the stage for Cutler's and Brennan's lucrative insider sales.

7. During the Class Period (July 27, 2023 through February 11, 2026), Defendants repeatedly lied about ICON's key business metrics and caused ICON to issue materially false financial statements in violation of Generally Accepted Accounting Principles ("GAAP"). Defendants' misstatements spanned ICON's entire business, from customer Requests for Proposal ("RFPs") to new business awards, revenue recognition, and customer losses. Specifically:

8. **Misstatements about ICON's RFP Growth and Win Rate:** The first step for ICON to secure new business is receiving RFPs from customers. Because ICON depends on RFPs to obtain new business, ICON's RFP volume is highly material to investors and serves as a leading indicator of ICON's business strength. Specifically, increasing RFPs to ICON conveyed the level of demand for ICON's services and the strength of its business.

9. During the Class Period, Defendants repeatedly touted an increase in ICON's RFP volume. For example, Cutler claimed on July 27, 2023 that "***[o]verall RFP activity continued the sequential improvement*** we experienced in quarter 1" and "we have seen ***RFP activity continue its positive trajectory in July***," and claimed on October 26, 2023 that ICON had RFP "***growth in the high single digits on a trailing 12-month basis***."

10. These statements were outright false. Cutler knew ICON's customer RFPs were declining across the board. As a former ICON Senior Proposal Manager (FE-7) explained, toward the end of each quarter in 2023, ***Cutler personally received—and sometimes sent—internal emails that called out a decline in ICON's RFPs and awards across the board***. FE-7 described the emails, which typically came from ICON's head of sales and consistently copied Cutler, as "calls to action" that urged employees' full attention to each RFP given the diminishing number. FE-7 further stated that the emails described the gap between ICON's current numbers and target, indicating that ICON needed to "book X amount more." At the time of receiving the quarterly

internal emails that called out ICON's declining RFPs, FE-7 questioned why Cutler publicly stated that ICON's RFPs were increasing when they were actually decreasing.

11. Defendants' misstatements also extended to RFPs from biotech customers, which were the focus of the PRA acquisition and comprised about a third of ICON's revenue post-acquisition. Because biotech customers represented an increasing proportion of clinical development spending, biotech was critical to ICON's growth.

12. Defendants claimed that ICON saw continuous, sustained increases in biotech RFPs, stating in October 2023 that ICON's biotech RFPs had increased "for the last 2 quarters" by "***high single digits***"; that in March 2024, biotech RFPs were "***in the mid-single digits, up [on] a trailing 12-month basis***"; and that in July 2024, biotech RFPs were up "***on a trailing 12-month and sequential basis***."

13. Contrary to these statements, ICON's RFPs from biotech customers were consistently ***decreasing*** throughout 2023 and 2024. FE-1, a former ICON director of business development who tracked RFPs in ICON's Salesforce system, explained that ICON's biotech RFPs consistently declined ***every quarter*** during 2023 and through fall 2024, with a total decline of about 40% (or about 6% per quarter) over this period. FE-1 confirmed that ICON's biotech RFPs did not increase at any point during 2023 or through September 2024.

14. The Individual Defendants knew biotech customers' RFPs were decreasing because they attended quarterly meetings in 2023 and 2024, with FE-1, where the decreasing biotech RFPs were presented and discussed. During these quarterly meetings, Brennan and Balfe also presented a Salesforce dashboard that showed increasing biotech cancellations from mid-2023. (FE-1.)

15. Defendants' statements touting ICON's purported RFP growth were also materially misleading because they concealed the fact that up to 40% of customer RFPs never resulted in

awards: as Defendant Cutler eventually admitted, many sponsors issued RFPs merely for price discovery—not to award actual business to ICON. These RFPs had zero prospect of being converted into new business. Moreover, many of the RFPs that ICON received were duplicative because they involved multiple proposed studies that were all competing for limited funding from the U.S. Department of Health and Human Services Biomedical Advanced Research and Development Authority ("BARDA"), but BARDA would ultimately fund only one study.

16. Nonetheless, analysts credited Defendants' lies about RFP growth. For example, when Cutler falsely touted "a ***notable pickup in RFP activity within the biotech segment***" on July 27, 2023, Barclays raised its price target by 12% and praised ICON's "***notable pickup in RFP activity within biotech***," repeating Cutler's misstatement nearly verbatim.

17. Cutler also lied about ICON's biotech "win rate," meaning the percentage of ICON's bids that resulted in actual awards for ICON. On April 25, 2024, Cutler claimed that "***[o]ur win rate in that biotech space has gone up over the last quarter or so***" and touted a "***nice uptick***" on ICON's biotech "win rate."

18. At the time, however, Cutler knew ICON's biotech win rate had ***decreased***. At a Company-wide town hall in February 2024, Cutler personally complained about ICON's ***lower*** biotech win rate and stated that the biotech RFPs that ICON received were not converting to wins at the same rate as in the past. (FE-3.)

19. Underscoring the dramatic decline in ICON's biotech business, by the fourth quarter of 2023, ICON's senior management ***secretly transferred $350 million in revenue to biotech*** from another business unit within ICON to prop biotech up and make it appear to be doing better than it actually was (FE-9). Further, ICON initiated quarterly "***revenue sweeps***" to close "gaps" between ICON's actual biotech performance and its targets, culminating with a "gap" of

$100 million in the third quarter of 2024 (FE-3). The "revenue sweeps" were initiated by ICON Biotech President Chris Smyth, who reported directly to CEO Cutler. (FE-3.)

20. **Misstatements about ICON's Large Pharma Business:** Defendants also lied about ICON's deteriorating business relationship with its large pharmaceutical customers—including Pfizer, ICON's largest customer and a material driver of its financial performance.

21. Pfizer single-handedly accounted for nearly 9% of ICON's revenue at the start of the Class Period. Confirming the materiality of Pfizer's business to ICON, the Company even set up a Pfizer Strategic Business Unit (the "PSBU") with thousands of ICON employees dedicated to Pfizer.

22. Unknown to investors, however, ICON's business with Pfizer was collapsing.

23. In 2023, Pfizer completed a "strategic refresh" and stopped awarding ICON any lucrative full-service work (which had generated ICON's highest margins, approaching 50%). As a former ICON Director of Clinical Operations (FE-2) explained, in fall 2023, Pfizer directed ICON to participate in a "mock bid defense" to decide how much business to allocate to ICON going forward. While CEO Cutler personally approved ICON's "pitch" to Pfizer to keep the business, the pitch failed: Before Christmas 2023, Pfizer communicated to ICON that it would award 85% of its Phase 2 and 3 studies—which are the largest and most financially significant studies—to another CRO. (FE-2.) Cutler knew about Pfizer's decision at the time: when ICON executives Sarah Gore (Executive Director of Project Management for the Pfizer oncology business) and Heather West (Vice President, Strategic Alliance Management) conveyed the decision to FE-2, their messaging indicated that Cutler and other senior executives had already been informed.

24. Thus, ICON entered a dry spell where Pfizer was awarding ICON virtually no new business, with a win rate near zero. (FE-1.) By the beginning of 2024, the absence of new Pfizer business was so extreme that ICON secretly started to wind down its dedicated PSBU and lay off its employees—whose employment was project-specific—because there was no more work from Pfizer, as a former Clinical Trial Manager in the PSBU explained. (FE-8.)

25. To make matters worse, in January 2024, CEO Cutler—desperate to hang on to the remaining Pfizer business—agreed to cut $50 million from the budget for ICON's portfolio of Pfizer studies, and approved similar requests from other top 10 customers with increasing frequency in early 2024 (FE-2). FE-2 saw Cutler's emails personally approving these budget cuts.

26. In parallel, Pfizer switched from ICON's full-service offering (FSO) to outsourced staffing (FSP). Again, Cutler was fully aware of Pfizer's switch to FSP: He reviewed and approved ICON's internal announcement of the change, headed a special Pfizer "liaison team" at ICON, and met with Pfizer regularly to work out the details of the transition, which was to be completed by April 2024. (FE-2.) Two other large ICON customers, including Bristol Myers Squibb ("BMS"), also switched to FSP during the same period in late 2023 and early 2024.

27. For ICON, the financial implications of three large customers' shift to FSP were enormous. ICON's profit margins on FSP were only around 15%, compared to 40–50% for FSO. (FE-2, FE-9.) As FE-2 emphasized, the combination of losing Pfizer's Phase 2 and 3 studies and simultaneously losing "a huge chunk of margin" because of Pfizer's switch to FSP was a "huge blow to ICON." Across the three customers that switched to FSP by early 2024, the 25–35% decrease in margin alone slashed up to $500 million (or 21%) from ICON's profits.

28. However, revealing the truth that Pfizer had largely stopped awarding ICON new business—and that ICON's profit margin from Pfizer and two other large customers was eroding

by over one-third—would have immediately tanked ICON's share price.

29. Thus, when analysts probed whether ICON's relationships with Pfizer and other large customers were experiencing any issues, Defendants consistently deflected and denied. For example, in February 2024, Cutler insisted that ICON was "***not hearing . . . any further concerns*** on funding or on their R&D spend" and claimed that ICON's large pharma customers "do appear to [be] becoming more open to outsourcing and ***outsourcing even more than they're doing at the moment***." Brennan declared in March 2024 that "***[t]hey are all saying that they're going to increase spending***." And to the extent Defendants acknowledged any customer shift to FSP at all, they falsely assured investors that it would have a minimal impact on ICON's margins, would be small and "very gradual," and had already been incorporated into ICON's guidance.

30. At the time of these statements, Defendants knew none of that was true. By January 2024, Cutler knew ICON had lost 85% of Pfizer's Phase 2 and 3 studies and all of Pfizer's full-service business, knew Pfizer's shift to nearly 100% FSP would be completed by April 2024, and had personally authorized a $50 million budget cut for the Pfizer portfolio.

31. Leaving no doubt as to Cutler's scienter, in February 2024, Cutler admitted at an internal, Company-wide town hall that ***ICON had lost the "Pfizer opportunity" and was no longer a preferred partner of Pfizer*** (FE-3)—even as he continued to tell investors that "***[n]othing has changed***" and touted "very stable and very strong demand in the large pharma."

32. As FE-2 emphasized, "[t]here is no way that Cutler or any member of leadership could say they didn't know what was happening or they didn't have access to it." Indeed, Cutler was intimately involved with every aspect of ICON's large customer relationships, personally reviewing "pitch" presentations and approving final budgets and cuts. Cutler was formally assigned as Pfizer's executive sponsor at ICON. Cutler also initiated "Partner of Choice" meetings

where he personally met with senior executives from Pfizer and other large customers to address challenges with the business, and Cutler publicly touted his personal involvement in "strategic meetings" with ICON's large pharmaceutical customers. This extensive personal interaction gave Cutler unique visibility into ICON's declining business from its largest customers.

33. ICON suffered another large setback in mid-2024, when one of its largest remaining projects for Pfizer—a large Phase 3 COVID-flu vaccine study—failed its trial. This was disastrous for ICON because the trial was huge, involving nearly 9,000 participants, and stood to generate at least $60 million in revenue for ICON. Defendants knew about the failure by early August 2024.

34. Nonetheless, on September 10, 2024, Cutler affirmed ICON's financial guidance and falsely stated that there had been "***no material changes***" in the business. In truth, ICON had already lost material work from Pfizer—including all full-service work, at least 85% of Phase 2 and 3 studies, and the large Phase 3 COVID-flu vaccine trial. And ICON's margins from Pfizer and two other large customers had materially eroded.

35. **ICON's Inflated Business Wins, Book-to-Bill Ratio, and Backlog:** Defendants also materially overstated ICON's backlog of awards, "business wins," and "book-to-bill ratio"—key metrics that indicated whether ICON's business was shrinking or growing.

36. For context, ICON regularly reported the total amount of business it had secured, called "backlog"; the amount of new business it had purportedly secured each quarter, called "business wins"; and its book-to-bill ratio, defined as net business wins divided by revenue. These metrics were critical to investors and analysts because they indicated whether ICON's business was shrinking or growing. For example, a book-to-bill ratio of 1.2 meant growth: ICON had secured 20% more new business than the work it had performed.

37. During most of the Class Period, Defendants reported book-to-bill ratios well above 1.0, peaking at 1.27 in the first quarter of 2024. ICON also reported a large and growing backlog. However, unknown to investors, ICON's book-to-bill ratio, business wins, and backlog were materially inflated for three reasons.

38. First, ICON included numerous "awards" without signed contracts. Many of these purportedly "awarded" studies were later canceled. As a result, ICON reported inflated book-to-bill ratios for at least three years based on sales representatives entering "wins" into Salesforce that they knew were highly unlikely to materialize. (FE-9.) ICON's actual book-to-bill ratios for 2023 and 2024 were ***0.9 or lower*** (FE-9)—evidence of a declining business, and far lower than Defendants publicly reported.

39. Second, CEO Cutler personally directed ICON to book awards at larger dollar amounts than sponsors had approved to boost ICON's claimed award numbers at least $20 to $30 million per quarter. As FE-7 explained, when sponsors gave ICON awards with caveats about reducing the size or scope of a study before a contract was signed, Cutler directed ICON to book the larger amount anyway. FE-7 was copied on emails from Cutler—and sometimes was standing in Cutler's office—when Cutler gave these directions. ICON used this practice regularly, including in the second and third quarters of 2023.

40. Third, ICON admittedly kept nearly $3 billion in canceled awards in its backlog for at least two years, which understated cancellations, overstated net business wins, and further inflated ICON's book-to-bill ratio. Specifically, ICON followed an aggressive internal policy of keeping inactive awards in backlog for years—long after customers told ICON that no revenue was forthcoming—until the customer served a written cancellation notice. As a result, stale "awards" without any revenue or other activity stayed in ICON's backlog for years. (FE-21.)

ICON's policy of keeping such awards in backlog originated from Cutler. (FE-21.)

41. When ICON belatedly changed the policy in May 2026, the Company slashed its backlog by $3.9 billion and Balfe acknowledged that "more than 75%" of the $3.9 billion "was 2023 or older," meaning that over $2.9 billion of stale "awards" had sat in ICON's backlog for at least two years without generating any revenue. ICON's failure to timely recognize the cancellation of such awards overstated net business wins by hundreds of millions of dollars per quarter, materially inflating ICON's book-to-bill ratio during the Class Period.

42. **ICON's False Financial Statements and GAAP Violations:** Finally, to obscure ICON's declining business performance and loss of key customers, Defendants engaged in improper revenue recognition and accounting practices in violation of GAAP. Specifically:

43. <u>Extending Reporting Periods to Inflate Financial Metrics</u>: ICON held reporting periods open beyond their stated close—typically by 10 to 14 days—to increase its purported billing and cash numbers, as a former Senior Finance Manager (FE-4) confirmed. For example, ICON's purported billing and cash as of "December 31, 2023" included amounts from January 2024. In doing so, ICON recorded assets and transactions that it was not entitled to collect from its customers at the end of the relevant period. (ASC 606-10-45-4.) ICON also recognized additional revenue and profit for work performed while the periods were held open.

44. <u>Issuing "Fake" Invoices to Pull Forward Revenue</u>: ICON created ***fake invoices*** for future work that ICON had not yet performed—***marked with an asterisk*** because they were "***known to be fake***." (FE-4, FE-23.) These fake invoices served to get "invoices on the books" (FE-4) and allowed ICON to prematurely recognize revenue it had not earned. Defendant Sheehan directed this premature billing and caused ICON to start recognizing revenue for the prematurely invoiced amounts. (FE-17.) The issue came to a head in Christmas 2023, when ICON fell

significantly short of its cash and billing targets, prompting a "***mad scramble***" as employees worked 14- to 16-hour days to try to find cash. (FE-4.) With no legitimate basis for the fake invoicing, which was widely discussed within ICON's Finance Department, employees suspected that Brennan and Cutler wanted to "jack up" ICON's share price before leaving ICON. (FE-4.)

45. <u>Manipulating and Understating Project Costs</u>: ICON used multiple related types of manipulation to artificially reduce studies' total costs—and thereby increase their percentage of completion, accelerate revenue recognition, and inflate margins.

46. When actual project costs exceeded ICON's budget—a common situation called "overburn" that reduced ICON's profitability on studies—Defendants simply omitted the additional costs to "***hold the margins***." (FE-5, FE-6.) To be clear, these were actual costs that ICON incurred and was required to include in its revenue recognition. Instead of including the costs, ICON used a dedicated Excel workbook to calculate the amount of costs to omit. This practice substantially inflated ICON's margin and resulted in ICON prematurely recognizing additional revenue in violation of GAAP. As a result, projects regularly reached—and even exceeded—100% completion before they were complete. (FE-5, FE-16, FE-20.)

47. ICON also used "negative management reserves," removing project costs, understating pass-through costs, and other improper techniques to similar effect. For example, in summer 2024, Aidan Jameson—a finance executive based in ICON's Irish headquarters whose titles have included Revenue Manager and Director of Financial Operations—instructed about 40 U.S.-based analysts to remove specific amounts of costs from their studies, even circulating an Excel file that showed the amounts of costs to remove (and identified ICON's revenue target). (FE-19.) After the analysts and their manager agreed that deleting the costs violated GAAP—and ***explicitly refused*** to do so—Jameson removed the costs anyway over their objections. (FE-18.)

48. Similarly, Defendant Sheehan directed a 15 percent reduction of forecasted pass-through costs to boost ICON's percentage of completion and prematurely recognize revenue, even after ICON's U.S.-based personnel told Sheehan that this was improper. (FE-18.)

49. Fake and Future Work: ICON recognized revenue from fake and future work, including where employees billed more hours than they actually worked. (FE-3, FE-16, FE-20.)

50. Draft, Unsigned Change Orders: ICON prematurely recognized revenue from draft, unsigned change orders, even as the final change orders were significantly smaller. (FE-3.)

51. **ICON's Restatement:** ICON has restated its 2023 and 2024 financial statements and stated that they "should no longer be relied upon" due to "***misstatements***" and "***material accounting errors***" that were "***material to the financial statements***." ICON has further admitted multiple "material weaknesses in [its] internal control over financial reporting" and that its disclosure controls and procedures were "not effective." These admissions establish that ICON's 2023 and 2024 financial statements, and Defendants' statements that ICON complied with GAAP and had "effective" internal controls, were materially false.

52. In restating, ICON admitted that 2023 and 2024 revenue was inflated by "improper adjustments"; "errors in determining the estimated cost to complete," "the assessment of realizable value," and "the impact of cost accruals"; and "manual adjustments in respect of certain long-term clinical services revenue contracts"—the same GAAP violations detailed herein.

53. ICON's objectively false financial statements were the product of deliberate manipulation, not any mistaken judgment or estimate. ICON has admitted that its "***tone from management***" contributed to the material weaknesses in controls and "material accounting errors." ICON's finance leadership in Ireland, including CFO Brennan and Defendant Sheehan, was at the center of the fraud. These executives initiated revenue sweeps—including via emails ***from***

***Sheehan himself***—to pressure employees into recognizing additional revenue on specific studies. (FE-3, FE-18.) Sheehan was "hell-bent" on hitting financial targets (FE-16), even as he also supervised ICON's internal audit team (FE-18)—a lack of separation of duties that enabled pervasive manipulation. In the first half of 2024, Senior Director of Finance Róisín Bedford aggressively pushed her team to increase revenue on monthly and quarterly Teams calls where she specifically mentioned management reserves and reducing pass-through costs. (FE-23.) FE-23 described Bedford's comments as unusual and indicated that they raised red flags. ICON even tried to conceal the manipulation from its auditors at KPMG by using a system KPMG did not review or test; Jameson boasted to FE-18 that ICON's external auditors would not be able to see the negative management reserves.

54. ICON's admitted misstatements were highly material. Not only has ICON admitted "material errors," but ICON's overstatements of revenue by $65.3 million in 2023 and $92.7 million in 2024 are ***more than double*** the materiality thresholds set by ICON's former auditor, KPMG. ICON also overstated net income by ***10.5%*** in 2023 and ***7.1%*** in 2024, and overstated adjusted EPS by 5.8% in 2023 and 4.7% in 2024.

55. Further demonstrating materiality—and motive to commit fraud—Defendants' manipulation repeatedly allowed ICON to beat earnings guidance in 2023 and the first half of 2024. As shown below, absent the manipulation, ICON missed consensus expectations for revenue, adjusted EBITDA, and adjusted EPS for ***every quarter*** during that period:

| **Revenue** | **1Q23** | **2Q23** | **3Q23** | **4Q23** | **1Q24** | **2Q24** |
|---|---|---|---|---|---|---|
| Original Outcome | Miss | Beat | Beat | Miss | Beat | Miss |
| Revised Outcome | Miss | Miss | Miss | Miss | Miss | Miss |

| **Adjusted EBITDA** | **1Q23** | **2Q23** | **3Q23** | **4Q23** | **1Q24** | **2Q24** |
|---|---|---|---|---|---|---|
| Original Outcome | Beat | Beat | Beat | Beat | Beat | Miss |
| Revised Outcome | Miss | Miss | Miss | Miss | Miss | Miss |

| **Adjusted EPS** | **1Q23** | **2Q23** | **3Q23** | **4Q23** | **1Q24** | **2Q24** |
|---|---|---|---|---|---|---|
| Original Outcome | Beat | Beat | Beat | Beat | Beat | Beat |
| Revised Outcome | Miss | Miss | Miss | Miss | Miss | Miss |

56. Defendants' misstatements and false financials set the stage for insiders to unload stock for ***over $79 million*** in profits—including $29.6 million for Cutler and Brennan alone. ***All*** of Cutler's and Brennan's sales occurred while ICON reported inflated quarterly financial results:




57. These large, unusual insider sales strongly support scienter. During the Class Period, Cutler and Brennan respectively sold 22.7% and 98.6% of their shares and vested options. Their sales occurred at suspicious times, including shortly after several of their misstatements to investors and while ICON's overstatements of revenue reached their peak. And since the Class

Period, neither executive has sold a ***single share*** (excluding sales to satisfy tax withholding).

58. After Cutler and Brennan cashed out, the truth emerged in piecemeal fashion.

59. First, on October 23, 2024, ICON—despite having reiterated guidance just six weeks earlier—announced disastrous results for the third quarter of 2024, including a surprise "revenue shortfall" of $100 million for the quarter, and reduced ICON's full-year 2024 revenue guidance by $220 million at the midpoint. Defendants blamed "material headwinds from two large customers undergoing budget cuts and changes in their development model" as well as "ongoing cautiousness from biotech customers resulting in award and study delays."

60. In reality, Defendants had long known about substantial business reductions from ICON's large customers—including Pfizer's decisions in 2023 to stop awarding ICON ***any*** new full-service business and to exclude ICON from at least 85% of Pfizer's large, lucrative Phase 2 and 3 studies—and the looming slowdown in ICON's biotech business, as evidenced by the continuous decline in biotech customer RFPs over the prior two years and a decreasing win rate.

61. ICON's poor results also reflected the partial collapse of Defendants' accounting fraud, which was increasingly unable to offset the declines in ICON's underlying business.

62. On this news, ICON's share price plunged by $59.03 per share, or 21%.

63. Second, on January 14, 2025, ICON issued financial guidance for 2025 well below analysts' expectations due to "trial activity [that] has been impacted by cautious spending from biopharma customers" and "a headwind from our top two customers." Again, Defendants had long known of these issues. Defendants also revealed that 2025 would be a "transition period" for ICON, indicating that the Company would not return to normal growth for some time. ICON's share price declined another $17.75, or 8.1%.

64. After these events, ICON's long-time auditor KPMG resigned, and on September

4, 2025, ICON announced Defendant Cutler's abrupt departure as CEO.

65. On September 12, 2025, Lead Plaintiffs filed their Amended Complaint (ECF 47) alleging that ICON had issued false financial statements in violation of GAAP and suffered from material weaknesses in controls. Shortly thereafter, ICON's Audit Committee secretly commenced an internal investigation of the Company's accounting and controls. The investigation ultimately spanned over six months.

66. Despite the pending (and undisclosed) internal investigation, Defendants publicly doubled down on the integrity of ICON's financial statements and controls. On October 23, 2025, Defendants falsely assured analysts that ICON "has ***strong internal controls in place***."

67. Third, on October 23, 2025, ICON reported elevated cancellations, which were the result of ICON's failure to timely recognize cancellations of stale awards and drove a $12.60, or 6.5%, decline in ICON's share price.

68. Fourth, on January 7, 2026, ICON announced that it would not release 2026 guidance in January, contrary to its historical practice—a delay driven by the still-concealed Audit Committee investigation. As the market digested this negative news, ICON's share price dropped by $14.70, or 7.2%, and $6.84, or 3.6%, over the next two days.

69. Finally, on February 12, 2026, ICON revealed an "ongoing internal investigation initiated by the Audit Committee of the Board of Directors in late October 2025 into certain of the Company's accounting practices and controls . . . primarily focuse[d] on revenue recognition in fiscal years 2023 through 2025," that ICON "expects to report one or more material weaknesses" in internal controls over financial reporting, and that "preliminary indications are that the Company's revenue in 2023 and 2024 may have been overstated." ICON further revealed that due to the ongoing investigation, it would not timely file fourth quarter and full-year 2025 financial

results. In response to these revelations, ICON's share price plunged another $53.06, or 39.9%.

70. Defendants' fraud has left investors with billions of dollars in losses.

## II. JURISDICTION AND VENUE

71. The claims alleged herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

72. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

73. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as many of the acts and transactions alleged herein occurred in substantial part in this District. Additionally, Defendant ICON carried out substantial economic activity in this District, including through ICON subsidiary ICON Central Laboratories, which has its headquarters in Farmingdale, New York.

74. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities exchange.

75. The Court has personal jurisdiction over each Defendant pursuant to 15 U.S.C. § 78aa(a). Each Defendant participated in a fraud directed to deceiving United States shareholders, including by signing ICON's false and misleading SEC filings; making misstatements during ICON's quarterly earnings calls and other events; and manipulating ICON's financial statements with knowledge that those statements would be filed with the SEC and relied upon by United States shareholders. These fraudulent actions directed to the United States

(including the New York forum), concerning securities traded in the United States on NASDAQ, render each Defendant subject to personal jurisdiction in this forum.

## III. PARTIES

### A. Plaintiffs

76. Plaintiff PFRSD provides retirement, disability, and death benefits to uniformed employees of the city of Detroit, Michigan, including police officers and firefighters, through a combination of defined benefit and defined contribution plans administered by a Board of Trustees. As indicated on the certification submitted herewith, PFRSD purchased ICON ordinary shares at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

77. Plaintiff Local 464A represents and advocates for workers primarily employed in the food industry. As indicated on the certification submitted herewith, Local 464A purchased ICON ordinary shares at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

78. Plaintiff MCRHC is a public employee health and welfare trust based in Macomb County, Michigan that provides healthcare benefits to County retirees. As indicated on the certification submitted herewith, MCRHC purchased ICON ordinary shares at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

79. Plaintiff Local 690 is an employee benefit plan that provides retirement benefits to the members of the Plumbers Local Union No. 690 based in Philadelphia, Pennsylvania. As indicated on the certification submitted herewith, Local 690 purchased ICON ordinary shares at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B. Defendants**

80. Defendant ICON is a CRO incorporated in Ireland, with its headquarters in Dublin, Ireland. ICON's ordinary shares trade on the NASDAQ Global Select Market under the ticker symbol "ICLR."

81. Defendant Cutler served as ICON's Chief Executive Officer since March 2017 and on ICON's Board of Directors since November 2015. On September 4, 2025, ICON announced that Cutler purportedly "retire[d]" as CEO and would be replaced by Defendant Balfe effective October 1, 2025. On May 27, 2026, ICON announced that Cutler "resigned from the Board effective May 21, 2026." As CEO, Cutler actively participated in ICON's process for preparing and making public disclosures regarding the Company's financial performance and related matters, including demand for ICON's services and various metrics such as RFP levels. During his tenure, Cutler was a core participant in preparing, reviewing, and approving: (i) ICON's quarterly earnings calls and Q&A scripts (in which Cutler was regularly a main speaker); (ii) the press releases that ICON published and filed with the SEC on Forms 6-K along with each quarterly earnings release (in which Cutler was often quoted); and (iii) the SEC Forms 20-F and 6-K that ICON filed and published for each fiscal period. Throughout his tenure, Cutler approved ICON's periodic filings with the SEC. Cutler also regularly spoke to investors and securities analysts about ICON's operations and financial performance in conference calls, and at meetings and conferences, after personally participating in the preparation and finalization of his public statements on behalf of ICON.

82. Defendant Brennan served as ICON's Chief Financial Officer from February 2012 until his departure in October 2024. During his twelve-year tenure as CFO, Brennan actively participated in ICON's process for preparing and making public disclosures regarding the Company's financial performance and related matters, including demand for ICON's services and

various metrics such as RFP levels. During this time, Brennan was a core participant in preparing, reviewing, and approving: (i) ICON's quarterly earnings calls and Q&A scripts (in which Brennan was regularly a main speaker); (ii) the press releases that ICON published and filed with the SEC on Forms 6-K along with each quarterly earnings release (in which Brennan was often listed as a contact or quoted); and (iii) the SEC Forms 20-F and 6-K that ICON filed and published for each fiscal period. Throughout his tenure, Brennan approved ICON's periodic filings with the SEC. Brennan also regularly spoke to investors and securities analysts about ICON's operations and financial performance in conference calls, and at meetings and conferences, after personally participating in the preparation and finalization of his public statements on behalf of ICON.

83. Defendant Balfe has served as ICON's CEO since October 1, 2025. Balfe was previously ICON's Chief Operating Officer ("COO") (since January 2025). Balfe joined ICON in 2003 and held a series of leadership roles. From July 2021 through December 2024, Balfe served as ICON's President of Pharma Development Solutions and focused on maintaining partnerships with large pharmaceutical customers. During his more than twenty years at ICON, Defendant Balfe also held roles in global business development, the FSP leadership team, and the business development team. Balfe reviewed and supplied information to Cutler, Brennan, and other executives in connection with ICON's statements to investors. Since becoming ICON's CEO, Balfe has been a core participant in preparing, reviewing, and approving: (i) ICON's quarterly earnings calls and Q&A scripts (in which Balfe was regularly a main speaker); (ii) the press releases that ICON published and filed with the SEC on Forms 6-K along with each quarterly earnings release (in which Balfe was quoted); and (iii) the SEC Forms 20-F and 6-K that ICON filed and published for each fiscal period. Throughout his tenure, Balfe approved ICON's periodic filings with the SEC. Balfe also regularly spoke to investors and securities analysts about ICON's

operations and financial performance at meetings and conferences after personally participating in the preparation and finalization of his public statements on behalf of ICON.

84. Defendant Clerkin has served as ICON's CFO since October 31, 2024, replacing Defendant Brennan. Clerkin has actively participated in ICON's process for preparing and making public disclosures regarding the Company's financial performance and related matters. During his tenure, Clerkin has been a core participant in preparing, reviewing, and approving: (i) ICON's quarterly earnings calls and Q&A scripts (in which Clerkin was regularly a main speaker); (ii) the press releases that ICON published and filed with the SEC on Forms 6-K along with each quarterly earnings release (in which Clerkin was often listed as a contact); and (iii) the SEC Forms 20-F and 6-K that ICON filed and published for each fiscal period. Throughout his tenure, Clerkin approved ICON's periodic filings with the SEC. Clerkin also regularly spoke to investors and securities analysts about ICON's operations and financial performance in conference calls, and at meetings and conferences, after personally participating in the preparation and finalization of his public statements on behalf of ICON.

85. Defendant Sheehan has served as ICON's Senior Vice President of Finance since 2021 and worked at ICON since 2007. At all relevant times, Sheehan reported directly to ICON's CFO. As detailed herein, Sheehan manipulated ICON's financial statements and committed deceptive acts in furtherance of a fraudulent scheme with knowledge that his misconduct would deceive ICON's customers, affect ICON's SEC filings, impair the integrity of the United States securities markets, and harm Plaintiffs and other Class members in the United States. Sheehan also signed ICON's April 26, 2024, registration statement on Form F-3 filed with the SEC.

86. Based on their positions with ICON, the Individual Defendants possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and

presentations to securities analysts, money and portfolio managers, and institutional investors.

87. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at its highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, customers, and business prospects, as alleged herein.

88. The Individual Defendants were provided with copies of the Company's presentations and SEC filings alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were materially false and/or misleading when made.

## IV. FACTUAL BACKGROUND

### A. ICON's Business Model

89. ICON is a CRO that claims to provide a range of services to assist pharmaceutical companies, biotechnology companies, government bodies, and public health organizations in bringing new drugs and medical devices to the market. ICON's service offerings include clinical development, functional outsourcing, and laboratory services.

90. During the Class Period, ICON offered its services through two main operating models: (1) Full-Service Outsourcing ("FSO" or "Full Service"); and (2) Functional Service Provision ("FSP").

91. Through the FSO model, ICON was responsible for conducting an entire clinical study on behalf of a client. Accordingly, FSO work provided ICON's highest profit margins.

92. Through FSP arrangements, in contrast, customers only outsourced discrete

functions or portions of the clinical trial to ICON, while performing other functions internally. For example, ICON may have provided individuals or teams that are specialized in certain areas to supplement the sponsor's existing workforce. An FSP model thus allowed customers to retain more control and offered customers lower costs. For ICON, however, FSP has substantially lower profit margins compared to FSO work.

93. Because clinical trials have limited duration, ICON's business model, including both its FSO and FSP offerings, relies on a constant stream of new contracts, which are typically secured through requests for proposals that ICON receives from customers.

**B. ICON's Large Pharma and Biotech Customer Segments**

94. During the Class Period, ICON had two major customer segments: (1) large pharmaceutical ("large pharma") companies with significant research and development ("R&D") expenditures; and (2) small and mid-size biotechnology ("biotech") companies with lower R&D expenditures (which ICON defines as companies outside the top 50 by R&D spending). ICON depicted its revenues from these customer segments as follows:




95. ICON's financial performance depended heavily on a handful of its largest customers. ICON's SEC filings admitted that it "depend[ed] on a limited number of customers."

For example, in the first half of 2023, ICON derived nearly 9% of its revenue from its largest customer. For the full year of 2023, ICON's top five customers represented 26.8% of its revenues, its top ten customers represented 41.4% of its revenues, and its top twenty-five customers represented 62.9% of its revenues. According to FE-14, a Director of Business Development for ICON's clinical trial services, ICON's relationships with large pharmaceutical companies, such as Pfizer, were the "bread and butter" that kept ICON's revenue rolling.[1]

**1. ICON's Critical Relationship with Its Largest Customer, Pfizer**

96. Historically, ICON's largest customer was Pfizer. Based on regularly working with Pfizer for over a decade, FE-1 explained that Pfizer was ICON's "number one since day one" and was a "centerpiece" of ICON's business. Pfizer alone represented 8.8% of ICON's revenues, or $683 million, in 2022.

97. CEO Cutler was central to ICON's relationship with Pfizer. FE-1 noted that Cutler was Pfizer's "executive sponsor" at ICON, and FE-11, a former Vice President and General Partner in ICON's FSP division, confirmed that Cutler has always managed the Pfizer account given its prominence and size.

98. ICON's own press releases confirmed Cutler's knowledge of and involvement in the key Pfizer relationship. For example, when ICON publicly announced in April 2020 that Pfizer had signed a new service agreement, Cutler praised the "further progression of ICON's long-standing relationship with Pfizer." In a January 2021 ICON press release touting ICON's work with Pfizer in a global Phase 3 trial of a COVID-19 vaccine, Cutler highlighted ICON's "close collaboration with Pfizer."

[1] Regardless of gender, all FEs are described in the masculine to protect their identities. Each FE's title, tenure, and role are provided in Section VIII.B.

99. Cutler repeatedly interacted personally with Pfizer executives. FE-11 explained that Cutler personally led Partner of Choice ("POC") meetings where ICON invited senior executives from Pfizer, Novartis, and other large accounts to the Company's U.S. headquarters in Blue Bell, Pennsylvania. FE-11 attended these POC meetings together with Cutler, Samir Shah (former President of ICON Strategic Solutions ("ISS")), and others. The goal of the POC meetings was to convene a think tank or whiteboard session to discuss challenges in the industry and issues related to ICON's business—including Pfizer's move from FSO to FSP, which threatened ICON's margins because the FSP work was less profitable for ICON.

100. According to FE-11, Balfe, Debbie Gilmore, and other senior ICON executives were also intimately involved with the Pfizer relationship. FE-11 described Pfizer as their "baby."

101. Similarly, FE-14 reported that senior ICON executives, such as Cutler and Chief Commercial Officer ("CCO") George McMillan, had direct involvement in ICON's business dealings with Pfizer and other large customers. ICON senior leadership reviewed any revenue opportunity worth approximately $30 million or more; for example, Cutler viewed target deals with Eli Lilly. (FE-14; FE-7.) McMillan was involved at the "pitch" phase of ICON's target deals with Eli Lilly and flew to meet customers for dinner and in-person meetings to win the deals. (FE-14.)

### 2. ICON's Other Largest Customers

102. Beyond Pfizer, ICON's other largest customers included Novartis, Janssen/Johnson & Johnson, Sanofi, BMS, Merck, GSK, and Eli Lilly, as FE-2, FE-11, FE-14, and FE-12, a former ICON Resource Manager, confirmed.

103. For example, FE-11 stated that Novartis was one of ICON's five largest accounts, with over 2,000 ICON employees embedded. The last award FE-11 obtained from Novartis was for three years and $780 million. FE-11 noted that the Janssen/Johnson & Johnson relationship

involved 3,000 ICON employees. FE-12 confirmed that the Sanofi relationship involved over $900 million in contracts with an average duration of about three years, translating into hundreds of millions of dollars each year.

### C. Before the Class Period, ICON Temporarily Benefits from COVID-19 Work and Incurs Significant Debt in the Costly PRA Merger

#### 1. ICON's Revenues Surge Due to COVID

104. During the COVID-19 pandemic, many large pharmaceutical companies increased their R&D spending as they worked to develop COVID vaccines and treatments.

105. This led to a temporary boom in business for ICON as it secured large COVID-era contracts. In January 2021, ICON itself publicly touted its role in Pfizer's large global trial of the first successful COVID-19 vaccine.[2]

#### 2. The PRA Merger

106. ICON leveraged the temporary boom in COVID-19 work to acquire PRA, one of its main CRO competitors. At the time, PRA was the fifth-largest CRO by revenue, while ICON was sixth-largest.

107. Unlike ICON, PRA focused on the biotech space. As FE-14 explained, ICON acquired PRA because it was a leader in biotech—meaning that everything at PRA was built for biotech—and ICON saw the acquisition as a way to build out its biotech arm.

108. On July 1, 2021, ICON completed its acquisition of PRA (the "PRA Merger"). ICON touted the PRA Merger as bringing together "38,000 employees across 47 countries, creating the world's most advanced healthcare intelligence and clinical research organization."

---

[2] https://www.iconplc.com/news-events/press-releases/icon-pfizer-biontech

CEO Cutler asserted that "[b]oth ICON and PRA have track records of robust growth and performance and we are ready to build on this unrivalled position of strength."

109. The PRA Merger saddled ICON with a heavy debt burden: a high-interest term loan of $5.515 billion, requiring ICON to make substantial interest payments, including over $80 million in the second half of 2021 alone. Given ICON's heavy debt load, credit rating agencies downgraded ICON to "junk." Specifically, in mid-2021, Moody's and S&P downgraded ICON's credit rating to BB+ and Ba1—below investment-grade. Moody's highlighted that "the announced [PRA] acquisition will materially change ICON's capital structure," while S&P flagged that "the debt-funded acquisition will put pressure on ICON's credit metrics."

**D. The PRA Merger Proves to Be a Disaster**

110. Unknown to investors, the PRA Merger proved to be a disaster. ICON's failure to integrate PRA, coupled with ICON's failure to provide the same level of service to legacy PRA biotech sponsors, and sponsors' concerns regarding overconcentration at the combined entity, resulted in a significant loss of customers and new business in the wake of the PRA Merger.

**1. ICON Failed to Retain PRA's Biotech Customers**

111. FE-14 described the PRA Merger as a "terrible merger" and a "failure." According to FE-14, following the Merger, ICON continued to promise strong biotech partnerships, but in reality, ICON was losing ground with its biotech customers.

112. FE-14 reported that although ICON tried to "spruce it up," customers eventually began to "see through the façade" and realize that ICON did not have biotech solutions. For example, ICON's Standard Operating Procedures were not always built for biotech, and ICON team members were not well-versed in biotech.

113. Similarly, FE-15, a former ICON Regional Lead, Business Development, explained that through the PRA Merger, ICON was simply buying a book of business and did not know how

to properly execute with the new customers. According to FE-15, after the Merger, smaller biotech companies that had previously worked with PRA were not getting the attention and resources they needed.

114. As FE-14 explained, this led to legacy PRA customers leaving ICON "in droves" and not providing ICON with additional work. FE-14 estimated that at least 30% of his biotech customers did not want to conduct business with ICON at all after the PRA Merger.

### 2. The PRA Merger Led to Overconcentration Among Large Customers

115. Further, several of ICON's large customers had business with both ICON and PRA before the PRA Merger. After the Merger, these customers were unhappy with the resulting overconcentration of their CRO business with ICON.

116. FE-11 confirmed that Janssen—a relationship that generated about $500 million per year—was unhappy with the overconcentration with ICON and ultimately used it as leverage to demand lower pricing, reducing ICON's margins. Similarly, FE-15 reported that some of ICON's large pharma customers had business with both PRA and ICON before the Merger and they "didn't want to put all of their eggs in one basket."

117. The overconcentration issue was exacerbated because the legacy PRA business (relabeled as ISS) competed with ICON's FSP business for similar business from the same sponsors, including Sanofi. FE-12 noted that ICON ISS and FSP "were constantly bidding against" each other on roughly half of Sanofi's RFPs, or approximately 20 RFPs per quarter.

## E. As COVID-Related Revenues Decline, Defendants Resort to Fraud

118. As the COVID-19 pandemic subsided, there was a significant reduction in pandemic-related funding and associated spending by study sponsors, and the temporary surge in trials came to an end.

119. For example, in early 2023, BARDA significantly reduced its funding for COVID-related vaccine research, and Sanofi lost approximately $150–$200 million in BARDA funding across two major COVID vaccine studies, which involved thousands of patients in 15–25 countries. (FE-12.) As FE-12 said, ICON "was not going to get $300 to $400 million per year" in vaccine revenue after the COVID vaccine funding cuts began.

120. Further, as interest rates rose dramatically during 2022, biotech companies saw significant decreases in funding—a slowdown that affected CRO companies, including ICON. At the J.P. Morgan Healthcare Conference on January 11, 2023, Cutler admitted that ICON had "seen some attenuation of biotech funding on the RFP side of things."

121. Meanwhile, ICON still had to service the debt it had incurred to acquire PRA.

122. These pressures impacted ICON's share price: after peaking at $309.70 in December 2021, ICON's share price suffered throughout 2022, ending the year at $194.25.

123. By mid-2023, ICON had reached a crucial juncture: Defendants were highly motivated to create the impression that ICON had overcome the recent industry headwinds and now had a healthy and growing business. That would help restore ICON's credit rating, clearing the path for ICON to offer new securities to pay down its $4.35 billion in remaining debt from the PRA Merger.

124. Significantly, persuading investors of ICON's growth would also allow Defendants Cutler and Brennan to sell stock for personal profit. In this regard, FE-3—an Executive Director of Project Delivery at ICON from early 2023 until November 2024—highlighted that Cutler had an internal goal of boosting ICON's stock price to $500 per share by 2025, a strategy called "***$500 by 2025***."

125. However, Defendants knew key aspects of ICON's business were declining, particularly its biotech RFP volume and business from large customers, including Pfizer, as detailed below. But revealing the truth would immediately depress ICON's share price, further imperil its credit rating, and sharply reduce Defendants' ability to profit from lucrative insider sales.

126. Thus, as detailed herein, Defendants turned to a fraudulent scheme to conceal ICON's weakening business, overstate ICON's financial performance in violation of GAAP, and cash out by selling stock at inflated prices.

### F. The Class Period Begins: Defendants Tout ICON's Purportedly Increasing RFPs and Strong Demand Across All Customer Segments

127. The Class Period begins on July 27, 2023, when ICON held a conference call to discuss its financial results for the second quarter of 2023.[3]

128. ICON's 2Q23 earnings call was an inflection point. ICON reported its highest-ever quarterly revenue of $2.02 billion—the first time its quarterly revenues had exceeded $2 billion—and touted broad growth across all areas of ICON's business.

129. During Defendant Cutler's introductory remarks, he declared that "[t]he industry demand environment has been solid with ***positive trends across all customer segments***."

130. The volume of potential customers' RFPs to ICON is a key leading indicator of demand for ICON's services and its growth. As ICON's 2023 annual report explained: "We are generally awarded projects based upon our responses to requests for proposals received from companies in the pharmaceutical, biotechnology and medical device industries[.]"

[3] Throughout this Complaint, ICON's quarterly results are referenced by quarter and the last two digits of the year. For example, the second quarter of 2023 is "2Q23."

131. During the 2Q23 earnings call, Cutler touted increased RFP opportunities as evidence of more demand for ICON's services, stating that "***the demand increase, the RFP opportunities are really across the segments of the business***. I mean our large pharma group, in our biotech group[.]" Cutler added that "an ***increase in RFP[s]*** on a sequential basis" had "continued in the second quarter," and that ICON had "seen RFP activity continue its positive trajectory in July."

132. Defendants also specifically stated that RFPs were increasing in the biotech segment. Cutler stated that ICON saw "a ***notable pickup in RFP activity within the biotech segment*** toward the end of quarter 2."

133. Biotech RFPs were particularly important to investors because biotech customers comprised an increasing proportion of clinical development spending, and thus were critical to driving ICON's growth. For example, on July 25, 2024, Cutler highlighted that about half of ICON's 25 largest opportunities are with biotech customers. On April 25, 2024, Cutler indicated that biotech customers comprised about one-third of ICON's revenues, stating: "we think of biotech overall . . . sort of low 30% of our revenues."

134. Further, Defendants deflected any concerns about ICON's large customers. Cutler stated that "we continue to work well with" ICON's largest customer. And when an analyst asked about the potential for growth among large pharma customers, Cutler claimed that ICON potentially had "more of an opportunity" when R&D budgets were constrained, stating that "***even when [R&D budgets are] going down or staying flat, we have an opportunity***," and asserting that "sometimes it's more of an opportunity for organizations like ours when budgets are flat because the pharma companies look at how they're spending and try to optimize their spend."

135. Defendants also touted ICON's business wins and book-to-bill ratio, reporting net business wins of $2.419 billion and a book-to-bill ratio of 1.20 in the second quarter of 2023.

136. Analysts credited Defendants' misstatements. For example, on July 27, 2023, Barclays raised its price target on ICON from $250 to $280 (a 12% increase), adding that ICON's "recent success is due to the company broadening its services to new ***and existing clients***" (emphasis in original). Tracking Cutler's statements, Barclays flagged ICON's "***notable pickup in RFP activity within biotech*** towards the end of 2Q" and that "RFP volume has continued its positive trajectory in July as well."

## G. In Reality, ICON's Business Was Slowing Significantly

137. Contrary to Defendants' public statements, key aspects of ICON's business were slowing and declining throughout the Class Period.

### 1. Biotech Customer RFPs Continuously Declined

138. Defendants knew biotech customer RFPs were continuously ***decreasing***—not increasing—before and during the Class Period.

139. Specifically, after peaking by 2021 or 2022, ICON received fewer biotech RFPs every quarter during 2023 and through fall 2024, with a total decline of approximately 40% over this period. (FE-1.) The overall 40% decline in seven quarters indicates that ICON's volume of RFPs from biotech customers consistently declined by approximately 6% per quarter. FE-1 further confirmed that ICON's biotech customer RFPs did not increase at any point through his departure in September 2024.

140. Similarly, FE-13—ICON's Vice President, Scientific Affairs from spring 2019 to September 2023—noted that RFPs from biotech and large pharma customers on the laboratory services side were noticeably down, by at least 20%, starting from January 2023.

141. ICON's flow of customer RFPs was carefully tracked internally. FE-1 explained that ICON's full-service RFPs with an Interactive Response Technology ("IRT") component—which were largely biotech and covered more than half of ICON's full-service biotech work—peaked by 2021 or 2022 at close to 50 RFPs per month, but dropped to the low 30s each month by 2024. FE-1 personally tracked these RFPs and confirmed that they showed a year-over-year decline in 2023, and average RFPs per month were also dropping. There was always a direct relationship between trends in these RFPs and the broader set of ICON's biotech customer RFPs based on FE-1 seeing reports for both categories.

142. FE-1 knew about the trends in ICON's biotech area from participating in weekly meetings that included reports on open and closed RFPs, and from accessing the Salesforce system. In particular, FE-1 attended weekly meetings to review Salesforce reports with Amanda Cohen (Executive Director Sales Strategy, Biometrics & Pharmacovigilance) and other colleagues. These reports could be viewed by logging in to Salesforce and were also circulated as screenshots for the meetings. The reports contained standard metrics, including how many open RFPs were in the pipeline, the percentage chance of winning the RFPs (as low as 30 percent), total awards, cancellations, and actual year-to-date numbers.

143. Similarly, FE-15 stated that he and all managers had access to ICON's Salesforce system, which contained managers' dashboards with RFP wins and losses, the win/loss reasons, and a year-over-year report. FE-15 further explained that Salesforce tracked both "outstanding" and "anticipated" RFPs.

144. ICON's declining biotech RFPs were regularly presented to the Individual Defendants. Specifically, FE-1 reported that ICON's decreasing biotech RFPs through 2023 and 2024 were presented in quarterly business development meetings with Defendants Brennan and

Balfe, as well as CCO McMillan (who reported to CEO Cutler). These quarterly meetings were held by video and typically lasted an hour; Defendant Cutler sometimes attended. Balfe and Cutler also attended structured, two-and-a-half-day Quarterly Business Review ("QBR") meetings where RFP information was presented, as discussed further below. (*Infra* Section VIII.B.11.)

**2. Overall RFPs Significantly Declined**

145. ICON's customer RFPs were declining across the board in 2023. As FE-7 explained, toward the end of each quarter in 2023, internal emails—copying CEO Cutler—called out a decline in ICON's customer RFPs.

146. The emails stated that ICON's RFPs and awards were declining across the board. (FE-7.) FE-7 described the emails as "calls to action" that urged employees' full attention to each RFP given the diminishing number. FE-7 further stated that the emails described the gap between ICON's current numbers and target, indicating that ICON needed to "book X amount more."

147. The emails usually came from the head of sales, consistently copied Cutler and McMillan, and sometimes came from Cutler or McMillan themselves. (FE-7.) Thus, Cutler knew throughout 2023 that ICON's overall RFPs were declining.

**3. ICON's Claimed RFP Flow Was Significantly Inflated**

148. Further undermining Defendants' public statements about RFPs, many of the RFPs that ICON received were duplicative or intended only for price discovery, meaning they had no prospect of translating into new business for ICON.

149. First, up to 40% of RFPs were issued merely for price discovery—not to award actual business to ICON. These RFPs had zero prospect of converting into new business. On November 21, 2024—near the end of the Class Period—Defendant Cutler admitted that "we've seen a number of projects or bids that we've made that really never have come to a decision. It

tends to be around 20% to 30% of the RFP dollars that we put out don't come to a decision. We call it close cancel. In other words, they're canceled before they even get to a contracting point."

150. In fact, Cutler understated the magnitude of the problem. FE-7 stated that up to 40% of the large pharma RFPs ICON received in 2023 were just "testing the waters"—*i.e.*, intended merely for price discovery. FE-7 stated that in about one-third of these cases, sponsors actually told ICON that the RFPs were just for price discovery purposes. In other cases, the sponsors sent three RFPs, reflecting three scenarios for the same study, which indicated to FE-7 and ICON that the sponsors were just "fishing" to discover ICON's pricing. FE-7 confirmed that the price discovery RFPs happened throughout 2022 and 2023 and increased towards the end of his tenure. FE-7 believed that Cutler and McMillan were both aware of the price discovery RFPs given their prevalence and because Cutler and McMillan were both "very hands on."

151. Likewise, FE-2 confirmed that customers sent RFPs to ICON merely to get a sense of ICON's pricing; once ICON responded, the customers indicated that they did not wish to move forward with the study. Similarly, FE-15 reported that in 2024, companies were sending out more RFPs than before: while sponsors had generally gone to three to four CROs for RFPs before, in 2024, they started going to as many as six to eight. Indeed, during the first quarter of 2024, Smyth (President of ICON Biotech) indicated that sponsors were going to more vendors than in the past and price shopping across six or more CROs (compared to three in the past). (FE-3.)

152. <u>Second</u>, many of the RFPs were duplicative because multiple customers submitted RFPs to conduct the same study using limited funding from BARDA. FE-1 reported that in 2023 and 2024, ICON bid on several relatively large studies, in the $30 to $50 million range, to be funded by BARDA. However, in each case, multiple companies were competing for the same BARDA funding for the same study, so even where ICON responded to three or four RFPs for a

given study, there would ultimately only be one study and one award. Thus, for example, what appeared to be "$1 million" in RFPs could all relate to a single $250,000 study. (FE-1.) As a result of this duplication, ICON's volume of RFPs from BARDA-funded studies was several times higher than the maximum possible award.

**4. ICON's Biotech Cancellations Consistently Increased**

153. Further demonstrating the slowdown in ICON's biotech business, biotech study cancellations had consistently increased since late 2022. As FE-1 explained, it was clear by June 2023 that the elevated cancellations were a trend, and the trend never improved. Instead, ICON's biotech cancellations progressively worsened into 2024. The biotech cancellations were financially significant and amounted to hundreds of millions of dollars, as most biotech studies ranged from $8 million to $30 million—and some were much larger.

154. ICON's senior leadership—including Defendants Cutler, Brennan, and Balfe—knew biotech cancellations were increasing throughout 2023 and 2024. As FE-1 explained, cancellation data was aggregated and rolled up to McMillan and SVP of Business Development Mark Cooper, who then submitted it to Cutler and Brennan; FE-1 learned from executives Cohen, Eloise Harris (Vice President of Business Development), and Yves Grenon (Senior Vice President) that "we need" the cancellation "numbers because it is going all the way up to the top and they are reviewing it."

155. FE-1 also attended multiple quarterly business development meetings in 2023 and 2024 where Defendants Brennan and Balfe personally used a company-wide Salesforce dashboard to present ICON's increasing biotech cancellations, which were "very high," and complained that high cancellations were really hurting ICON's numbers. And in April 2024, Cutler attended an ICON sales meeting in Tampa, Florida, where ICON's increasing biotech cancellations were discussed. (FE-1.)

### 5. ICON's Business from Pfizer and Other Large Customers Was Collapsing

156. Before and during the Class Period, ICON also experienced a trend of its largest customers, including Pfizer, significantly reducing their business with ICON.

157. According to FE-1, Pfizer was not awarding a lot of new business to ICON throughout 2023 and 2024. For context, ICON had enjoyed a 50% win rate for Pfizer's studies through approximately 2021, but saw a trend of a declining Pfizer win rate over the next several years.

158. Corroborating FE-1, FE-2—ICON's Director of Clinical Operations, Oncology/Director of Clinical Research from summer 2022 to February 2024—explained that throughout his tenure, ICON's oncology business with Pfizer decreased, and Pfizer had largely stopped giving ICON new late-phase awards (which involved the largest and most financially significant studies). In late 2023, Pfizer dropped various oncology studies with ICON, and ICON's margins on the remaining studies eroded; ICON was "overburning on the budgets and eating the costs" because its staff was incurring extensive overtime that was not being billed to Pfizer. FE-2's supervisor, Vice President, Global Project Management Martin Lachs—who reported to Cutler—described the situation as "like a dying dinosaur."

159. Further, in mid- to late 2023, Pfizer stopped awarding new full-service business to ICON as part of a "strategic refresh."

160. FE-1 explained that in the "strategic refresh," Pfizer asked ICON to bid on mock studies under several models, ranging from FSP to full-service to a combination of both. FE-1 worked on preparing the bids submitted to Pfizer, together with Michael Ohrwashel (Senior Director, Business Development), Karen Tormey (Executive Director, Business Development), and other ICON executives, including CCO McMillan. ICON provided the bids in 2023.

In response, Pfizer responded that ICON was not getting any full-service work. This was a negative development for ICON given the higher margins for full-service work and the lower margins on FSP work, coupled with the fact that Pfizer's full-service work had previously involved large, global Phase 3 studies of $20 to $30 million each.

161. Corroborating FE-1, FE-2 explained that in fall 2023, Pfizer had directed ICON and its other CRO providers (PPD, Parexel, and Syneos) to participate in a "mock bid defense" so Pfizer could decide how to allocate its CRO business. Cutler was intimately involved: he approved ICON's final budget forecasting and "pitch" presentation to Pfizer; FE-2 knows this from seeing the email where Cutler signed off.

162. Nonetheless, ICON's "pitch" to Pfizer was unsuccessful. Shortly before Christmas 2023, Pfizer communicated to ICON that it would award all of its Phase 1 business—and 85% of its Phase 2 and 3 business—to other CROs. (FE-2.) Cutler knew about Pfizer's decision at the time: when FE-2 learned about it from Gore and West, their messaging indicated that Cutler and other senior executives had already been informed.

163. FE-2 explained that these results effectively capped ICON's opportunities with Pfizer, as ICON was shut out of the vast majority of Pfizer's Phase 2 and 3 studies, which are the largest and most financially significant.[4]

164. These results were materially negative for ICON. They did ***not*** mean that ICON's Pfizer business increased or that Pfizer was awarding ICON 15% of its new Phase 2 and 3 studies. Instead, once Pfizer's "strategic refresh" was completed, ICON's win rate with Pfizer dropped

---

[4] For example, an article highlighted that "[c]linical studies are responsible for the major costs of vaccine development" and estimated development costs as $17-28 million for Phase 2 and about $200 million for Phase 3. Thomas J. Brouwers and Bernard AM Van der Zeijst, *Vaccine Production, Safety, and Efficacy*, ENCYCLOPEDIA OF VIROLOGY, published Mar. 1, 2021, *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC7917445/ (Figure 2).

near zero, as FE-1 confirmed. FE-1 was aware of the declining Pfizer business from participating in monthly business development calls dedicated to Pfizer, which included representatives from each of ICON's functional groups on the sales side, including Ohrwashel (for the full-service business), Tormey, and sometimes Mark Cooper (then head of ICON FSP). During these monthly calls, the participants reviewed detailed Salesforce reports (maintained by Ohrwashel) that included, among other things, Pfizer's backlog, awards, pipeline, all open RFPs, and ICON's chance of winning those RFPs. FE-1 explained that during these monthly meetings, no one offered positive projections for the Pfizer relationship. Instead, the most positive development concerning Pfizer was an IRT award of about $2.5 million that FE-1 achieved shortly before he left ICON in September 2024. While this award was "small dollars," FE-1 explained that it stood out given the lack of other new awards from Pfizer.

165. As another indication of ICON's declining business from Pfizer, FE-8—a Clinical Trial Manager in ICON's Pfizer Strategic Business Unit from March 2022 until September 2024—noted that ICON's dedicated PSBU was initially handling several large Phase 3 trials for Pfizer, with at least four or five Pfizer trials active. During FE-8's tenure (starting in March 2022), however, the PSBU continuously decreased in size. FE-8 applied for a new job outside ICON in June 2024 and began interviewing in early August 2024.

166. ICON's issues with large customers were not confined to Pfizer. By October 2023, several large pharma companies, including GSK and Sanofi, were shutting down their studies in the oncology area. (FE-2.) In fall 2023, Janssen stopped awarding any new studies to ICON due to performance issues—a situation that continued through at least February 2024. (FE-2.) FE-9 learned from his supervising SVP that large customers like Pfizer, Janssen, Eli Lilly, and Roche were reducing their business with ICON, including in the full-service area, from late 2023 and

onward. And FE-15 reported that in 2023 and 2024, both internal and external sales representatives indicated that sponsors were shopping around their business and not reupping with ICON as much as in previous years.

167. Overall, FE-4—a Senior Finance Manager employed at ICON from 2019 to November 2024 who worked on large pharma customers and saw billing and revenue information for ICON's top 5 to 10 customers—confirmed that ICON experienced a decrease in business from Pfizer and all other large clients—with only two exceptions—in early 2023 through 2024.

168. Further, Cutler approved requests from top 10 customers to reduce ICON's project budgets. FE-2 knows this from seeing emails where Cutler approved budget cuts, which also included Lachs, Gore, West, and Ohrwashel. For example, if an ICON budget included 40% of the budget for project management, Cutler would state something along the lines of "this is too much. They are not going to approve it. Take another $1 million out." The frequency of these emails increased towards the end of FE-2's tenure in February 2024. And in 2Q24, ICON's slowing business with large pharma drove Cutler to personally meet with the CEO of ICON's tenth-largest customer and accept unfavorable terms in an effort to "boost" ICON's book through new business at an even lower margin. (FE-4.)

169. FE-2 said Cutler was "aware in near real time" what the status of business was with Pfizer. As FE-2 put it, Cutler was "aware of everything as soon as we were." Thus, as FE-2 summarized, "[t]here is no way that Cutler or any member of leadership could say they didn't know what was happening or they didn't have access to it."

### 6. ICON's Business Wins, Book-to-Bill Ratio, and Backlog Were Materially Inflated and Cancellations Were Materially Understated

170. Defendants materially overstated ICON's gross and net business wins, book-to-bill ratio, and backlog, while concealing billions of dollars in cancellations for years.

171. Crucially, these metrics indicate whether ICON's business is shrinking or growing: since clinical trials have limited duration, ICON must replace trials that end with a stream of new business. Thus, ICON's business wins and book-to-bill ratio measure whether ICON was securing more or less new business than the work it had performed. ICON's backlog measures the total amount of awards not yet converted to revenue.

172. During the Class Period, ICON reported gross business wins and net business wins (after cancellations) for each quarter. ICON calculated its book-to-bill ratio as net business wins divided by revenue in the quarter using the formula below:

$$\textbf{Book} - \textbf{to} - \textbf{Bill Ratio} = \frac{\textbf{Net Business Wins}}{\textbf{Revenue}}$$

173. A book-to-bill ratio above 1.0 means that ICON's new business exceeded revenue, indicating growth. For example, a book-to-bill ratio of 1.2 means that ICON had secured 20% more new business than its revenue during the period.

174. By contrast, any book-to-bill ratio below 1.0 indicates a decline, since ICON had failed to secure enough new business to replace the work it had performed during the period. For example, a book-to-bill ratio of 0.8 means that ICON had secured 20% less new business than its revenue during the period.

175. During most of the Class Period, Defendants reported book-to-bill ratios well above 1.0, starting at 1.20 for the second quarter of 2023 and peaking at 1.27 in the first quarter of 2024. Analysts highlighted this metric. For example, on October 26, 2023, UBS stated that "ICON beat our bookings expectations for Q3 . . . with a quarterly net book-to-bill of 1.26x (vs. 1.22x UBSe)."

176. In reality, however, ICON's business wins, book-to-bill ratio, and backlog were significantly inflated for three reasons.

177. First, ICON included numerous "wins" entered into Salesforce that were highly unlikely to materialize, including "wins" without signed contracts. FE-1 confirmed, from personally accessing the Salesforce system, that there were numerous studies marked as "awarded" in Salesforce even though the contract was not signed. For example, FE-1 noticed that Salesforce was showing a larger amount of "awards" than FE-1 tracked in his own Excel file of awards. Further, FE-1's manager Cohen had concerns that some of the full-service sales representatives were marking contracts in Salesforce as "awarded" to improve their numbers—even before receiving the necessary assurances and/or documentation that the studies would materialize.

178. The "awards" without signed contracts were included in Salesforce dashboards, and FE-1 believed they were also included in ICON's public forecasts, revenues and earnings guidance, despite the absence of signed contracts.

179. Many of the "awarded" studies without signed contracts were later canceled. FE-1 knows this because he was the client account manager for the IRT component of ICON's full-service studies (covering more than half of ICON's full-service work for biotech customers), and thus had access to those full-service awards in the Salesforce system and tracked whether they materialized into work and revenue or whether they were canceled. FE-1 also received automatic email notifications from Salesforce when cancellations or other changes were made to these studies.

180. Corroborating FE-1, FE-9—the department head of one of ICON's clinical research divisions until late 2024—noted that ICON's Salesforce system shows whether a given "win" has a signed contract and recalled seeing many "wins" recorded in Salesforce, without signed contracts, during FE-9's tenure at ICON.

181. FE-9 explained that ICON's sales representatives are paid a percentage of the contract value for their "wins" as a commission. They are also given sales targets: (1) the dollar value of new contracts, and (2) the dollar value of change orders (called "upselling" at ICON). As a result of this compensation structure, the sales representatives are incentivized to record "wins," even without a signed contract. (FE-9.)

182. FE-9 learned from an ICON employee that ICON has publicly reported inflated book-to-bill ratios for at least three years based on ICON sales representatives entering "wins" into Salesforce that they knew were highly unlikely to materialize, and were later canceled. Without these "wins," ICON's actual book-to-bill ratios for 2023 and 2024 were 0.9 or lower. (FE-9.)

183. The gap between ICON's actual book-to-bill ratios of 0.9 or lower—and its reported ratios well above 1.0—is highly material. It translates into hundreds of millions of dollars and the difference between a declining business and growth. For example, for the second quarter of 2023, ICON reported net business wins of $2.419 billion and $2.020 billion in revenue, yielding a reported book-to-bill ratio of 1.20. At an actual book-to-bill ratio of 0.9, however, ICON's actual net business wins were only $1.818 billion. FE-9 noted that any book-to-bill ratio below 1 is a serious problem and means ICON's pipeline is below the level necessary to sustain the business in the medium term.

184. <u>Second</u>, ICON's gross and net business wins and book-to-bill ratio were further inflated because CEO Cutler personally directed ICON to book awards at larger dollar amounts than sponsors had approved. FE-7 knows this because he was copied on emails from Cutler, and sometimes was standing in Cutler's office, when Cutler gave these directions.

185. As FE-7 explained, sponsors often gave ICON awards with caveats about reducing the size or scope of a study before a contract was signed. For example, if ICON bid for a $100

million study with 500 patients, the sponsor might award the study with the caveat that the sponsor was only approving a $60 million study with 300 patients. At Cutler's direction, ICON would book the $100 million award reflected in its bid. (FE-7.) However, when booking the larger award amounts, ICON knew the award amounts would decrease because ICON had agreed to the reductions during the bid defense phase, or because the award itself referenced a reduction in costs. (FE-7.)

186. FE-7 explained that ICON engaged in this practice regularly, especially near the end of the quarter, when ICON would "creatively get there" to hit the numbers. FE-7 confirmed that ICON used this practice in the second and third quarters of 2023.

187. Within the subset of ICON's awards that FE-7 personally observed, this practice raised ICON's claimed award numbers by $20 to $30 million for the quarter. (FE-7.) Further, Cutler and McMillan were aware of the practice because of the large dollar amounts involved: Cutler's sign-off was required for opportunities of $30 million and above, while McMillan's sign-off was required for opportunities of $15-$20 million and above. (FE-7.)

188. Third, ICON admittedly kept nearly $3 billion in canceled awards in its backlog for at least two years, which understated cancellations, overstated net business wins, and inflated the book-to-bill ratio.

189. During the Class Period, ICON followed an internal policy of keeping awards in backlog and refusing to recognize cancellations until the customer served a written cancellation notice—even where the customer had already told ICON that no revenue was forthcoming. In May 2026, Balfe admitted that ICON "had a long-standing policy of only taking cancels out of backlog when there was a written notification of cancellation or termination[,] and there's all sorts of things that can fall through the cracks in that context." For example, Balfe explained that

ICON's prior policy did not capture instances where "we became aware that a study was not going ahead because the customer notified us." ICON further admitted that its prior policy was to only recognize cancellations when formal "agreements were finalized with customers," and that "[n]o cancellations [were] taken for studies placed on-hold or undefined delay."

190. Former employees confirmed that ICON's policy allowed stale "awards"—without any revenue or other activity—to linger in backlog for years. (FE-21.) For example, in approximately August 2024, FE-21—a Financial Analyst at ICON from before the Class Period until September 2024—analyzed ICON's medical device awards by filtering them by date in Salesforce. FE-21 identified about $10 million in awards that were years old, with no recent activity, yet remained in ICON's backlog at the award value. These stale awards were about double the amount of the backlog that was active, which was only about $5 million. FE-21 also understood that the stale awards in backlog extended beyond the medical device area. FE-21 noted that ICON did not have a formal process on removing stale awards from backlog, so they just sat there. FE-21 further confirmed that ICON's policy of keeping such awards in backlog originated from Cutler and recalled that multiple levels above him discussed the presence of stale awards in backlog, including Senior Director, Finance Nicholas Bateman. FE-21 noted that reporting on ICON's backlog was available from Salesforce, which indicated each award's date and the number of days it had been outstanding.

191. ICON's policy of keeping stale awards in backlog understated cancellations and overstated net business wins by at least $325 million per quarter. When ICON changed the policy in May 2026 and slashed its backlog by $3.9 billion (from $25 billion to $21.1 billion) as of October 1, 2025, Balfe acknowledged that "more than 75%" of the $3.9 billion "was 2023 or

older"—meaning that over $2.9 billion of stale "awards" from 2023 or earlier had sat in ICON's backlog for at least two years.

192. By failing to remove the $2.9 billion in stale awards as they accrued, ICON failed to timely recognize the cancellation of at least $325 million in awards each quarter from 2Q23 through 2Q25. This materially overstated ICON's net business wins and book-to-bill ratio:

| | 2Q23 | 3Q23 | 4Q23 | 1Q24 | 2Q24 | 3Q24 | 4Q24 | 1Q25 | 2Q25 |
|---|---|---|---|---|---|---|---|---|---|
| **Reported Net Business Wins (in billions)** | $2.419 | $2.581 | $2.531 | $2.654 | $2.579 | $2.328 | $2.413 | $2.022 | $2.057 |
| **Actual Net Business Wins (in billions)** | **$2.09** | **$2.26** | **$2.21** | **$2.33** | **$2.25** | **$2.00** | **$2.09** | **$1.70** | **$1.73** |
| **Reported Book to Bill** | 1.20 | 1.26 | 1.22 | 1.27 | 1.22 | 1.15 | 1.18 | 1.01 | 1.02 |
| **Actual Book to Bill** | **1.04** | **1.10** | **1.07** | **1.11** | **1.06** | **0.99** | **1.02** | **0.84** | **0.85** |

### H. With ICON's Share Price Artificially Inflated, Cutler and Brennan Begin Their Insider Sales

193. Just two business days after the start of the Class Period, CEO Cutler began to unload his stock with a series of lucrative insider sales. First, Cutler sold 5,202 shares on July 31, 2023, followed by 13,500 shares on September 14, 2023, and 2,500 more shares on September 15, 2023. These sales of over 21,000 shares reaped over $4.2 million in net profits in just seven weeks.

194. ICON's purported success also lifted its credit rating. On October 12, 2023, ICON issued a press release touting that S&P had upgraded ICON to investment-grade (BBB-), stating that S&P highlighted ICON's "solid operating performance and voluntary debt prepayments," the "expansion of scope with existing clients, and profitability" after the PRA Merger.

### I. When Pfizer Spending Cuts Threaten ICON's Purported Turnaround, Defendants Double Down, While Continuing to Tout Increased RFPs

195. On October 13, 2023, Pfizer announced an "enterprise-wide cost realignment program," including spending cuts of at least $3.5 billion. During Pfizer's October 16, 2023 conference call, Pfizer CFO David Denton explained that Pfizer's cost-cutting program was

"comprehensive" and would "touch all parts of the business in all regions," "across both R&D and [Selling, Informational, and Administrative]" expenses.

196. Given Pfizer's centrality to ICON's business, Defendants knew Pfizer's spending cuts posed an existential threat. Indeed, Pfizer had already significantly cut its business with ICON, and ICON's PSBU was decreasing in size. But disclosing that reality would immediately sink ICON's share price and end Cutler's and Brennan's ability to profit from insider sales.

197. Thus, when analysts probed whether ICON's relationship with Pfizer was experiencing any issues, Defendants consistently deflected and denied.

198. On October 26, 2023, ICON held its earnings call for the third quarter of 2023. During the call, an analyst pointedly asked about "Pfizer's recently announced cost cuts" and questioned whether this was "baked into [ICON's] outlook? Or were they unexpected?"

199. In response, Cutler assured investors that the cuts were "***relatively expected***," claiming that "[w]e're in close contact with our partner customers on a regular basis, and . . . [w]e're working closely with them in terms of what they're looking to do." Cutler further declared that "***nothing has been decided at this point.***"

200. Cutler was quick to spin the Pfizer initiative as a positive for ICON, stating that "***[there is] some opportunity for us and that they were happy to further consolidate their spending***," and that "these things aren't always a negative for us, but we work closely with our partners to look at it, and ***we have that in the forecast***."

201. These statements were false and misleading. As detailed above, the amount of new business Pfizer was awarding ICON had dropped significantly, and ICON's dedicated PSBU had been shrinking for over a year. (FE-1; FE-8.)

202. During ICON's 3Q23 earnings call, Cutler also touted ICON's purportedly

increasing RFP numbers, stating that "[o]verall, RFP activity continued to improve in quarter [three] with ***growth in the high single digits*** on a trailing 12-month basis." Cutler added that ICON's claimed RFP growth covered "***all the segments across biotech, large pharma*** . . . . So I talked about ***high single digits as being sort of across the landscape***, and it's fairly consistently across those segments."

203. Again, these statements were false and misleading. ICON's RFPs from biotech customers had consistently declined in every quarter during 2023, and Cutler himself received quarterly emails stating that RFPs were declining across the board. Further, ICON's claimed RFP flow was significantly inflated, with up to 40% of RFPs merely for price discovery.

204. Cutler further downplayed "challenges out there in the macroeconomic environment," asserting that "***there's nothing that we've seen, certainly from an RFP point of view or from an awards point of view that would change***" the current "constructive solid positive environment." In reality, ICON had experienced a trend of losing awards from its largest customer, Pfizer, and ICON's RFP flow had been declining for at least three consecutive quarters.

205. Further, Defendants touted ICON's purported business wins and book-to-bill ratio—both of which were significantly inflated, as detailed above. Cutler cited a "good book-to-bill of 1.26x revenue in the quarter," and Brennan stated: "In quarter 3, ICON achieved gross business wins of $3.06 billion and recorded $474 million worth of cancellations. This resulted in an impressive level of net awards in the quarter of $2.58 billion, and net book-to-bill of 1.26x."

206. Analysts credited Defendants' misstatements. Barclays wrote on October 26, 2023 that "RFP activity continued to grow in HSD [high single digits] in 3Q following HSD growth in 2Q. ***RFP growth was broad based across biotech and pharma customers***." Similarly, on October 26, 2023, Evercore ISI wrote that Defendants' commentary "should be helpful in quelling some

worries about the overall demand environment" and accepted their assurances as to "Pharma R&D cuts," specifically citing Defendants' representations that they "***[h]ave Pfizer in the #s***."

207. On November 14, 2023, Brennan participated in the Jefferies London Healthcare Conference. In response to an analyst question about "the RFP flow acceleration that both you and Steve Cutler have talked about kind of seemingly starting in 2Q and extending to now," Brennan stated: "***We've seen definitely an uptick. . . . what we saw really in around -- it was probably around June, July time, was a significant kind of uptick from our biotech customers***. And that certainly has persisted into the good volumes that we saw and we talked about in the Q3 call and persists as we go into Q4 as well."

208. Brennan's claim of an "uptick" in biotech RFPs was false and directly contrary to the facts known to him at the time. ICON's biotech RFP volume had consistently declined in every quarter during 2023. Brennan knew the truth because he personally attended quarterly meetings in 2023 where ICON's decreasing biotech RFPs were presented. (FE-1.)

209. The Individual Defendants quickly seized the opportunity to profit from their fraud. On November 16, 2023, just two days after lying about ICON's biotech customer RFPs at the Jefferies conference, Brennan made his first—and largest—insider sale during the Class Period, selling 30,206 shares for net profits of $5.2 million. On November 21, 2023, Cutler followed suit, selling 18,517 shares for net profits of $5 million.

### J. Multiple Negative Developments Further Threaten ICON's Business

210. Several key negative developments occurred in late 2023 and early 2024.

211. First, before Christmas 2023, Pfizer completed the "refresh" described above and shut ICON out of at least 85% of its most lucrative Phase 2 and 3 studies, as well as all full-service work. These actions slowed the pipeline of new Pfizer work to a trickle (at most).

212. Second, in late 2023 and early 2024, Pfizer, BMS, and a third large customer all switched their ICON work from FSO to FSP for both new studies and existing awards. (FE-2.) BMS shifted to FSP in part due to a "crisis" in fall 2023 when an ICON CRA fraudulently claimed to have performed monitoring that she did not perform. (FE-2.) Corroborating FE-2, FE-3 confirmed the issue with ICON's fraudulent monitoring for BMS and noted that BMS had not awarded ICON any new business during FE-3's entire tenure at ICON (January 2023 through November 2024).

213. By January 2024, Pfizer advised ICON that it was moving to FSP to reduce costs. Cutler was aware of Pfizer's switch to FSP because he reviewed and approved ICON's internal email announcing the change. (FE-2.) Indeed, Cutler headed a special Pfizer "liaison team" at ICON, which also included senior executives Gore and West. FE-2 explained that Gore and West managed ICON's transition from FSO to FSP and prepared multiple presentations describing the organization, treatment of benefits, and other issues.

214. Based on email updates and regular meetings with Gore, FE-2 learned that Cutler was meeting with Pfizer regularly to work out the details of the transition to FSP. FE-2 explained that Cutler and his management team had to "work out what the finances were going to be" and "approve what the structure was going to look like." Pfizer's transition to FSP was scheduled to occur in three "waves," each affecting a group of studies, from February to March 2024 (with the third "wave" later extended to April 2024). (FE-2.) By February 2024, in advance of Wave 1, Gore conducted internal training sessions with slide decks to explain the FSP rollout. (FE-2.)

215. For ICON, the financial implications of three large customers' simultaneous shift to FSP were extreme and amounted to losing hundreds of millions of dollars each year. FE-2

explained that Pfizer, BMS, and the third customer switched from nearly 100% FSO to nearly 100% FSP. This was a huge loss for ICON, since FSP was significantly cheaper for customers and its profit margins were only around 15%, compared to 40–50% margins for FSO. (FE-2, FE-9.) ICON's SEC filings indicate that the three customers accounted for 18% (or more) of ICON's revenues.[5] As a result, the 25–35% lower margin on FSP work ***slashed up to $500 million (or 21%) from ICON's profits***—even before considering these customers' overall reduction in revenue. Defendants have also admitted (as reflected in an October 25, 2024 Truist report) that ICON's "top 2" customers, which were "15%" of revenues, had a "mid-teens" revenue decline for 2024, translating into a revenue cut of over $180 million from just two of the three large customers.

216. Corroborating FE-2, in late 2023, FE-9's supervising SVP explained that "FSP was keeping us afloat." To FE-9, that was a major concern, since ICON's margins on the FSP business were significantly lower than those of the full-service segment. And as FE-2 emphasized, the combination of losing Pfizer's Phase 2 and 3 studies and simultaneously losing "a huge chunk of margin" because of Pfizer's switch to the FSP model was a "huge blow to ICON."

217. Third, in January 2024, CEO Cutler—desperate to keep Pfizer's remaining business—personally approved a $50 million budget cut that Pfizer had demanded in September 2023. FE-2 saw emails where Cutler approved the cuts, as well as an electronic notification from ICON's computer system that Cutler had given final approval to the cuts. FE-2 emphasized that Cutler was extensively involved in approving final budgets related to Pfizer and was "always undercutting margin" in an effort to obtain more business from Pfizer.

[5] ICON claimed that in 2023, its largest customer comprised about 8.9% of revenue, while the next four largest customers (2-5) each averaged 4.5% of revenue.

218. Fourth, ICON's biotech business continued to dramatically underperform. In the fourth quarter of 2023, ICON's senior management internally transferred $350 million in revenue to biotech from another business unit within ICON to prop biotech up and make it appear to be doing better than it actually was. (FE-9.) FE-9's supervising SVP explained that ICON's biotech business was "doing miserably" and "dying."

219. Indeed, the $350 million transferred to biotech is ***over 13%*** of ICON's purported biotech revenues—and over 4.3% of ICON's purported overall revenue—for 2023. The $350 million false allocation to biotech also confirms ICON's deficient internal controls.

220. Finally, with ICON's large pharma and biotech businesses both failing, ICON's finance operations in Ireland went into overdrive, initiating a "mad scramble" around Christmas 2023 as employees tried to find cash before year-end. As part of this scheme, ICON created fake invoices for future work that ICON had not performed to get "invoices on the books." While this practice violated GAAP, as detailed further below (at Section IV.T), these desperate measures temporarily succeeded in concealing ICON's actual decline from investors.

### K. In February 2024, ICON Reports Strong Earnings and Affirms Guidance

221. As 2024 began, Defendants' public mantra remained unchanged—demand was strong, ICON was receiving more RFPs, and ICON had already accounted for any potential impact from Pfizer's cost-cutting initiative.

222. On January 9, 2024, ICON issued a press release announcing positive earnings guidance for 2024, stating that ICON expected revenue "in the range of $8,400 - $8,800 million, representing growth of 3.2% – 8.1%, and adjusted earnings per share is expected to be in the range of $14.50 - $15.30, representing growth of 13.5% – 19.8%, over Full Year 2023 revenue and adjusted earnings per share guidance midpoints, respectively."

223. On February 21, 2024, ICON announced the Company's FY23 and 4Q23 results and re-affirmed its 2024 guidance. Cutler praised these "strong financial results despite challenging macroeconomic conditions" and cited "the positive demand environment as we enter this year."

224. On February 22, 2024, ICON held an earnings call to discuss the FY23 and 4Q23 results. During the call, Cutler continued to tout increasing RFPs: "In totality, across all segments, ***our overall trailing 12-month RFP activity increased in the high single digits in quarter 4***, consistent with quarter 3[,] and this appears to be ***continuing or even accelerating*** early in 2024." Cutler further claimed that ICON had seen an "***early '24 mid-teens increase in RFP[s] on a trailing 12-month basis***." In other words, Cutler claimed that the growth in RFPs was accelerating from "high single digits" to "mid-teens."

225. In response to an analyst question about whether ICON's recent trends could create "upside to your expectations for the year," Cutler reiterated that "we're seeing sort of ***mid-teens growth on the RFP opportunity***." In the same response, Cutler claimed that ICON was "seeing a ***modest uptick around mid-single digits in the biotech space*** as well," noting that "biotech stabilizing and improving . . . seems to be playing out in the first . . . very early part of this year."

226. Contrary to these statements, ICON's biotech customer RFPs ***decreased***—never increased—through fall 2024, ICON's overall RFPs decreased throughout 2023, and ICON's claimed RFP flow was significantly inflated.

227. During the call, an analyst asked about the pricing and demand environment for customers in ICON's large pharmaceutical segment and whether ICON was "seeing fewer projects across large pharma."

228. By this point, Pfizer and other large ICON customers had already made significant cuts—including Pfizer's decisions during 2023 to stop awarding ICON full-service business and to exclude ICON from at least 85% of its Phase 2 and 3 studies. (FE-1; FE-2.) Further, Cutler had personally approved a $50 million budget cut for ICON's portfolio of Pfizer studies, and was approving similar requests from other large customers with increasing frequency. (FE-2.) To make matters worse, three large customers' shift to nearly 100% FSP had depressed ICON's margins and slashed its profit by hundreds of millions of dollars.

229. Instead of disclosing these material, negative facts, Cutler assured that ICON was "***[c]ertainly seeing more opportunities in large pharma. No question about that***."

230. Further, when an Evercore analyst probed the "trajectory" of ICON's "strategic partnerships with large pharma," Cutler asserted: "***I'm not hearing again at this stage any further concerns on funding or on their R&D spend.***" The truth was the opposite. Pfizer and other large customers had already sharply reduced their business with ICON, and Cutler had personally approved large budget cuts—including $50 million for Pfizer alone.

231. During the call, Cutler even claimed that ICON's large customers were "becoming more open" to "outsourcing even more": "If anything, based on the RFP[s] of opportunities we've got over the last couple of months and even last quarter, . . . we're seeing more opportunities. So I guess I keep saying it, but as their budgets become perhaps a little bit more constrained or they watch where they're spending their dollars, they do appear to [be] becoming ***more open to outsourcing and outsourcing even more than they're doing at the moment***." Again, Pfizer and other large customers were doing the opposite.

232. To the extent Defendants acknowledged any customer shift to FSP, they consistently—and falsely—downplayed its significance. For example, during the February 22,

2024 call, Cutler falsely claimed that any shift would be "very gradual"—and, crucially, Brennan assured that "***certainly***" the "midpoint" of ICON's guidance ***already reflected*** "***the mix shift, if you like, to the extent we see that*** during the course of the current year." Brennan further tried to deflect by claiming that "***I'm not even sure we'll see a material shift in terms of the percentage year-over-year from '23 to '24 in terms of the FSP, non-FSP business***."

233. At the time of these statements, Defendants knew that Pfizer, BMS, and a third large customer—which comprised about 18% of ICON's overall business—were shifting to nearly 100% FSP within weeks.

234. Defendants also continued to tout ICON's purported business wins and book-to-bill ratio. During the call, Defendant Brennan stated: "In quarter 4, ICON achieved gross business wins of $2.99 billion and recorded $461 million worth of cancellations. This resulted in a solid level of net awards in the quarter of $2.53 billion, and net book-to-bill of 1.22x."

235. On February 26, 2024, just days after the earnings call, Defendant Brennan sold 7,021 shares at $316.33 per share, reaping $2.2 million in net profits.

### L. In February 2024, Cutler Internally Admits That ICON Is No Longer a Pfizer Preferred Partner

236. Despite Defendants' highly positive public statements in early 2024, within ICON, Cutler admitted that the Pfizer relationship was collapsing.

237. Specifically, during a Company-wide quarterly town hall in February 2024, Cutler announced (in a pre-recorded video) that ICON had lost its contract with Pfizer as a result of softening in the COVID vaccine space. As FE-3 recalled, Cutler indicated ICON had lost the "Pfizer opportunity" and was no longer a preferred partner of Pfizer.

238. Notably, when ICON became a Pfizer preferred partner in 2011, ICON publicly touted that its "strategic partnership with Pfizer" would "see [ICON] serve as one of two preferred providers of clinical trial implementation services."[6]

239. When ICON lost the Pfizer preferred partnership, however, Defendants issued no press release. Instead, they concealed the truth and repeatedly misled investors.

240. During the same February 2024 town hall, Cutler also stated that ICON had missed its revenue and new business award targets and presented a slide deck that showed ICON had missed its targets. (FE-3.)

241. Cutler's internal disclosure of this negative news prompted FE-3 to discuss the impact of losing the Pfizer preferred partnership in meetings with his supervisor, Vice President Mary Frances Sassaman, and Sassaman's boss, Brandon Early (VP of Project Delivery until December 2023, then SVP, Global Project Delivery—ICON Biotech through November 2024), as well as instant messages with colleagues.

### M. In March and April 2024, Defendants Continue to Misrepresent ICON's Business Growth

242. On March 5, 2024, Brennan spoke at an industry conference hosted by TD Cowen. The TD Cowen analyst asked Brennan about the funding environment in biotech and how ICON's relationships with large pharma clients had evolved following the PRA Merger.

243. In response, Brennan lauded the PRA Merger, claiming that ICON had "good customer retention" and that ICON's large pharma business was increasing: "in the large and midsized pharmas, it's worked well over the last couple of years. We've seen good traction. We've seen the evolution of existing relationships and development of new relationships in that space."

[6] https://investor.iconplc.com/news-releases/news-release-details/icon-selected-pfizer-global-strategic-partner-clinical-research

244. Further, when the analyst cited potential issues with "cost-cutting and concerns with the large customers," Brennan misleadingly deflected any issues, claiming that "***the thinking around what the model should look like has been done.*** Even some of the new selections of partners has been done. And I think what I'd like to see now is more of a traction. ***They are all saying that they're going to increase spending***, even some of the -- I think, some of the companies that have been more troubled over the last period have even said in their own press releases over the last while that Q4 was probably at a later point and they want to continue to increase R&D spend as they go forward."

245. What Brennan did ***not*** say was that ICON's key relationship with Pfizer—its largest customer—had continued to decline. Indeed, Pfizer's "thinking around what the model should look like" meant drastically reduced business for ICON, as detailed above, and two other large customers had also shifted nearly 100% of their business to FSP, slashing ICON's profit margins. And a month earlier, Cutler had internally admitted that ICON had lost the "Pfizer opportunity" and was no longer a preferred partner of Pfizer.

246. Further, ICON had started "dissolving" the dedicated PSBU because Pfizer was moving the work in-house. (FE-8.) That led FE-8's supervisor to encourage FE-8 to apply to Pfizer in-house positions in February or March 2024. And by March 2024, ICON had made significant layoffs, including from the PSBU. FE-8 indicated that Cutler and Brennan were aware that ICON was dissolving the PSBU, since they participated in periodic Zoom town halls where they answered questions from ICON employees submitted by Zoom chat. (FE-8.) FE-8 explained that by early 2024, these questions expressed concern about bonuses and why ICON was laying off employees. FE-8 confirmed that there wasn't much work within the PSBU in the first half of 2024 and emphasized, "everyone was applying for jobs outside of the PSBU."

247. On March 6, 2024, the day after the TD Cowen conference, Cutler executed a large insider sale, unloading 15,442 shares at $335.98 per share—ICON's highest share price to date—to reap $5.2 million in net profits. This was Cutler's final insider sale during the Class Period. In total, Cutler sold 22.7% of his shares and vested options during the Class Period and secured $15.8 million in proceeds and $14.5 million in net profits.

248. On March 12, 2024, Defendant Cutler participated in the Barclays Global Healthcare Conference, where he asserted that "the demand environment for us is strong." Cutler further asserted that ICON was "seeing overall a very constructive environment, fueled for us mainly by large pharma." Cutler claimed that "***[w]e've certainly seen some significant upticks in opportunity in large pharma over the last 3 to 6 months***"—while knowing that ICON's business from three large customers, including Pfizer, had sharply declined, and after admitting internally that ICON had lost the "Pfizer opportunity" and was no longer a preferred partner of Pfizer.

249. In addition, Cutler asserted that "[t]he biotech front has also been positive. We see RFPs in the mid-single digits, up a trailing 12-month basis." In truth, ICON's biotech customer RFPs had continued to decline.

250. On April 3, 2024, ICON issued a press release announcing that Brennan would be stepping down as the Company's CFO for "a new opportunity outside of the CRO industry." However, ICON allayed any concerns about a CFO transition by reaffirming its previously announced full-year 2024 guidance in the same press release. Analysts accepted ICON's assurances. On April 3, 2024, an Evercore ISI report expressed "surprise timingwise" at the announcement, but noted that Brennan's departure was occurring "at as calm a time as any for a transition." On April 4, 2024, a Truist report noted Brennan's departure but highlighted ICON's statement that "this transition will not impact its approach to guidance in any manner, especially

as . . . the first 2 quarters are important in terms of impact to full year revenue." Truist added that "Brennan reiterated the company's tone and comments from earlier in the year around the stronger start to the year and biotech being in a more favorable position."

251. On April 25, 2024, ICON held a conference call to discuss its financial results for the first quarter of 2024. In his prepared remarks, Defendant Cutler claimed that "underlying demand drivers are incrementally more positive . . . . Proposal volumes are at healthy levels with ***overall RFP volume increasing low-double digits on a trailing 12-month basis***." In response to analyst questions, Cutler stated that ICON saw an increase in biotech RFPs that was "probably ***more in the mid-singles***."

252. However, Cutler made no mention of the fact that ICON's biotech customer RFPs had continued to decrease, not increase.

253. Cutler and Brennan also fielded a specific analyst question about how much large pharma R&D "is already locked in," especially in light of recent news about Bristol Myers Squibb's layoffs of 2,200 employees, and "upside/downside risk for the rest of the year."

254. In response, Cutler declared that ICON had seen "***very stable and very strong demand*** in the large pharma" over the last 12 to 18 months and that "***[n]othing has changed***": "we've seen pretty strong demand in the large pharma space. And it's not just this quarter. ***It's been really over the last 12, 18 months***. ***Nothing has changed in that for now***. . . . Overall we see a very stable and very strong demand in the large pharma."

255. That was simply false. Cutler had internally admitted that ICON had lost the "Pfizer opportunity" and was no longer a preferred partner of Pfizer. And Cutler had known for months that (i) Pfizer and other large customers had made significant cuts and shifted nearly 100% to FSP, slashing ICON's profit by hundreds of millions of dollars; (ii) Pfizer had stopped awarding

ICON any new full-service business and at least 85% of its Phase 2 and 3 studies; (iii) Cutler had given Pfizer a $50 million budget cut on the remaining work; and (iv) ICON was "dissolving" the dedicated PSBU and laying off employees. And notably, while ICON had previously reported the percentage of revenue from its largest customer on a quarterly basis, ICON ***stopped disclosing*** that figure in 1Q24—as ICON was shutting down the PSBU and laying off employees.

256. During ICON's April 25, 2024 earnings call, Cutler further claimed that ICON's "***win rate in that biotech space has gone up over the last quarter or so***." This statement was highly significant to investors because it indicated that ICON was securing a higher percentage of "wins" in a key growth area. A UBS analyst followed up, asking Cutler: "Steven, I was hoping maybe you could elaborate a bit further on your improved win rate in biotech." Cutler responded, "Dan, I could give you a million reasons why we've improved that. It's a multifactorial thing," and reiterated that ICON had "a ***nice uptick on the win rate***."

257. These statements were outright false. In reality, Cutler knew ICON's biotech win rate had ***decreased*** because he had personally complained about it at a Company-wide town hall in February 2024. Specifically, during the Company-wide town hall in February 2024, Cutler spoke about ICON's lower biotech win rate, indicating that the biotech RFPs that ICON received were not converting to wins at the same rate as in the past. (FE-3.)

258. In addition, FE-3 attended a separate town hall for ICON's biotech division in the first quarter of 2024 where Smyth similarly announced that the biotech RFPs that ICON received were not converting to wins at the same rate as in the past. As FE-3 stated, it was clear that ICON's win rate had declined and not improved: Smyth explained that the fourth quarter of 2023 had been "difficult" and that instead of winning 1 of 3 RFPs, ICON was now only winning 1 of 5 or 6 RFPs.

During the town hall, Smyth attributed the lower conversion rate to sponsors going to more vendors than in the past and price shopping across six or more CROs (compared to three in the past).

259. Nonetheless, analysts accepted Cutler's lies: on April 25, 2024, UBS wrote that "***ICON flagged an increasing win rate in biotech*** driven by commercial/marketing rebranding efforts in its biotech segment" and raised its price target on ICON to $380 (from $368).

**N. Defendants Exploit ICON's Inflated Share Price to Offer New Securities and Refinance Its Costly Debt from the PRA Merger**

260. With ICON's share price north of $300, Defendants capitalized on ICON's apparent success to offer $2 billion in bonds to repay a portion of its $3 billion term loan from the PRA Merger. The registration statement was signed by Defendants Cutler, Brennan, and Sheehan (among others) and incorporated ICON's inflated financial results for 2023 and 1Q24. ICON's bond offering closed on May 8, 2024.

261. Two days later, on May 10, 2024, CFO Brennan sold 7,930 shares of stock at $316.43 per share, pocketing $2.5 million in net profits.

**O. Defendants Make Further Misstatements at ICON's May 2024 Investor Day**

262. Next, ICON held an Investor Day on May 30, 2024. In prepared remarks, Defendant Balfe stressed ICON's growth in the "large pharma space." Balfe declared that "[t]he rate at which we've managed to add new alliances in the space and to expand the alliances we already have into new business areas has increased," claiming that "[o]ne of the founding pillars of the deal rationale for the merger between ICON and PRA was that we would advance our position in this sector, and I'm pleased to say that is borne out by the data."

263. Balfe further asserted: "We have seen in the last 18 months, in my 25 years, the most sustained and intense period of realignment or ***refreshing of large pharma preferred***

***partnerships***. And it's particularly encouraging that ***ICON has come out of that period with all of the alliances we had before, many of them expanded.***"

264. Balfe concealed the truth that the "refreshing of large pharma preferred partnerships" was highly negative for ICON. ICON's largest customer, Pfizer, had sharply reduced its business starting in 2023, leading ICON to shut down the PSBU and lay off employees (whose employment was project-specific), and forcing Cutler to admit internally that ICON had lost the "Pfizer opportunity" and was no longer a preferred partner of Pfizer. Further, Pfizer and other large customers' shift to nearly 100% low-margin FSP work stripped ICON of hundreds of millions of dollars in profits.

265. Balfe knew the truth. His role focused specifically on ICON's large pharma customers. He was intimately involved with the Pfizer relationship and attended two-and-a-half-day QBR meetings where he saw PowerPoint presentations with detailed operational metrics for ICON's key accounts, including Pfizer (FE-11), as detailed below. (*Infra* Section VIII.B.11.)

266. As ICON's business continued to slow, the Company executed two more rounds of layoffs—with no public announcement—in May and June 2024.

**P. In July 2024, ICON Reports Inflated Earnings**

267. On July 24, 2024, ICON reported financial results for the second quarter of 2024 in a press release filed on Form 6-K with the SEC. These financial results were materially inflated, as ICON later admitted. For example, while ICON originally claimed to have generated $450.4 million in adjusted EBITDA in 2Q24, ICON has admitted that the actual figure was only $377.5 million. Thus, 2Q24 adjusted EBITDA was overstated by $72.9 million, or 19.3%.

268. On July 25, 2024, ICON held a conference call with analysts to discuss the 2Q24 results. In prepared remarks, Cutler claimed that the biotech market was "continuing to stabilize," with "a ***modest uptick in RFPs on a trailing 12-month and sequential basis*** within this segment."

That was false; ICON's biotech customer RFPs had declined for over a year and continued to do so.

269. Aware that Defendants' misstatements and ICON's inflated financial results could not be sustained indefinitely, CFO Brennan rushed to execute his final insider sale. On July 29, 2024—just two business days after the 2Q24 earnings call—Brennan unloaded 26,064 shares at $325.99 per share to generate net profits of $5.2 million. In total, Brennan sold 98.6% of his shares and vested options during the Class Period and raked in $21.3 million in proceeds and $15.1 million in net profits.

### Q. By Mid-2024, a Large Pfizer Vaccine Trial Fails, Further Crippling ICON's Pfizer Business

270. On top of Pfizer's sharp reduction in new business awarded to ICON, by mid-2024, one of ICON's largest remaining projects for Pfizer—a large Phase 3 COVID-flu vaccine study—failed its trial. This failure was disastrous because the trial, if completed, stood to generate significant money for ICON—at least $60 million.

271. FE-8, who joined ICON as a Clinical Trial Manager in the PSBU in March 2022, was hired into the PSBU to work on COVID trials and specifically worked on Pfizer's RSV and COVID/flu "combo" vaccine studies. FE-8 explained that the COVID/flu "combo" vaccine study was a large Phase 3 trial that involved about 8,800 participants. Corroborating FE-8, the U.S. government's database of clinical studies, clinicaltrials.gov, identifies Pfizer's Phase 3 trial of a COVID-flu vaccine candidate called PF-07926307 involving 8,798 people.[7]

272. According to FE-8, over 50 ICON personnel within the PSBU worked on the Pfizer COVID-flu vaccine trial, which had an estimated contract value of at least $60 million. He

[7] https://clinicaltrials.gov/study/NCT06178991?a=1&b=5

supervised 15 trial sites that collectively enrolled about 1,000 patients.

273. However, the Pfizer trial quickly failed to meet one of its primary objectives: showing that PF-07926307 was at least as effective against influenza B as existing influenza vaccines. In vaccine development, the failure to meet a primary objective is a highly material negative development that calls the potential vaccine's viability into question. Indeed, since Pfizer's proposed COVID-flu vaccine was ***less effective*** against flu than a flu-only vaccine, it had no regulatory or commercial viability.

274. FE-8 reported that by early August 2024, he and ICON learned that the Pfizer COVID-flu vaccine had failed its Phase 3 trial. FE-8 recalls learning of the trial failure by early August 2024 because he had begun interviewing for a new job at the time.

275. Defendants knew about the Pfizer trial failure by early August 2024 at the latest. Indeed, on August 16, 2024, Pfizer itself publicly disclosed that "[t]he trial did not meet one of its primary immunogenicity objectives of non-inferiority against the influenza B strain"[8] —although ICON's involvement in the failed trial was not publicly disclosed.

276. The Pfizer COVID-flu vaccine trial's failure was a large financial setback. FE-8 noted that under its contract with Pfizer, ICON would lose a significant amount of money from the vaccine trial's failure. Further, once a trial fails, enrollment stops immediately and Pfizer's staffing needs decrease. FE-8 explained that there was "nowhere for me to go" in terms of another study with Pfizer. He saw that there were no Pfizer jobs posted on ICON's job board and no more active studies with Pfizer, confirming the dry spell with Pfizer in the first half of 2024.

---

[8] https://www.pfizer.com/news/press-release/press-release-detail/pfizer-and-biontech-provide-update-mrna-based-combination

### R. In Late August 2024, ICON's Deteriorating Biotech Performance Triggers a $100 Million "Revenue Sweep"

277. FE-3 explained that Smyth demanded quarterly "revenue sweeps" when ICON's actual performance in the biotech segment was not meeting its targets. Such sweeps had occurred twice in 2023 and initially involved shortfalls of about $10 million.

278. However, in the first three quarters of 2024, the sweeps continued every quarter, with increasingly large shortfalls—culminating with a "gap" of $100 million in the third quarter of 2024. (FE-3.) Specifically, the $100 million "revenue sweep" was initiated in late August 2024 on a Thursday night and demanded responses by Monday morning Irish time.

279. FE-3 noted that the request was "ridiculous" given the short time remaining in the third quarter and the large dollar amount. The "gap" of $100 million compared to total quarterly revenues of approximately $750 million for ICON's biotech segment. (FE-3.) FE-3 added that the turnaround time underscored that the revenue sweep was "completely fake," since it was not possible to collect real data in such a short amount of time.

280. The "revenue sweep" began with an email announcing the "sweep," which was sent by Smyth or one of his SVPs and signed by Smyth (who was always copied), to all of ICON's Project Delivery personnel, from SVPs down to junior levels. (FE-3.) The emails linked to or attached a spreadsheet identifying the studies where additional revenue could be recognized (*e.g.*, by pulling billable work forward or adding work from ICON's out-of-scope logs). (FE-3.)

281. Next, the recipients (including FE-3) responded with their updates to the spreadsheet identifying additional revenue. FE-3 noted that the spreadsheet covered ICON's biotech segment, and FE-3 saw the updates that others were sending.

282. Although the revenue sweep instructions formally came from Smyth, ICON employees widely understood that the sweeps were directed by CEO Cutler given his extensive

involvement in the details of ICON's operations; Smyth reported directly to Cutler. (FE-3.)

### S. In September 2024, Defendants Affirm Guidance and Falsely Claim There Had Been "No Material Change" in ICON's Business

283. With the Pfizer relationship collapsing, the large COVID-flu vaccine trial's failure, and ICON's ongoing slowdown in biotech, by September 2024, ICON's outlook was bleak.

284. Nonetheless, Defendants seized another opportunity to mislead investors. On September 10, 2024, Cutler participated in the Baird Healthcare Conference. In prepared remarks, Cutler assured investors that ICON was "reiterating guidance" for 2024. Cutler further claimed that in the "biotech space," "***the percentage of RFPs that are coming through, the dollar amounts that are coming through remain strong, remain good***." Again, this was false: ICON's biotech customer RFPs had continuously declined since 2022.

285. Cutler further asserted that there were "***[n]o material changes***" "***to the environment or to our business*** apart from, as I said, some of the biotech slowdown and some of the biotech decision making, which is having potentially some impact in the very short term."

286. In response to an analyst, Cutler confirmed that any potential headwinds were already incorporated into ICON's guidance, assuring that "***there's nothing that's fundamentally changed that we hadn't already thought about or included in our guidance***. We are seeing a little bit of what we thought we were thinking, and those predictions if you like or that planning, is coming to fruition, if that makes sense. So we're seeing what we thought we'd see."

287. When the analyst asked if "there's really no notable change in, frankly, much of anything since you talked last quarter," Cutler reiterated the point: "No, that's exactly right. ***No material -- no really material changes***."

288. These assurances were false: ICON's business had materially worsened, as Pfizer and other large customers had made significant cuts and shifted nearly 100% to FSP, and ICON

was no longer a preferred partner of Pfizer; the Pfizer vaccine trial's failure by early August 2024 was another material setback. Further, biotech RFPs continued to decline, and ICON's biotech segment was subject to a "revenue sweep" to attempt to close a $100 million "gap" in the third quarter of 2024 (FE-3). None of these existing, material negative facts—known to Defendants at the time—were reflected in ICON's guidance.

**T. Defendants Violate GAAP Through Fraudulent Accounting Practices**

289. Starting in mid-2022, ICON's actual revenue gradually began to fall short of its targets. This gap persisted and widened from mid-2022 through July 2024, as FE-17—an ICON Senior Manager of Operations Finance from before the Class Period until July 2024—explained.

290. In response, to obscure ICON's declining business performance and loss of key customers, Defendants engaged in fraudulent revenue recognition and other violations of GAAP. Specifically, to boost ICON's claimed financial performance during the Class Period, Defendants:

- Extended reporting periods to inflate billing, cash received, revenue, and profit;
- Deliberately created fake invoices to pull forward revenue;
- Manipulated and understated project costs to prematurely recognize revenue and inflate margins, including by not "loading" project costs to "hold the margins," using "negative management reserves," removing project costs, understating pass-through costs, and using "blue sky forecasts";
- Prematurely recognized revenue from fake billing and future work; and
- Prematurely recognized revenue from draft, unsigned change orders.

291. These pervasive GAAP violations, detailed below, materially overstated ICON's publicly reported revenue, net income, adjusted EBITDA, EPS, profit margins, billing, and cash during 2023 and 2024. ICON has ***admitted*** that it overstated revenue by $65.3 million in 2023 and $92.7 million in 2024, driven by "material errors," "improper adjustments," and "inaccuracies in

certain inputs to revenue recognition." ICON also admitted material weaknesses in internal controls, directly contradicting Defendants' statements that ICON's controls were "effective."

292. ICON's false accounting during the Class Period had no factual basis and was not the product of any judgment or opinion. Instead, ICON's senior management simply dictated the methods and amounts of manipulation—such as holding periods open, fabricating fake invoices, arbitrarily deleting project costs, and conducting "revenue sweeps"—to fabricate material amounts of revenue that did not exist. Thus, ICON was forced to restate its financials and admit "material accounting errors," including "improper adjustments." Under GAAP, such "errors" are not judgment calls. Instead, they result from the incorrect application of GAAP or the "oversight or misuse of facts that existed at the time the financial statements were prepared." (ASC 250-10-20.)

### 1. Percentage-of-Completion Revenue Recognition

293. Defendants represented that ICON complied with GAAP. ICON purported to recognize revenue under Accounting Standards Codification 606 ("ASC 606"), which constitutes GAAP's governing revenue recognition standard for sales contracts.

294. Under ASC 606, ICON claimed to apply the following five steps to recognize revenue during each reporting period:

1. Identify the contract(s) with a customer;
2. Identify the performance obligation in the contract;
3. Determine the transaction price;
4. Allocate the transaction price to the performance obligations in the contract;
5. Recognize revenue when (or as) the entity satisfies the performance obligation(s).

295. Under ASC 606, ICON is only permitted to recognize revenue as it ***performs*** work under a given contract based on its percentage of completion. ICON explained that "[r]evenue is

recognized over time as the single performance obligation is satisfied. The progress towards completion for clinical service contracts is measured based on an input measure being total project costs incurred (inclusive of pass-through/ reimbursable expenses) at each reporting period as a percentage of forecasted total project costs."

296. Thus, ICON purported to calculate the percentage of completion as (1) costs incurred to date, divided by (2) the total estimated costs of the project. For example, when ICON had performed 25% of its contractual obligation, ICON could recognize 25% of the revenue. At 100% completion, ICON could recognize 100% of the revenue. The difference between the revenue recognized and ICON's costs incurred is ICON's profit.

### 2. ICON Extended Reporting Periods to Inflate Billing, Cash Received, Revenue, and Profit

297. One basic GAAP violation involved holding reporting periods open beyond their stated close, which rendered ICON's Class Period financial statements false and allowed ICON to inflate its reported revenue and profit.

298. FE-4 stated that ICON regularly held its books open for 10 to 14 days after month- or quarter-end to increase its billing and cash numbers. FE-4 explained that when ICON's monthly and quarterly targets for billing and cash were not met by the end of the month or quarter, the reporting period was simply held open—typically by 10 to 14 days—until the targets were reached. Holding the periods open led to a cycle where the next period was effectively shortened by 10 to 14 days, preventing ICON from hitting the targets for that period, which was then held open in turn. FE-4 indicated that the increased billing and cash from the delayed closings were reflected in Excel spreadsheets maintained by Lisa Dukissis, who reported to Defendant Sheehan.

299. Sheehan communicated the "directive" to hold periods open to FE-4 and "took a hard line" on the issue in meetings. However, as FE-4 explained, "there's no way" Sheehan would

have done that if CFO Brennan was unaware. Notably, Sheehan reported directly to Brennan.

300. As the CFO and CEO of a public company, Brennan and Cutler knew—and were required to know—when ICON's reporting periods actually closed. Indeed, Brennan and Cutler personally affirmed that "***material information***" and "***information required to be disclosed***" was "***accumulated and communicated to***" them. Specifically, under the Sarbanes-Oxley Act of 2002 ("SOX"), Brennan and Cutler each certified that they had designed ICON's disclosure controls and procedures to "ensure that material information relating to" ICON "is made known to us by others within [ICON], particularly during the period in which this report is being prepared." They further affirmed that ICON's disclosure controls and procedures "ensure that information required to be disclosed by the Company in the reports that it files or submits under the [Exchange] Act . . . is accumulated and communicated to the Company's management, including its" CEO and CFO.

301. FE-4 further noted a "mad scramble" at ICON to find "anything" that could be counted towards the cash and billing targets. Sheehan, Vice President of Finance Pat O'Grady and Senior Director of Finance Ronan Flood relayed to FE-4 that it was Brennan's "priority one, two and three to get cash in the door," and that Brennan was aware of the "anemic" cash ICON was actually receiving at times.

302. Holding reporting periods open beyond their stated close is a classic violation of GAAP. ASC 606-10-25-23 only allows revenue to be recognized "when (or as)" ICON "satisfies a performance obligation." By holding periods open, ICON inflated projects' percentage of completion with additional work performed while the periods were held open and recognized additional revenue and profit. Further, ICON recorded assets and transactions that it was not entitled to collect from its customers at the end of the relevant period. (ASC 606-10-45-4.)

303. In addition, the Public Company Accounting Oversight Board's Accounting

Standard 1105: Audit Evidence, AS 1105.11, "Financial Statement Assertions," states that in "representing that the financial statements are presented fairly in conformity with the applicable financial reporting framework, management" makes the following "assertions" (among others):

- "*Existence or occurrence*—Assets or liabilities of the company exist at a given date, and recorded transactions have occurred during a given period."
- "*Completeness*—All transactions and accounts that should be presented in the financial statements are so included."

304. ICON violated both assertions by holding periods open past their reported closing date. First, ICON's financial statements included assets and transactions that occurred ***after*** the close of the "given period," and thus did not "exist at a given date" or "occur during a given period." For example, ICON's purported cash received as of "December 31, 2023" in reality included cash received in January 2024. Second, by recording assets and transactions in periods in which they did not exist or occur, ICON's financial statements did not include "all transactions and accounts that should be presented in the financial statements." Accordingly, ICON's fraudulent practice of holding its reporting periods open violated GAAP.

305. Holding ICON's reporting periods open had a significant impact on its financial statements. FE-4 stated that ICON's practice of holding reporting periods open by 10 to 14 days added approximately $100 to $200 million to ICON's billing and cash each quarter.

306. Notably, these amounts are 5–10% of ICON's purported quarterly revenue reported in its public filings, and even larger percentages of its purported cash from operating activities. For example, ICON claimed $440.1 million in cash generated from operating activities for 4Q23—a figure that was ***inflated by up to 45%*** as a result of holding the period open. This practice also significantly inflated ICON's profit and margins.

307. Further, ICON recorded clients' mere ***promises*** to pay as cash that ICON had ***received***; ICON included those promised amounts in the cash it had purportedly received when it closed a period. (FE-4.) This is another violation of GAAP. (ASC 606-10-45-4.)

308. Corroborating FE-4, several other former employees described ICON's practice of holding periods open. FE-16—an ICON Senior Manager, Finance Business Partnering from before the Class Period until December 2023—stated that in 2023, ICON held billing periods open by 8-10 days, which lowered ICON's unbilled revenue figure and impacted its cash generated from operating activities. FE-16 recalled that because this practice shortened the next billing period, ICON employees called it "kicking the can down the road" internally.

309. FE-18—a manager of operations finance at ICON from before the Class Period until July 2024—confirmed that ICON repeatedly held periods open to create the appearance of better performance, including every month from late 2023 through the end of his employment in July 2024. FE-18 stated that the directions to hold periods open came from O'Grady to Tomkinson; they indicated that revenue was not finalized yet and remained subject to further "updates." As a result, periods were held open by up to three weeks. FE-18 recalled that closing the books for 2023 was delayed by three weeks. Thus, FE-18 and his team regularly spent almost the entire month calculating revenue, since they spent several weeks finishing revenue for the prior month, then had to start the revenue cycle for the next month a week later.

310. Holding periods open increased ICON's revenue, billing and profit. FE-17 stated that ICON held periods open for up to three weeks until the revenue gaps could be filled using the types of manipulation described herein. FE-17 confirmed that Sheehan directed Edkins to hold periods open and provided a list of studies that were being targeted for additional revenue recognition. And FE-18 explained that ICON selectively delayed the revenue closing, even as it

closed accounts payable on time, by keeping ICON's Rev system open and adding revenue for the prior month while closing accounts payable in the Oracle system.

### 3. ICON Used "Fake" Invoices to Pull Forward Revenue

311. ICON also issued fake invoices to prematurely recognize additional revenue and pull it forward from future periods.

312. FE-4 stated that under Sheehan's direction, ICON "deliberately" created "fake" invoices for future work that ICON had not performed. For example, ICON issued invoices during a given period where the contractual billing milestone was in the first 10 days of the next period. These fake invoices served to get "invoices on the books."

313. There is no legitimate reason for creating fake invoices for work that ICON had not yet performed. Indeed, the fake invoices were ***marked with an asterisk*** because they were "***known to be fake***" and were not intended to be sent to ICON clients. (FE-4.) Corroborating FE-4, FE-23—a Financial Accountant I from January 2024 to March 2025 based in ICON's Dublin office—saw pro-forma invoices marked with asterisks and confirmed that they were issued prematurely for future periods. FE-23 recalled seeing the asterisk and questioning whether the pro-forma invoices represented actual sales.

314. Nonetheless, FE-4 was given a "firm directive that this had to happen." The fake invoices were widely discussed within ICON's Finance Department; the only reason FE-4 and his colleagues could identify for this practice is that CFO Brennan and CEO Cutler were probably about to leave ICON and wanted to "jack up" its share price.

315. Indeed, ICON used these fake invoices to artificially inflate its percentage of completion and prematurely recognize revenue pulled forward from future periods. Under ASC 606, ICON can only recognize revenue once it has actually ***performed*** its contractual obligations. Crucially, ICON's fake invoices—for work it had ***not*** yet performed—provided a

pretext for ICON's management to claim that it had performed services and thereby recognize revenue that ICON had not actually earned. ICON thus manipulated its financial results by prematurely recognizing revenue in violation of GAAP.

316. As FE-4 explained, ICON's creation of fake invoices created a "hole" in the next month, which continued over time. The issue came to a head in Christmas 2023, when ICON fell significantly short of its targets. FE-4 described a "mad scramble" as employees worked 14- to 16-hour days to try to find cash. "The billing practices got pretty ropey" as ICON issued fake invoices to clients, such as Celgene. (FE-4.)

317. Several other former employees corroborated ICON's practice of prematurely issuing fake invoices to pull forward revenue. FE-17 stated that ICON began prematurely issuing invoices in advance of contractual milestones to pull revenue forward from future periods, with invoices pulled forward by six weeks or more at times. FE-17 noted that these premature invoices tended to be forced before the close of quarters to bump up ICON's numbers.

318. At Sheehan's direction, the premature invoicing affected ICON's revenue recognition. While ICON purportedly followed ASC 606 and did not recognize revenue based on invoicing, FE-17 stated that one of Sheehan's ideas to manipulate revenue was to start recognizing revenue for the amounts that ICON had prematurely invoiced. Thus, ICON manually updated Rev to reflect the revenue that ICON had pulled forward based on the premature invoices. FE-17 noted that this approach amounted to ICON following a cash accounting method to recognize revenue, which was contrary to the ASC 606 methodology that ICON supposedly followed.

319. This premature invoicing led to a "spiral" when ICON sometimes had to credit clients for the prematurely issued invoices in the following month, then had to pull more invoices forward—and accelerate the recognition of more revenue—to cover the shortfall. (FE-17.)

320. Similarly, FE-16 stated that in 2023, based on instructions from Sheehan's level, ICON billed two months of units in a single month across all of the unit-billed projects in FE-16's portfolio. This accelerated one month of revenue—up to $3 million—on the affected projects.

321. Sheehan also gave instructions to bill clients prematurely in advance of contractual billing milestones; even where a milestone was still 45 days away, Sheehan instructed ICON personnel to bill it now. FE-16 described internal, management-level billing calls where Sheehan used swearing and colorful language.

322. FE-22—a Financial Analyst II at ICON from before the Class Period until September 2025—described premature and double-billing to ICON's large customers, including Eli Lilly, from mid-2022 through at least summer 2025. For example, ICON's total improper billing to Eli Lilly was $40–60 million; ICON invoiced Eli Lilly millions of dollars in investigator fees before the studies were complete (billing too early), then billed it again (double billing). Large customers like Eli Lilly, Novartis, and Vertex began to complain, prompting "governance" calls (held via Teams) between these customers and ICON's senior financial leadership—including CFO Brennan.

323. FE-22 explained that the governance calls with Eli Lilly started in fall 2022 and were held monthly (and twice a month at one point). FE-22 participated in an Eli Lilly governance call at the end of 2022 or early 2023 that included Brennan and other members of ICON's financial leadership. Brennan did most of the speaking during the call. ICON's premature billing was a major topic of discussion, as was ICON's refusal to refund the amounts Eli Lilly had overpaid. At the time, FE-22 feared that ICON was recognizing additional revenue based on the overbilling to Eli Lilly.

324. After the call, the billing issues continued to the point where by summer 2025, shortly before FE-22's departure, ICON had started to discuss resuming the governance calls.

325. FE-18 corroborated ICON's practice of premature invoicing. FE-18 stated that in late 2023 or early 2024, ICON generated premature "pro-forma" invoices based on draft change orders that had not yet been agreed to by ICON and its customers. ICON created these "pro-forma" invoices to increase the amount that ICON had purportedly invoiced for the month. (FE-18.) These invoices were also too large because they typically reflected the full amount of draft change orders, even though the final change orders were often significantly smaller. (FE-18.)

326. The premature pro-forma invoicing was led by Sheehan. FE-18 said the direction to issue the pro-forma invoices came from Sheehan (via O'Grady). Because FE-18 was not comfortable with these practices, he regularly made notes in the Rev system—"per Pat O'Grady"—to indicate that the invoicing was done at O'Grady's direction.

327. FE-18 stated that the pro-forma invoices were issued to all clients with large change orders in progress. FE-18 recalled about $1 million in pro-forma invoicing on one of his own studies, for Ionis, in late 2023 or early 2024. FE-18 noted that while the premature pro-forma invoices were not supposed to be sent to clients, ICON accidentally sent them to clients, including Ionis, anyway. Similarly, FE-4 stated that ICON's offshored billing function in India accidentally sent some fake invoices—showing work that ICON had not yet performed—to clients.

### 4. ICON Manipulated and Understated Project Costs to Prematurely Recognize Revenue and Inflate Margins

328. Former ICON finance personnel described several related types of manipulation that artificially reduced studies' total costs. By not accounting for the entire costs of the projects, ICON shrank the denominator of the ASC 606 formula and thereby increased its percentage of completion, accelerated revenue recognition, and inflated margins.

329. This manipulation contradicted ICON's public statements, including that "[f]orecast time (and related costs) is determined by reference to (i) contract terms and (ii) past experience," and violated GAAP, which required ICON to "update its measure of progress to reflect any changes in the outcome of the performance obligation" (ASC 606-10-25-35) and to apply a "single method of measuring progress . . . consistently" (ASC 606-10-25-32).

330. As detailed below, these manipulative practices share several characteristics: (1) the cost reductions were arbitrary, lacked any factual basis, and contradicted ICON's historical experience; (2) the practices were explicitly linked to meeting ICON's revenue targets; (3) the manipulation was directed by ICON's senior financial leadership in Ireland, including Defendants Brennan and Sheehan; and (4) employees regularly objected and refused to manipulate the costs, only to be overruled by ICON's Irish executives, including Sheehan, O'Grady, and Jameson.

**a. ICON Omitted Project Costs to "Hold the Margins"**

331. As detailed below, ICON manipulated and inflated its revenues, profit, and margins, and obscured negative margins on projects, by not "loading" certain project costs.

332. <u>ICON Bears Responsibility for Cost Overruns</u>: ICON worked primarily with fixed-price contracts, where any cost overruns are ICON's responsibility. Thus, ICON customers are not required to pay for hours or fees beyond the original accepted bid. As ICON's 2022 annual report explained, "Many of our contracts are long-term fixed price or fixed unit price contracts for services." For example, a 2020 agreement between ICON and the U.S. government specified: "Under no circumstances shall the Government's financial obligation exceed the amount obligated in this Agreement or by amendment to the Agreement."[9]

[9] https://www.hhs.gov/sites/default/files/covid-related-mcm-clinical-trial-agreement-with-icon.pdf

333. Because ICON Underbid Studies, ICON Regularly Experienced "Overburn": In an effort to win business, ICON regularly issued low-ball bids for studies. For example, FE-10 reported that at the direction of senior management, ICON regularly made "lean" bids for projects that were "not enough to get the work done." Similarly, FE-14 explained that it was common for ICON senior leadership to green-light discounts on $30 million-plus deals to get the work. FE-14 recalled that a member of ICON's senior leadership said ICON would never lose a deal due to pricing. FE-6, a Finance Manager at ICON from 2021 to November 2023, corroborated that ICON consistently bid studies too low.

334. Internally, ICON called the difference between its budgeted and actual project costs "overburn." ICON rigorously tracked overburn given its significance for profits and margins. ICON used the Tableau tool within Salesforce to track the actual hours for each project, as well as "units" based on the number of hours for a given task, and compared these figures to ICON's budget to assess overburn. (FE-10.) The Tableau tool provided dashboard reports, including a "finance" report and a report that flagged each study as being in "red," "amber" or "green" status, with red and amber indicating that the project was underperforming. (FE-10.) FE-8 explained that ICON's studies for Pfizer experienced overburn on the CRA monitoring component; ICON closely tracked this cost and Pfizer was not happy with the overburn, requiring ICON to reduce monitoring visits. Similarly, FE-2 stated that ICON was overburning on four multiple myeloma studies for Pfizer and incurring extensive overtime that was not being billed to Pfizer.

335. ICON's regular underbidding of projects—and the resulting "overburn"—directly eroded its profit margins because under ICON's fixed-price contracts, customers were under no obligation to pay any additional amounts to ICON for work beyond the project budget. For example, if a project budget reflected $20 million in revenue and $10 million in costs (yielding

$10 million profit at a 50% margin), but actual costs reached $16 million, ICON would be left with only $4 million in profit (at a 20% margin).

336. GAAP Required ICON to Continuously Update Estimated Costs: If ICON incurs additional costs—even if they reduce profits—they must be included in ICON's revenue and margin calculations. ASC 606-10-25-35 requires that "[a]s circumstances change over time, an entity shall update its measure of progress to reflect any changes in the outcome of the performance obligation." And ICON's SEC filings represented that its cost calculations were up-to-date and accurate, stating that ICON performed (1) "an evaluation of labor and related time cost incurred at the reporting date" and (2) "an up to date evaluation of the forecast costs to complete" projects.

337. In violation of GAAP, however, ICON artificially inflated its gross margins and revenue by omitting significant portions of project costs that ICON had actually incurred.

338. ICON Omitted Project Costs to Inflate Margins: ICON's finance personnel were instructed to inflate ICON's margins using a process called "cost not loaded," or "CNL." FE-5, a Project Financial Analyst from spring 2022 until August 2024, was instructed by his managers Justin Mason (Director, Finance Business Partnering) and Matt Doran (Supervisor, Financial Planning) not to "load" certain project costs to prevent margins from declining.

339. Specifically, FE-5 explained that Mason and Doran indicated that they wanted no change in margins. Thus, whenever additional project costs caused margins to decline, even by 0.2%, Mason and Doran instructed FE-5 to apply a "CNL" entry in ICON's software used for financial reporting (called "Revenue") to prevent the increased costs from impacting margins. These instructions were typically given to FE-5 via Teams chat. Mason also held Teams meetings and explained that the "CNL" practice came from Mason's supervisor or ICON's CFO, explaining that the "instructions from above" were that "we need to hold margin for the studies."

340. FE-5 explained that the CNL process had three steps:

(1) First, FE-5 used an Excel workbook with a "CNL" tab that calculated the dollar amount of costs necessary to keep margins the same.

(2) Second, ICON's Revenue software had a button to add costs to a study, with a drop-down menu that allowed the user to select "Costs Not Loaded." FE-5 selected the "Costs Not Loaded" option and entered the dollar amount from the Excel workbook. The software also required a mandatory text comment, which FE-5 entered as "CNL to hold the margins."

(3) Finally, FE-5 submitted the Revenue entry for approval. FE-5 explained that if the entry showed a drop in margin, Mason rejected it and instructed FE-5 to add a CNL entry.

341. ICON's CNL practice was standardized, built into ICON's training, and applied across studies. (FE-5.) FE-5's own portfolio was about $30 million and included over 20 studies, mostly biotech with some large pharma. FE-5's friends at ICON worked on large pharma studies, including for Janssen and Pfizer, and reported that CNL was also applied on their studies.

342. FE-5 confirmed that the CNL practice substantially impacted ICON's current margin on studies. For example, FE-5 stated that CNL greatly impacted at least half of his studies, resulting in up to a 10% to 20% difference in margin. FE-5 further stated that for one study, without CNL, the margin was negative—meaning ICON's project costs exceeded its revenue.

343. FE-5 noted that margins declined over time for most projects; as a result, the amount of CNL grew to keep the margins the same. Several of FE-5's studies had margins that worsened by a few percent each month, so applying CNL to hold the margins had a large impact over a year.

344. FE-5 was uncomfortable with ICON's use of CNL. The explanation provided by FE-5's supervisors was that they would "fix it next month," which never happened. Instead, FE-5 was provided with the same CNL and "hold the margins" instruction the next month. The CNL practice continued until FE-5 left ICON in August 2024.

345. FE-6 corroborated FE-5's account of how ICON used CNL to "hold the margins." FE-6 was instructed to hold the margins by using the CNL procedure. The instruction was communicated by Senior Finance Director Bridget Hennessy (via email or phone), although FE-6 believed that Hennessy was new to the role and inexperienced, so the actual instruction came from the person above her, Senior Director of Finance Ronan Flood.

346. FE-6 also corroborated FE-5's description of the mechanics of the CNL process. FE-6 explained that ICON used a "reserve workbook" to calculate the amount of costs that were necessary to remove to keep the margin the same. The calculation was based on hours and an average rate. For example, the spreadsheet included an average hourly rate for North America-based workers to facilitate calculation of how many hours needed to be removed to preserve the study's margin. FE-6 noted that the workbook was saved in ICON's Revenue system as audit support. Finally, FE-6 entered the CNL amount into the Revenue system and inserted comments that "per Bridget [Hennessy]," he was adding a reserve to hold the margins.

347. FE-6 explained that the number of CNL instructions increased towards the end of his tenure in October and November 2023, and he became uncomfortable that ICON was "pushing the line." As a result, FE-6 decided to add comments indicating the source of the CNL instruction so more junior team members would not get into trouble.

348. FE-6 managed a team of 9 to 12 analysts and worked on ICON's Janssen partnership. As such, FE-6 explained that the "CNL" treatment applied to most or all Janssen studies and noted that ICON had at least five to six large Janssen studies, which totaled about $150 to $300 million and averaged about $1.5 to $2 million in revenue per month. The reserves on these studies fluctuated in size, but could be as large as $1 million for a given study.

349. FE-6 confirmed that the CNL procedure impacted ICON's financial reporting: FE-6 stated that ICON's revenue team used the results of the "CNL" for ICON's financial reporting and also had access to the reserves and comments indicating to hold the margin, including the workbook showing the calculation of the "CNL" amount.

350. Finally, FE-6 indicated that in addition to the "CNL" process, ICON consistently included a "management reserve" to account for an assumption of 2% overburn at the beginning of each study. Specifically, because ICON consistently bid studies too low, ICON included a reserve to accommodate 2% overburn through the end of the study startup phase (when the last site was activated). This reserve prevented overburn from reducing margin in the early stages of the study. FE-6 explained that this 2% management reserve was "company standard" and affected each study FE-6 worked on.

351. <u>The Omitted Costs Inflated ICON's Reported Revenue</u>: ICON's "CNL" and "management reserve" practices also resulted in recognizing additional revenue by overstating ICON's percentage of completion. Specifically, under ASC 606, omitting existing project costs shrank the denominator of the ASC 606 formula (total estimated costs) and thus overstated ICON's percentage of completion.

352. For example, on a $20 million project where ICON's budget assumed total costs of $10 million, but actual costs had reached $8 million halfway through the project, ASC 606 requires updating the total project costs to $16 million to include the "overburn" to date and the expected overburn through project completion. *See, e.g.*, ASC 606-10-25-35. Thus, the proper ASC 606 calculation would recognize $10 million in revenue, or 50% of total project revenue, based on incurring $8 million of $16 million, or 50%, of total project costs. Given ICON's $8 million in costs incurred, the $10 million in revenue would yield $2 million in profit at a 20% margin.

353. However, ICON's "CNL" and "management reserve" practices resulted in omitting the "overburn" from total project costs. That error significantly overstated ICON's percentage of completion and inflated its profit and margin. In the example above, the error kept total project costs at $10 million instead of $16 million. Halfway through the project, that error inflated revenue to $16 million, or 80% of total project revenue, based on incurring $8 million of $10 million, or 80%, of total project costs. In turn, the inflated revenue boosted ICON's profit to $8 million (at an inflated 50% margin). This example is illustrated below.

| | **Correct ASC 606 Calculation** | **Erroneous Calculation in Violation of GAAP** |
|---|---|---|
| **Total Project Value** | $20 million | $20 million |
| **Costs Incurred to Date** | $8 million | $8 million |
| **Total Project Costs** | $16 million | **$10 million** |
| **Percentage of Completion** | 50% | **80%** |
| **Revenue Recognized** | $10 million | **$16 million** |
| **Profit** | $2 million | **$8 million** |
| **Profit Margin** | 20% | **50%** |

354. Ultimately, ICON's premature revenue recognition in violation of ASC 606 led to reaching "100%" completion on projects before they were complete. Confirming the point, FE-5 noted that five or six of his studies were still ongoing but reported 100% completion in ICON's Revenue software (which calculated percentage of completion from a forecast in Salesforce). FE-5 explained that the studies were ongoing and still incurring costs, but ICON was not forecasting them out. The Revenue software's "100%" completion was significantly different than the studies' actual status at the time. For example, one study marked as 100% complete was only 75% complete, while another marked as 100% complete was subject to repeated change orders and months of additional work.

**b. Negative Management Reserves and Removing Project Costs**

355. ICON applied negative management reserves and removed project costs to artificially reduce studies' total costs and shrink the denominator of the ASC 606 formula to increase ICON's percentage of completion, accelerate revenue recognition, and inflate margins.

356. As FE-18 explained, putting in a negative reserve was akin to saying that ICON was not expecting to incur all the originally forecasted costs of the study because the rest of the study was expected to be more efficient.

357. However, the purported efficiencies had no factual basis. For example, FE-18 described a study in his portfolio where the trial had just started and ICON did not have all the sites activated, yet was already overburning by 2,000 hours per month. Despite this significant overburn, O'Grady (via Tomkinson) instructed FE-18 to apply negative management reserves to the study. FE-18 explained that there was no way, given ICON's large overburn and the current status of the study, that the purported efficiencies could materialize. Thus, FE-18 objected and refused to comply with the instruction to take a negative management reserve, and informed the analysts who reported to him at the time that they would not put their names on any of this.

358. Nonetheless, FE-18 saw in Rev that Aidan Jameson had both submitted and approved the negative management reserves. FE-18 explained that having the same person both submit and approve the reserves represented a lack of internal controls because companies are supposed to have a secondary review between the submission and approval processes.

359. After seeing Jameson's approval in Rev, FE-18 specifically warned Jameson that ICON's external auditors would be able to track the manipulation. In response, Jameson denied that ICON's external auditors would be able to see the negative management reserves.

360. Within FE-18's portfolio alone, ICON booked at least $10 million in negative management reserves in the first half of 2024, including $1.85 million for Neumora studies and

$750,000 for Ionis studies as of May 2024. FE-18 noted that the practice involved the largest studies in his portfolio.

361. Corroborating FE-18's account, FE-19—a Financial Analyst at ICON from July 2023 to December 2024—explained that around summer 2024, Jameson instructed ICON's U.S. analysts to remove specific amounts of costs from their studies. Jameson sent an Excel file that showed the amounts of costs to remove and identified ICON's revenue target for the month. Jameson also asked the analysts to include a note indicating that the costs were removed to reflect "efficiency by management."

362. Again, the cost removals had no factual basis. FE-19 emphasized that the claimed "efficiencies" did not make sense and that Jameson's instructions lacked any supporting analysis. Instead, Jameson simply demanded that the analysts remove certain costs and sign off.

363. FE-19 stated that he and the other 40 U.S.-based analysts refused to participate because they believed deleting the costs was in violation of GAAP. FE-19's managers told the U.S.-based analysts not to remove the costs. FE-19 compared the situation to a mutiny.

364. However, Jameson removed the costs anyway over these objections. FE-19 learned about this when he entered the Rev system to review his studies and saw that Rev indicated Jameson had removed the costs. The deleted costs significantly affected FE-19's studies; up to $100,000 in costs were deleted on one study alone.

365. FE-16 witnessed similar manipulation of cost reserves to accelerate ICON's revenue recognition. FE-16 described instructions from Sheehan (conveyed via Edkins), in the second half of 2023, not to load certain cost reserves. As FE-16 explained, when completing trial tasks took longer than ICON's budget, instead of increasing the denominator to reflect the updated cost to complete the study—which would slow down revenue recognition—ICON kept the

denominator the same. Moreover, where ICON did enter cost reserves, there was internal pressure to release the reserves—and thereby shrink the percentage-of-completion denominator—to recognize revenue more quickly than the facts warranted. FE-16 estimated that these practices boosted revenue by 1-2% across his portfolio.

366. The negative management reserves were significant and widespread. FE-18 indicated that negative management reserves were used on a large number of projects and knew from conversations with other managers that ICON applied the negative management reserve practice broadly across the entire legacy PRA business. The legacy PRA business comprised about 50% of ICON's total revenue. FE-19 stated that Jameson deleted costs on approximately 40 analysts' studies, and some analysts had portfolios that generated up to $20 million in monthly revenue. FE-16's colleagues experienced the same issues with premature revenue recognition and not loading cost reserves as FE-16, confirming that these issues were not unique to his projects.

367. ICON's use of negative management reserves was directed by the Company's senior financial leadership in Ireland. In particular, FE-18 understood that the direction to use the negative management reserves was coming from CFO Brennan, since the directions were typically communicated to FE-18 just after Brennan met with ICON's VPs.

368. The negative management reserves were a recurring point of contention between U.S. and Irish-based finance personnel. When FE-18 asked Tomkinson why ICON was taking the negative reserves, Tomkinson informed FE-18 that he had already brought up concerns about the practice to ICON's more senior leadership. FE-18 described constant battles in which Tomkinson and other U.S.-based personnel told the finance leaders in Ireland that the negative management reserves were improper, and the Irish personnel directed them to do it anyway. Tomkinson agreed with FE-18 that the use of negative management reserves was improper.

### c. ICON Understated Pass-Through Costs

369. As FE-18 explained, a portion of ICON's revenue comes from pass-through costs, such as vendor costs, where ICON earns zero margin. In the second half of 2023, ICON artificially understated its forecasts of pass-through costs to boost its percentage of completion on studies and increase margins. (FE-18.)

370. FE-18 stated that where ICON's percentage of completion on the services portion of the contract (*i.e.*, ICON's billable, profit-generating work) was higher than on the pass-through portion of the contract, ICON reduced its forecast of total pass-through costs to increase the pass-through percentage of completion until it aligned with the service portion. This increased ICON's overall percentage of completion on the contract and led to premature revenue recognition.

371. Understating forecasted pass-through costs also boosted ICON's margins. FE-18 explained that removing pass-through costs—where ICON earned zero margin—made them a lower proportion of total study revenue and reduced ICON's overall project costs, both of which boosted ICON's margins.

372. To recognize additional revenue and boost margins, ICON reduced forecasted pass-through costs by 15 percent. FE-18 participated in a call with Tomkinson, O'Grady, Sheehan, and others where the instruction to reduce forecasted pass-through costs by 15 percent was conveyed. During the call, as FE-18 explained, ICON's U.S.-based personnel explained to Sheehan and the other Irish attendees that it was improper to remove millions of dollars of pass-through costs on a study that was just starting. After this call, FE-18 refused to reduce the pass-through costs on his own large studies. However, FE-18 confirmed that Sheehan and O'Grady successfully directed other ICON employees to remove pass-through costs on numerous other studies.

373. FE-17 corroborated that ICON understated its forecast of total pass-through costs to increase its percentage of completion and boost revenue and margin. FE-17 indicated that at

the outset of studies, ICON regularly reduced its forecast of pass-through costs by a set percentage, such as 15 percent, below ICON's budget. FE-17 stated that the reductions to pass-through costs were arbitrary and became more aggressive over time as the gap between ICON's actual revenue and its targets widened. As studies progressed, ICON further reduced its forecast of pass-through costs by using whatever metric would yield the most revenue, such as using a six or nine-month run rate (*i.e.*, the last six or nine months of pass-through costs). FE-17 added that ICON further reduced total project costs by using "CNL" entries (described above).

374. FE-17 personally experienced these improper revenue recognition practices when Edkins, conveying instructions from Sheehan, asked FE-17 to approve the manipulations in Rev on FE-17's studies. While FE-17 pushed back on many of these requests, he later saw that the inflated revenue numbers were nonetheless approved by someone else in Rev.

375. The improper revenue recognition compounded over time. As FE-17 explained, once a particular manipulation was entered into Rev, Sheehan and other senior executives looked for new opportunities to recognize more revenue the next month, and as a result, inputs like forecasted pass-through costs were reduced again and again.

#### d. ICON's "Blue Sky" Forecasts Understated Total Project Costs

376. ICON also used "blue sky" forecasts to shrink the denominator of ASC 606's formula. As detailed above, ICON experienced significant overburn on studies. FE-20, an ICON Project Finance Analyst from before the Class Period until September 2024, explained that ICON regularly experienced 10-15% overburn on FE-20's studies, while ICON's actual work performed—in units—lagged behind. FE-20 explained that ICON did not account for this overburn in its cost forecasts for the remainder of the studies.

377. Instead, ICON used overly optimistic "blue sky" forecasts that ignored ICON's actual overburn and assumed everything would go perfectly—despite the historical experience to

the contrary. FE-20 confirmed that these forecasts were consistently inaccurate and remained the same regardless of what was happening in the studies. FE-3 similarly explained that when studies experienced cost overruns, ICON forecasted offsetting "efficiencies" near the end of the studies. As FE-3 explained, this led to overly positive margin.

378. FE-20 noted that internally, ICON personnel regularly made oral statements to the effect of "let's use the blue sky forecast." The instructions to use these "blue sky" forecasts were conveyed to FE-20 by David Talbot and Nicholas Bateman, who expressed reluctance and made clear that the directive came from more senior levels of the Company (*i.e.*, executives in Ireland).

### 5. ICON Prematurely Recognized Revenue for Fake and Future Work

379. To prematurely recognize revenue, ICON inflated ASC 606's numerator by including fake and future work. In doing so, ICON violated GAAP by failing to measure actual "progress toward complete satisfaction of [its] performance obligation." (ASC 606-10-25-31.)

380. FE-20 explained that while ICON recognized revenue based on time billed to projects, the amount of time employees entered did not correlate with the work ICON had actually performed. FE-20 stated that this disconnect arose from two sources:

381. <u>First</u>, ICON employees routinely overstated their hours and billed more hours than they had actually worked. FE-20 quantified this overbilling as 10-15% and explained that it also generated overburn of 10-15% compared to ICON's project budgets. FE-20 noted that ICON employees were under tremendous pressure to meet billable hour requirements—including a requirement to have 80% billable time—that impacted their reviews and compensation. Recognizing revenue based on fake time entries is inherently fraudulent.

382. <u>Second</u>, ICON employees had not completed as many "units" as ICON's project budgets and forecasts called for. FE-20 identified this discrepancy from working with Jim Miller

(Senior Manager, Finance Business Partnering) to compare the hours billed to the units project managers reported as complete.

383. The disconnect between ICON's (a) time billed and (b) actual work performed meant that ICON overstated its percentage of completion and prematurely recognized revenue for work that ICON had not yet completed. FE-20 explained that the overbilling allowed ICON's management to recognize more revenue than they should have recognized, which forced ICON to later attempt to seek a change order from customers to make them pay for the overburn. FE-20 added that because ICON was recognizing revenue prematurely based on work it had not yet performed, ICON sometimes reached 100% completion and recognized all revenue on studies before they were finished.

384. In other instances, ICON management explicitly directed revenue recognition before ICON had performed the corresponding work—a transparent violation of GAAP. FE-16 identified an incident in the second half of 2023 where ICON recognized 100% of the revenue on a clinical trial for MAPI Pharma when the project was only 88-90% complete. Specifically, ICON had not yet completed various close-out tasks, which amounted to about $500,000 in revenue, or 10-12% of the trial's total revenue. (FE-16.)

385. Nonetheless, Rev indicated that ICON had already recognized the full 100% of revenue from the trial. Edkins conveyed instructions from Sheehan for FE-16 to approve ICON's recognition of revenue on the remaining 10-12% of the MAPI Pharma study—despite the fact that ICON had yet to perform that work. FE-16 refused to approve this revenue recognition and stated that he wouldn't put his name to it. However, ICON's Rev system continued to show the revenue from the remaining 10-12% of the MAPI Pharma study.

386. Further, when ICON needed to "find revenue" for the quarter, it recognized revenue in advance of contractual milestones. For example, as FE-3 explained, if the contract only allowed ICON to claim revenue upon site activation, and ICON planned to activate the site in September but encountered challenges that delayed activation to October, ICON still recognized the revenue in September.

### 6. ICON Prematurely Recognized Revenue from Draft, Unsigned Change Orders

387. Finally, in violation of GAAP, ICON prematurely recognized revenue from draft, unsigned change orders. FE-3 stated that ICON used draft, unsigned change orders to recognize revenue and increase margins as "standard operating procedure" during 2023 and 2024.

388. Recognizing revenue from draft, unsigned change orders affected both the timing and amount of revenue. FE-3 explained that obtaining a final, signed change order could take six months. As to the amount of revenue, FE-3 explained that the first draft of a change order typically provides for a much larger amount of revenue than the client ultimately approves. FE-3 estimated that the final change orders were typically 20–30% smaller than the first draft that ICON used to recognize revenue, and this disparity increased over time.

389. ICON violated GAAP by prematurely recognizing revenue from draft, unsigned change orders. For change orders, ASC 606-10-25-10 requires that "the parties to a contract ***approve*** a modification that either creates new or changes existing ***enforceable rights and obligations*** of the parties to the contract." However, ICON's draft, unsigned change orders were not legally enforceable and were not "approved" in any meaningful sense. Demonstrating the point, ICON regularly failed to recover the full amount stated in the draft, unsigned change orders. For example, FE-3 noted that for one large customer, Gilead, ICON regularly wrote off 50% of the amounts it initially sought via change orders.

390. The revenue that ICON prematurely recognized from draft, unsigned change orders was significant. For example, FE-3's studies—which accounted for about 10% of ICON's biotech division—involved large change orders of $5–6 million, with some exceeding $10 million, and generally had one to two change orders of $5 million or more per quarter.

391. ICON's practice of recognizing revenue from draft, unsigned change orders was directed by senior management. FE-3 stated that the instructions as to change orders were communicated by Aine McGill, VP Client Contract Services. McGill convened weekly meetings about change orders with FE-3, other project leaders with change orders and VPs of Project Delivery, and Sassaman. FE-3 explained that McGill (who was located in Ireland) reported to CFO Brennan or CEO Cutler and always framed her instructions as "the directive is." During each weekly meeting, the attendees provided updates about what they were able to achieve in accordance with the directive; McGill then consulted with either Cutler or Brennan and returned the next week with new marching orders.

**7. ICON's Structured Process for Financial Manipulation**

392. ICON used a structured, two-pronged process, driven by financial targets disseminated from the Company's Irish headquarters, to implement the financial manipulation.

393. <u>First</u>, ICON regularly held its reporting periods open by up to three weeks, as described above. These delayed closings (a) allowed more time to manipulate ICON's revenue using the techniques described above, and (b) increased ICON's purported billings and cash.

394. <u>Second</u>, ICON initiated recurring revenue sweeps to inflate the Company's financial performance. The revenue sweeps amounted to aggressive instructions from ICON's senior executives to suddenly recognize large amounts of additional revenue on specific studies to meet revenue targets. Unsurprisingly, this tactic resulted in significant financial manipulation.

395. As detailed above, FE-3 described quarterly revenue sweeps that were widely understood to be directed by CEO Cutler. Each sweep began with an email that linked to or attached a spreadsheet identifying the studies where additional revenue could be recognized (*e.g.*, by pulling billable work forward or adding work from ICON's out-of-scope logs). (FE-3.) FE-3 described such revenue sweeps in 2023 and the first three quarters of 2024.

396. Similarly, FE-18 described recurring revenue sweeps initiated by Sheehan or O'Grady. FE-18 stated that starting in the second half of 2023, the sweeps occurred with increasing frequency, ultimately occurring every month in the period before FE-18's departure in July 2024. These revenue sweeps significantly increased ICON's purported revenue, which was admittedly overstated by $165.7 million for the 12-month period from 3Q23 through 2Q24.

397. These revenue sweeps typically started in calls that Tomkinson had with O'Grady or Sheehan, or via emails from Sheehan or O'Grady. FE-18 received the emails and explained that all of the North American finance team received similar emails, which directed the specific amount of costs that should be removed from studies to increase revenue.

398. FE-18 noted that the emails detailed schemes to remove costs from studies and attached spreadsheets that described the specific number of hours and costs to be removed from various studies. The amounts FE-18 was told to remove often did not match reality. For example, FE-18 recalled representatives from the operations team asking how it was possible to remove 3,000 hours from a study. Nonetheless, the operations team complied, while warning that it was not realistic and that the study would remain in overburn for its entire duration.

399. The structured, highly artificial nature of ICON's revenue sweeps underscores the fraudulent nature of Defendants' manipulation. For example, FE-3 noted that the $100 million biotech revenue sweep in the third quarter of 2024 was "ridiculous" and "completely fake" given

the amount, the short time remaining in the quarter, and the one-business-day turnaround.

400. ICON's Irish financial leadership was centrally involved in the revenue sweeps. FE-18 noted that the revenue sweep emails came from Sheehan or O'Grady. Similarly, in summer 2024, Jameson instructed ICON's U.S. analysts to remove specific amounts of costs from studies and attached an Excel file that showed the amounts of costs to remove and identified ICON's revenue target for the month. (FE-19.) Similarly, in the first half of 2024, Senior Director of Finance Bedford repeatedly pushed her team to increase revenue on monthly and quarterly Teams calls where she specifically mentioned management reserves and reducing pass-through costs. (FE-23.) FE-23 described Bedford's comments as unusual and indicated that they raised red flags, which prompted FE-23 to make contemporaneous notes of what he heard.

401. ICON also attempted to conceal the manipulation from its auditors. When the sweeps started in the second half of 2023, FE-18 was instructed to remove hours from ICON's Planning & Forecasting ("P&F") system instead of entering negative management reserves in Rev, since removing hours from P&F was less visible to ICON's external auditors. As FE-18 explained, ICON's auditors at KPMG did not review or test the P&F system. Jameson even told FE-18 that ICON's external auditors would not be able to see the Company's negative management reserves.

### 8. ICON Offshores Finance Personnel to Maintain Its Fraudulent Accounting Practices

402. Employees who challenged ICON's aggressive accounting practices were sidelined and silenced. For example, FE-3 described a practice where ICON pulled money from later years of budgets forward into the current month or year, and ICON's financial leadership demanded that employees "find efficiencies" to make up the hole in future years. One employee complained about this practice as inconsistent with "Accounting 101" and raised his complaints up to the Director of Finance and VP of his area. (FE-3.)

403. However, after U.S. personnel began asking more questions about why revenue was being recognized, in summer 2024, ICON laid off the vast majority of U.S. finance personnel and replaced them with low-cost employees in countries like India. (FE-3.) FE-18 corroborated that ICON moved the finance function to India after complaints by U.S.-based personnel about ICON's approach to managing revenue.

### U. Clerkin Becomes CFO and Signs ICON's False 2024 Financial Statements

404. In October 2024, Defendant Clerkin replaced Brennan as CFO. Clerkin signed ICON's 2024 Form 20-F and attested to the accuracy of its 2024 financial statements, which have now been restated due to "misstatements" and "material errors."

### V. ICON Secretly Commences an Internal Investigation While Defendants Falsely Deny Any Issues With Internal Controls

405. On September 12, 2025, Lead Plaintiffs filed the Amended Complaint (ECF 47), alleging (among other things) that ICON violated GAAP, misstated certain financial results, and suffered from material weaknesses in controls. Defendants publicly denounced these allegations, falsely assuring analysts that "[a]s a public company, ICLR [ICON] has strong internal controls in place," as reflected in an October 23, 2025 Truist report.

406. At the time, however, ICON's Audit Committee had secretly commenced an internal investigation of "the Company's accounting and controls." ICON has admitted that the investigation was "initiated by the Audit Committee of the Board of Directors in late October 2025 . . . following concerns reported to the Audit Committee through Company management," indicating that the "concerns" were "reported" before "late October 2025."

407. Underscoring that the internal investigation had started before October 23, 2025, on October 21, 2025, ICON quietly updated the Audit Committee's charter to specify its responsibility to "***review[] complaints sent to the Ethics Line***" regarding "accounting, internal

accounting controls or auditing matters and any other aspects of the Company's internal controls over financial reporting."

408. ICON's Audit Committee had good reason to review such complaints. The ***same executive*** tasked with reporting "ethics concerns" to the Board, Chief Administrative Officer Diarmaid Cunningham,[10] was simultaneously profiting from the fraud. As discussed below, during the Class Period, Cunningham sold 46% of his holdings for net profits of $4.5 million.

409. As CFO, Defendant Clerkin was aware of the Audit Committee investigation from its inception (and no later than October 21, 2025). ICON's annual reports confirm that the "Chief Financial Officer, the Head of Internal Audit, the Chief Administrative Officer and General Counsel and the external auditors normally attend all meetings of the Audit Committee."

**W. ICON's Restatement Establishes That Its Financial Statements Were Materially False**

410. ICON has admitted that its 2023 and 2024 financial statements were materially false and contained "***misstatements***" and "***material errors***." As detailed below, these admitted misstatements were highly material. They transformed ICON's EBITDA and/or EPS misses into purported "beats" throughout 2023 and the first half of 2024—the same period when Cutler and Brennan unloaded stock for $29.6 million in personal gain.

411. On April 29, 2026, ICON filed a Form 6-K disclosing that "the Audit Committee has completed its investigation," that ICON's "revenue was overstated in 2023 and in 2024," and that ICON's Audit Committee had "concluded that the Company's previously issued audited financial statements" for 2023 and 2024, and its quarterly financial statements for 2023, 2024 and the first three quarters of 2025, "should no longer be relied upon" and required restatement.

---

[10] https://www.sec.gov/Archives/edgar/data/1060955/000106095525000044/ifrsfinancial statements2024.htm

412. On May 27, 2026, ICON restated its 2023 and 2024 financial statements. In doing so, ICON admitted that these financial statements contained "misstatements" and "material errors." ICON further admitted: "The restated financial statements as of and for the years ended December 31, 2024 and 2023 correct errors (the 'Restatement Items') ***that were concluded to be material to the financial statements*** for [2023 and 2024]."

413. Specifically, ICON admitted "a $92.7 million overstatement of revenue for the year ended December 31, 2024 and a $65.3 million overstatement of revenue for the year ended December 31, 2023." These overstatements included admitted "errors of $73.6 million and $68.9 million for the years ended December 31, 2024 and 2023" related "to improper adjustments recorded to recognize revenue outside of normal system processes for long-term clinical services revenue contracts, errors in determining the estimated cost to complete, the assessment of realizable value, and certain manual adjustments in respect of certain long-term clinical services revenue contracts." ICON also admitted that an error as to "the impact of cost accruals on the measure of progress at period end" boosted 2023 revenue by "$5.9 million" and reduced 2024 revenue by "$1.6 million." ICON admitted that these were "material accounting errors."

414. The "errors" and "improper adjustments" also inflated ICON's net income, adjusted EBITDA, adjusted EBITDA margin, gross margin, and adjusted EPS by material amounts. ICON's admitted overstatements of these metrics in 2023 and 2024 are shown below:

| **Revenue (in millions)** | | | | |
|---|---|---|---|---|
| | Originally Reported | As Restated | Increase/Decrease | % Overstatement |
| **1Q23** | $1,978.6 | $1,965.8 | **-$12.8** | **0.6%** |
| **2Q23** | $2,020.3 | $2,008.2 | **-$12.1** | **0.6%** |
| **3Q23** | $2,055.1 | $2,040.3 | **-$14.8** | **0.7%** |
| **4Q23** | $2,066.2 | $2,040.6 | **-$25.6** | **1.3%** |
| **1Q24** | $2,090.4 | $2,043.3 | **-$47.1** | **2.3%** |
| **2Q24** | $2,120.2 | $2,041.9 | **-$78.2** | **3.8%** |
| **3Q24** | $2,030.0 | $2,041.9 | $11.9 | -0.6% |

| Revenue (in millions) | | | | |
|---|---|---|---|---|
| | Originally Reported | As Restated | Increase/Decrease | % Overstatement |
| **4Q24** | $2,041.1 | $2,061.9 | $20.8 | -1.0% |
| **FY 2023** | $8,120.2 | $8,054.9 | **-$65.3** | **0.8%** |
| **FY 2024** | $8,281.7 | $8,189.0 | **-$92.7** | **1.1%** |

| Net Income (in millions)[11] | | | | |
|---|---|---|---|---|
| | Originally Reported | As Restated | Increase/Decrease | % Overstatement |
| **1Q23** | $116.7 | $108.9 | **-$7.8** | **7.1%** |
| **2Q23** | $115.6 | $108.0 | **-$7.6** | **7.0%** |
| **3Q23** | $163.7 | $153.9 | **-$9.8** | **6.3%** |
| **4Q23** | $216.4 | $183.4 | **-$33.0** | **18.0%** |
| **1Q24** | $187.4 | $148.3 | **-$39.1** | **26.4%** |
| **2Q24** | $146.9 | $82.8 | **-$64.1** | **77.5%** |
| **3Q24** | $197.1 | $213.3 | $16.1 | -7.6% |
| **4Q24** | $260.0 | $294.7 | $34.7 | -11.8% |
| **FY 2023** | $612.3 | $554.2 | **-$58.1** | **10.5%** |
| **FY 2024** | $791.5 | $739.1 | **-$52.3** | **7.1%** |

| Adjusted EBITDA (in millions) | | | | |
|---|---|---|---|---|
| | Originally Reported | As Restated | Increase/Decrease | % Overstatement |
| **1Q23** | $399.1 | $390.0 | **-$9.1** | **2.3%** |
| **2Q23** | $414.2 | $405.3 | **-$8.9** | **2.2%** |
| **3Q23** | $432.5 | $421.1 | **-$11.4** | **2.7%** |
| **4Q23** | $448.2 | $426.2 | **-$22.0** | **5.2%** |
| **1Q24** | $444.0 | $401.0 | **-$43.0** | **10.7%** |
| **2Q24** | $450.4 | $377.5 | **-$72.9** | **19.3%** |
| **3Q24** | $418.8 | $435.9 | $17.1 | -3.9% |
| **4Q24** | $422.6 | $455.9 | $33.4 | -7.3% |
| **FY 2023** | $1,694.1 | $1,642.6 | **-$51.5** | **3.1%** |
| **FY 2024** | $1,735.8 | $1,670.4 | **-$65.4** | **3.9%** |

| Adjusted EBITDA Margin | | | | |
|---|---|---|---|---|
| | Originally Reported | As Restated | Increase/Decrease | % Overstatement |
| **1Q23** | 20.2% | 19.8% | **-33 bps** | **1.7%** |
| **2Q23** | 20.5% | 20.2% | **-32 bps** | **1.6%** |
| **3Q23** | 21.0% | 20.6% | **-41 bps** | **2.0%** |
| **4Q23** | 21.7% | 20.9% | **-81 bps** | **3.9%** |

[11] ICON's adjusted net income was overstated by the same dollar amounts.

| Adjusted EBITDA Margin | | | | |
|---|---|---|---|---|
| | Originally Reported | As Restated | Increase/Decrease | % Overstatement |
| **1Q24** | 21.2% | 19.6% | **-162 bps** | **8.2%** |
| **2Q24** | 21.2% | 18.5% | **-276 bps** | **14.9%** |
| **3Q24** | 20.6% | 21.3% | 72 bps | -3.4% |
| **4Q24** | 20.7% | 22.1% | 141 bps | -6.4% |
| **FY 2023** | 20.9% | 20.4% | **-47 bps** | **2.3%** |
| **FY 2024** | 21.0% | 20.4% | **-56 bps** | **2.8%** |

| Gross Margin[12] | | | | |
|---|---|---|---|---|
| | Originally Reported | As Restated | Increase/Decrease | % Overstatement |
| **1Q23** | 29.8% | 29.3% | **-46 bps** | **1.6%** |
| **2Q23** | 29.6% | 29.1% | **-42 bps** | **1.5%** |
| **3Q23** | 29.8% | 29.3% | **-51 bps** | **1.7%** |
| **4Q23** | 30.4% | 29.5% | **-87 bps** | **3.0%** |
| **1Q24** | 29.9% | 28.3% | **-162 bps** | **5.7%** |
| **2Q24** | 29.9% | 27.2% | **-269 bps** | **9.9%** |
| **3Q24** | 29.5% | 29.9% | 41 bps | -1.4% |
| **4Q24** | 29.6% | 30.3% | 71 bps | -2.3% |
| **FY 2023** | 29.9% | 29.3% | **-57 bps** | **1.9%** |
| **FY 2024** | 29.7% | 28.9% | **-80 bps** | **2.7%** |

| Adjusted EPS[13] | | | | |
|---|---|---|---|---|
| | Originally Reported | As Restated | Increase/Decrease | % Overstatement |
| **1Q23** | $2.90 | $2.81 | **-$0.09** | **3.2%** |
| **2Q23** | $3.11 | $3.02 | **-$0.09** | **3.0%** |
| **3Q23** | $3.30 | $3.18 | **-$0.12** | **3.8%** |
| **4Q23** | $3.46 | $3.06 | **-$0.40** | **13.1%** |
| **1Q24** | $3.47 | $3.00 | **-$0.47** | **15.7%** |
| **2Q24** | $3.75 | $2.98 | **-$0.77** | **25.8%** |
| **3Q24** | $3.35 | $3.53 | $0.18 | -5.1% |
| **4Q24** | $3.43 | $3.86 | $0.43 | -11.1% |
| **FY 2023** | $12.79 | $12.09 | **-$0.70** | **5.8%** |
| **FY 2024** | $14.00 | $13.37 | **-$0.63** | **4.7%** |

[12] ICON calculated its reported gross margin by dividing its reported non-GAAP direct costs by its revenue and subtracting that result from one.

[13] ICON's GAAP EPS was overstated by the same dollar amounts.

415. SEC Staff Accounting Bulletin No. 99 ("SAB 99") confirms the materiality of ICON's admitted misstatements. SAB 99, codified in GAAP at ASC 250-10-S99, makes clear that an assessment of materiality requires an evaluation of both quantitative and qualitative factors.

416. ICON's admitted misstatements were quantitatively material because they had a significant impact on key financial measures relied upon by investors, analysts, and other market participants in evaluating ICON's financial performance. As shown above, ICON's net income was overstated by 10.5% in 2023 and 7.1% in 2024, with quarterly overstatements of up to 77.5% (in 2Q24). ICON's adjusted EBITDA was overstated by 3.1% in 2023 and 3.9% in 2024, with quarterly impacts of up to 19.3% (in 2Q24). Adjusted EPS was overstated by 5.8% in 2023 and 4.7% in 2024, with quarterly overstatements of up to 25.8% (in 2Q24). ICON's adjusted EBITDA and adjusted EPS are two of the primary financial measures relied upon by investors and analysts.

417. The overstatements are also well above the materiality thresholds set by ICON's auditor, KPMG. KPMG determined that materiality for ICON's "financial statements as a whole" was $30 million for 2023 and $35 million for 2024. ICON's admitted revenue overstatements of $65.3 million in 2023 and $92.7 million in 2024 were ***more than double*** KPMG's materiality thresholds in the corresponding years. ICON's admitted overstatements of net income ($58.1 million in 2023 and $52.3 million in 2023) and adjusted EBITDA ($51.5 million in 2023 and $65.4 million in 2024) were also well above KPMG's materiality thresholds.

418. Relevant qualitative factors further confirm the materiality of ICON's misstatements. <u>First</u>, the misstatements concealed ICON's failure to meet analysts' consensus expectations. The misstatements drove ***every*** revenue, adjusted EBITDA, and adjusted EPS "beat" ICON reported during 2023 and the first two quarters of 2024. After correcting the misstatements,

ICON missed consensus expectations for revenue, adjusted EBITDA, and adjusted EPS for ***every quarter*** during that period, as shown below:

| **Revenue** | **1Q23** | **2Q23** | **3Q23** | **4Q23** | **1Q24** | **2Q24** |
|---|---|---|---|---|---|---|
| Consensus Estimate | $1,980.4 | $2,017.3 | $2,054.8 | $2,093.0 | $2,088.4 | $2,141.6 |
| Original Reported | $1,978.6 | $2,020.3 | $2,055.1 | $2,066.2 | $2,090.4 | $2,120.2 |
| Original Outcome | Miss | Beat | Beat | Miss | Beat | Miss |
| Restated | $1,965.8 | $2,008.2 | $2,040.3 | $2,040.6 | $2,043.3 | $2,041.9 |
| Revised Outcome | Miss | Miss | Miss | Miss | Miss | Miss |

| **Adjusted EBITDA** | **1Q23** | **2Q23** | **3Q23** | **4Q23** | **1Q24** | **2Q24** |
|---|---|---|---|---|---|---|
| Consensus Estimate | $397.6 | $411.7 | $425.0 | $438.4 | $439.5 | $453.2 |
| Original Reported | $399.1 | $414.2 | $432.5 | $448.2 | $444.0 | $450.4 |
| Original Outcome | Beat | Beat | Beat | Beat | Beat | Miss |
| Restated | $390.0 | $405.3 | $421.1 | $426.2 | $401.0 | $377.5 |
| Revised Outcome | Miss | Miss | Miss | Miss | Miss | Miss |

| **Adjusted EPS** | **1Q23** | **2Q23** | **3Q23** | **4Q23** | **1Q24** | **2Q24** |
|---|---|---|---|---|---|---|
| Consensus Estimate | $2.87 | $3.08 | $3.28 | $3.45 | $3.41 | $3.67 |
| Original Reported | $2.90 | $3.11 | $3.30 | $3.46 | $3.47 | $3.75 |
| Original Outcome | Beat | Beat | Beat | Beat | Beat | Beat |
| Restated | $2.81 | $3.02 | $3.18 | $3.06 | $3.00 | $2.98 |
| Revised Outcome | Miss | Miss | Miss | Miss | Miss | Miss |

419. The misstatements also drove ICON's adjusted EBITDA and adjusted EPS "beats" for full-year 2023 and revenue and adjusted EBITDA "beats" for full-year 2024:

| **Revenue** | **2023** | **2024** |
|---|---|---|
| Consensus Estimate | $8,146.3 | $8,281.1 |
| Original Reported | $8,120.2 | $8,281.7 |
| Original Outcome | Miss | Beat |
| Restated | $8,054.9 | $8,189.0 |
| Revised Outcome | Miss | Miss |

| **Adjusted EBITDA** | **2023** | **2024** |
|---|---|---|
| Consensus Estimate | $1,674.6 | $1,732.0 |
| Original Reported | $1,694.1 | $1,735.8 |
| Original Outcome | Beat | Beat |
| Restated | $1,642.6 | $1,670.4 |
| Revised Outcome | Miss | Miss |

| **Adjusted EPS** | **2023** | **2024** |
|---|---|---|
| Consensus Estimate | $12.77 | $14.01 |
| Original Reported | $12.79 | $14.00 |
| Original Outcome | Beat | Miss |
| Restated | $12.09 | $13.37 |
| Revised Outcome | Miss | Miss |

420. The examples above—where ICON's admitted overstatements repeatedly turned earnings "misses" into "beats"—are hallmarks of qualitative materiality.

421. Second, the misstatements masked a change in earnings trends. As shown above, ICON's actual revenue remained flat for four consecutive quarters—from 3Q23 through 2Q24. However, the misstatements falsely indicated sustained revenue growth, with revenue purportedly increasing ***every quarter*** during that period. Similarly, ICON's adjusted EBITDA declined in 1Q24 and 2Q24, and adjusted EPS declined from 4Q23 through 2Q24, but the misstatements falsely indicated adjusted EBITDA and adjusted EPS growth during these periods.

422. Third, the misstatements concerned a segment of ICON's business that played a significant role in its operations and profitability. ICON's clinical trial services provided over 95% of ICON's total revenue.

423. Fourth, the misstatements increased management's compensation by allowing Cutler and Brennan to reap nearly $2 million in Performance Stock Units. (*See* Section VIII.A.)

424. Multiple former employees described the systemic practices that led ICON to admit "material accounting errors," including "improper adjustments recorded to recognize revenue outside of normal system processes"; "errors in determining the estimated cost to complete," "the assessment of realizable value," and "the impact of cost accruals"; and "manual adjustments."

425. As detailed above, the "improper adjustments" and "errors in determining the estimated cost to complete" included: (1) negative management reserves and other manipulation to understate project costs (FE-16, FE-18, FE-19); (2) the 15 percent reduction of forecasted pass-

through costs (FE-17, FE-18); (3) "CNL" entries to inflate revenue and margins (FE-5, FE-6, FE-17, FE-18); and (4) "blue sky" forecasts to understate total project costs (FE-20). These practices shrank the denominator of the ASC 606 formula to inflate ICON's revenue and margins.

426. Other "manual adjustments" and errors in "the assessment of realizable value" and "the impact of cost accruals" included: (1) recognizing revenue based on hours that were either fraudulent (*i.e.*, not actually worked) or did not advance the project (FE-20); (2) prematurely recognizing revenue for work that ICON had not performed (FE-3, FE-16, FE-20); (3) recognizing revenue from draft, unsigned change orders (FE-3); and (4) using premature, fake invoices and manual entries in Rev to pull forward revenue (FE-4, FE-16, FE-17, FE-18, FE-22).

427. Former employees also confirmed the improper practices' material impact on ICON's revenue. The impact on the FEs' own studies alone was at least $20 million in annual revenue, comprising a substantial portion of the revenue that ICON admittedly overstated ($65.3 million in 2023 and $92.7 million in 2024). Further, the FEs made clear that their own studies are merely illustrative, since the same improper practices were broadly applied to other studies. In total, the FEs observed over $75 million in improperly recognized annual revenue from Defendants' GAAP violations, impacting over eighty studies in both the U.S. and Europe.

428. FE-3 indicated that ICON's improper accounting practices added up to $10 million in annual revenue on his biotech portfolio, which generated $350 million in annual revenue, comprised about 10% of ICON's biotech division, and ranged from 50 to 70 studies. FE-3 reported that ICON's improper accounting practices affected his full portfolio and added up to $1 million to a single study within his portfolio, and that this impact could be multiplied by hundreds of studies to understand the full impact on ICON's biotech division.

429. FE-5, who worked on over 20 studies, stated that the use of CNL greatly impacted

at least half of his studies, resulting in up to a 10% to 20% difference in margin. Similarly, FE-6 explained that CNL applied to most or all Janssen studies and noted that ICON had at least five to six large Janssen studies, which averaged about $1.5 to $2 million in revenue per month.

430. FE-16 described three practices that added $4.9 million in revenue to his own portfolio, which generated up to $72 million in annual revenue, in 2023: (1) ICON's manipulation of cost reserves that boosted revenue by 1-2% (or up to $1.4 million); (2) the acceleration of up to $3 million in revenue by billing two months of units in one month; and (3) ICON's premature revenue recognition of about $500,000 on a MAPI Pharma study in the second half of 2023.

431. FE-17's studies were part of ICON's broader European portfolio, which generated about $40 million in monthly revenue, or $480 million per year. FE-17 explained that this European portfolio had revenue gaps of up to $5 million per month that were repeatedly filled through various forms of "creative accounting," including from July 2023 to July 2024, indicating that ICON's manipulation added up to $60 million in annual revenue to the European portfolio.

432. FE-18, who managed a portfolio that generated over $420 million in annual revenue, explained that ICON booked at least $10 million in improper negative management reserves on his studies in the first half of 2024 alone. By understating total project costs, these improper negative management reserves boosted annual revenue by $4.2 million on FE-18's studies.[14] FE-18 noted that ICON's negative management reserve practice broadly affected the entire legacy PRA business. FE-19 stated that Jameson deleted costs on approximately 40 analysts' studies; some analysts had portfolios that generated up to $20 million in monthly revenue.

[14] These calculations apply $10 million in negative management reserves to total project costs of $1 billion on a portfolio with $1.68 billion in total contract value and average study duration of four years. By reducing the percentage-of-completion denominator from $1 billion to $990 million, the negative management reserves increase revenues by $4.2 million per year.

433. FE-20 estimated ICON's overstatement of revenue as about 2% across his portfolio of large, full-service projects that generated up to $40 million in annual revenue, indicating an increase in annual revenue of nearly $1 million.

434. This extensive manipulation rendered ICON's public financial statements materially false. Not only has ICON admitted that its financial statements contained "misstatements" and "material errors," but multiple FEs confirmed that the manipulation affected ICON's financial reporting. (FE-5, FE-6, FE-16, FE-18.) Studies' financial performance was manipulated in Rev, which was used to calculate revenue and used for financial reporting. (FE-5, FE-6, FE-16, FE-18.) Rev was the source of truth for ICON's revenue calculations (FE-17) and provided the revenue numbers used in Oracle to prepare ICON's financial statements (FE-18).

435. These systemic violations were no accident. They resulted from intense pressure from ICON's senior management that was enforced via "revenue sweeps" and operationalized through Company-wide procedures and practices, including CNL, which was taught in training and incorporated into Rev software via a drop-down menu that allowed the user to select "Costs Not Loaded" (FE-5); revenue recognition from draft, unsigned change orders, which was "standard operating procedure" at ICON (FE-3); and ICON's manipulation of costs, negative management reserves, and cost deletion on numerous studies (FE-16, FE-17, FE-18, FE-19, FE-20).

### X. ICON's Admitted "Material Weaknesses" in Internal Controls and Ineffective Disclosure Controls Establish Material Falsity

436. Defendants falsely stated that ICON's "internal control over financial reporting was effective" and that ICON had "effective" disclosure controls and procedures, even touting "strong internal controls" after the Audit Committee secretly commenced an internal investigation. ICON has now admitted to having "material weaknesses" in internal controls over financial reporting and disclosure controls and procedures that "were not effective."

437. Internal controls over financial reporting ("ICFR") ensure that public companies provide investors with complete and accurate financial reporting. The 2013 COSO Framework, which ICON claimed to apply, identifies five components: (1) Control Environment, (2) Risk Assessment, (3) Control Activities, (4) Information and Communication, and (5) Monitoring. Each component must be effective for management to assert that ICFR as a whole is effective.

438. At the time of its restatement, ICON acknowledged the existence of two material weaknesses[15] in ICFR that had "contributed to material accounting errors":

> I ***The Company's entity level controls, including the tone from management, were insufficient*** to enforce the monitoring and maintenance of a proper environment for effective internal control over financial reporting consistent with the COSO framework that:
>
> a. Reinforces the ***importance of internal controls and the expected standards of conduct***, and the ***need to hold individuals accountable for their internal control responsibilities in the pursuit of business objectives***; and,
>
> b. Maintains a ***sufficient complement of appropriately experienced personnel with expertise, knowledge and training in U.S. GAAP and internal control over financial reporting*** commensurate with the Company's financial reporting requirements.
>
> II ***Management did not design and operate effective internal controls to prevent material errors to revenue and related accounts.*** Specifically:
>
> a. ***Management's review of estimates, including underlying assumptions, made for the percentage-of-completion input method for long-term clinical trial contracts, were not performed sufficiently***;
>
> b. There was ***ineffective segregation of duties and review of manual revenue adjustments recorded in the revenue systems*** in respect of long-term clinical trial contracts; and

[15] A "[m]aterial weakness" means "a deficiency, or a combination of deficiencies, in [ICFR] such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis." 17 C.F.R. § 210.1-02(a)(4).

c. Management's reviews of the accounting for other performance obligations and contract asset and liability balances associated with the long-term clinical trial contracts were not performed sufficiently.

439. ICON's first material weakness occurred within the Control Environment, which encompasses the overriding entity-level controls that provide the basis for carrying out internal control. ICON failed in at least two relevant principles: (1) establishing an internal control structure with appropriate structures, reporting lines, authorities and responsibilities in the pursuit of objectives; and (2) failing to attract, develop, and retain competent personnel.

440. The second material weakness occurred in the Control Activities component. Control Activities are the process-level actions that help ensure management mitigates the risk of material misstatements. The failures within the Control Activities component are observable in the errors that required restatement of revenue in ICON's financial statements (described above).

441. ICON's admitted material weaknesses in ICFR establish the falsity of Defendants' prior statements that ICON had "effective" and "strong" ICFR. As the SEC has explained, "***if a material weakness exists, management may not state that the company's ICFR is effective***." (SEC Release No. 33-8810, at 38.) ICON has further admitted that the material weaknesses led to "material errors to revenue and related accounts."

442. While ICON stated that its ICFR "was not effective as of December 31, 2025," ICON also admitted that the material weaknesses "contributed to material accounting errors" in its "financial statements ***for the years ended December 31, 2024 and 2023***," demonstrating the material weaknesses' existence at the time. Moreover, ICON had previously stated that "[t]here were no changes in" its ICFR between January 1, 2023 and December 31, 2024, confirming that the same material weaknesses had existed since the start of the Class Period.

443. Former employees' accounts confirm the material weaknesses in ICON's ICFR. Relevant to the admitted material weakness regarding "tone from management" and failure to

enforce "the expected standards of conduct," FE-16 observed that ICON was governed by SOX and U.S. GAAP, but it never seemed to register with ICON's leadership that the Company had to comply with these requirements. For example, FE-16 indicated that Sheehan was "hell-bent" on hitting financial targets rather than ensuring accuracy and noted that Sheehan didn't seem to care about process deviations or SOX requirements.

444. Relevant to ICON's lack of "appropriately experienced personnel" in "U.S. GAAP and internal control over financial reporting" and the admitted material weakness concerning "material errors to revenue" and "ineffective segregation of duties and review of manual revenue adjustments," Sheehan both led ICON's finance function and supervised ICON's internal audit team (FE-18)—a lack of separation of duties. Further, Jameson both submitted and approved negative management reserves in Rev, which represented a lack of internal controls because companies are supposed to have a secondary review between the submission and approval processes. (FE-18.) Similarly, FE-17 confirmed that ICON allowed the same person to submit and approve revenue tasks in Rev. Notably, Rev originally had controls that prevented this, but after ICON acquired PRA in 2021, the process quickly changed to allow such "double approvals." (FE-17.) Even where employees like FE-16 tried to report accurately on their studies, someone else overrode them and manipulated the results, which led FE-16 to state that ICON did not have the most sophisticated control environment.

445. Relevant to the admitted material weakness concerning "manual revenue adjustments," multiple former employees confirmed that ICON's systems allowed for such adjustments, including revenue sweeps (FE-3, FE-18), the use of CNL (FE-5, FE-6, FE-17), negative management reserves and the manual deletion of hours and costs, including Jameson's

deletion of costs on approximately 40 analysts' studies (FE-16, FE-17, FE-18, FE-19), and manual updates to Rev to reflect revenue that ICON pulled forward based on premature invoices (FE-17).

446. Disclosure controls and procedures ("DCP") are "controls and other procedures . . . designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the [Exchange] Act . . . is recorded, processed, summarized and reported, within the time periods specified in the [SEC's] rules and forms." 17 C.F.R. § 240.13a-15(e).

447. During the Class Period, Defendants stated that ICON's DCP were "effective" and that management had designed DCP "to ensure that material information relating to [ICON], including its consolidated subsidiaries, is made known to us by others within those entities." However, ICON has now admitted that its "disclosure controls and procedures were not effective as of December 31, 2025, due to the existence of material weaknesses in the Company's internal control over financial reporting . . . ." This admission establishes that Defendants' prior statements of "effective" DCP were false. As explained above, ICON's underlying material weaknesses in ICFR had existed since January 2023, rendering ICON's DCP ineffective for the same period.

## V. DEFENDANTS' FRAUD UNRAVELS

448. The truth about ICON came to light through a series of disclosures driven by the facts that Defendants misstated and concealed. Each event was followed by a significant decline in ICON's share price.

449. First, on October 23, 2024, ICON reported 3Q24 financial results in a press release filed on Form 6-K with the SEC after market close. In the press release, ICON revealed a surprise "revenue shortfall" of $100 million for 3Q24, reduced 2024 guidance, and revealed that leading indicators of underlying demand had significantly deteriorated.

450. During ICON's earnings conference call on October 24, 2024, before market open, Cutler purported to explain the drivers of the poor financial results and reduced guidance.

451. First, Cutler revealed that ICON experienced "lower than anticipated revenue contribution from two of our largest customers." Cutler claimed that the customers had "delay[ed] the expected ramp-up of new work that was forecast to begin in the new models." As a result, "studies clos[ed] out . . . without the counterbalancing revenue from new studies as expected."

452. These explanations were misleading (at best). As detailed above, Cutler had long known about the prolonged slowdown in business from Pfizer and other large customers, including Pfizer's decisions in 2023 to stop awarding ICON any lucrative full-service work and to exclude ICON from 85% of Pfizer's largest studies.

453. By early 2024, Pfizer, BMS and a third large customer had shifted to nearly 100% FSP, decimating ICON's margins from 40–50% to 15%. That slashed hundreds of millions of dollars from ICON's profits, leaving a hole ICON could not fill.

454. Further, in January 2024, Cutler personally approved Pfizer's request to cut $50 million from the budget for ICON's remaining studies. These developments drove ICON's efforts to dissolve the dedicated PSBU since early 2024 and significant layoffs in March 2024. Pfizer's large COVID-flu vaccine trial had also failed by early August 2024.

455. FE-11 described the notion that CEO Cutler only learned about Pfizer's cuts in September 2024 as "***bullshit***." FE-11 explained that a business reduction of that magnitude was known to Cutler and ICON's other executives 12 to 18 months ahead of time, and they simply decided to delay public disclosure in an effort to generate other business to make up for the known loss. FE-11 cited Novartis' 10% headcount reduction, which was extensively discussed internally starting seven months before it happened.

456. Moreover, with ICON's years-long trend of declining business from Pfizer and other large customers—including budget cuts that Cutler had personally approved—Defendants

had no factual basis to "expect[]" "counterbalancing revenue from new studies." Indeed, the three large customers' shift to FSP carried a 25–35% lower margin and slashed up to $500 million from ICON's profits. Filling that substantial hole in profits would require ICON to immediately ***triple*** its revenue from these customers. But these customers never offered to triple their business with ICON. Instead, they canceled studies and aggressively pushed ICON for budget cuts, which Cutler approved.

457. Defendants' purported expectation of "counterbalancing revenue from new studies" also had no factual basis because ICON's study revenue is tied to enrollment of patients—a lengthy process that can take over a year. ICON itself has stated that it "typically takes 6-12 months to start up a global phase III drug trial and another 12 months to enroll the required number of patients."[16] Given this lengthy start-up period, Cutler and other ICON executives necessarily knew long before October 2024 that there would be no "counterbalancing revenue" in 2024. Indeed, Defendant Brennan admitted on November 29, 2023 that "80% of our business for next year or there or thereabouts is already decided by the time we get to the end of Q3." Thus, the vast majority of ICON's 2024 business was already decided by 3Q23.

458. Second, Cutler revealed "slower than expected activity in our biotech segment" that "impacted our total level of new awards" and led to "delays in study startup."

459. Again, this biotech slowdown had long been known to Defendants: ICON had seen a continuous reduction in biotech RFPs since late 2022, and a trend of increasing biotech cancellations by mid-2023, even as Defendants told investors the opposite. These internally known metrics made clear to Defendants that ICON's biotech business was dying.

---

[16] https://www.iconplc.com/news-events/press-releases/revolutionising-clinical-trials

460. Third, Cutler asserted that "an outsized level of vaccine related cancellations" was "contributing to the lower than expected revenue in the second half of this year." However, Defendants had known for months that the Pfizer COVID-flu vaccine trial had failed; Pfizer itself had admitted the failure on August 16, 2024 (though ICON's role was not revealed at the time).

461. Tellingly, in response to analyst questions, Cutler admitted that ICON had not accurately gauged the "risks and opportunities" in 3Q24, explaining that "going forward [we] will reformulate and relook at what those risks and opportunities are and ***be able to be a little bit more accurate***, if that's the right word in terms of in terms of how we I [sic] think the world is going to go and how it's going to come in." Cutler added that "we need to just look at ourselves a little bit more closely and ***make sure that we are projecting and forecasting in a way that is reflective of those risks***," tacitly admitting that Defendants had not done so before.

462. In response to an analyst question, Cutler also admitted that customers' overconcentration with ICON after the PRA Merger played a part in the disappointing results: "it's fair to say that one or two [customers] have looked at if PRA and ICON were significant providers in the previous mix and now [that] we've come together" customers have "looked at that" concentration of work and "in one or two cases [they] brought on [a] competitor" to take work ICON previously handled. Cutler then revealed, "that's what we expected."

463. ICON's poor 3Q24 results and guidance cut also reflected the partial collapse of Defendants' accounting scheme and GAAP violations, which were increasingly unable to offset the declines in ICON's underlying business.

464. While ICON's October 23 and 24, 2024 disclosures were highly negative, Defendants continued to misstate and conceal the full truth. For instance, Cutler indicated in ICON's October 23 press release that the headwinds would be short-lived, while insisting the

"fundamentals of our business remain strong," and during ICON's October 24 earnings call, Cutler falsely claimed that "the RFP flow continues to be solid across both segments of our market, both large pharma and biotech." Defendants also continued to publish false financial statements in violation of GAAP and falsely state that ICON had effective controls.

465. On the news from October 23, 2024 to October 24, 2024, the price of ICON ordinary shares declined $59.03 per share, or 21%, from $280.76 per share on October 23, 2024, to $221.73 per share on October 24, 2024.

466. Next, on January 14, 2025, before market open, ICON issued financial guidance for 2025 in a press release filed on Form 6-K with the SEC. ICON announced revenue guidance for 2025 in the range of $8.05 billion to $8.65 billion, below analysts' expectations. In the press release, ICON cited "cautious spending from biopharma customers, in both the biotech and large pharma businesses" and "an expected transition period which includes a headwind from our top two customers on a combined basis, coupled with an inconsistent recovery in biotech."

467. Also on January 14, 2025, ICON participated in an industry conference call hosted by J.P. Morgan. In response to an analyst question about the disappointing guidance, Cutler explained: "What we see is, particularly on the biotech side, a little bit of softening and softening of the backlog. Cancellations ticked up modestly in Q4." As detailed above, however, ICON's biotech cancellations had steadily increased for over two years, since late 2022.

468. When pressed on ICON's assumptions on growth for its "two largest customers and the rest of the portfolio," Cutler further revealed that ICON only expected "lower single digits [growth] outside of [its] top 2" customers, while newly-appointed COO Balfe added that ICON did not have "a huge update" on its two largest customers from the 3Q24 earnings call.

469. On the January 14, 2025 news, the price of ICON ordinary shares declined $17.75 per share, or 8.1%, from $217.99 per share on January 13, 2025, to $200.24 per share on January 14, 2025.

470. Next, on October 22, 2025, after market close, ICON reported elevated cancellations, which reached $901 million in 3Q25—the delayed result of ICON's failure to timely recognize cancellations of stale awards. In response, ICON's share price declined by $12.60, or 6.5%, on October 23, 2025.

471. On January 7, 2026, after market close, ICON announced that it would not release 2026 guidance in January, contrary to its historical practice. ICON's delayed 2026 guidance was driven by the ongoing—but not yet publicly disclosed—internal investigation of the Company's accounting and controls. As the market digested this negative news, ICON's share price dropped by $14.70, or 7.2%, on January 8, 2026, and dropped another $6.84, or 3.6%, on January 9, 2026.

472. Despite delaying the release of 2026 guidance, ICON still needed to file its 2025 financial statements—its first audited financial reporting since Cutler's departure as CEO. In addition, ICON's new auditors at Ernst & Young were required to review the Company's accounting practices and controls for the first time. Coupled with the Audit Committee's ongoing internal investigation of these issues, the dam was about to break.

473. Finally, on February 12, 2026, before market open, ICON issued a press release that revealed ICON's months-old internal investigation "into certain of the Company's accounting practices and controls"; "preliminary indications" that "the Company's revenue in 2023 and 2024 may have been overstated"; and that ICON "expects to report one or more material weaknesses" in internal controls. ICON also reported that it "is not yet able to communicate its 2025 financial performance and is withdrawing its previously issued 2025 full year financial guidance."

474. On this news, the price of ICON ordinary shares declined $53.06 per share, or 39.9%, from $133.14 per share on February 11, 2026, to $80.08 per share on February 12, 2026.

## VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

475. Defendants made false and misleading statements throughout the Class Period concerning the following topics: (1) ICON's RFPs, large pharma and biotech businesses; (2) ICON's book-to-bill ratio, gross and net business wins, cancellations, and backlog; (3) ICON's purported GAAP compliance, revenue recognition, and accounting methodology; (4) ICON's internal controls over financial reporting and disclosure controls; and (5) ICON's financial performance. Each misstatement that Plaintiffs allege to be actionable is identified in this section.

### A. Misstatements about ICON's RFPs, Large Pharma and Biotech Businesses

#### 1. 2Q23 Earnings Call

476. On July 27, 2023, ICON hosted a conference call with analysts to discuss the Company's 2Q23 financial results. In his prepared remarks, Defendant Cutler stated:

> ***Overall RFP activity continued the sequential improvement we experienced in quarter 1***, and ***we saw a notable pickup in RFP activity within the biotech segment toward the end of quarter 2***.

This statement was materially false because ICON's overall RFPs and biotech customer RFPs declined throughout 2023. This statement was also materially misleading because it cited purported improvements in ICON's "RFP activity" while omitting the existing, material, negative facts that (1) many of these RFPs were issued only for price discovery, not to award actual business to ICON; (2) many of these RFPs were duplicative because they involved proposed studies that were competing for limited BARDA funding, such that only one study would materialize; and (3) ICON's biotech business was experiencing declining RFPs and increased cancellations. By failing to disclose these existing, material, negative facts, Defendant Cutler omitted material facts necessary to make the statement not misleading in the context in which it was made.

477. Defendant Cutler then continued with his prepared remarks, stating:

> ***And while it's early in the third quarter, we have seen RFP activity continue its positive trajectory in July***.

This statement was materially false because ICON's overall RFPs declined throughout 2023. This statement was also materially misleading because it cited purported improvements in ICON's "RFP activity" while omitting the existing, material, negative facts that (1) many of these RFPs were issued only for price discovery, not to award actual business to ICON; (2) many of these RFPs were duplicative because they involved proposed studies that were competing for limited BARDA funding, such that only one study would materialize; and (3) ICON's biotech business was experiencing declining RFPs and increased cancellations. By failing to disclose these existing, material, negative facts, Defendant Cutler omitted material facts necessary to make the statement not misleading in the context in which it was made.

478. Later in the call, analyst Alexander Yearley Draper from Guggenheim Securities, LLC, asked for "any more color on how you see [bookings improvement] and is that primarily driven by the biotech area?" Defendant Cutler replied:

> The opportunities that we're seeing in the business and not just in the biotech, they're really fairly broad-based across the business. So really, we -- I think ***we reported last quarter an increase in RFP[s] on a sequential basis. That's continued in the second quarter***.

This statement was materially false because ICON's overall RFPs declined throughout 2023. This statement was also materially misleading because it cited "an increase in RFP[s] on a sequential basis" while omitting the existing, material, negative facts that (1) many of these RFPs were issued only for price discovery, not to award actual business to ICON; (2) many of these RFPs were duplicative because they involved proposed studies that were competing for limited BARDA funding, such that only one study would materialize; and (3) ICON's biotech business was experiencing declining RFPs and increased cancellations. By failing to disclose these existing,

material, negative facts, Defendant Cutler omitted material facts necessary to make the statement not misleading in the context in which it was made.

### 2. 3Q23 Earnings Call

479. On October 26, 2023, ICON hosted a conference call with analysts to discuss the Company's 3Q23 financial results. In his prepared remarks, Defendant Cutler stated:

> Overall, ***RFP activity continued to improve in quarter 3 with growth in the high single digits on a trailing 12-month basis***.

This statement was materially false because ICON's overall RFPs declined throughout 2023. This statement was also materially misleading because it cited the purported fact that "RFP activity continued to improve in quarter 3" while omitting the existing, material, negative facts that (1) many of these RFPs were issued only for price discovery, not to award actual business to ICON; (2) many of these RFPs were duplicative because they involved proposed studies that were competing for limited BARDA funding, such that only one study would materialize; and (3) ICON's biotech business was experiencing declining RFPs, a lower win rate, and increased cancellations. By failing to disclose these existing, material, negative facts, Defendant Cutler omitted material facts necessary to make the statement not misleading in the context in which it was made.

480. During the call, analyst Christine Rains of William Blair asked about the "impact [that] Pfizer's recently announced cost cuts [would have]? And was this baked into your outlook? Or were they unexpected?" Defendant Cutler replied:

> ***No, these are relatively expected***. We're in close contact with our partner customers on a regular basis, and we recognize the challenges that, that particular customer has. We're working closely with them in terms of what they're looking to do. ***No. [N]othing has been decided at this point. There is sometimes, with these sort of things, some opportunity for us and that they were happy to further consolidate their spending, even though they're looking to take that overall spend down over the relatively short term. So these things aren't always negative for us***, but we work closely with our partners to look at it, and we have that in the forecast.

This statement was materially false because Pfizer had already "decided" to implement significant spending cuts, as detailed herein, that were "negative for" ICON and did not present "some opportunity for us." This statement was also materially misleading because it omitted the existing, material, negative facts, as detailed herein, that (1) Pfizer had materially decreased the amount and dollar value of its awards to ICON; (2) Pfizer had demanded significant budget cuts for ICON's existing studies; (3) ICON's PSBU continuously decreased in size from 2022; (4) ICON was losing significant business from other large customers, with the majority declining from early 2023 through 2024; (5) Pfizer and other large customers were switching to nearly 100% FSP, slashing ICON's profit margins; and (6) the PRA Merger had led to large customers' overconcentration that caused them to reduce their business with ICON. By failing to disclose these existing, material, negative facts, Defendant Cutler omitted material facts necessary to make the statement not misleading in the context in which it was made.

481. Later in the call, analyst Justin D. Bowers of Deutsche Bank asked, "can you sort of take the landscape for large pharma customers and biotech customers and maybe sort of like contrast that to this time last year or maybe even earlier this year?" Defendant Cutler responded:

> Yes. Justin, I mean, we've seen pretty constructive positive ***RFP numbers for -- certainly for the last 2 quarters over all the segments across biotech, large pharma***, in more sort of ancillary services, labs, early phases, et cetera, et cetera, ***and obviously, FSP as well***. ***So I talked about high single digits as being sort of across the landscape, and it's fairly consistently across those segments***.

This statement was materially false because ICON's overall RFPs and biotech customer RFPs declined throughout 2023. This statement was also materially misleading because it cited the purported fact that ICON's RFPs had increased by "high single digits" during "the last 2 quarters over all the segments across biotech [and] large pharma" while omitting the existing, material, negative facts that (1) many of these RFPs were issued only for price discovery, not to award actual business to ICON; (2) many of these RFPs were duplicative because they involved proposed

studies that were competing for limited BARDA funding, such that only one study would materialize; and (3) ICON's biotech business was experiencing declining RFPs, a lower win rate, and increased cancellations. By failing to disclose these existing, material, negative facts, Cutler omitted material facts necessary to make the statement not misleading in the context in which it was made.

482. Later in the call, analyst Patrick Bernard Donnelly of Citigroup Inc. asked, "given what you're seeing on RFPs, it would be helpful maybe to frame up that 4Q book-to-bill expectations given what you've seen over the last couple of months." Defendant Cutler responded:

> Well, I think, Patrick, we've said pretty clearly that ***RFPs have been up in the last couple of quarters***. . . . ***We've got the [1.26] this quarter***.

This statement was materially false because ICON's overall RFPs and biotech customer RFPs declined throughout 2023. This statement was also materially misleading because it cited the purported fact that "RFPs have been up in the last couple of quarters" while omitting the existing, material, negative facts that (1) many of these RFPs were issued only for price discovery, not to award actual business to ICON; (2) many of these RFPs were duplicative because they involved proposed studies that were competing for limited BARDA funding, such that only one study would materialize; and (3) ICON's biotech business was experiencing declining RFPs, a lower win rate, and increased cancellations. By failing to disclose these existing, material, negative facts, Defendant Cutler omitted material facts necessary to make the statement not misleading in the context in which it was made.

**3. November 2023 Jefferies Conference**

483. On November 14, 2023, Brennan attended Jefferies' London Healthcare Conference, during which analyst David Howard Windley asked Brennan "to start at the demand

environment again this afternoon and talk about the RFP flow acceleration that both you and Steve Cutler have talked about kind of seemingly starting in 2Q and extending to now." Brennan replied:

> ***Yes, it's been a solid environment over the last couple of quarters. We've seen definitely an uptick. . . . I think what we saw really in around -- it was probably around June, July time, was a significant kind of uptick from our biotech customers. And that certainly has persisted into the good volumes that we saw and we talked about in the Q3 call and persists as we go into Q4 as well*.**

This statement was materially false because ICON had not seen "an uptick" or "a significant kind of uptick from our biotech customers" that "persisted into the good volumes that we saw and we talked about in the Q3 call and persists as we go into Q4." Instead, ICON's overall RFPs and biotech customer RFPs declined throughout 2023. This statement was also materially misleading because it cited an "uptick," "a significant kind of uptick from our biotech customers," and "the good volumes that we saw and we talked about in the Q3 call and persists as we go into Q4" while omitting the existing, material, negative facts that (1) many of these RFPs were issued only for price discovery, not to award actual business to ICON; (2) many of these RFPs were duplicative because they involved proposed studies that were competing for limited BARDA funding, such that only one study would materialize; and (3) ICON's biotech business was experiencing declining RFPs, a lower win rate, and increased cancellations. By failing to disclose these existing, material, negative facts, Defendant Brennan omitted material facts necessary to make the statement not misleading in the context in which it was made.

484. In addition, Brennan indicated that ICON's full-service and FSP businesses had similar margins, stating:

> We obviously have a blended margin of -- in the 29% to 30% gross margin profile as an organization. ***It is fair to say that our pure full service work is a couple of percent higher than that in terms of its margin profile. It's also fair to say that our FSP work is a couple of percent below that. So one is in the kind of in the mid-to high 20s and the other one is in the kind of low 30s***.

This statement was materially false because ICON's margins on FSP and full-service work are not "in the mid-to high 20s" and "low 30s," and neither is within "a couple of percent" of 29–30% gross margin. Instead, ICON's actual margins on FSP work are only around 15%, compared to 40–50% for full-service work.

#### 4. November 2023 Evercore ISI Conference

485. On November 29, 2023, Defendant Brennan attended Evercore ISI's HealthCONx Conference. At the conference, analyst Elizabeth Hammell Anderson asked, "any sort of changes in RFP flow as we're thinking about 4Q?" Defendant Brennan responded:

> ***No***, at this stage, it remains solid. ***And we talked about being up nicely year-over-year on a trailing 12-month basis. That persists into Q4***. I think the mix of it is pretty decent as well. So it's not – we've seen obviously -- ***as I mentioned, we saw kind of good recovery in biotech and emerging biotech, small biotech, particularly in Q3. That remains stable, is the best way to put it as we go into Q4***.

This statement was materially false because ICON was not "up nicely year-over-year on a trailing 12-month basis" and had not seen a "good recovery in biotech . . . particularly in Q3," and biotech was not "stable . . . as we go into Q4." Instead, ICON's overall RFPs and biotech customer RFPs declined throughout 2023. This statement was also materially misleading because it touted an increase in ICON's RFPs, a "good recovery in biotech," and that biotech was "stable . . . as we go into Q4," while omitting the existing, material, negative facts that (1) many of these RFPs were issued only for price discovery, not to award actual business to ICON; (2) many of these RFPs were duplicative because they involved proposed studies that were competing for limited BARDA funding, such that only one study would materialize; and (3) ICON's biotech business was experiencing declining RFPs, a lower win rate, and increased cancellations. By failing to disclose these existing, material, negative facts, Defendant Brennan omitted material facts necessary to make the statement not misleading in the context in which it was made.

### 5. 4Q23 Earnings Call

486. On February 22, 2024, ICON hosted a conference call to discuss the Company's 4Q23 and full-year 2023 financial results. In his prepared remarks, Defendant Cutler stated:

> ***In totality, across all segments, our overall trailing 12-month RFP activity increased in the high single digits in quarter 4, consistent with quarter 3 and this appears to be continuing or even accelerating early in 2024***.

This statement was materially false because ICON's overall RFPs declined throughout 2023. This statement was materially misleading because it claimed ICON's "overall trailing 12-month RFP activity increased in the high single digits in quarter 4" and that "this appears to be continuing or even accelerating early in 2024," while omitting the existing, material, negative facts that (1) many of these RFPs were issued only for price discovery, not to award actual business to ICON; (2) many of these RFPs were duplicative because they involved proposed studies that were competing for limited BARDA funding, such that only one study would materialize; and (3) ICON's biotech business was experiencing declining RFPs, a lower win rate, and increased cancellations. By failing to disclose these existing, material, negative facts, Defendant Cutler omitted material facts necessary to make the statement not misleading in the context in which it was made.

487. Later in the call, analyst Elizabeth Hammell Anderson from Evercore ISI asked, "Can you talk about sort of the level of visibility on your strategic partnerships with large pharma and how kind of you -- maybe they help you get a sense of sort of where their pipelines are going, and can help give people a little bit more confidence in the trajectory there?" Defendant Cutler replied:

> ***I'm not hearing again at this stage any further concerns on funding or on their R&D spend***. ***If anything, based on the RFP of opportunities we've got over the last couple of months and even last quarter, last year and the second and third quarter was strong as well, we're seeing more opportunities***. So I guess I keep saying it, but as their budgets become perhaps a little bit more constrained or they watch where they're spending their dollars, ***they do appear to becoming*** [sic] ***more***

> ***open to outsourcing and outsourcing even more than they're doing at the moment*. . .**

This statement was materially false because, contrary to Defendant Cutler's statement that "I'm not hearing again at this stage any further concerns on funding or on their R&D spend" and "they do appear to [be] becoming more open to outsourcing and outsourcing even more," (1) Pfizer had stopped awarding new full-service business to ICON as part of a "strategic refresh," and Cutler had internally admitted that ICON had lost the "Pfizer opportunity" and was no longer a preferred partner of Pfizer; (2) Pfizer had materially decreased the amount and dollar value of its awards to ICON, such that ICON's win rate was near zero and ICON was closed out of 85% of Pfizer's most lucrative Phase 2 and 3 business; (3) Pfizer had demanded—and Cutler had personally approved—significant budget cuts for ICON's existing studies; (4) ICON's PSBU continuously decreased in size from 2022; (5) ICON was losing significant business from other large customers, with the majority declining from early 2023 through 2024; (6) Pfizer and other large customers were switching to nearly 100% FSP, slashing ICON's profit margins; and (7) the PRA Merger had led to large customers' overconcentration that caused them to reduce their business with ICON. This statement was also materially misleading because it omitted these existing, material, negative facts, as well as the facts that (8) many of ICON's purported RFPs were issued only for price discovery and/or duplicative because they involved proposed studies that were competing for limited BARDA funding; and (9) ICON's biotech business was experiencing declining RFPs, a lower win rate, and increased cancellations. By failing to disclose these existing, material, negative facts, Defendant Cutler omitted material facts necessary to make the statement not misleading in the context in which it was made.

488. Later in the call, analyst Jailendra P. Singh of Truist asked, "It seems you're encouraged by data points and trends you've seen in Q1 thus far, but you're maintaining your

outlook, which assume[s] slower CRO industry growth. So is it fair to say that you're not reflecting recent trends in your outlook? And if these trends continue, would you say that will be kind of upside to your expectations for the year?" Defendant Cutler replied:

> . . . ***As we've gone into the first half of the first quarter of this year, we've probably seen the RFPs tick up and the environment sort of move up a notch*. *A lot of that [is] through strength in large pharma***, some of the strategic partnerships we've talked about are bearing fruit in terms of opportunities. ***But we're also seeing a modest uptick around mid-single digits in the biotech space as well. So we talked about biotech stabilizing and improving. And that seems to be playing out in the first -- as I say, the first very early part of this year***.

This statement was materially false because the Company did not "see[] the RFPs tick up and the environment sort of move up a notch" due to "strength in large pharma" and an "uptick around mid-single digits in the biotech space." Instead, ICON's biotech customer RFPs declined throughout 2023 and 2024. This statement was also materially misleading because it claimed that the purportedly increasing RFP activity was due to "strength in large pharma" and an "uptick around mid-single digits in the biotech space" while omitting the existing, material, negative facts that (1) many of these RFPs were issued only for price discovery, not to award actual business to ICON; (2) many of these RFPs were duplicative because they involved proposed studies that were competing for limited BARDA funding, such that only one study would materialize; (3) ICON's biotech business was experiencing declining RFPs, a lower win rate, and increased cancellations; and (4) ICON was losing significant business from Pfizer and other large pharma customers, with the majority declining from early 2023 through 2024. By failing to disclose these existing, material, negative facts, Defendant Cutler omitted material facts necessary to make the statement not misleading in the context in which it was made.

489. Later in the call, analyst Luke England Sergott of Barclays asked, "as you guys have shifted more towards large pharma, given the lack of biotech funding and RFPs out there, the

large CROs are competing on fewer projects. So are you guys seeing fewer projects across large pharma?" Defendant Cutler replied:

> ***Well, we're certainly seeing more opportunities in large pharma. No question about that. The RFP dollars that are coming through are very solid. And then driving that, as I say, that early '24 mid-teens increase in RFP on a trailing 12-month basis***. . . . I would say that in our -- with our opportunities, ***because we're strategic with a number of these customers, our win rate tends to be higher in that part of the market as well. So we win a greater proportion of those dollars*** and [sic] we do in other parts of the market where we're competing with a number of different organizations and there are different perspectives on large versus small CROs, et cetera, et cetera.

This statement was materially false because rather than "seeing more opportunities in large pharma" and having a higher "win rate . . . in that part of the market," (1) Pfizer had stopped awarding new full-service business to ICON as part of a "strategic refresh," and Cutler had internally admitted that ICON had lost the "Pfizer opportunity" and was no longer a preferred partner of Pfizer; (2) Pfizer had materially decreased the amount and dollar value of its awards to ICON, such that ICON's win rate was near zero and ICON was closed out of 85% of Pfizer's most lucrative Phase 2 and 3 business; (3) Pfizer had demanded—and Cutler had personally approved—significant budget cuts for ICON's existing studies; (4) ICON's PSBU continuously decreased in size from 2022; (5) ICON was losing significant business from other large customers, with the majority declining from early 2023 through 2024; (6) Pfizer and other large customers were switching to nearly 100% FSP, slashing ICON's profit margins; and (7) the PRA Merger had led to large customers' overconcentration that caused them to reduce their business with ICON. This statement was also materially misleading because it omitted these existing, material, negative facts, as well as the facts that (8) many of ICON's purported RFPs were issued only for price discovery and/or duplicative because they involved proposed studies that were competing for limited BARDA funding; and (9) ICON's biotech business was experiencing declining RFPs, a lower win rate, and increased cancellations. By failing to disclose these existing, material, negative facts,

Defendant Cutler omitted material facts necessary to make the statement not misleading in the context in which it was made.

**6. March 2024 TD Cowen Conference**

490. On March 5, 2024, Brennan attended TD Cowen's Health Care Conference. At the conference, analyst Charles Rhyee asked, "Obviously, one of the big topics has been the funding environment in the biotech. You guys have generally been pretty resilient through all of this, right? And I think this is despite the concerns and perhaps that's sort of a testament to your relationship with particularly a lot of large pharma companies. Maybe talk about sort of how that relationships -- those have changed or evolved particularly with the acquisition of PRA." Brennan responded:

> Obviously, ***sequentially, RFP flow was up well from Q4 -- sorry, Q3 to Q4. . . we see decent traction from all of our business units and all of our customer segments even in the first couple of months of the year from a business development perspective***.

This statement was materially false because ICON's "RFP flow" was not "up" from "Q3 to Q4"; instead, ICON's overall RFPs declined throughout 2023. This statement was also materially misleading because it omitted the existing, material, negative facts that (1) Pfizer had stopped awarding new full-service business to ICON as part of a "strategic refresh," and Cutler had internally admitted that ICON had lost the "Pfizer opportunity" and was no longer a preferred partner of Pfizer; (2) Pfizer had materially decreased the amount and dollar value of its awards to ICON, such that ICON's win rate was near zero and ICON was closed out of 85% of Pfizer's most lucrative Phase 2 and 3 business; (3) Pfizer had demanded—and Cutler had personally approved—significant budget cuts for ICON's existing studies; (4) ICON's PSBU continuously decreased in size from 2022; (5) ICON was losing significant business from other large customers, with the majority declining from early 2023 through 2024; (6) Pfizer and other large customers were switching to nearly 100% FSP, slashing ICON's profit margins; (7) the PRA Merger had led to

large customers' overconcentration that caused them to reduce their business with ICON; (8) many of ICON's purported RFPs were issued only for price discovery and/or duplicative because they involved proposed studies that were competing for limited BARDA funding; and (9) ICON's biotech business was experiencing declining RFPs, a lower win rate, and increased cancellations. By failing to disclose these existing, material, negative facts, Defendant Brennan omitted material facts necessary to make the statement not misleading in the context in which it was made.

491. Later during the conference, Rhyee asked, "I know on the call, you mentioned sort of this uptick in sort of activity, good RFP flow starts for the start of '24 here and continued strength in the large pharma segment. At the same time, right, we've all seen the news of pharma kind of retrenching cost-cutting and concerns with the large customers. Maybe kind of reconcile those two a little bit. I guess some people are worried, maybe does that flow into then the R&D budgets? Or maybe those two are a little distinct from each other?" Defendant Brennan responded:

> . . . ***Like the thinking around what the model should look like has been done. Even some of the new selections of partners has been done***. And I think what I'd like to see now is more of a traction. ***They are all saying that they're going to increase spending***, even some of the -- I think, some of the companies that have been more troubled over the last period have even said in their own press releases over the last while that Q4 was probably at a later point and they want to continue to increase R&D spend as they go forward.

This statement was materially false because ICON's large pharmaceutical partners were not "all saying that they're going to increase spending." Instead, (1) Pfizer had stopped awarding new full-service business to ICON as part of a "strategic refresh," and Cutler had internally admitted that ICON had lost the "Pfizer opportunity" and was no longer a preferred partner of Pfizer; (2) Pfizer had materially decreased the amount and dollar value of its awards to ICON, such that ICON's win rate was near zero and ICON was closed out of 85% of Pfizer's most lucrative Phase 2 and 3 business; (3) Pfizer had demanded—and Cutler had personally approved—significant budget cuts for ICON's existing studies; (4) ICON's PSBU continuously decreased in size from 2022;

(5) ICON was losing significant business from other large customers, with the majority declining from early 2023 through 2024; (6) Pfizer and other large customers were switching to nearly 100% FSP, slashing ICON's profit margins; and (7) the PRA Merger had led to large customers' overconcentration that caused them to reduce their business with ICON. This statement was also materially misleading because Defendant Brennan claimed that "[e]ven some of the new selections of partners has been done" while omitting the existing, material, negative facts that Pfizer had stopped awarding new full-service business to ICON and had decided to award the vast majority (85%) of its lucrative Phase 2 and 3 business to another CRO. By failing to disclose these existing, material, negative facts, Defendant Brennan omitted material facts necessary to make the statement not misleading in the context in which it was made.

**7. March 2024 Barclays Conference**

492. On March 12, 2024, Defendant Cutler attended Barclays' Global Healthcare Conference. At the conference, analyst Luke England Sergott asked, the "biotech funding market has kind of started to unlock a little bit, but you guys have seen continued strength in large pharma. Give us kind of the lay of the lands [sic] right now as you exited the year and then into 1Q, how that's kind of playing out versus your expectations?" Defendant Cutler responded:

> ***The biotech front has also been positive. We see RFPs in the mid-single digits, up [on] a trailing 12-month basis***.

This statement was materially false because ICON's biotech customer RFPs declined throughout 2023 and 2024. This statement was also materially misleading because it omitted the existing, material, negative facts that (1) many of these RFPs were issued only for price discovery, not to award actual business to ICON; (2) many of these RFPs were duplicative because they involved proposed studies that were competing for limited BARDA funding, such that only one study would materialize; and (3) ICON's biotech business was experiencing declining RFPs, a lower win rate,

and increased cancellations. By failing to disclose these existing, material, negative facts, Defendant Cutler omitted material facts necessary to make the statement not misleading in the context in which it was made.

**8. 1Q24 Earnings Call**

493. After the close of trading on April 24, 2024, ICON filed a press release on Form 6-K with the SEC reporting the Company's 1Q24 financial results. On April 25, 2024, ICON hosted a conference call to discuss the results. In his prepared remarks, Cutler stated:

> The market trends we saw early in quarter 1 continued throughout the balance of the quarter, characterized by ***stabilizing demand within the biotech customer base as well as a continuation of the robust demand we have consistently seen from large pharma customers***. . . . Proposal volumes are at healthy levels, ***with overall RFP volume increasing low double digits on a trailing 12-month basis***.

494. Later in the call, analyst Maxwell Andrew Smock from William Blair asked, "Maybe just to clarify quickly on RFPs. You mentioned up low double digits in total. Do you have that breakdown or how that breaks down between biotech and large pharma? And then how does each of those buckets compare to where they were at, at the end of last year? And then it sounds like, based on your prior answer a few minutes ago, you would actually expect RFPs to get better from here given the lag between funding and that ultimately, showing up in RFP flow. I just wanted to make sure I understood that commentary correctly." Defendant Cutler responded:

> [W]e don't really split out too much the RFP data. But qualitatively, certainly, ***large pharma continues to be strong, and we've seen that***. ***The biotech's also been solid***, perhaps not quite as strong, ***but it does seem to be on the uplift***. So if I look at, say, ***low double digits, large pharma is well above that. Biotech is probably more in the mid-singles if I had to put a number on it***.

495. Later in the call, analyst Michael Leonidovich Ryskin of BofA Securities asked, "in your prepared remarks, you called out a continuation of robust demand. You talked about R&D for the group for 2024 seems to be pretty stable, in line with prior. I just want to get a sense of how

much of that is already locked in when we think where we are in the year in April. Is there a risk of that changing as you go forward?" Defendant Cutler responded:

> As you said, ***we've seen pretty strong demand in the large pharma space***. And it's not just this quarter. ***It's been really over the last 12, 18 months***. ***Nothing has changed in that for now*** . . . Overall, ***we see a very stable and very strong demand in the large pharma***.

496. The statements identified in Paragraphs 493–495 were materially false because ICON had not seen "stabilizing demand within the biotech customer base as well as a continuation of the robust demand we have consistently seen from large pharma customers," "very stable and very strong demand in the large pharma" over "the last 12, 18 months," or a "mid-singles" increase in biotech RFPs. Instead, ICON's overall RFPs declined throughout 2023 and biotech customer RFPs declined throughout 2023 and 2024, and with respect to large pharma customers, (1) Pfizer had stopped awarding new full-service business to ICON as part of a "strategic refresh," and Cutler had internally admitted that ICON had lost the "Pfizer opportunity" and was no longer a preferred partner of Pfizer; (2) Pfizer had materially decreased the amount and dollar value of its awards to ICON, such that ICON's win rate was near zero and ICON was closed out of 85% of Pfizer's most lucrative Phase 2 and 3 business; (3) Pfizer had demanded—and Cutler had personally approved—significant budget cuts for ICON's existing studies; (4) ICON's PSBU continuously decreased in size from 2022; (5) ICON was losing significant business from other large customers, with the majority declining from early 2023 through 2024; (6) Pfizer and other large customers were switching to nearly 100% FSP, slashing ICON's profit margins; and (7) the PRA Merger had led to large customers' overconcentration that caused them to reduce their business with ICON. These statements were also materially misleading because Defendants Cutler and Brennan claimed "demand" was "stabilizing" for "biotech customer[s]," touted "the robust demand we have consistently seen from large pharma customers" and "very stable and very strong demand in the

large pharma," adding that "[n]othing has changed in that for now," and asserted that ICON had received increased RFPs in large pharma, biotech, and overall, all while omitting these existing, material, negative facts, as well as the facts that (8) many of ICON's purported RFPs were issued only for price discovery and/or duplicative because they involved proposed studies that were competing for limited BARDA funding; and (9) ICON's biotech business was experiencing declining RFPs, a lower win rate, and increased cancellations. By failing to disclose these existing, material, negative facts, Defendants Cutler and Brennan omitted material facts necessary to make the statements not misleading in the context in which they were made.

497. During the April 25, 2024 call, Cutler stated in his prepared remarks: "One of our important strategic initiatives as we came into 2024 was the focused rebranding of our dedicated biotech solutions business, ICON biotech. . . . Following the rebrand activity in quarter 4 last year, I am pleased to report that ***we are already seeing*** positive momentum in terms of customer receptivity and ***an increased win rate in this segment***."

498. Later in the call, in response to an analyst question, Cutler stated: "We've been successful. ***Our win rate in that biotech space has gone up over the last quarter or so***."

499. In response to another analyst question about "your improved win rate in biotech," Cutler stated: "Dan, I could give you a million reasons why we've improved that. It's a multifactorial thing. . . . And it's, as I say, turned into a -- ***gave us a nice uptick on the win rate***."

500. The statements identified in Paragraphs 497–499 were materially false because ICON's biotech win rate was decreasing, as Cutler admitted at a Company-wide town hall in February 2024 and Chris Smyth reiterated at a biotech town hall in the first quarter of 2024.

**9. May 2024 Investor Day**

501. On May 30, 2024, ICON hosted an Investor Day. During the Investor Day, Defendant Balfe stated the following in his prepared remarks:

> The rate at which we've managed to add new alliances in the space and to expand the alliances we already have into new business areas has increased. One of the founding pillars of the deal rationale for the merger between ICON and PRA was that we would advance our position in this sector, and I'm pleased to say that is borne out by the data. ***We have seen in the last 18 months, in my 25 years, the most sustained and intense period of realignment or refreshing of large pharma preferred partnerships. And it's particularly encouraging that ICON has come out of that period with all of the alliances we had before, many of them expanded***, and a number of new alliances where we've either replaced an incumbent or added ourselves into the mix where previously we didn't compete.

This statement was materially misleading because Balfe touted that "ICON has come out" of a period of "intense" large pharma "realignment or refreshing . . . with all of the alliances we had before, many of them expanded" while omitting the existing, material, negative facts that (1) Pfizer had stopped awarding new full-service business to ICON as part of a "strategic refresh," and Cutler had internally admitted that ICON had lost the "Pfizer opportunity" and was no longer a preferred partner of Pfizer; (2) Pfizer had materially decreased the amount and dollar value of its awards to ICON, such that ICON's win rate was near zero and ICON was closed out of 85% of Pfizer's most lucrative Phase 2 and 3 business; (3) Pfizer had demanded—and Cutler had personally approved—significant budget cuts for ICON's existing studies; (4) ICON's PSBU continuously decreased in size from 2022; (5) ICON was losing significant business from other large customers, with the majority declining from early 2023 through 2024; (6) Pfizer and other large customers were switching to nearly 100% FSP, slashing ICON's profit margins; and (7) the PRA Merger had led to large customers' overconcentration that caused them to reduce their business with ICON. By failing to disclose these existing, material, negative facts, Defendant Balfe omitted material facts necessary to make the statement not misleading in the context in which it was made.

### 10. 2Q24 Earnings Call

502. On July 25, 2024, ICON hosted a conference call with analysts to discuss the Company's 2Q24 financial results. In his prepared remarks, Defendant Cutler stated:

> While biotech funding levels attenuated slightly in quarter two from a robust start in quarter one, ***we see this market continuing to stabilize and have seen a modest uptick in RFPs on a trailing 12-month and sequential basis within this segment***.

This statement was materially false because ICON was not seeing the biotech "market continue to stabilize" and had not seen "a modest uptick in RFPs on a trailing 12-month and sequential basis within this segment." Instead, ICON's biotech customer RFPs declined throughout 2023 and 2024. This statement was also materially misleading because Defendant Cutler touted increased biotech RFPs while omitting the existing, material, negative facts that (1) many of these RFPs were issued only for price discovery, not to award actual business to ICON; (2) many of these RFPs were duplicative because they involved proposed studies that were competing for limited BARDA funding, such that only one study would materialize; (3) ICON's biotech business was experiencing declining RFPs, a lower win rate, and increased cancellations. By failing to disclose these existing, material, negative facts, Defendant Cutler omitted material facts necessary to make the statement not misleading in the context in which it was made.

503. Later in the call, analyst Dave Windley from Jefferies asked, "Biotech, you had both at [our conference] in June and then again on the call, talked about attenuation in funding. I wanted to understand, is that just a funding comment or did you also see that flow through to your activity?" Defendant Cutler responded:

> Interestingly, as we look at the cancellations in the biotech and the RFP area, we typically talk about biotech dollars coming through and not so much what actually gets decided on. ***So we've seen actually in quarter two, a reduction in the number of cancels in the pending side of things***. In other words, proposals that come to us, and we bid on, a proportion of those always get canceled never actually come to a decision. ***We've seen a reduction in that.***

This statement was materially false because ICON had not experienced "a reduction in the number of cancels in the pending side of things" in biotech. Instead, ICON's biotech cancellations increased every quarter from mid-2023 through at least September 2024, amounting to hundreds

of millions of dollars; Cutler received aggregated data on the increasing cancellations and personally attended an April 2024 sales meeting in Florida where they were discussed. This statement was also materially misleading because it omitted the existing, material, negative fact that ICON had failed to timely recognize billions of dollars in cancellations, even after becoming "aware that a study was not going ahead because the customer notified us."

### 11. September 2024 Baird Conference

504. On September 10, 2024, Defendant Cutler attended the Robert W. Baird Global Healthcare Conference. At the conference, analyst Eric Codwell asked, "There's been some interesting moves in the stock, in the sector. And I think we're going to shift gears away from some of the canned Q&A and just jump right into what the heck is going on and maybe give us a little lay of the land on what's on your mind." Defendant Cutler responded:

> Our nature as an organization is to be honest and open with shareholders and with analysts and try to give you a perspective of what our business. We don't try to sugarcoat things too much. We like to be upfront, and that's what we're trying to do. ***No material changes really to the environment or to our business apart from, as I said, some of the biotech slowdown and some of the biotech decision making, which is having potentially some impact in the very short term***.

505. In response to Cutler's answer, Codwell asked, "were all of the topics that you just highlighted, topics that you had considered when you gave the recent update and the recent guidance?" Defendant Cutler responded:

> ***Yeah, yeah. Absolutely***. Really, over the last sort of six, eight week -- and summer's also a bit of a challenging time. August, not much happens in our business, and September is a big month for us. So we have a lot of wood to chop obviously in September to get our quarter-three number done. So there's a little bit of that playing in. ***But there's nothing that's fundamentally changed that we hadn't already thought about or included in our guidance. We are seeing a little bit of what we thought we were thinking, and those predictions if you like or that planning, is coming to fruition, if that makes sense. So we're seeing what we thought we'd see***, and we just wanted to be specific and honest and open about that.

506. Codwell also asked, "I think I have to throw out there, it's September 10. So we found out from a few times this year across the industry that what happens from the second week of the quarter to the end of the quarter can change, but it sounds like there's really no notable change in frankly much of anything since you talked last quarter." Defendant Cutler responded:

> ***No, that's exactly right. No material, no really material changes***, but we are trying to be, as you say, honest and open around some of the perhaps slow down, parents [sic] slowing down in decision making, particularly in the biotech and the challenges that we're addressing in our large pharma, in our top large pharma.

507. The statements identified in Paragraphs 504–506 were materially false because ICON had experienced a "material" and "fundamental[] change[]" that ICON "hadn't already . . . included in our guidance" because the Pfizer COVID-flu vaccine had failed its Phase 3 trial, meaning ICON would lose a significant amount of money, and ICON's guidance did not include the impact of this loss or the following facts known to Defendants at the time: (1) Pfizer had stopped awarding new full-service business to ICON as part of a "strategic refresh," and Cutler had internally admitted that ICON had lost the "Pfizer opportunity" and was no longer a preferred partner of Pfizer; (2) Pfizer had materially decreased the amount and dollar value of its awards to ICON, such that ICON's win rate was near zero and ICON was closed out of 85% of Pfizer's most lucrative Phase 2 and 3 business; (3) Pfizer had demanded—and Cutler had personally approved—significant budget cuts for ICON's existing studies; (4) ICON's PSBU continuously decreased in size from 2022; (5) ICON was losing significant business from other large customers, with the majority declining from early 2023 through 2024; (6) Pfizer and other large customers were switching to nearly 100% FSP, slashing ICON's profit margins; (7) the PRA Merger had led to large customers' overconcentration that caused them to reduce their business with ICON; and (8) ICON's biotech segment was subject to a "revenue sweep" to attempt to close a $100 million "gap" in the third quarter of 2024. These statements were also materially misleading because they

omitted these existing, material, negative facts, which were necessary to make the statements not misleading in the context in which they were made.

### 12. 3Q24 Earnings Call

508. On October 24, 2024, ICON hosted a conference call with analysts to discuss the Company's 3Q24 financial results. During the call, analyst Max Smock of William Blair asked, "I just wanted to make sure I understand the drivers behind the miss on gross bookings versus the miss on revenue here because a lot of the factors you mentioned at the top of the call, the only one that really struck me as being more tied to new bookings and not burn rate was the award from small biotech. So -- can you just walk through kind of whatever the key drivers of that shortfall in net bookings specifically?" Defendant Cutler responded:

> We're looking hard at the business, certainly over the next three or four months and will provide a guidance in January as we normally do. Having said that, as I indicated in my comments, there are some good opportunities in the pipeline. ***And the RFP flow continues to be solid across both segments of our market, both large pharma and biotech***.

This statement was materially false because the Company had not experienced "solid" "RFP flow" for "both large pharma and biotech." Instead, ICON's biotech customer RFPs declined throughout 2023 and 2024. This statement was also materially misleading because Defendant Cutler touted "solid" "RFP flow" for "both large pharma and biotech" while omitting the existing, material, negative facts that (1) many of these RFPs were issued only for price discovery, not to award actual business to ICON; (2) many of these RFPs were duplicative because they involved proposed studies that were competing for limited BARDA funding, such that only one study would materialize; and (3) ICON's biotech business was experiencing declining RFPs, a lower win rate, and increased cancellations. By failing to disclose these existing, material, negative facts, Defendant Cutler omitted material facts necessary to make the statement not misleading in the context in which it was made.

### 13. November 2024 Jefferies Conference

509. On November 21, 2024, Defendant Cutler attended the Jefferies London Healthcare Conference. At the conference, during his prepared remarks, Defendant Cutler stated:

> We had a disappointing quarter three for some specific reasons relating to, particularly, our top two customers. And we'll talk about that a bit more in the fireside chat. And that's been an area that we've been aware of. But ***there are certainly [a] confluence of circumstances that hit us rather hard and rather late in quarter three leading to us reducing our guidance. I would say though, with the guidance we gave or the revised guidance we gave in quarter three stands, and we reiterate that firmly. For 2024, nothing's changed in that respect***. We are a company that's had something like 50 quarters of good, solid progression in terms of earnings and progress on revenues. ***And the last quarter was something of an anomaly, due, as I said, to particularly to a couple of our larger customers***.

This statement was materially false because ICON's negative 3Q24 performance was not due to a "confluence of circumstances that hit us rather hard and rather late in quarter three leading to us reducing our guidance" or "an anomaly" related "to a couple of our larger customers." Instead, as detailed herein, for well over a year before 3Q24, ICON had been losing significant business from its largest customers, including that (1) Pfizer had stopped awarding new full-service business to ICON as part of a "strategic refresh," and Cutler had internally admitted that ICON had lost the "Pfizer opportunity" and was no longer a preferred partner of Pfizer; (2) Pfizer had materially decreased the amount and dollar value of its awards to ICON, such that ICON's win rate was near zero and ICON was closed out of 85% of Pfizer's most lucrative Phase 2 and 3 business; (3) Pfizer had demanded—and Cutler had personally approved—significant budget cuts for ICON's existing studies; (4) ICON's PSBU continuously decreased in size from 2022; (5) ICON was losing significant business from other large customers, with the majority declining from early 2023 through 2024; (6) Pfizer and other large customers were switching to nearly 100% FSP, slashing ICON's profit margins; and (7) the PRA Merger had led to large customers' overconcentration that caused them to reduce their business with ICON.

### 14. Materially Misleading Statements Concerning Risk Factors That Were a Known Certainty

510. ICON's FY22 Form 20-F was filed on February 24, 2023, and incorporated by reference into ICON's 2Q23 and 3Q23 Form 6-Ks, filed on July 28, 2023 and October 27, 2023, respectively. ICON's FY23 Form 20-F was filed on February 23, 2024, and incorporated by reference into ICON's 1Q24, 2Q24 and 3Q24 Form 6-Ks, filed on April 25, 2024, July 25, 2024, and October 25, 2024, respectively. ICON's FY22 Form 20-F and FY23 Form 20-F were signed by Defendant Brennan and certified by Brennan and Cutler, and each stated:

> ***The potential loss or delay of our large contracts, or of multiple contracts, could adversely affect our results.***
>
> Our clients may discontinue using our services completely or cancel some projects either without notice or upon short notice. ***The termination or delay of a large contract, or of multiple contracts, could have a material adverse effect on our revenue and profitability***. . . . [T]he loss, early termination or delay of a large contract or contracts could adversely affect our revenues and profitability.
>
> ***If we do not generate new business awards, or if new business awards are delayed, terminated, reduced in scope or fail to go to contract, our business, financial conditions, results of operations or cash flows may be materially adversely affected.***
>
> Our business is dependent on our ability to generate new business awards from new and existing customers and maintain existing customer contracts. ***If we were unable to generate new business awards on a timely basis and contract for those awards, that could have a material impact on our business, financial condition, results of operations or cash flows.***

511. ICON's FY22 Form 20-F stated:

> ***We depend on a limited number of customers and a loss of, or significant decrease in, business from one or more of them could affect our business.***
>
> While no customers individually contributed more than 10% of our revenues during the years ended December 31, 2022 and December 31, 2021, our top five customers represented 28.3% and 31.6% of our revenues, respectively.
>
> ***The loss of, or a significant decrease in, business from one or more of these key customers could have a material adverse impact on our results of operations and financial results.***

512. ICON's FY23 Form 20-F stated:

> ***We depend on a limited number of customers and a loss of, or significant decrease in, business from one or more of them could affect our business.***
>
> While no customers individually contributed more than 10% of our revenues during the years ended December 31, 2023 and December 31, 2022, our top five customers represented 26.8% and 28.3% of our revenues, respectively. ***The loss of, or a significant decrease in, business from one or more of these key customers could have a material adverse impact on our results of operations and financial results.***

513. The statements identified in Paragraphs 510–512 were materially misleading because, in purportedly warning investors about various risks and hypothetical future events that "could" or "may" have "a material adverse impact" on ICON, they omitted the existing, material negative facts that ICON had already lost significant business from its largest customers, including that (1) Pfizer had stopped awarding new full-service business to ICON as part of a "strategic refresh," and Cutler had internally admitted that ICON had lost the "Pfizer opportunity" and was no longer a preferred partner of Pfizer; (2) Pfizer had materially decreased the amount and dollar value of its awards to ICON, such that ICON's win rate was near zero and ICON was closed out of 85% of Pfizer's most lucrative Phase 2 and 3 business; (3) Pfizer had demanded—and Cutler had personally approved—significant budget cuts for ICON's existing studies; (4) ICON's PSBU continuously decreased in size from 2022; (5) ICON was losing significant business from other large customers, with the majority declining from early 2023 through 2024; (6) Pfizer and other large customers were switching to nearly 100% FSP, slashing ICON's profit margins; and (7) the PRA Merger had led to large customers' overconcentration that caused them to reduce their business with ICON. By portraying the loss of business from ICON's large customers as merely hypothetical risks, rather than known certainties, these statements omitted material facts necessary to make the statements not misleading in the context in which they were made.

### B. Misstatements about ICON's Book-to-Bill Ratio, Gross and Net Business Wins, Cancellations, and Backlog

514. Defendants also materially overstated ICON's book-to-bill ratio (purportedly ICON's net business wins divided by revenue) and gross and net business wins, while materially understating ICON's cancellations and overstating backlog.

515. ICON's 2Q23 Form 6-K, filed on July 26, 2023, stated: "Gross business wins in the second quarter were $2,860 million and cancellations were $441 million. This resulted in net business wins of $2,419 million and a book to bill of 1.20. . . . Gross business wins year to date were $5,718 million and cancellations were $884 million. This resulted in net business wins of $4,834 million and a book to bill of 1.21." The 2Q23 Form 6-K also stated that ICON had "backlog of $21.7 billion."

516. During ICON's July 27, 2023 earnings call, Cutler stated that "net bookings grew 4% over quarter 2 2022, resulting in a net book-to-bill of 1.2x," and Brennan stated: "In quarter 2, ICON achieved gross business wins of $2.86 billion and recorded $441 million worth of cancellations. This resulted in a net awards [sic] in the quarter of $2.42 billion and net book-to-bill of 1.2x." Brennan also stated that "our backlog grew to a record $21.7 billion."

517. ICON's 3Q23 Form 6-K, filed on October 25, 2023, stated: "Gross business wins in the third quarter were $3,055 million and cancellations were $474 million. This resulted in net business wins of $2,581 million and a book to bill of 1.26. . . . Gross business wins year to date were $8,773 million and cancellations were $1,358 million. This resulted in net business wins of $7,415 million and a book to bill of 1.22." The 3Q23 Form 6-K also stated that ICON had "backlog of $22.2 billion."

518. During ICON's October 26, 2023 earnings call, Defendant Cutler stated: "Net bookings increased 10% year-over-year, resulting in a good book-to-bill of 1.26x revenue in the

quarter," and Defendant Brennan stated: "In quarter 3, ICON achieved gross business wins of $3.06 billion and recorded $474 million worth of cancellations. This resulted in an impressive level of net awards in the quarter of $2.58 billion, and net book-to-bill of 1.26x." Brennan also stated that "our backlog grew to a record $22.2 billion."

519. During ICON's October 26, 2023 earnings call, Brennan further stated: "We've ***always been relatively conservative*** in how we book our business into our backlog."

520. ICON's 4Q23 Form 6-K, filed on February 21, 2024, stated: "Gross business wins in the fourth quarter were $2,992 million and cancellations were $461 million. This resulted in net business wins of $2,531 million and a book to bill of 1.22. . . . Gross business wins were $11,765 million and cancellations were $1,819 million. This resulted in net business wins of $9,946 million and a book to bill of 1.22." The 4Q23 Form 6-K also stated that ICON had "backlog of $22.8 billion."

521. During ICON's February 22, 2024 earnings call, Defendant Brennan stated: "In quarter 4, ICON achieved gross business wins of $2.99 billion and recorded $461 million worth of cancellations. This resulted in a solid level of net awards in the quarter of $2.53 billion, and net book-to-bill of 1.22x." Brennan also stated that "our backlog grew to a $22.8 billion."

522. ICON's 1Q24 Form 6-K, filed on April 24, 2024, stated: "Gross business wins in the first quarter were $3,114 million and cancellations were $460 million. This resulted in net business wins of $2,654 million and a book to bill of 1.27." The 1Q24 Form 6-K also stated that ICON had "backlog of $23.4 billion."

523. During ICON's April 25, 2024 earnings call, Cutler stated: "In quarter 1, net bookings grew 10% on a year-over-year basis, resulting in a book-to-bill of 1.27x in the quarter and increasing our trailing 12-month book-to-bill ratio to 1.24," and Brennan stated: "In quarter

1, ICON achieved gross business wins of $3.11 billion, and recorded $460 million worth of cancellations. This resulted in a solid level of net awards in the quarter of $2.65 billion and a net book-to-bill of 1.27." Brennan also stated that "our backlog grew to a record $23.4 billion."

524. ICON's 2Q24 Form 6-K, filed on July 24, 2024, stated: "Gross business wins in the second quarter were $3,072 million and cancellations were $493 million. This resulted in net business wins of $2,579 million and a book to bill of 1.22. . . . Gross business wins year to date were $6,185 million and cancellations were $953 million. This resulted in net business wins of $5,232 million and a book to bill of 1.24." The 2Q24 Form 6-K also reported "a trailing twelve month net book to bill of 1.24." The 2Q24 Form 6-K also stated that ICON had "backlog of $23.8 billion."

525. During ICON's July 25, 2024 earnings call, Defendant Cutler stated, "Turning to financial performance in quarter two, net bookings grew 7% on a year-over-year basis, resulting in a book-to-bill of 1.2 times in the quarter and sustaining our trailing 12-month book-to-bill ratio of 1.24 times," and Defendant Brennan stated: "In quarter two, ICON achieved gross business wins of $3.07 billion, an increase of 7.4% on a year-over-year basis. In addition, we recorded $493 million worth of cancellations resulting in net awards in the quarter of $2.58 billion and net book to bill of 1.22 times." Brennan also stated that "our backlog grew to a record $23.8 billion."

526. ICON's 3Q24 Form 6-K, filed on October 23, 2024, stated: "Gross business wins in the third quarter were $2,832 million and cancellations were $504 million. This resulted in net business wins of $2,328 million and a book to bill of 1.15. . . . Gross business wins year to date were $9,017 million and cancellations were $1,457 million. This resulted in net business wins of $7,560 million and a book to bill of 1.21." The 3Q24 Form 6-K also reported "a trailing twelve

month net book to bill of 1.21." The 3Q24 Form 6-K also stated that ICON had "backlog of $24.3 billion."

527. During ICON's October 24, 2024 earnings call, Defendant Brennan stated: "In quarter three, ICON achieved gross business wins of $2,832 million, a decrease of 7.3% on a year-over-year basis. In addition, we recorded $504 million worth [of] cancellations, resulting in net awards in the quarter of $2,328 million [and] a net book-to-bill of 1.15 times." Brennan also stated that "our backlog grew to a record $24.3 billion."

528. ICON's 4Q24 Form 6-K, filed February 19, 2025, stated: "Gross business wins in the fourth quarter were $3,064 million and cancellations were $651 million. This resulted in net business wins of $2,413 million and a book to bill of 1.18. . . . Gross business wins were $12,082 million and cancellations were $2,108 million. This resulted in net business wins of $9,974 million and a book to bill of 1.20." The 4Q24 Form 6-K also stated that ICON had "backlog of $24.7 billion."

529. During ICON's February 20, 2025 earnings call, Cutler stated that in "quarter 4" ICON had "gross bookings of $3.06 billion, increasing 8% sequentially and 3% year-over-year. . . . Unfortunately, this better performance in gross bookings was offset by an uptick in overall cancellations in the quarter, which totaled $651 million and this resulted in a net book-to-bill ratio of 1.18x in quarter 4 and 1.2x on a trailing 12-month basis." Cutler also stated that "our backlog grew to $24.7 billion."

530. ICON's 1Q25 Form 6-K, filed April 30, 2025, stated: "Gross business wins in the first quarter were $2,681 million and cancellations were $659 million. This resulted in net business wins of $2,022 million and a book to bill of 1.01." The 1Q25 Form 6-K also stated that ICON had "backlog of $24.7 billion."

531. ICON's 2Q25 Form 6-K, filed July 23, 2025, stated: "Gross business wins in the second quarter were $2,966 million and cancellations were $909 million. This resulted in net business wins of $2,057 million and a book to bill of 1.02. . . . Gross business wins year to date were $5,647 million and cancellations were $1,568 million. This resulted in net business wins of $4,079 million and a book to bill of 1.01." ICON's 2Q25 earnings presentation stated that ICON's backlog was $25.0 billion.

532. The statements identified in Paragraphs 515–531 were materially false and misleading because ICON's gross business wins, net business wins, book-to-bill ratio, and backlog during the Class Period were significantly inflated by (1) large numbers of customer "awards" entered into Salesforce that lacked signed contracts or were otherwise highly unlikely to materialize, (2) Cutler's directions to book awards at larger dollar amounts than sponsors had actually approved, and (3) ICON's failure to timely recognize billions of dollars in cancellations, even after becoming "aware that a study was not going ahead because the customer notified us." ICON's reported cancellations were also materially understated. ICON ultimately reduced its backlog by $3.9 billion, including the removal of over $2.9 billion in "2023 or older" awards, indicating that ICON's quarterly cancellations were at least $325 million higher—and quarterly net business wins were at least $325 million lower—than the Company publicly reported in the statements above. These facts also contradicted Brennan's statement that "[w]e've always been relatively conservative in how we book our business into our backlog."

### C. Misstatements about ICON's Purported GAAP Compliance, Revenue Recognition, and Accounting Methodology

533. ICON's FY22 and FY23 Forms 20-F are described above. ICON's FY24 Form 20-F was filed on February 21, 2025, signed by Defendant Clerkin, and certified by Clerkin and Cutler. ICON's FY22, FY23, and FY24 Forms 20-F stated:

> ***We prepare our financial statements in accordance with generally accepted accounting principles in the United States of America*** ("[U.S.] GAAP") . . . .
>
> ***The consolidated financial statements have been prepared in accordance with U.S. GAAP***.

534. ICON's Forms 6-K filed on July 28, 2023, October 27, 2023, April 25, 2024, and July 25, 2024 (each signed by Brennan) each stated:

> These condensed consolidated financial statements ***which have been prepared in accordance with United States Generally Accepted Accounting Principles*** ('US GAAP') have not been audited. . . .
>
> The consolidated financial statements ***have been prepared in accordance with accounting principles generally accepted in the United States***.

535. The statements identified in Paragraphs 533–534 were materially false and misleading because the financial statements and other financial data contained in the FY23 and FY24 Forms 20-F and 1Q23, 2Q23, 3Q23, 1Q24, and 2Q24 Forms 6-K were not prepared "in accordance with" U.S. GAAP. Instead, these financial statements contained admitted "misstatements" and "material errors," and Defendants violated GAAP because they (1) extended ICON's reporting periods to overstate billing and cash received, and recognize additional revenue and profit; (2) deliberately created fake invoices to pull forward revenue; (3) manipulated and understated project costs to prematurely recognize revenue and inflate ICON's margins; (4) prematurely recognized revenue from fake and future work; and (5) prematurely recognized revenue from draft, unsigned change orders, as detailed herein. These GAAP violations inflated ICON's reported revenue, net income, adjusted EBITDA, gross margin, EPS, and cash generated from operating activities. By failing to disclose the existing, material, negative facts concerning Defendants' GAAP violations, Defendants omitted material facts necessary to make the statements not misleading in the context in which they were made.

536. The FY22, FY23, and FY24 Forms 20-F each stated:

***Revenue is recognized over time as the single performance obligation is satisfied. The progress towards completion for clinical service contracts is measured based on an input measure being total project costs incurred (inclusive of pass-through/ reimbursable expenses) at each reporting period as a percentage of forecasted total project costs***. . . .

***The assessment of progress towards completion also requires an up to date evaluation of the forecast costs to complete in respect of these projects***. Given the long-term nature of the clinical trials, and the complex nature of those trials, the forecast costs to complete (being internal direct costs and costs that will be incurred by third parties (principally investigators)) is judgmental. ***Forecast time (and related costs) is determined by reference to (i) contract terms and (ii) past experience. Forecast third party costs to complete are determined by project by reference to (i) contract terms and (ii) past experience***. . . .

***Revenue from long term contracts is recognized on a proportional performance method based on the relationship between cost incurred and the total estimated costs of the trial or on a fee-for-service basis according to the particular circumstances of the contract***. . . .

Contract fees are generally payable in installments based on the achievement of certain performance targets or "milestones" (e.g. target patient enrollment rates, clinical testing sites initiated or case report forms completed), such milestones being specific to the terms of each individual contract, ***while revenues on contracts are recognized as contractual obligations are performed***. . . .

***Revenue from contracts is generally recognized as income on the basis of the relationship between costs incurred and the total estimated contract costs***. . . .

As discussed in Note 2 to the consolidated financial statements, ***clinical trial service revenue is recognized over time, using an input measure, being total project costs (inclusive of third-party costs, principally pass-through/ reimbursable expenses) incurred at each reporting period as a percentage of forecasted total project costs***, to measure progress towards satisfying the Company's performance obligation. . . .

***The progress towards completion for clinical service contracts is measured based on total project costs*** (including reimbursable costs). . . .

***We regularly review the estimated hours on each contract to determine if the budget accurately reflects the agreed tasks to be performed, taking into account the state of progress at the time of review***. . . .

537. The FY22 Form 20-F stated:

***Revenue is recognized on a percentage completion basis as the single performance obligation is satisfied. The progress towards completion for clinical***

> ***service contracts is measured therefore based on an input measure being total project costs (inclusive of third party costs) at each reporting period***.

538. The FY23 and FY24 Forms 20-F each stated:

> ***Revenue is recognized on a percentage completion basis as the single performance obligation is satisfied. The progress towards completion for clinical service contracts is measured based on an input measure being total project costs (inclusive of third party costs) at each reporting period***.

539. The FY22 and FY23 Forms 20-F each stated:

> ***The progress towards completion for clinical service contracts is measured based on total project costs*** (direct fees are therefore inclusive of third party costs).

540. The FY24 Form 20-F stated:

> ***The progress towards completion for clinical service contracts is measured based on total project costs*** (fees are therefore inclusive of third party costs).

541. ICON's Forms 6-K filed on July 28, 2023, October 27, 2023, April 25, 2024, and July 25, 2024 (each signed by Brennan) each further stated:

> ***Revenue is recognized over time as the single performance obligation is satisfied. The progress towards completion for clinical service contracts is measured based on an input measure being total project costs incurred (inclusive of pass-through/ reimbursable expenses) at each reporting period as a percentage of forecasted total project costs***. . . .
>
> ***Revenue from long term contracts is recognized on a proportional performance method based on the relationship between cost incurred and the total estimated costs of the trial or on a fee-for-service basis according to the particular circumstances of the contract***. . . .
>
> Contract fees are generally payable in installments based on the achievement of certain performance targets or "milestones" (e.g. target patient enrollment rates, clinical testing sites initiated or case report forms completed), such milestones being specific to the terms of each individual contract, ***while revenues on contracts are recognized as contractual obligations are performed***. . . .
>
> ***Revenue from contracts is generally recognized as income on the basis of the relationship between time incurred and the total estimated contract duration or on a fee-for-service basis***.

542. The statements identified in Paragraphs 536–541 were materially false and misleading because ICON did not recognize revenue "over time as the single performance

obligation is satisfied" based on "total project costs incurred" or "as contractual obligations are performed," and did not accurately calculate "total project costs," perform "an up to date evaluation of the forecast costs to complete . . . determined by reference to (i) contract terms and (ii) past experience," or "regularly review the estimated hours on each contract to determine if the budget accurately reflects the agreed tasks to be performed." Instead, ICON's financial statements admittedly contained "misstatements" and "material errors," and Defendants: (1) extended ICON's reporting periods to overstate billing and cash received, and recognize additional revenue and profit; (2) deliberately created fake invoices to pull forward revenue; (3) manipulated and understated project costs to prematurely recognize revenue and inflate ICON's margins; (4) prematurely recognized revenue from fake and future work; and (5) prematurely recognized revenue from draft, unsigned change orders, as detailed herein. These GAAP violations overstated ICON's percentage of completion on clinical trials and inflated ICON's reported revenue, net income, adjusted EBITDA, gross margin, EPS, and cash generated from operating activities. By failing to disclose these existing, material, negative facts, Defendants omitted material facts necessary to make the statements not misleading in the context in which they were made.

### D. Misstatements about ICON's Internal Controls over Financial Reporting and Disclosure Controls and False SOX Certifications

543. ICON's FY23 and FY24 Forms 20-F each stated:

> Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2023.[17] In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control – Integrated Framework 2013*. ***Based upon the assessment performed, we determined that, as of December 31, 2023 the Company's internal control over financial reporting was effective.*** There have been no changes in the Company's internal control over financial reporting

[17] Throughout this section, the FY24 Form 20-F refers to "December 31, 2024" and "2024."

> during 2023 that have materially affected, or are reasonably likely to affect materially, the Group's internal control over financial reporting.

544. The FY23 and FY24 Forms 20-F also stated:

> An evaluation was carried out under the supervision and with the participation of the Company's management, including the Chief Executive Officer (CEO) and the Chief Financial Officer (CFO), of the effectiveness of our disclosure controls and procedures as at December 31, 2023. ***Based on that evaluation, the CEO and CFO have concluded that the Company's disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in reports that it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms***.

545. Exhibit 12.1 to the FY23 Form 20-F contains Cutler's and Brennan's respective Certifications Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. Exhibit 12.1 to the FY24 Form 20-F contains Cutler's and Clerkin's respective Certifications Pursuant to Section 302 of the Sarbanes Oxley Act of 2002. Pursuant to Exhibit 12.1 to the FY23 and FY24 Forms 20-F, Cutler, Brennan and Clerkin certified that:

> 1. I have reviewed this annual report on Form 20-F of ICON plc ("the registrant").
>
> 2. Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;
>
> 3. Based on my knowledge, ***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > a) ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those***

> ***entities, particularly during the period in which this report is being prepared***;
>
> b) ***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***;
>
> c) ***Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures***, as of the end of the period covered by this report based on such evaluation; and
>
> d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting.
>
> 5. ***The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):***
>
> a) ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***
>
> b) ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.

546. Exhibit 12.2 to the FY23 Form 20-F contains Cutler's and Brennan's Certifications Pursuant to 18 U.S.C. Section 1350, As Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. Exhibit 12.2 to the FY24 Form 20-F contains Cutler's and Clerkin's Certifications Pursuant to 18 U.S.C. Section 1350, As Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. Pursuant to Exhibit 12.2 to the FY23 and FY24 Forms 20-F, Cutler, Brennan and Clerkin certified that:

> (1) the Report [the FY23 and FY24 Form 20-F, respectively] fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
>
> (2) the ***information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company***.

547. On October 23, 2025, "ICON management" stated the following in a conversation with Truist, which Truist published in an analyst report that same day:

> Question: We have fielded some questions around the lawsuit document circulating within the investment community. Any comments you can make?
>
> Answer: Since it's active litigation, ICLR can't comment on specific allegations. The company believes the claims lack merit and will be vigorously defending them. ***As a public company, ICLR has strong internal controls in place***.

548. The statements identified in Paragraphs 543–547 were materially false and misleading because (1) the FY23 and FY24 Forms 20-F admittedly did not "fairly present[], in all material respects, the financial condition and result of operations of the Company," (2) ICON admittedly suffered from material weaknesses in ICFR and ineffective DCP, (3) ICON's "[m]anagement" admittedly "did not design and operate effective internal controls to prevent material errors to revenue and related accounts," and (4) Cutler, Brennan, and Clerkin had not reported "[a]ll significant deficiencies and material weaknesses in the design or operation of" ICFR, and "[a]ny fraud . . . that involves management or other employees who have a significant role in" ICFR, to ICON's auditors and Audit Committee. As detailed herein, Defendants violated GAAP because they (1) extended ICON's reporting periods to overstate billing and cash received, and recognize additional revenue and profit; (2) deliberately created fake invoices to pull forward revenue; (3) manipulated and understated project costs to prematurely recognize revenue and inflate ICON's margins; (4) prematurely recognized revenue from fake and future work; and (5) prematurely recognized revenue from draft, unsigned change orders. Further, in the fourth quarter of 2023, ICON's senior management falsely allocated $350 million in revenue to ICON's biotech

segment to prop it up. Defendants also inflated ICON's reported gross business wins, net business wins, and book-to-bill ratio by including large numbers of customer "awards" that lacked signed contracts or were otherwise highly unlikely to materialize, booking awards at larger dollar amounts than sponsors had approved at Cutler's direction, and refusing to timely recognize cancellations. ICON's material weaknesses in internal controls over financial reporting and ineffective disclosure controls and procedures allowed these GAAP violations and manipulations to occur. By failing to disclose these existing, material, negative facts, Defendants omitted material facts necessary to make the statements not misleading in the context in which they were made. Further, given the pervasive nature and material impact of Defendants' GAAP violations—for example, ICON admitted to overstating net income in 2Q24 by 77.5%—Defendants Cutler, Brennan, and Clerkin did not, and had no basis to, believe that ICON's ICFR and DCP were effective.

### E. Misstatements about ICON's Financial Performance

#### 1. 2Q23 Filings

549. After the close of trading on July 26, 2023, ICON filed a press release on Form 6-K with the SEC reporting the Company's 2Q23 financial results. The Form 6-K was signed by Defendant Brennan. In the press release, the Company reported:

> ***Quarter two adjusted EBITDA of $414.2 million or 20.5% of revenue***, an increase of 16.9% on quarter two 2022. ***YTD adjusted EBITDA of $813.4 million or 20.3% of revenue***, representing a year on year increase of 17.0%. . . .
>
> ***Quarter two adjusted net income*** attributable to the Group was ***$256.9 million or $3.11 per diluted share***, an increase of 8.7% on quarter two 2022 adjusted earnings per share. ***Year to date adjusted net income*** attributable to the Group of ***$496.7 million or $6.01 per diluted share***, an increase of 6.9% year on year. . . .
>
> ***Cash generated from operating activities for the quarter was $203.9 million.***

550. The next day, on July 27, 2023, ICON hosted a conference call with analysts to discuss the Company's 2Q23 financial results. In his prepared remarks, Defendant Brennan stated:

> ***Gross margin for the quarter was 29.6%*** compared to ***29.8% in quarter 1, 2023***.

551. On July 28, 2023, ICON filed its 2Q23 quarterly financial report on Form 6-K. The 2Q23 Form 6-K was signed by Defendant Brennan. ICON's 2Q23 Form 6-K reported quarterly revenue of $2.02 billion and year-to-date revenue of $4.00 billion; quarterly GAAP net income of $115.6 million or $1.40 per diluted share and year-to-date GAAP net income of $232.3 million or $2.81 per diluted share; and year-to-date net cash from operating activities of $379.4 million and year-to-date cash and cash equivalents of $270.2 million.

552. The 2Q23 Form 6-K further stated that ICON's financial results—including its condensed consolidated balance sheets, condensed consolidated statements of operations, condensed consolidated statements of comprehensive income, and condensed consolidated statements of cash flows; ICON's net income per ordinary share and diluted net income per ordinary share; changes in ICON's revenue and income from operations; ICON's cash and short term investment balances; and ICON's net cash provided by operating activities—were each reported for periods ending "June 30, 2023."

553. The statements identified in Paragraphs 549–552 were materially false and misleading because ICON's reported revenue, net income, adjusted EBITDA, adjusted EBITDA margin, gross margin, EPS, and cash generated from operating activities were materially misstated, including ICON's admitted overstatements of (1) revenue by $12.1 million in 2Q23 and $24.8 million year-to-date; (2) GAAP and adjusted net income by $7.6 million in 2Q23 and $15.3 million year-to-date; (3) adjusted EBITDA by $8.9 million in 2Q23 and $18.1 million year-to-date; (4) adjusted EBITDA margin by 32 bps in 2Q23 and 33 bps year-to-date; (5) gross margin by 46 bps in 1Q23 and 42 bps in 2Q23; and (6) GAAP and adjusted EPS by $0.09 in 2Q23 and $0.18 year-

to-date. These statements were also materially misleading because Defendants, in violation of GAAP, (1) extended ICON's reporting periods to overstate billing and cash received, and recognize additional revenue and profit; (2) deliberately created fake invoices to pull forward revenue; (3) manipulated and understated project costs to prematurely recognize revenue and inflate ICON's margins; (4) prematurely recognized revenue from fake and future work; and (5) prematurely recognized revenue from draft, unsigned change orders, as detailed herein. These GAAP violations inflated ICON's reported revenue, net income, adjusted EBITDA, gross margin, EPS, and cash generated from operating activities. By failing to disclose these existing, material, negative facts, Defendants omitted material facts necessary to make the statements not misleading in the context in which they were made.

**2. 3Q23 Filings**

554. After the close of trading on October 25, 2023, ICON filed a press release on Form 6-K with the SEC reporting the Company's 3Q23 financial results. The Form 6-K was signed by Defendant Brennan. In the press release, the Company reported:

> ***Quarter three adjusted EBITDA of $432.5 million or 21% of revenue***, an increase of 13.9% on quarter three 2022. ***YTD adjusted EBITDA of $1,245.9 million or 20.6% of revenue***, representing a year on year increase of 16.0%. . . .
>
> ***Quarter three adjusted net income*** attributable to the Group was ***$273.9 million or $3.30 per diluted share***, an increase of 10.0% on quarter three 2022 adjusted earnings per share. ***Year to date adjusted net income*** attributable to the Group of ***$770.7 million or $9.31 per diluted share***, an increase of 8.0% year on year. . . .
>
> ***Cash generated from operating activities for the quarter was $341.5 million.***

555. The next day, on October 26, 2023, ICON hosted a conference call with analysts to discuss the Company's 3Q23 financial results. In his prepared remarks, Defendant Brennan stated:

> ***Gross margin for the quarter was 29.8%*** compared to ***29.6% in quarter 2, 2023***.

556. On October 27, 2023, ICON filed its 3Q23 quarterly financial report on Form 6-K.

The 3Q23 Form 6-K was signed by Defendant Brennan. ICON's 3Q23 Form 6-K reported quarterly revenue of $2.06 billion and year-to-date revenue of $6.05 billion; quarterly GAAP net income of $163.7 million or $1.97 per diluted share and year-to-date GAAP net income of $395.9 million or $4.79 per diluted share; and year-to-date net cash from operating activities of $720.9 million and year-to-date cash and cash equivalents of $313.1 million.

557. The 3Q23 Form 6-K further stated that ICON's financial results—including its condensed consolidated balance sheets, condensed consolidated statements of operations, condensed consolidated statements of comprehensive income, and condensed consolidated statements of cash flows; ICON's net income per ordinary share and diluted net income per ordinary share; changes in ICON's revenue and income from operations; ICON's cash and short term investment balances; and ICON's net cash provided by operating activities—were each reported for periods ending "September 30, 2023."

558. The statements identified in Paragraphs 554–557 were materially false and misleading because ICON's reported revenue, net income, adjusted EBITDA, adjusted EBITDA margin, gross margin, EPS, and cash generated from operating activities were materially misstated, including ICON's admitted overstatements of (1) revenue by $14.8 million in 3Q23 and $39.6 million year-to-date; (2) GAAP and adjusted net income by $9.8 million in 3Q23 and $25.1 million year-to-date; (3) adjusted EBITDA by $11.4 million in 3Q23 and $29.5 million year-to-date; (4) adjusted EBITDA margin by 41 bps in 3Q23 and 35 bps year-to-date; (5) gross margin by 42 bps in 2Q23 and 51 bps in 3Q23; and (6) GAAP and adjusted EPS by $0.12 in 3Q23 and $0.30 year-to-date. These statements were also materially misleading because Defendants, in violation of GAAP, (1) extended ICON's reporting periods to overstate billing and cash received, and recognize additional revenue and profit; (2) deliberately created fake invoices to pull forward

revenue; (3) manipulated and understated project costs to prematurely recognize revenue and inflate ICON's margins; (4) prematurely recognized revenue from fake and future work; and (5) prematurely recognized revenue from draft, unsigned change orders, as detailed herein. These GAAP violations inflated ICON's reported revenue, net income, adjusted EBITDA, gross margin, EPS, and cash generated from operating activities. By failing to disclose these existing, material, negative facts, Defendants omitted material facts necessary to make the statements not misleading in the context in which they were made.

**3. 4Q23 and FY23 Filings**

559. After the close of trading on February 21, 2024, ICON filed a press release on Form 6-K with the SEC reporting the Company's 4Q23 and full-year 2023 financial results. The Form 6-K was signed by Defendant Brennan. In the press release, the Company reported:

> ***Quarter four revenue of $2,066.2 million*** representing an increase of 5.3% on prior year revenue. ***Full year revenue of $8,120.2 million*** representing a year on year increase of 4.9%.
>
> ***Quarter four adjusted EBITDA of $448.2 million or 21.7% of revenue***, an increase of 10.7% on quarter four 2022. ***Full year adjusted EBITDA of $1,694.1 million or 20.9% of revenue***, representing a year on year increase of 14.5%.
>
> ***GAAP net income for the quarter of $216.4 million or $2.60 per diluted share***. . . .
>
> ***Quarter four adjusted net income was $287.5 million or $3.46 per diluted share***, an increase of 10.5% on quarter four 2022 adjusted earnings per share. ***Full year adjusted net income of $1,058.2 million or $12.79 per diluted share***, an increase of 8.9% on the prior year adjusted earnings per share. . . .
>
> ***Cash generated from operating activities for the quarter was $440.1 million***. . . . ***Cash generated from operating activities in 2023 was $1,161.0 million.***

560. The next day, February 22, 2024, ICON hosted a conference call with analysts to discuss the Company's 4Q23 financial results. In his prepared remarks, Defendant Brennan stated:

> ***Gross margin for the quarter was 30.4%*** compared to 29.8% in quarter 3, 2023. Gross margin increased 50 basis points of gross margin of 29.9% in quarter 4 2022.

> ***Full year 2023 gross margin was 29.9%***, and we anticipate this to be a similar level for the full year 2024.

561. On February 23, 2024, ICON filed its full-year 2023 financial report on Form 20-F. The FY23 Form 20-F was signed by Defendant Brennan and certified by Brennan and Cutler. ICON's FY23 Form 20-F reported FY23 revenue of $8.12 billion; FY23 GAAP net income of $612.3 million or $7.40 per diluted share; and FY23 net cash from operating activities of $1.16 billion and cash and cash equivalents of $378.1 million.

562. The FY23 Form 20-F further stated that ICON's financial results—including its condensed consolidated balance sheets, condensed consolidated statements of operations, condensed consolidated statements of comprehensive income, and condensed consolidated statements of cash flows; ICON's net income per ordinary share and diluted net income per ordinary share; changes in ICON's revenue and income from operations; ICON's cash and cash equivalents and available for sale investments; and ICON's net cash provided by operating activities—were each reported for periods ending "December 31, 2023."

563. The statements identified in Paragraphs 559–562 were materially false and misleading because ICON's reported revenue, net income, adjusted EBITDA, adjusted EBITDA margin, gross margin, EPS, and cash generated from operating activities were materially misstated, including ICON's admitted overstatements of (1) revenue by $25.7 million in 4Q23 and $65.3 million for FY23; (2) GAAP and adjusted net income by $33 million in 4Q23 and $58.1 million for FY23; (3) adjusted EBITDA by $22 million in 4Q23 and $51.5 million for FY23; (4) adjusted EBITDA margin by 81 bps in 4Q23 and 47 bps for FY23; (5) gross margin by 87 bps in 4Q23 and 57 bps for FY23; and (6) GAAP and adjusted EPS by $0.40 in 4Q23 and $0.70 for FY23. These statements were also materially misleading because Defendants, in violation of GAAP, (1) extended ICON's reporting periods to overstate billing and cash received, and recognize additional

revenue and profit; (2) deliberately created fake invoices to pull forward revenue; (3) manipulated and understated project costs to prematurely recognize revenue and inflate ICON's margins; (4) prematurely recognized revenue from fake and future work; and (5) prematurely recognized revenue from draft, unsigned change orders, as detailed herein. These GAAP violations inflated ICON's reported revenue, net income, adjusted EBITDA, gross margin, EPS, and cash generated from operating activities. By failing to disclose these existing, material, negative facts, Defendants omitted material facts necessary to make the statements not misleading in the context in which they were made.

**4. 1Q24 Filings**

564. After the close of trading on April 24, 2024, ICON filed a press release on Form 6-K with the SEC reporting the Company's 1Q24 financial results. The Form 6-K was signed by Defendant Brennan. In the press release, the Company reported:

> ***Quarter one adjusted EBITDA of $444.0 million or 21.2% of revenue***, an increase of 11.3% on quarter one 2023. . . .
>
> ***Quarter one adjusted net income was $288.5 million or $3.47 per diluted share***, an increase of 19.7% on quarter one 2023 adjusted earnings per share. . . .
>
> ***Cash generated from operating activities for the quarter was $327.1 million.*** . . .
>
> ***[A]djusted diluted earnings per share [was] $2.90 per share for the first quarter 2023.***

565. The next day, on April 25, 2024, ICON hosted a conference call with analysts to discuss the Company's 1Q24 financial results. In his prepared remarks, Defendant Brennan stated:

> ***Gross margin of 29.9%*** increased 10 basis points over quarter 1 2023.

566. On April 25, 2024, ICON filed its 1Q24 quarterly financial report on Form 6-K. The 1Q24 Form 6-K was signed by Defendant Brennan. ICON's 1Q24 Form 6-K reported quarterly revenue of $2.09 billion; quarterly GAAP net income of $187.4 million or $2.25 per

diluted share; and year-to-date net cash from operating activities of $327.1 million and year-to-date cash and cash equivalents of $396.1 million. ICON's 1Q24 Form 6-K also reported that in 1Q23, ICON had quarterly revenue of $1.98 billion and quarterly GAAP net income of $116.7 million or $1.41 per diluted share.

567. The 1Q24 Form 6-K further stated that ICON's financial results—including its condensed consolidated balance sheets, condensed consolidated statements of operations, condensed consolidated statements of comprehensive income, and condensed consolidated statements of cash flows; ICON's net income per ordinary share and diluted net income per ordinary share; changes in ICON's revenue and income from operations; ICON's cash and cash equivalents and available for sale investment balances; and ICON's net cash provided by operating activities—were each reported for periods ending "March 31, 2024."

568. ICON's reported revenue, net income, adjusted EBITDA, gross margin, EPS, and cash generated from operating activities in 1Q24 were also reported in ICON's April 30, 2025, press release filed on Form 6-K and its May 2, 2025 quarterly financial report on Form 6-K (both signed by Clerkin) reporting the Company's 1Q25 financial results.

569. The statements identified in Paragraphs 564–568 were materially false and misleading because ICON's reported revenue, net income, adjusted EBITDA, adjusted EBITDA margin, gross margin, EPS, and cash generated from operating activities were materially misstated, including ICON's admitted overstatements of (1) revenue by $47.1 million in 1Q24 and $12.8 million in 1Q23; (2) GAAP and adjusted net income by $39.1 million in 1Q24 and $7.8 million in 1Q23; (3) adjusted EBITDA by $43 million in 1Q24 and $9.1 million in 1Q23; (4) adjusted EBITDA margin by 162 bps in 1Q24 and 33 bps in 1Q23; (5) gross margin by 162 bps in 1Q24 and 46 bps in 1Q23; and (6) GAAP and adjusted EPS by $0.47 in 1Q24 and $0.09 in 1Q23. These

statements were also materially misleading because Defendants, in violation of GAAP, (1) extended ICON's reporting periods to overstate billing and cash received, and recognize additional revenue and profit; (2) deliberately created fake invoices to pull forward revenue; (3) manipulated and understated project costs to prematurely recognize revenue and inflate ICON's margins; (4) prematurely recognized revenue from fake and future work; and (5) prematurely recognized revenue from draft, unsigned change orders, as detailed herein. These GAAP violations inflated ICON's reported revenue, net income, adjusted EBITDA, gross margin, EPS, and cash generated from operating activities. By failing to disclose these existing, material, negative facts, Defendants omitted material facts necessary to make the statements not misleading in the context in which they were made.

**5. April 2024 Registration Statement**

570. On April 26, 2024, ICON filed a registration statement on Form F-3, which was signed by Defendants Cutler, Brennan, and Sheehan.[18] The Form F-3 incorporated ICON's FY23 Form 20-F and 1Q24 Form 6-K, which stated that ICON had (1) FY23 revenue of $8.12 billion; FY23 GAAP net income of $612.3 million or $7.40 per diluted share; and FY23 net cash from operating activities of $1.16 billion and cash and cash equivalents of $378.1 million; and (2) 1Q24 revenue of $2.09 billion; 1Q24 GAAP net income of $187.4 million or $2.25 per diluted share; 1Q24 net cash from operating activities of $327.1 million and cash and cash equivalents of $396.1 million; and 1Q23 quarterly revenue of $1.98 billion and quarterly GAAP net income of $116.7 million or $1.41 per diluted share.

[18] Sheehan signed the Form F-3 as the Director, Principal Executive Officer, Principal Financial Officer, and Principal Accounting Officer of Accellacare Limited, and as a Director of ICON Global Treasury Unlimited Company and ICON Clinical Research Holdings (Ireland) Unlimited Company, all of which are wholly owned subsidiaries of ICON and served as guarantors of the offered bonds.

571. The statements identified in Paragraph 570 were materially false and misleading because ICON's reported revenue, net income, EPS, and cash generated from operating activities were materially misstated, including ICON's admitted overstatements of (1) revenue by $65.3 million for FY23, $47.1 million in 1Q24, and $12.8 million in 1Q23; (2) GAAP net income by $58.1 million for FY23, $39.1 million in 1Q24 and $7.8 million in 1Q23; and (3) GAAP EPS by $0.70 for FY23, $0.47 in 1Q24 and $0.09 in 1Q23. These statements were also materially misleading because Defendants, in violation of GAAP, (1) extended ICON's reporting periods to overstate billing and cash received, and recognize additional revenue and profit; (2) deliberately created fake invoices to pull forward revenue; (3) manipulated and understated project costs to prematurely recognize revenue and inflate ICON's margins; (4) prematurely recognized revenue from fake and future work; and (5) prematurely recognized revenue from draft, unsigned change orders, as detailed herein. These GAAP violations inflated ICON's reported revenue, net income, EPS, and cash generated from operating activities. By failing to disclose these existing, material, negative facts, Defendants omitted material facts necessary to make the statements not misleading in the context in which they were made.

**6. 2Q24 Filings**

572. After the close of trading on July 24, 2024, ICON filed a press release on Form 6-K with the SEC reporting the Company's 2Q24 financial results. The Form 6-K was signed by Defendant Brennan. In the press release, the Company reported:

> ***Quarter two adjusted EBITDA of $450.4 million or 21.2% of revenue***, an increase of 8.7% on quarter two 2023. . . . ***Adjusted EBITDA year to date was $894.4 million or 21.2% of revenue***, a year on year increase of 10.0%.
>
> ***Quarter two adjusted net income was $312.6 million or $3.75 per diluted share***, an increase of 20.6% on quarter two 2023 adjusted diluted earnings per share. . . . ***Adjusted net income attributable to the Group was $601.1 million resulting in an adjusted diluted earnings per share of $7.22*** compared to $6.01 per share for the equivalent prior year period.

> ***Cash generated from operating activities for the quarter was $218.6 million.***

573. The next day, on July 25, 2024, ICON hosted a conference call with analysts to discuss the Company's 2Q24 financial results. In his prepared remarks, Defendant Brennan stated:

> ***Gross margin for the quarter was 29.9%***, consistent with quarter one, 2024, as expected.

574. Also on July 25, 2024, ICON filed its 2Q24 quarterly financial report on Form 6-K. The 2Q24 Form 6-K was signed by Defendant Brennan. ICON's 2Q24 Form 6-K reported quarterly revenue of $2.120 billion and year-to-date revenue of $4.210 billion; quarterly GAAP net income of $146.9 million or $1.76 per diluted share and year-to-date GAAP net income of $334.3 million or $4.02 per diluted share; and year-to-date net cash from operating activities of $545.7 million, and year-to-date cash and cash equivalents of $506.6 million.

575. The 2Q24 Form 6-K further stated that ICON's financial results—including its condensed consolidated balance sheets, condensed consolidated statements of operations, condensed consolidated statements of comprehensive income, and condensed consolidated statements of cash flows; ICON's net income per ordinary share and diluted net income per ordinary share; changes in ICON's revenue and income from operations; ICON's cash and cash equivalents; and ICON's net cash provided by operating activities—were each reported for periods ending "June 30, 2024."

576. ICON's reported revenue, net income, adjusted EBITDA, gross margin, EPS, and cash generated from operating activities in 2Q24 were also reported in ICON's July 23, 2025, press release filed on Form 6-K and its July 24, 2025 quarterly financial report on Form 6-K (both signed by Clerkin) reporting the Company's 2Q25 financial results.

577. The statements identified in Paragraphs 572–576 were materially false and misleading because ICON's reported revenue, net income, adjusted EBITDA, adjusted EBITDA

margin, gross margin, EPS, and cash generated from operating activities were materially misstated, including ICON's admitted overstatements of (1) revenue by $78.2 million in 2Q24 and $125.4 million year-to-date; (2) GAAP and adjusted net income by $64.1 million in 2Q24 and $103.2 million year-to-date; (3) adjusted EBITDA by $72.9 million in 2Q24 and $116 million year-to-date; (4) adjusted EBITDA margin by 276 bps in 2Q24 and 219 bps year-to-date; (5) gross margin by 269 bps in 2Q24 and 162 bps in 1Q24; and (6) GAAP and adjusted EPS by $0.77 in 2Q24 and $1.24 year-to-date. These statements were also materially misleading because Defendants, in violation of GAAP, (1) extended ICON's reporting periods to overstate billing and cash received, and recognize additional revenue and profit; (2) deliberately created fake invoices to pull forward revenue; (3) manipulated and understated project costs to prematurely recognize revenue and inflate ICON's margins; (4) prematurely recognized revenue from fake and future work; and (5) prematurely recognized revenue from draft, unsigned change orders, as detailed herein. These GAAP violations inflated ICON's reported revenue, net income, adjusted EBITDA, gross margin, EPS, and cash generated from operating activities. By failing to disclose these existing, material, negative facts, Defendants omitted material facts necessary to make the statements not misleading in the context in which they were made.

#### 7. 3Q24 Filings

578. After the close of trading on October 23, 2024, ICON filed a press release on Form 6-K with the SEC reporting the Company's 3Q24 financial results. The Form 6-K was signed by Defendant Brennan. In the press release, the Company reported year-to-date adjusted EBITDA of $1.31 billion or 21.0% of revenue and year-to-date adjusted net income of $880.3 million or $10.57 per diluted share. ICON further reported in the press release that in 3Q23, adjusted EBITDA was $432.5 million and adjusted net income was $273.9 million or $3.30 per diluted share.

579. The next day, on October 25, 2024, ICON filed its 3Q24 quarterly financial report

on Form 6-K. The 3Q24 Form 6-K was signed by Defendant Brennan. ICON's 3Q24 Form 6-K reported year-to-date revenue of $6.241 billion and year-to-date GAAP net income of $531.5 million or $6.38 per diluted share. ICON's 3Q24 Form 6-K also reported that in 3Q23, ICON had quarterly revenue of $2.06 billion and quarterly GAAP net income of $163.7 million or $1.97 per diluted share.

580. ICON's reported revenue, net income, adjusted EBITDA, gross margin, EPS, and cash generated from operating activities for the first three quarters of 2024 were also reported in ICON's October 22, 2025, press release filed on Form 6-K and its October 23, 2025 quarterly financial report on Form 6-K (both signed by Clerkin) reporting the Company's 3Q25 financial results.

581. The statements identified in Paragraphs 578–580 were materially false and misleading because ICON's reported revenue, net income, adjusted EBITDA, adjusted EBITDA margin, EPS, and cash generated from operating activities were materially misstated, including ICON's admitted overstatements of (1) revenue by $14.8 million in 3Q23, $47.1 million in 1Q24, $78.2 million in 2Q24, and $113.5 million year-to-date in 2024; (2) GAAP and adjusted net income by $9.8 million in 3Q23, $39.1 million in 1Q24, $64.1 million in 2Q24, and $87.1 million year-to-date in 2024; (3) adjusted EBITDA by $11.4 million in 3Q23, $43 million in 1Q24, $72.9 million in 2Q24, and $98.8 million year-to-date in 2024; (4) adjusted EBITDA margin by 122 bps year-to-date in 2024; and (5) GAAP and adjusted EPS by $0.12 in 3Q23, $0.47 in 1Q24, $0.77 in 2Q24, and $1.06 year-to-date in 2024. These statements were also materially misleading because Defendants, in violation of GAAP, (1) extended ICON's reporting periods to overstate billing and cash received, and recognize additional revenue and profit; (2) deliberately created fake invoices to pull forward revenue; (3) manipulated and understated project costs to prematurely recognize

revenue and inflate ICON's margins; (4) prematurely recognized revenue from fake and future work; and (5) prematurely recognized revenue from draft, unsigned change orders, as detailed herein. These GAAP violations inflated ICON's reported revenue, net income, adjusted EBITDA, and EPS. By failing to disclose these existing, material, negative facts, Defendants omitted material facts necessary to make the statements not misleading in the context in which they were made.

### 8. 4Q24 and FY24 Filings

582. After the close of trading on February 19, 2025, ICON filed a press release on Form 6-K with the SEC reporting the Company's 4Q24 and FY24 financial results. The Form 6-K was signed by Clerkin. In the press release, the Company reported:

> ***Full year revenue of $8,282 million***, representing a year on year increase of 2.0% . . .
>
> ***Full year adjusted EBITDA of $1,735.8 million or 21.0% of revenue***, representing a year on year increase of 2.5% . . .
>
> ***Full year GAAP net income of $791.5 million or $9.53 per diluted share*** . . .
>
> ***Full year adjusted net income of $1,162.7 million*** or $14.00 per diluted share, an increase of 9.5% on the prior year adjusted diluted earnings per share . . .
>
> ***Cash generated from operating activities in 2024 was $1,286.7 million***.

583. ICON's press release also reported that in 4Q23, ICON had quarterly revenue of $2.07 billion; quarterly GAAP net income of $216.4 million or $2.60 per diluted share; and adjusted EBITDA of $448.2 million. ICON's press release on Form 6-K further reported that for FY23, ICON had adjusted EBITDA of $1.69 billion.

584. The next day, February 20, 2025, ICON hosted a conference call with analysts to discuss the Company's 4Q24 and FY24 financial results. In his prepared remarks, Clerkin stated:

> ***Gross margin for the quarter was 29.6% and 29.7% for the year*** compared to ***30.4% and 29.9% in quarter 4 and full year 2023***, respectively.

585. On February 21, 2025, ICON filed its full-year 2024 financial report on Form 20-F. The FY24 Form 20-F was signed by Clerkin and certified by Clerkin and Cutler. ICON's FY24 Form 20-F reported FY24 revenue of $8.28 billion; FY24 GAAP net income of $791.5 million or $9.53 per diluted share; and FY24 net cash from operating activities of $1.29 billion and cash and cash equivalents of $538.8 million. The FY24 Form 20-F also reported FY23 revenue of $8.12 billion and FY23 GAAP net income of $612.3 million or $7.40 per diluted share.

586. The FY24 Form 20-F further stated that ICON's financial results—including its condensed consolidated balance sheets, condensed consolidated statements of operations, condensed consolidated statements of comprehensive income, and condensed consolidated statements of cash flows; ICON's net income per ordinary share and diluted net income per ordinary share; changes in ICON's revenue and income from operations; ICON's cash and cash equivalents and available for sale investments; and ICON's net cash provided by operating activities—were each reported for periods ending "December 31, 2024."

587. The statements identified in Paragraphs 582–586 were materially false and misleading because ICON's reported revenue, net income, adjusted EBITDA, adjusted EBITDA margin, gross margin, EPS, and cash generated from operating activities were materially misstated, including ICON's admitted overstatements of (1) revenue by $25.6 million in 4Q23, $65.3 million in FY23, $47.1 million in 1Q24, $78.2 million in 2Q24, and $92.7 million for FY24; (2) GAAP and adjusted net income by $33 million in 4Q23, $58.1 million for FY23, $39.1 million in 1Q24, $64.1 million in 2Q24, and $52.3 million for FY24; (3) adjusted EBITDA by $22 million in 4Q23, $51.5 million for FY23, $43 million in 1Q24, $72.9 million in 2Q24, and $65.4 million for FY24; (4) adjusted EBITDA margin by 162 bps in 1Q24, 276 bps in 2Q24, and 56 bps for FY24; (5) gross margin by 87 bps in 4Q23, 57 bps for FY23, 162 bps in 1Q24, 269 bps in 2Q24, and 80 bps

for FY24; and (6) GAAP and adjusted EPS by $0.40 in 4Q23, $0.70 for FY23, $0.47 in 1Q24, $0.77 in 2Q24, and $0.63 for FY24. These statements were also materially misleading because Defendants, in violation of GAAP, (1) extended ICON's reporting periods to overstate billing and cash received, and recognize additional revenue and profit; (2) deliberately created fake invoices to pull forward revenue; (3) manipulated and understated project costs to prematurely recognize revenue and inflate ICON's margins; (4) prematurely recognized revenue from fake and future work; and (5) prematurely recognized revenue from draft, unsigned change orders, as detailed herein. These GAAP violations inflated ICON's reported revenue, net income, adjusted EBITDA, gross margin, EPS, and cash generated from operating activities. By failing to disclose these existing, material, negative facts, Defendants omitted material facts necessary to make the statements not misleading in the context in which they were made.

#### 9. False Attributions of Increased Revenue

588. The 2Q23 Form 6-K stated:

> ***The increase in revenue for the three months ended June 30, 2023 is due to continued organic growth across the Company's markets*. . . .**
>
> ***The increase in revenue for the six months ended June 30, 2023 is due to continued organic growth across the Company's markets*.**

589. The 3Q23 Form 6-K stated:

> ***The increase in revenue for the three months ended September 30, 2023 is due to continued organic growth across the Company's markets*. . . .**
>
> ***The increase in revenue for the nine months ended September 30, 2023 is due to continued organic growth across the Company's markets*.**

590. The FY23 Form 20-F stated:

> ***The increase in revenues in the year ended December 31, 2023 is due to the continued organic growth across the Company's markets*.**

591. The 1Q24 Form 6-K stated:

***The increase in revenue for the three months ended March 31, 2024 is due to continued organic growth across the Company's markets*.**

592. The 2Q24 Form 6-K stated:

***The increase in revenue for the three months ended June 30, 2024 is due to continued organic growth across the Company's markets*. . . .**

***The increase in revenue for the six months ended June 30, 2024 is due to continued organic growth across the Company's markets*.**

593. ICON's FY24 Form 20-F stated:

***The increase in revenues in the year ended December 31, 2024 is due to the Company's acquisitions and continued organic growth.***

594. The statements identified in Paragraphs 588–593 were materially false and misleading because ICON's purported increases in revenue during 2023 and 2024 were not "due to continued organic growth across the Company's markets" or "due to the Company's acquisitions and continued organic growth." Instead, the purported increases were the result of Defendants' violations of GAAP, including ICON's admitted overstatements of revenue by $12.8 million in 1Q23, $12.1 million in 2Q23, $14.8 million in 3Q23, $25.6 million in 4Q23, $65.3 million for FY23, $47.1 million in 1Q24, $78.2 million in 2Q24, and $92.7 million for FY24. Indeed, after correcting these overstatements, ICON's revenue was flat from 3Q23 through 2Q24. These statements were also materially misleading because Defendants, in violation of GAAP, (1) extended ICON's reporting periods to overstate billing and cash received, and recognize additional revenue and profit; (2) deliberately created fake invoices to pull forward revenue; (3) manipulated and understated project costs to prematurely recognize revenue and inflate ICON's margins; (4) prematurely recognized revenue from fake and future work; and (5) prematurely recognized revenue from draft, unsigned change orders, as detailed herein. These GAAP violations inflated ICON's reported revenue, net income, adjusted EBITDA, gross margin, EPS, and cash generated from operating activities. By stating that ICON's purported increases in

revenue were "due to continued organic growth across the Company's markets" and "due to the Company's acquisitions and continued organic growth," while failing to disclose these existing, material, negative facts, Defendants omitted material facts necessary to make the statements not misleading in the context in which they were made.

**10. Materially Misleading Statements Concerning Risk Factors That Were a Known Certainty**

595. ICON's FY22, FY23, and FY24 Forms 20-F each stated:

> ***Our financial results may be adversely impacted if we underprice our contracts, overrun our cost estimates or fail to receive approval for, or experience delays in, documenting change orders.***

596. ICON's FY22 and FY23 Forms 20-F each stated:

> We bear the risk of cost overruns unless the scope of activity is revised from the contract specifications and we are able to negotiate a contract modification. ***We endeavor to ensure that any changes in scope are appropriately monitored and change orders or contract modifications are promptly negotiated and documented for changes in scope. If we fail to successfully negotiate change orders for changes in the resources required or the scope of the work to be performed, and the costs of performance of these contracts exceeded their fixed fees, it could materially adversely affect our operations and financial results***.

597. ICON's FY24 Form 20-F stated:

> We bear the risk of cost overruns unless the scope of activity and/or the assumptions upon which budget is built are revised via a change order and we are able to negotiate a contract modification. ***We endeavor to ensure that any changes in scope are appropriately monitored and change orders or contract modifications are promptly negotiated and documented. If we fail to successfully negotiate change orders for changes in the resources required or the scope of the work to be performed, it could materially adversely affect our operations and financial results***.

598. The statements identified in Paragraphs 595–597 were materially misleading because, in purportedly warning investors about various risks and hypothetical future events that "could" or "may" "adversely impact[]" or "adversely affect" ICON's financial results, they omitted the existing, material negative facts that ICON had admittedly issued false financial

statements that contained "misstatements" and "material errors," and, in violation of GAAP, (1) extended ICON's reporting periods to overstate billing and cash received, and recognize additional revenue and profit; (2) deliberately created fake invoices to inflate ICON's purported billing to clients and recognize additional revenue; (3) manipulated and understated project costs to prematurely recognize revenue and inflate ICON's margins; (4) prematurely recognized revenue from fake and future work; and (5) prematurely recognized revenue from draft, unsigned change orders, as detailed herein. These GAAP violations inflated ICON's reported revenue, net income, adjusted EBITDA, gross margin, EPS, and cash generated from operating activities. By portraying various issues as merely hypothetical risks, rather than known certainties, these statements omitted material facts necessary to make the statements not misleading in the context in which they were made.

## VII. DEFENDANT SHEEHAN'S FRAUDULENT SCHEME

599. As set forth herein, during the Class Period, Defendant Sheehan employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon, purchasers and acquirers of ICON ordinary shares. In furtherance of the scheme, Sheehan artificially inflated ICON's financial performance, generated false records, and deceived ICON's customers, as detailed below. These inherently deceptive and fraudulent acts were performed to manipulate key metrics relevant to investors and provided investors with a materially false picture of ICON's performance.

600. Financial Manipulation: The fraudulent scheme included manipulating ICON's financial statements. For example, Sheehan directed ICON employees to remove pass-through costs on numerous studies, despite a call where ICON's U.S.-based personnel explained to Sheehan and the other Irish attendees that it was improper to remove millions of dollars of pass-through costs on a study that was just starting. (FE-18.) Sheehan also gave "rash" and

"aggressive" directives to boost revenue by specific amounts, such as stating that "we need to increase service revenue by 'x' or increase pass-through revenue by 'y.'" (FE-17.) This financial manipulation, which was driven by the fact that ICON's actual revenue fell increasingly short of the Company's targets from mid-2022 through at least July 2024 (FE-17), was inherently deceptive and fraudulent.

601. Fake and Premature Invoices: The fraudulent scheme also involved creating fake and premature invoices to boost ICON's purported results and deceive ICON's customers. Sheehan led the effort to generate fake "pro-forma" invoices—marked with asterisks because they were fake—to get "invoices on the books." (FE-4, FE-18.) Some of the fake invoices were sent to customers. (FE-4, FE-18.) Sheehan also directed premature invoicing to boost revenue and other metrics, with invoices pulled forward by six weeks or more at times, especially before the close of quarters to bump up ICON's numbers (FE-17), and billing clients prematurely in advance of contractual billing milestones (FE-16, FE-17). ICON's premature and improper billing resulted in large overpayments by Eli Lilly and other customers. (FE-22.) Further, Sheehan directed ICON personnel to recognize revenue for the prematurely invoiced amounts, contrary to the ASC 606 methodology that ICON supposedly followed. (FE-17.) ICON's fake and premature invoices were false records, and their creation was inherently deceptive and fraudulent.

602. Holding Periods Open: At Sheehan's direction, ICON's monthly and quarterly periods were repeatedly held open to record additional billing and cash, and to enable various forms of manipulation to increase revenue. This practice was inherently deceptive and fraudulent, violated GAAP, and rendered ICON's records and financial statements false because they included assets and transactions that occurred ***after*** the stated periods.

603. Revenue Sweeps: ICON's recurring "revenue sweeps," which continued until at

least July 2024, were directed by Sheehan through emails that detailed schemes to remove costs and increase revenue and attached spreadsheets that described the specific number of hours and costs to be removed (FE-18). These revenue sweeps were deceptive and fraudulent because Sheehan directed employees to artificially inflate the Company's revenue. The sweeps resulted in false records—spreadsheets describing the artificially inflated revenue on the affected studies—and directly affected ICON's reported financial results.

604. Sheehan personally committed and/or directed the deceptive and fraudulent acts described above. In doing so, Sheehan knew that these actions affected investors by artificially boosting ICON's revenue and other key financial and business metrics that investors relied on. Indeed, Sheehan knew that ICON filed the resulting false financial statements with the SEC in connection with a $2 billion U.S. securities offering: Sheehan signed ICON's April 26, 2024 registration statement on Form F-3, which incorporated ICON's false FY23 Form 20-F and false 1Q24 Form 6-K (as well as future filings) and explicitly told investors to rely on it, stating: "You should rely only on the information incorporated by reference or provided [herein]." As a result, Sheehan knew that his deceptive acts affected U.S. investors. The registration statement that Sheehan signed allowed ICON to leverage its false financial statements to raise $2 billion near the peak of the fraud. Shortly after the offering closed, ICON raised its 2024 earnings per share guidance from $14.65–$15.15 to $14.75–$15.25, highlighting "the impact of the successful $2 billion investment grade bond offering" and stating that the offering "advanc[ed] our strong financial position."

## VIII. SCIENTER

605. Together with the above-alleged facts, the Individual Defendants acted with scienter in that each knew or recklessly disregarded the true facts in making the materially false and misleading statements identified in Section VI above. The key allegations that support a strong

inference of scienter are summarized below.

### A. Over $79 Million in Unusual, Highly Profitable Insider Sales Support a Strong Inference of Scienter

606. Demonstrating their motive and opportunity to commit fraud, CEO Cutler, CFO Brennan, and three other ICON insiders collectively reaped over $79 million in profits from unusual insider sales during the Class Period.

607. Cutler's and Brennan's Insider Sales Support Scienter: Cutler and Brennan capitalized on ICON's inflated stock price by selling over 126,000 shares of their ICON ordinary shares at inflated prices to reap net profits of nearly $30 million. The fact that ICON's two most senior executives made unusual, large stock sales while they inflated ICON's financial results—and as ICON's stock price approached its Class Period high—supports a strong inference of scienter, particularly given Cutler's internal "$500 by 2025" goal of boosting ICON's stock price to $500 by 2025.

608. Each executive's insider sales of ICON ordinary shares during the Class Period, and the resulting proceeds and profits, are set forth below:[19]

**Stephen Cutler: Insider Sales of ICON Stock During Class Period**

| Date | Shares Sold | Share Price | Sale Proceeds | Estimated Net Profits |
|---|---|---|---|---|
| 7/31/2023 | 5,202 (from RSUs/PSUs) | $251.21 | $1,306,776.73 | $1,306,776.73 |
| 9/14/2023 | 13,500 (from options) | $265.48 | $3,583,971.90 | $2,516,661.90 |

[19] These transactions are drawn from the Forms 144 that each insider filed with the SEC. These tables exclude transactions occurring on or near the vesting dates for Cutler and Brennan (March 3, 2022; March 3, 2023; and March 3, 2024), which are presumed to be effected for tax withholding purposes. Estimated Net Profits for transactions involving RSUs (Restricted Stock Units) or PSUs (Performance Stock Units) are identical to their Sale Proceeds. Estimated Net Profits for transactions involving options is the difference between the stock's market price at the time of exercise and the exercise price (determined from ICON's Annual Reports from 2022–2024). Share Price is rounded to the nearest cent.

| Date | Shares Sold | Share Price | Sale Proceeds | Estimated Net Profits |
|---|---|---|---|---|
| 9/15/2023 | 2,500 (from options) | $265.36 | $663,396.00 | $465,746.00 |
| 11/21/2023 | 18,517 (from RSUs/PSUs) | $271.03 | $5,018,732.87 | $5,018,732.87 |
| 3/6/2024 | 15,442 (from RSUs/PSUs) | $335.98 | $5,188,132.13 | $5,188,132.13 |

| | |
|---|---|
| **Gross Sale Proceeds** | $15,761,009.63 |
| **Estimated Total Net Profits** | $14,496,049.63 |
| **Total Shares Sold** | 55,161 |
| **Total Shares and Vested Options**[20] | 242,662 |
| **Shares Sold as a % of Total Shares and Vested Options** | 22.7% |

**<u>Brendan Brennan: Insider Sales of ICON Stock During Class Period</u>**

| Date | Shares Sold | Share Price | Sale Proceeds | Estimated Net Profits |
|---|---|---|---|---|
| 11/16/2023 | 25,926 (from options) | $267.79 | $6,942,625.02 | $4,074,950.16 |
| 11/16/2023 | 4,280 (from RSUs) | $267.79 | $1,146,124.94 | $1,146,124.94 |
| 2/26/2024 | 7,021 (from private acquisition) | $316.33 | $2,220,929.06 | $2,220,929.06 |
| 5/10/2024 | 7,930 (from RSUs) | $316.43 | $2,509,319.24 | $2,509,319.24 |
| 7/29/2024 | 18,518 (from options) | $325.99 | $6,036,706.89 | $2,736,428.93 |
| 7/29/2024 | 7,546 (from PSUs) | $325.99 | $2,459,930.35 | $2,459,930.35 |

| | |
|---|---|
| **Gross Sale Proceeds** | $21,315,635.50 |
| **Estimated Total Net Profits** | $15,147,682.68 |
| **Total Shares Sold** | 71,221 |
| **Total Shares and Vested Options** | 72,224 |
| **Shares Sold as a % of Total Shares and Vested Options** | 98.6% |

[20] Total Shares and Vested Options are equal to shares held at the start of the Class Period, plus RSUs, PSUs, and options that vested during the Class Period, less shares sold on or near vesting dates. Option grants are assumed to vest over five years at a rate of 20% per year. Cutler's Total Shares and Vested Options exclude the shares subject to accelerated vesting upon his October 2025 departure as CEO.

609. Cutler's and Brennan's insider sales were highly unusual and suspicious.

610. First, these insider sales realized unusually large profits. Cutler's and Brennan's estimated net profits were $14,496,050 and $15,147,683, respectively, for a combined total of $29,643,733. Cutler's net profits were twice his total 2023 compensation of $7.2 million, and Brennan's net profits were seven times his total 2023 compensation of $2.1 million.

611. Second, Cutler and Brennan each sold large percentages of their total holdings. As detailed above, Cutler and Brennan respectively divested 22.7% and 98.6% of their total holdings during the Class Period. Significantly, Brennan sold most of his holdings (52.3%, or 37,227 shares) prior to the announcement of his resignation on April 3, 2024.

612. Third, Cutler's and Brennan's insider sales were unusual compared to their sales before and after the Class Period.

613. During the equivalent-length period before the Class Period, from January 7, 2021 to July 26, 2023 (the "Control Period"), Cutler made only one discretionary sale on August 17, 2021, of 21,568 shares at $240.26 per share, for $5,181,927 in profits. Cutler's Class Period sales—of 55,161 shares for $14.5 million in profits—were over 2.5 times larger. Cutler made ***no*** non-tax sales between August 17, 2021 and the start of the Class Period nearly two years later. Cutler has sold zero shares since the Class Period.

614. Brennan's Class Period sales dwarf his pre-Class Period sales. During the Control Period, Brennan sold only 20,327 shares in non-tax transactions for $3,070,198.88 in profits, compared to 71,221 shares for profits of $15,147,682.68 during the Class Period. Thus, Brennan sold over 3.5 times as many shares—and reaped nearly five times as much profit—during the Class Period compared to the Control Period. Brennan has sold zero shares since the Class Period.

615. Fourth, the timing of Cutler's and Brennan's insider sales was unusual. ***All*** of their

sales occurred while ICON admittedly overstated its financial performance due to "material accounting errors." As detailed above, these "errors" materially overstated ICON's revenue, net income, adjusted EBITDA, and adjusted EPS—and repeatedly turned earnings "misses" into "beats"—during the period of Cutler's and Brennan's sales. That is no coincidence.

616. Moreover, the sales occurred near peaks in ICON's stock price (which was artificially inflated due to their misstatements), making them highly profitable. Cutler's most lucrative sale occurred at $335.98 per share—ICON's all-time peak price at the time. Cutler's volume-weighted average sales price during the Class Period was $285.73, and Brennan's was $299.29. The majority of Brennan's sales occurred at prices well over $300 per share.

617. In addition, several sales occurred shortly after Cutler and Brennan made false statements to investors. For example, Cutler made his first insider sale (for net profits of $1.3 million) on July 31, 2023—just two business days after he made the first misstatements in this action on July 27, 2023. Brennan made his first and largest insider sale (for net profits of $5.2 million) on November 16, 2023—just two days after the November 14, 2023 Jefferies conference where he falsely claimed there was "definitely" a "significant kind of uptick [in RFPs] from our biotech customers." On March 6, 2024—the day after misstatements at the March 5, 2024 TD Cowen Health Care Conference—Cutler sold shares for $5.2 million of net profits. On July 29, 2024—just two business days after ICON's July 25, 2024 earnings call, when ICON reported 2Q24 net income that was overstated by ***77.5%***—Brennan sold shares to reap net profits of $5.2 million.

618. Further, shortly before the fraud began to unravel, Cutler's and Brennan's sales quickly stopped: neither sold a single share after July 29, 2024 through present (excluding sales to satisfy tax withholding). Thus, Cutler's and Brennan's suspicious and unusual insider sales appear calculated to maximize their personal profits from their fraud.

619. Fifth, none of Cutler's and Brennan's insider sales were conducted through a Rule 10b5-1 insider trading plan. These sales were entirely discretionary.

620. Finally, Cutler's and Brennan's insider sales occurred when both were uniquely situated to profit from knowing the truth they concealed from investors.

621. As detailed above, Cutler and Brennan knew ICON's biotech customer RFPs were continuously declining through 2023 and 2024, while biotech cancellations increased, totaling several hundred million dollars in 2023 alone. They were also aware of significant issues with ICON's large customers, including (i) Pfizer's decision in 2023 to stop awarding new full-service awards and at least 85% of its Phase 2 and 3 studies to ICON, causing ICON's win rate with Pfizer to drop near zero; (ii) ICON's effort to begin shutting down its Pfizer-dedicated PSBU by early 2024 given the lack of business from Pfizer; (iii) Cutler's personal approval in January 2024 of a $50 million budget cut on ICON's remaining Pfizer studies; and (iv) Pfizer's and other large customers' shift to nearly 100% FSP, decimating ICON's profits and margins.

622. Indeed, Cutler's single largest sale (on March 6, 2024, yielding $5.2 million in net profits) occurred shortly after he internally admitted, at an ICON town hall in February 2024, that ICON had lost the "Pfizer opportunity" and was no longer a preferred partner of Pfizer—a highly material, non-public fact that would significantly reduce ICON's share price once it was revealed.

623. That Defendants Cutler and Brennan profited nearly $30 million from selling ICON stock, while concealing the truth about ICON's declining business, is strong evidence of scienter.

624. Cutler and Brennan Reaped Nearly $2 Million in PSUs from Violating GAAP: Further supporting scienter, Defendants' GAAP violations allowed Cutler and Brennan to reap nearly $2 million in Performance Stock Units (PSUs) by inflating ICON's earnings per share.

625. During 2024, 4,452 PSUs vested for Cutler, and 1,050 vested for Brennan, based on ICON's purported "achievements of diluted non-GAAP specified EPS targets over the three year period from 2021 - 2023." By materially boosting ICON's purported EPS in 2023, Defendants' GAAP violations enabled these PSUs to vest for Cutler and Brennan.

626. These PSUs vested at average prices of $325.51, meaning that Cutler and Brennan respectively received $1,449,170.52 and $341,785.50 in vested PSUs in 2024. This significant financial benefit—116% of Cutler's salary and 55% of Brennan's salary for 2024—confirms Cutler's and Brennan's motive to inflate ICON's claimed financial performance.

627. Based on their insider sales and vested PSUs, in total, Cutler profited nearly $16 million and Brennan profited $15.5 million from the fraud they perpetrated on investors.

628. Notably, in restating, ICON stated that it is currently "evaluating whether any incentive-based compensation received by current or former executive officers . . . was erroneously awarded as a result of the incorrect financial statements" and must be clawed back.

629. Other ICON Insiders Reaped Over $50 Million in Profits from Insider Sales: Further supporting scienter, three other ICON insiders reaped over $50 million in combined profits from unusual and suspicious stock sales during the Class Period.[21]

630. First, ICON Director and co-founder John Climax reaped estimated net profits of ***$43.1 million*** from unloading 247,514 shares—46.4% of his total holdings—during the Class

[21] These transactions are drawn from the Forms 144 that each insider filed with the SEC and exclude transactions occurring on or near the vesting dates, which are presumed to be effected for tax withholding purposes. Estimated net profits for transactions involving RSUs or PSUs are identical to their sale proceeds. Estimated net profits for transactions involving options are the difference between the stock's market price at the time of exercise and the exercise price (determined from ICON's Annual Reports from 2022–2024). Share price is rounded to the nearest cent. Total holdings are equal to shares held at the start of the Class Period, plus RSUs, PSUs, and options that vested during the Class Period, less shares sold on or near vesting dates. Option grants are assumed to vest over five years at a rate of 20% per year.

Period. These sales were highly unusual: Climax sold over ***twelve times*** as many shares during the Class Period than the Control Period, when he sold just 20,000 shares for estimated profits of $3.1 million. Climax has sold zero shares since the Class Period.

631. Second, ICON's Chief Administrative Officer, General Counsel and Company Secretary Diarmaid Cunningham obtained estimated net profits of $4.5 million from selling 25,886 shares—46.3% of his holdings—during the Class Period. During the Control Period, by contrast, Cunningham made ***zero*** non-tax sales. Cunningham has sold zero shares since the Class Period.

632. Third, ICON's Chief Information Officer Thomas O'Leary obtained estimated net profits of $2.6 million from selling 18,388 shares during the Class Period. O'Leary sold over ***thirty times*** more shares during the Class Period than the Control Period (when he sold just 602 shares for estimated net profits of $146,112).[22] O'Leary has sold zero shares since the Class Period.

633. Climax's, Cunningham's, and O'Leary's Class Period sales are set forth below:

**John Climax: Insider Sales of ICON Stock During Class Period**

| Date | Shares Sold | Share Price | Sale Proceeds | Estimated Net Profits |
|---|---|---|---|---|
| 8/25/2023 | 5,000 (Founder Shares) | $252.62 | $1,263,075.00 | $1,263,075.00 |
| 12/13/2023 | 60,000 (Founder Shares) | $225.28 | $13,516,800.00 | $13,516,800.00 |
| 5/15/2024 | 10,557 (from options) | $321.34 | $3,392,387.44 | $2,699,848.24 |
| 6/5/2024 | 6,764 (from RSUs) | $225.28 | $1,523,793.92 | $1,523,793.92 |
| 12/5/2024 | 17,500 (Founder Shares) | $214.50 | $3,753,750.00 | $3,753,750.00 |
| 5/6/2025 | 140,000 (Founder Shares) | $143.02 | $20,022,800.00 | $20,022,800.00 |

[22] Because ICON has not publicly reported O'Leary's option exercise prices, O'Leary's estimated net profits for transactions involving options are estimated as the difference between the stock's market price at the time of exercise and the highest average option exercise price reported for ICON's directors and officers in the corresponding years.

| Date | Shares Sold | Share Price | Sale Proceeds | Estimated Net Profits |
|---|---|---|---|---|
| 5/19/2025 | 7,693 (from options) | $130.04 | $1,000,421.57 | $307,820.78 |

| | |
|---|---|
| **Gross Sale Proceeds** | $44,473,027.93 |
| **Estimated Total Net Profits** | $43,087,887.94 |
| **Total Shares Sold** | 247,514 |
| **Total Shares and Vested Options** | 533,956 |
| **Shares Sold as a % of Total Shares and Vested Options** | 46.4% |

**Diarmaid Cunningham: Insider Sales of ICON Stock During Class Period**

| Date | Shares Sold | Share Price | Sale Proceeds | Estimated Net Profits |
|---|---|---|---|---|
| 8/4/2023 | 501 (from options) | $255.25 | $127,880.35 | $67,730.29 |
| 8/8/2023 | 10,410 (from options) | $255.21 | $2,656,726.73 | $1,406,902.13 |
| 2/26/2024 | 3,441 (from employee stock units) | $317.11 | $1,091,189.62 | $1,091,189.62 |
| 3/8/2024 | 200 (from options) | $341.49 | $68,298.00 | $35,746.00 |
| 3/13/2024 | 488 (from options) | $341.00 | $166,408.00 | $86,981.12 |
| 6/5/2024 | 4,877 (from options) | $329.00 | $1,604,533.00 | $810,752.48 |
| 7/30/2024 | 5,969 (from RSUs/PSUs) | $330.42 | $1,972,303.84 | $1,000,789.40 |

| | |
|---|---|
| **Gross Sale Proceeds** | $7,687,339.54 |
| **Estimated Total Net Profits** | $4,500,091.04 |
| **Total Shares Sold** | 25,886 |
| **Total Shares and Vested Options** | 55,915 |
| **Shares Sold as a % of Total Shares and Vested Options** | 46.3% |

**Thomas O'Leary: Insider Sales of ICON Stock During Class Period**

| Date | Shares Sold | Share Price | Sale Proceeds | Estimated Net Profits |
|---|---|---|---|---|
| 7/31/2023 | 3,924 (from options) | $252.55 | $990,993.64 | $519,878.20 |
| 8/1/2023 | 6,968 (from options) | $248.90 | $1,734,347.05 | $897,768.97 |
| 7/29/2024 | 6,360 (from options) | $324.32 | $2,062,668.84 | $1,027,515.24 |
| 8/8/2025 | 1,136 (from RSUs) | $157.46 | $178,876.72 | $178,876.72 |

| | |
|---|---|
| **Gross Sale Proceeds** | $4,966,886.25 |
| **Estimated Total Net Profits** | $2,624,039.13 |
| **Total Shares Sold** | 18,388 |

634. Climax's, Cunningham's, and O'Leary's insider sales are highly unusual and suspicious given their large profits, large percentages of holdings sold, and dramatic increase in sales compared to the Control Period. Further, none of these insider sales were conducted through a Rule 10b5-1 insider trading plan; the sales were entirely discretionary.

635. The fact that Cutler, Brennan, Climax, Cunningham, and O'Leary reaped over $79 million in profits from unusual insider sales during the Class Period strongly supports scienter.

**B. Former Employee Allegations**

636. Former ICON employees provided information on a confidential basis supporting the strong inference that the Individual Defendants acted with scienter in making the alleged materially false and misleading statements. The former employees' accounts corroborate one another and the additional facts alleged herein.

**1. FE-1**

637. FE-1 initially worked at ICON as a technical project manager for product development between November 2011 and March 2017, and a senior technical project manager for product management until June 2017. FE-1 rejoined ICON in January 2020 as a senior project

manager for the IRT (Interactive Response Technologies) division. In March 2021, FE-1 became a director of business development for ICON's IRT and Clinical Supplies Management ("CSM") Solutions divisions and remained at ICON in that role until September 1, 2024. FE-1's role involved sales for the IRT and CSM businesses for the whole company, maintaining clients, and cultivating new business. FE-1 was ICON's salesperson responsible for the IRT and CSM sales for most of FE-1's second employment term. During the period from January 2023 to September 2024, FE-1 reported to Executive Director Sales Strategy, Biometrics & Pharmacovigilance Amanda Cohen; Cohen initially reported to Senior Vice President Yves Grenon and later reported to current Vice President of Business Development Eloise Harris. Grenon and Harris reported to Executive Vice President and Chief Commercial Officer George McMillan. According to FE-1, based on personal knowledge:

i. **Cutler Was the Pfizer Executive Sponsor:** Pfizer was ICON's largest customer. Based on regularly working with Pfizer for over a decade, FE-1 explained that Pfizer has always been ICON's "number one since day one" and was a "centerpiece" of ICON's business. Further, CEO Cutler was Pfizer's "executive sponsor." FE-1 recalled that ICON internal documents listed top customers with the assigned business development lead and an executive-level sponsor. Cutler was the executive sponsor for Pfizer and certain other customers.

ii. **Pfizer Slowdown:** FE-1 described a trend of Pfizer reducing its business with ICON starting in 2023. During a 2023 "strategic refresh," Pfizer informed ICON that it was not getting any full-service work. This was a negative development for ICON given the higher margins for full-service work and the lower margins on FSP work.

   a. In 2023, Pfizer stopped awarding new full-service business to ICON as part of a "strategic refresh."

      i. FE-1 explained that in the "strategic refresh," Pfizer asked ICON to bid on mock studies under several models, ranging from FSP to full-service to a combination of both. FE-1 worked on preparing the bids submitted to Pfizer, together with Michael Ohrwashel, Karen Tormey, and other ICON executives, including CCO McMillan. FE-1 recalled that McMillan was "always involved in anything strategic," and based on working with ICON's full-service personnel, FE-1 explained that any budgets over $9 or $10 million required executive approval and review by McMillan. The Pfizer "strategic refresh" involved hundreds of millions of dollars.

ii. ICON provided the bids in 2023. In response, Pfizer responded that ICON was not getting any full-service work. ICON's full-service work for Pfizer had previously involved large, global Phase 3 studies of $20 to $30 million each.

iii. The Pfizer "strategic refresh" was completed by mid- to late 2023.

b. FE-1 confirmed that Pfizer was not awarding a lot of new business to ICON throughout 2023 and 2024.

i. For context, ICON had enjoyed a 50% win rate for Pfizer's studies through approximately 2021, but saw a trend of a declining Pfizer win rate over the next several years.

ii. Once Pfizer's "strategic refresh" was completed in mid- to late 2023, ICON's win rate with Pfizer dropped near zero.

c. FE-1 was aware of the declining Pfizer business from participating in monthly business development calls dedicated to Pfizer, which included representatives from each of ICON's functional groups on the sales side, including Ohrwashel (for the full-service business), Tormey, and sometimes Mark Cooper (then head of ICON FSP).

i. During the calls, the participants reviewed detailed Salesforce reports (maintained by Ohrwashel) that included, among other things, Pfizer's backlog, awards, pipeline, all open RFPs, and ICON's chance of winning those RFPs.

ii. FE-1 explained that during these monthly meetings, no one offered positive projections for the Pfizer relationship. Instead, the most positive development concerning Pfizer was an IRT award of about $2.5 million that FE-1 achieved shortly before he left ICON in September 2024. While this award was "small dollars," FE-1 explained that it stood out given the lack of other new awards from Pfizer.

d. On the FSP side, ICON's standard contracts generally required 90 days advance notice for staffing changes.

iii. **Biotech Slowdown:** FE-1 described a trend of slowdown in ICON's biotech business in 2023 and 2024 based on decreasing biotech RFPs, increasing cancellations, numerous "awards" without signed contracts driving ICON's revenue forecasts, and RFPs that were premature or duplicative.

iv. **Brennan, Balfe and Other Senior Executives Knew about ICON's Decreasing Biotech Customer RFPs in 2023 and 2024:** ICON saw a decreasing number of biotech customer RFPs through 2023 and 2024. These declining biotech RFPs in 2023 and 2024 were shown in quarterly business development meetings that FE-1 attended with Brennan, Balfe, and McMillan.

a. The quarterly business development meetings were led by McMillan as CCO. FE-1 attended these meetings, which were held by video and typically lasted an hour; FE-1 believed the meetings were recorded. Brennan was a regular attendee at these quarterly meetings, and Cutler sometimes attended.

b. During the quarterly meetings, Brennan and Balfe presented a company-wide dashboard in Salesforce that contained 10 or 15 datapoints.

c. ICON's biotech customer RFPs continued to decline through 2023 and 2024 and did not increase at any point through FE-1's departure in September 2024.

d. FE-1 also knew the trends in ICON's biotech area from participating in weekly meetings that included reports on open and closed RFPs, and from accessing the Salesforce system, both as described below.

e. FE-1 explained that ICON's full-service RFPs with an IRT component—which were largely biotech and covered more than half of ICON's full-service biotech work—peaked by 2021 or 2022 at close to 50 per month. FE-1 personally tracked these RFPs and confirmed that they showed a year-over-year decline in 2023, and average RFPs per month were also dropping. By 2024, they had dropped to the low 30s each month.

f. FE-1 confirmed that there was always a direct relationship between trends in these RFPs and the broader set of ICON's biotech customer RFPs based on seeing reports for both categories.

v. **Increasing Biotech Cancellations Throughout 2023 and 2024:** Starting in late 2022, ICON saw a "trend" of increasing study cancellations—especially in the biotech area.

a. FE-1 learned about ICON's increasing cancellations from attending weekly meetings to review Salesforce reports with Cohen and other colleagues. These reports were visible from logging in to Salesforce and were also circulated as screenshots for the meetings. The reports contained standard metrics, including how many open RFPs were in the pipeline, the percentage chance of winning the RFPs (as low as 30 percent), total awards, cancellations, and actual year-to-date numbers.

b. During the weekly meetings, the participants discussed ICON's pipeline, open and closed RFPs, win and loss rates, and the reasons why opportunities were lost. At the meetings, Cohen, FE-1, and the other attendees "went over every win or loss and the cancellations."

c. By June 2023, FE-1 explained, it was clear that the elevated cancellations were a trend. From that point, the trend never improved, and ICON's biotech cancellations progressively worsened into 2024.

d. FE-1 emphasized that the "cancellations were a big thing because we realized they were going up" and that the number of cancellations "was a big concern." FE-1

noted that out of 30 or 40 full-service studies awarded by biotech customers to ICON over the course of a year, "five to 10 canceled."

e. The canceled studies were financially significant, as most biotech studies ranged from $8 million to $30 million—and some were much larger. FE-1 estimated that ICON's total biotech cancellations were at least several hundred million dollars in 2023 alone.

f. In addition to the weekly meetings, FE-1 learned from Cohen, Harris, and Grenon that "we need" the cancellation "numbers because it is going all the way up to the top and they are reviewing it." Thus, Cohen aggregated the cancellation data for her team, and passed it up to her managers for further aggregation. FE-1 understood that the roll-up of cancellation data extended to McMillan and Cooper, who then submitted the data to Cutler and Brennan.

vi. **CFO Brennan Personally Presented ICON's Increasing Biotech Cancellations:** FE-1 confirmed that Brennan, Balfe, and McMillan were aware of ICON's increasing biotech cancellations based on their attendance and presentations at quarterly meetings with FE-1 in 2023 and 2024, described above, where the increasing cancellations were consistently discussed.

a. Brennan and Balfe presented ICON's cancellation data in multiple quarterly business development meetings using a company-wide dashboard; cancellations were a "fixed piece" on the dashboard that was always presented.

i. From the middle of 2023 onward, ICON's cancellations were discussed consistently at these quarterly meetings and reflected in the dashboards, and the number was always "very high."

ii. Between mid-2023 and FE-1's departure in September 2024, there was no quarter with a reduction in ICON's biotech cancellation rate.

iii. The message Brennan and Balfe delivered during the quarterly meetings was that high cancellations were really hurting ICON's numbers.

b. ICON's increasing biotech cancellations were also discussed at an annual sales meeting that Cutler and FE-1 attended in April 2024 in Tampa, Florida.

i. The April 2024 sales meeting was held at a Westin resort in Tampa and included the full service and FSP sales staff, as well as CEO Cutler and other executives. Cutler had consistently attended the sales meeting in prior years, while CFO Brennan sometimes attended. FE-1 specifically recalled one year when Brennan forgot his wallet, and FE-1 had to pay for Brennan's drinks.

vii. **ICON Forecast Revenue from "Awards" without Signed Contracts:** Heightening the impact of ICON's increasing biotech cancellations, ICON's forecasts had included revenue from studies without signed contracts in place.

a. As FE-1 explained, once a study was marked as "awarded" in ICON's Salesforce system, the revenue from that study was included in ICON's financial forecast for the duration of the study.

b. FE-1's manager Cohen had concerns that some of the full-service sales representatives were marking contracts in Salesforce as "awarded" to improve their numbers—even before receiving the necessary assurances and/or documentation that the studies would materialize.

c. From personally accessing the Salesforce system, FE-1 confirmed that there were numerous studies marked as "awarded" in Salesforce, even though the contract was not signed. For example, FE-1 noticed that Salesforce was showing a larger amount of "awards" than FE-1 tracked in his own Excel file of awards.

d. These "awards" without signed contracts were included in Salesforce dashboards, and FE-1 believed they were also included in ICON's public forecasts, revenues and earnings guidance, despite the absence of signed contracts.

e. Many of the "awarded" studies without signed contracts were later canceled. FE-1 knows this because he was the client account manager for the IRT component of ICON's full-service studies (covering more than half of ICON's full-service work for biotech customers), and thus had access to those full-service awards in the Salesforce system and tracked whether they materialized into work and revenue or whether they were canceled. FE-1 also received automatic email notifications from Salesforce when cancellations or other changes were made to these studies.

viii. **Duplicative RFPs for Limited BARDA Funding:** Finally, FE-1 identified another issue with ICON RFPs. In 2023 and 2024, ICON bid on several relatively large studies, in the $30 to $50 million range, to be funded by BARDA. However, in each case, multiple companies were competing for the same BARDA funding for the same study, so even where ICON responded to three or four RFPs for a given study, there would ultimately only be one study and one award. Thus, for example, what appeared to be "$1 million" in RFPs could all relate to a single $250,000 study. As a result of this duplication, ICON's volume of RFPs from BARDA-funded studies was several times higher than the maximum possible award.

### 2. FE-2

638. FE-2 was Director of Clinical Operations, Oncology/Director of Clinical Research from summer 2022 to February 2024. In this role, FE-2 ran ICON's oncology projects for Pfizer and also worked on projects for Elicio Therapeutics and Janssen. FE-2 reported to Vice President, Global Project Management Martin Lachs, who reported in parallel to a Senior Vice President and to CEO Cutler. According to FE-2, based on personal knowledge:

i. **ICON's Oncology Division:** FE-2 explained that ICON's oncology division was the second-largest division in the company (and had been the largest before the COVID-19 pandemic). FE-2 estimated that one-third of ICON's overall business came from the oncology area.

ii. **Pfizer's Oncology Business Had Slowed for Years:** Upon starting at ICON in summer 2022, FE-2 was informed that ICON's oncology business with Pfizer was decreasing.

a. During FE-2's entire tenure, Pfizer had largely stopped giving ICON new late-phase awards (which involved the largest and most financially significant studies). Over FE-2's tenure, FE-2 participated in 5 to 6 bid defenses with Pfizer that ICON did not win.

b. Further, in late 2023, Pfizer dropped various oncology studies with ICON. For the remaining studies, ICON's margins eroded. FE-2 described four multiple myeloma studies (ranging from $4 to $15 million each) that Pfizer decided to continue because the drug was headed for approval. However, ICON was "overburning on the budgets and eating the costs" because its staff was incurring extensive overtime that was not being billed to Pfizer. FE-2 estimated that the unbilled overtime was tens of thousands of dollars per month, per study.

c. Overall, Pfizer's oncology business with ICON decreased substantially during FE-2's tenure. FE-2 estimated the reduction as $30 to $40 million, stating that "the portfolio was dying" and "they weren't giving us a lot to replace it with," coupled with the impact of Pfizer's shift to FSP (described below). FE-2's supervisor Lachs described the situation as "like a dying dinosaur."

iii. **Other Large Customers Also Reduced Their ICON Oncology Studies:** FE-2 stated that ICON's oncology business from Pfizer and BMS was declining throughout 2023 and through FE-2's departure in February 2024.

a. Further, by October 2023, several large pharma companies, including GSK and Sanofi, were shutting down their studies in the oncology area. FE-2 learned of this from his direct reports who had worked on those studies and indicated that they had time available for other projects. However, ICON did not have other active studies to assign them.

iv. **Janssen Stopped All New Awards in Fall 2023:** Janssen was dissatisfied with ICON due to performance issues, such as delays in study start-up and issues with quality and performance in terms of monitoring. Lachs and West had to meet face-to-face with Janssen in an effort to smooth things over, as FE-2 learned from Lachs and the Janssen project manager, Mary McKay. Nonetheless, in fall 2023, Janssen advised that it would not award any new studies to ICON until the issues were fully resolved. As of FE-2's departure in February 2024, the issues were not fully resolved, and Janssen was not awarding any further studies to ICON.

v. **Cutler Headed ICON's Pfizer Liaison Team:** Cutler headed a special Pfizer "liaison team" at ICON, which also included Sarah Gore (Executive Director of Project

Management for the Pfizer oncology business) and Heather West (Vice President, Strategic Alliance Management), who dealt with Pfizer and other strategic partnerships.

vi. **Cutler Personally Approved Pfizer's Demand for a $50 Million Budget Cut:** In mid-September 2023, Pfizer came to ICON and its other CROs demanding that each CRO cut $50 million from the budget for its portfolio of Pfizer studies. In January 2024, CEO Cutler approved the $50 million cuts for Pfizer. FE-2 knows this from seeing emails where Cutler approved the cuts, as well as an electronic notification from ICON's computer system that Cutler had given final approval to the cuts.

a. The cuts affected all of the approximately 19 oncology studies FE-2 oversaw at the time, as well as Pfizer studies in other therapeutic areas. After the budget cuts were prepared in FE-2's department, approved by Lachs, and reviewed by ICON's finance department, the final package was presented to Cutler.

b. Cutler also approved other requests from Pfizer and other top 10 customers to reduce ICON's project budgets. FE-2 knows this from seeing emails with Cutler, which also included Lachs, Gore, West, and Senior Director, Business Development Michael Ohrwashel, where Cutler approved budget cuts.

c. For example, if an ICON budget included 40% of the budget for project management, Cutler would state something along the lines of "this is too much. They are not going to approve it. Take another $1 million out." The frequency of these emails increased towards the end of FE-2's tenure in February 2024.

d. FE-2 emphasized that Cutler was extensively involved in approving final budgets related to Pfizer and was "always undercutting margin" in an effort to obtain more business from Pfizer.

vii. **In 2023, ICON Lost Much of Pfizer's Most Lucrative Work:** In fall 2023, Pfizer directed ICON and its other CRO providers (PPD, Parexel, and Syneos) to participate in a "mock bid defense" so Pfizer could decide how to allocate its CRO business.

a. FE-2 participated in preparing ICON's submission to Pfizer, which described ICON's plan for study sites, use of technology, proposed vendors and their costs, and other information.

b. CEO Cutler approved the final budget forecasting and "pitch" presentation to Pfizer. FE-2 knows this from seeing the email where Cutler reviewed and approved the "pitch" to Pfizer.

c. Shortly before Christmas 2023, Pfizer communicated the results to ICON via Gore and West, whose messaging to FE-2 indicated that Cutler and other senior executives had already been informed. The outcome was that:

i. Pfizer would no longer award business to PPD.

ii. Pfizer would award its Phase 1 business to Syneos.

iii. Pfizer would award 85% of Phase 2 and 3 business to Parexel.

iv. Pfizer would award 15% of the Phase 2 and 3 business to ICON.

d. FE-2 explained that these results effectively capped ICON's opportunities with Pfizer, as ICON was shut out of the vast majority of Pfizer's Phase 2 and 3 studies, which are the largest and most financially significant.

viii. **Pfizer, BMS and Another Large Customer All Switched to FSP by Early 2024, Slashing ICON's Margins:** In late 2023 and early 2024, Pfizer, BMS, and another large ICON customer all switched from FSO to FSP for both new studies and existing awards.

a. FE-2 indicated that these customers switched from nearly 100% FSO to nearly 100% FSP. This was a huge loss for ICON, since FSP profit margins were only around 15%, compared to 40–50% margins for FSO.

b. FE-2 was aware of Pfizer's switch from working with Pfizer and losing CRAs who were reassigned from Pfizer full-service to FSP work in January or early February 2024. FE-2 knew about BMS's switch because ICON's protocols in the oncology area were affected.

c. One of the catalysts for BMS's shift to FSP was a "crisis" in fall 2023 when an ICON CRA fraudulently claimed to have performed monitoring that she did not perform. BMS discovered the issue when the study reached database lock and the data was wrong, although the monitor had falsely marked it as clean. In response to the fraudulent monitoring, Lachs asked FE-2 to perform an internal audit.

ix. **Pfizer's Strategic "Refresh" to FSP:** FE-2 confirmed that by January 2024, Pfizer had notified ICON that it was moving to an FSP model to reduce costs. ICON's shift to FSP for Pfizer, called a "refresh" or "reset," was to be completed by March 2024. Cutler was aware of Pfizer's switch to FSP because he reviewed and approved ICON's internal announcement of the change. FE-2 noted that the FSP announcement was made by email, which was sent by Gore but signed by Cutler.

a. FE-2 explained that Gore and West managed ICON's transition from FSO to FSP for Pfizer and prepared multiple presentations describing the organization, treatment of benefits, and other issues.

b. FE-2 explained that there were meetings in late 2023 and early 2024 involving Cutler and the Pfizer "liaison team," as well as Lachs. These were "lengthy meetings," during which the attendees had to "approve all this information – messaging" around the change, "how it would roll out to the team, when it would roll out."

c. In early 2024, Gore held regular meetings with ICON's Director-level employees, including FE-2, assigned to Pfizer studies. Later, Gore's meetings expanded to "town halls," held via Teams, that included both ICON Director and VP-level

personnel. By February 2024, in advance of Wave 1 (described below), Gore conducted internal training sessions with slide decks to explain the FSP rollout.

d. Based on email updates from Gore and regular meetings with Gore, FE-2 learned that Cutler was meeting with Pfizer regularly to work out the details of the transition to FSP. FE-2 explained that Cutler and his management team had to "work out what the finances were going to be" and "approve what the structure was going to look like."

e. Pfizer's transition to FSP was scheduled to occur in three "waves," each affecting a group of studies:

i. Wave 1 was to occur in mid- to late February 2024.

ii. Wave 2 was scheduled to be completed in March 2024.

iii. Wave 3 was initially scheduled to be finished in March 2024, but was extended to start on April 8, 2024 and to be completed by the end of April 2024.

f. While Pfizer sought to retain the ICON staff members from the FSO side, the FSP positions did not pay as well. FE-2 pointed out that on the FSO side, a project manager might make $185,000 per year, while the FSP side only paid $130,000 with no benefits, vacation, or job security, since their employment would end with the study for which they were engaged. As a result, ICON had to "scramble" to adjust compensation to fill the positions on the FSP side.

x. The combination of losing Pfizer's Phase 2 and 3 studies and simultaneously losing "a huge chunk of margin" because of Pfizer's switch to the FSP model, as detailed above, was a "huge blow to ICON."

xi. **Cutler Participated in "Brutal" Monthly VP Meetings to Review Detailed Financial Data:** FE-2's supervisor, Lachs, participated in monthly VP meetings with Cutler, Brennan, Balfe and other members of senior management to convey the status of the oncology division and defend its performance. FE-2 added that these meetings "could be brutal."

a. FE-2 explained that the monthly VP meetings were scheduled through a standing calendar invite to Cutler, Brennan, Balfe and other members of senior management.

b. In advance of the meetings, Lachs prepared a slide deck; FE-2 was involved in preparing the decks, which included financial information (such as revenue and margins), wins and losses, the studies' needs, problems, and upcoming deadlines and milestones.

c. As Lachs explained to FE-2, the slide decks were transmitted to Cutler and other executives in advance. Cutler and other senior management received and reviewed the materials because they came to the meetings with questions about specific

studies. FE-2 knows this because Lachs sent FE-2 instant messages during the meetings with specific questions, such as "Steve [Cutler] wants to know what the problem is with study startup."

xii. **Cutler Participated in "End Gate" Meetings for Underperforming Studies:** In addition to the monthly VP meetings, ICON held periodic Teams meetings for studies with quality problems, such as Janssen and BMS. Cutler, Brennan, Balfe, McMillan, and other senior executives (including in biotech, study startup, and data management) attended at various times.

a. FE-2 explained that the directors had to complete Excel-based slides maintained on an internal portal. The slides captured numerous metrics about each study, and if the numbers were not where ICON wanted, the director was called to a meeting.

b. During the meeting, each presenter was given a 15-minute slot. The executives in attendance asked difficult questions about why the study numbers were not where they were supposed to be and whether more resources were required. FE-2 emphasized that the attendees "would run you through the wringer about why you were not where you needed to be."

c. FE-2 presented at two such "end gate" meetings around October and December 2023; Cutler attended the October 2023 meeting, which related to a study for Pfizer, and an SVP attended the December meeting in Cutler's place.

xiii. **Cutler Monitored the Pfizer Business "in Near Real Time":** As FE-2 summarized, "[t]here is no way that Cutler or any member of leadership could say they didn't know what was happening or they didn't have access to it." FE-2 said Cutler was "aware in near real time" what the status of business was with Pfizer. As FE-2 put it, Cutler was "aware of everything as soon as we were." For example, FE-2 had regular calls with Lachs to provide updates on the Pfizer business. Lachs then had to provide updates to Cutler in the monthly VP meetings described above.

xiv. **ICON's "Close Canceled" RFPs:** FE-2 confirmed that customers sent RFPs to ICON merely to get a sense of ICON's pricing; once ICON responded, the customers indicated that they did not wish to move forward with the study.

**3. FE-3**

639. FE-3 worked as an Executive Director of Project Delivery at ICON from early 2023 until November 2024. In this role, FE-3 oversaw 15 Directors of Project Delivery and served as ICON's senior leadership client contact for clients within FE-3's portfolio. FE-3's portfolio encompassed 25 to 28 sponsors and ranged from 50 to 70 studies. Overall, FE-3's portfolio generated about $350 million in revenue per year. FE-3 reported to Vice President Mary Frances

Sassaman, who reported to Brandon Early (VP of Project Delivery until December 2023, then SVP, Global Project Delivery—ICON Biotech through November 2024). Early reported to ICON Biotech President Chris Smyth, who reported to CEO Cutler. According to FE-3, based on personal knowledge:

i. **Cutler's Internal Goal of "$500 by 2025":** FE-3 explained that Cutler had an internal goal of boosting ICON's stock price to $500 per share by 2025, a strategy called "$500 by 2025." FE-3 heard about Cutler's "$500 by 2025" strategy from Early and explained that it drove many of ICON's business practices, like extensive offshoring and cost-cutting.

ii. **Cutler and Other Senior Executives Admitted ICON's Lower Biotech Win Rate by Early 2024:** FE-3 attended a Company-wide town hall in February 2024 where CEO Cutler spoke about ICON's lower biotech win rate, indicating that the biotech RFPs that ICON received were not converting to wins at the same rate as in the past. During the town hall, Cutler also stated that ICON had missed its revenue and new business award targets and presented a slide deck that showed ICON had missed its targets.

   a. In addition, FE-3 attended a town hall for ICON's biotech division in the first quarter of 2024 where Chris Smyth, who headed the biotech division at the time, similarly announced that the biotech RFPs that ICON received were not converting to wins at the same rate in the past. As FE-3 stated, it was clear that ICON's win rate had declined and not improved: Smyth explained that the fourth quarter of 2023 had been "difficult" and that instead of winning 1 of 3 RFPs, ICON was now only winning 1 of 5 or 6 RFPs.

   b. During the town hall, Smyth attributed the lower conversion rate to sponsors going to more vendors than in the past and price shopping across six or more CROs (compared to three in the past).

   c. FE-3 noted that the biotech town hall was "demoralizing" and that Smyth blamed ICON's biotech personnel for not delivering results.

iii. **ICON Lost Business from Pfizer and Other Large Customers by Early 2024:** During the quarterly town hall in February 2024, Cutler announced that ICON had lost its contract with Pfizer as a result of softening in the COVID vaccine space. As FE-3 recalled, Cutler indicated ICON had lost the "Pfizer opportunity" and was no longer a preferred partner of Pfizer. FE-3 noted that Cutler's town hall presentation was a pre-recorded video.

   a. After the February 2024 town hall, FE-3 discussed the negative impact of losing the Pfizer preferred partnership in meetings with Sassaman and Early. FE-3 and colleagues also exchanged instant messages discussing this news.

b. Further, FE-3 explained that BMS had not awarded ICON any new business during FE-3's entire tenure at ICON (January 2023 through November 2024). FE-3 also confirmed the issue with ICON's fraudulent monitoring for BMS.

c. FE-3 noted that another large customer, Gilead, had allocated all of its new work to ICON's competitors in late 2022. Throughout 2023, ICON was on a Performance Improvement Plan, or PIP, and not allowed to bid for new Gilead studies because Gilead had previously given studies to both ICON and PRA, and was concerned about the overconcentration that resulted from the PRA Merger. FE-3 explained that the PIP was widely known within ICON because ICON was required to provide Gilead with quarterly reporting against certain KPIs. ICON was allowed to resume bidding for Gilead's studies in 2024, but Gilead did not award any new work to ICON through FE-3's departure.

iv. **ICON's Increasingly Frequent "Revenue Sweeps" Sought Up to $100 Million:** FE-3 explained that Chris Smyth demanded quarterly "revenue sweeps" when ICON's actual performance in the biotech segment was not meeting its targets. The "revenue sweeps" occurred twice in 2023 and initially involved shortfalls of about $10 million. However, in the first three quarters of 2024, the sweeps continued every quarter, with increasingly large shortfalls—culminating with a "gap" of $100 million in the third quarter of 2024.

a. FE-3 explained that the $100 million "revenue sweep" was initiated in late August 2024 on a Thursday night and demanded responses by Monday morning Irish time. FE-3 noted that the request was "ridiculous" given the short time remaining in the third quarter and the large dollar amount. The "gap" of $100 million compared to total quarterly revenues of approximately $750 million for ICON's biotech segment. FE-3 added that the turnaround time underscored that the revenue sweep was "completely fake," since it was not possible to collect real data in such a short amount of time.

b. FE-3 noted that although the revenue sweep instructions formally came from Smyth, ICON employees widely understood that the sweeps were directed by Cutler given his extensive involvement in the details of ICON's operations. For example, FE-3 noted that all new awards above a certain dollar threshold are reviewed by Cutler, who often dictated changes to the terms. FE-3 worked on a potential award over $50 million, involving an Asian client, that Cutler personally reviewed in May 2024. After Cutler insisted that the award should exclude trial sites in Asia because ICON's margins were not high enough in the region, ICON lost the work.

c. The "revenue sweeps" started with emails announcing the "sweep," which linked to or attached a spreadsheet identifying the studies where additional revenue could be recognized (*e.g.*, by pulling billable work forward or adding work from ICON's out-of-scope logs). These revenue sweep emails were sent by Smyth or one of his SVPs and signed by Smyth, who was always copied, and included all of ICON's Project Delivery personnel, from SVPs down to junior levels.

d. Next, the recipients (including FE-3) responded with their updates to the spreadsheet identifying additional revenue. FE-3 noted that the spreadsheet covered ICON's biotech segment, and FE-3 saw the updates that others were sending.

e. At the conclusion of the process, the spreadsheet "always" matched the revenue target, as FE-3 learned via oral reports from Sassaman. As FE-3 stated, "people would do anything to find revenue" in these "sweeps."

v. **ICON's Aggressive Accounting Practices:** FE-3 stated that ICON engaged in three practices to boost financial performance. These practices affected FE-3's full portfolio, which generated $350 million in revenue per year and accounted for about 10% of ICON's biotech division. FE-3 estimated that these practices added $5 to $10 million per year to FE-3's portfolio and contributed up to $1 million to a single study, and that this impact could be multiplied by hundreds of studies to understand the full impact on ICON's biotech division.

a. First, ICON's treatment of change orders increased its revenue and margins. FE-3 explained that the first draft of a change order typically provides for a much larger amount of revenue than the client ultimately approves, and that obtaining a final, signed change order could take six months. However, ICON used the draft, unsigned change order to recognize revenue. FE-3 emphasized that this was "standard operating procedure" at ICON during 2023 and 2024.

i. FE-3 estimated that the final change orders were typically 20–30% smaller than the first draft that ICON used to recognize revenue, and this variance increased over time. FE-3 noted that these are large change orders of $5–6 million, with some exceeding $10 million. FE-3's studies generally had one to two change orders of $5 million or more per quarter.

ii. Recognizing revenue from draft, unsigned change orders raised the risk that ICON would not recover the full amount. For example, FE-3 noted that for one large customer, Gilead, ICON regularly wrote off 50% of the amounts it initially sought via change orders.

iii. FE-3 stated that the instructions as to change orders were communicated by Aine McGill, VP Client Contract Services. McGill convened weekly meetings about change orders with FE-3, other project leaders with change orders and VPs of Project Delivery, and Sassaman. FE-3 explained that McGill (who was located in Ireland) reported to CFO Brennan or CEO Cutler and always framed her instructions as "the directive is." During each weekly meeting, the attendees provided updates about what they were able to achieve in accordance with the directive; McGill then consulted with either Cutler or Brennan and returned the next week with new marching orders.

b. Second, FE-3 indicated that when ICON needed to "find revenue" for the quarter, it recognized revenue in advance of contractual milestones. For example, FE-3 explained, if the contract only allowed ICON to claim revenue upon site activation, and ICON planned to activate the site in September but encountered challenges that delayed activation to October, ICON still recognized the revenue in September.

c. Third, when studies experienced cost overruns, ICON forecasted offsetting "efficiencies" near the end of the studies. This led to overly positive margin by assuming that the future "efficiencies" would offset the near-term cost overruns.

d. FE-3 also described a practice where ICON pulled money from later years of budgets forward into the current month or year, and ICON's financial leadership demanded that employees "find efficiencies" to make up the hole in future years. One employee complained about this practice as inconsistent with "Accounting 101"—questioning, for instance, who would remember that ICON needed to deliver the "efficiencies" five or six years later—and raised his complaints up to the Director of Finance and VP of his area. After U.S. personnel began asking more questions about why revenue was being recognized, in summer 2024, ICON laid off the vast majority of U.S. finance personnel and replaced them with low-cost employees in countries like India.

**4. FE-4**

640. FE-4 was employed by ICON from 2019 until November 2024, based in Ireland. FE-4 was initially an Associate Finance Manager and was promoted to Senior Finance Manager in September 2023. FE-4's role involved billing and cash matters for large pharma customers. FE-4 reported to Ronan Flood, Senior Director of Finance. Flood reported to Vice President of Finance Pat O'Grady, who reported to Senior Vice President of Finance Alan Sheehan. Sheehan reported to CFO Brennan. According to FE-4, based on personal knowledge:

i. **ICON Manipulated Financial Metrics:** At ICON, FE-4 observed a focus on cash and billing at all costs given ICON's cost to acquire PRA and pay interest on the resulting debt. To that end, ICON manipulated financial metrics, particularly during the last year of FE-4's employment (*i.e.*, November 2023 to November 2024). As detailed below, to boost ICON's financial performance, ICON extended reporting periods to overstate billing and cash received; deliberately created fake invoices to inflate ICON's purported billing to clients; and recognized large amounts of unbilled revenue.

ii. **ICON Held Periods Open to Inflate Billing and Cash:** ICON regularly ***held the books open for 10–14 days after month or quarter-end*** to increase its billing and cash numbers.

a. Specifically, FE-4 received monthly and quarterly targets for billing and cash. When the targets weren't met by the end of the month or quarter, the period was simply held open—typically by 10 to 14 days—until the targets were reached. The increased billing and cash from the delayed closings were reflected in Excel spreadsheets maintained by Lisa Dukissis, who reported to Sheehan.

b. Holding the periods open led to a cycle where the next period was effectively shortened by 10 to 14 days, preventing ICON from hitting the targets for that period, which was then held open in turn.

c. ICON's practice of holding periods open by 10 to 14 days ***added approximately $100 to $200 million*** to ICON's billing and cash each quarter.

d. Sheehan communicated the "directive" to hold periods open to FE-4. Sheehan "took a hard line" on the issue in meetings; as FE-4 explained, "there's no way" Sheehan would have done that if CFO Brennan was unaware.

e. FE-4 described a "***mad scramble***" at ICON to find "anything" that could be counted towards the cash and billing targets. Sheehan, O'Grady and Flood relayed to FE-4 that it was Brennan's "priority one, two and three to get cash in the door," and that Brennan was aware of the "anemic" cash ICON was actually receiving at times.

f. Further, ICON recorded clients' mere ***promises*** to pay as cash that ICON had ***received***; ICON included those promised amounts in the cash it had purportedly received when it closed a period.

iii. **ICON Issued Fake Invoices Before Performing Work:** Under Sheehan's direction, ICON "deliberately" created "***fake***" ***invoices*** for future work that ICON had not performed. For example, ICON issued invoices during a given period where the contractual billing milestone was in the first 10 days of the ***next*** period. These fake invoices served to get "invoices on the books."

a. The fake invoices were ***marked with an asterisk*** because they were "***known to be fake***" and were not intended to be sent to ICON clients.

b. However, ICON's offshored billing function in India accidentally sent some fake invoices—showing work that ICON had not yet performed—to clients ahead of time.

c. FE-4 explained that ICON's Finance Department was given a "firm directive that this had to happen." The fake invoices were widely discussed within the Finance Department; the only reason FE-4 and his colleagues could identify for this practice is that CFO Brennan and CEO Cutler were probably about to leave ICON and wanted to "jack up" its share price.

d. Similar to the issue of holding periods open, described above, FE-4 explained that ICON's creation of fake invoices created a "hole" in the next month, which continued over time.

e. The issue came to a head in Christmas 2023, when ICON fell significantly short of its targets. FE-4 described a "mad scramble" as employees worked 14- to 16-hour days to try to find cash. "The billing practices got pretty ropey" as ICON issued fake invoices to clients, such as Celgene.

f. ICON finally began to stop the fake invoicing in early 2024 because it was causing too many problems.

iv. **ICON's High Unbilled Revenue:** ICON recognized substantially more revenue that it had billed, resulting in large amounts of unbilled revenue, described internally as "being ahead of your skis." One manager said to FE-4 that she had $50 million in unbilled revenue on her studies—while others in her group had even larger amounts.

v. **ICON's Decline in Business from Pfizer and Other Large Customers:** FE-4 worked on large pharma customers, which accounted for most of ICON's revenue, and saw billing and revenue information for ICON's top 5 to 10 customers. Within this group of customers, FE-4 confirmed that ICON experienced a decrease in business from its largest customer, Pfizer, and all other large clients—with only two exceptions—in early 2023 through 2024.

a. Evidencing the decline in ICON's large customers, FE-4 described an incident where CEO Cutler sacrificed margin to gain new business. FE-4 functioned as business operations lead for a customer that was ICON's tenth-largest client at the time and one of FE-4's main clients. Over time, the margins on the customer's business shrank substantially. Nonetheless, as ICON was negotiating rates and other terms with the customer, late in 2Q24, CEO Cutler met with the customer's CEO and accepted all of the customer's terms in exchange for allowing ICON to handle investigative fee work (with no margin) and an upcoming trial in China. As FE-4 explained, Cutler had further reduced ICON's margin with the customer—which was "already the weakest" among large clients—to "boost" ICON's book through new business at an even lower margin.

b. Ultimately, FE-4 explained, ICON was winning less work at a lower margin. FE-4 noted that in the past, ICON's Pfizer work had approached 50% margin.

vi. **ICON's Biotech Business Was "Dying on the Vine":** After ICON acquired PRA and its book of business, ICON's biotech business was "dying on the vine" because ICON did not build on PRA's customer relationships. At the same time, ICON assigned revenue and cash flow targets to Bridget Hennessy (Senior Finance Director) that were impossible to meet with a diminishing portfolio; no one listened to the notion that ICON should report realistic numbers.

### 5. FE-5

641. FE-5 worked as a Project Financial Analyst from spring 2022 until August 2024. In this role, FE-5 initially reported to Justin Mason, Director, Finance Business Partnering, and then

to Matt Doran, Supervisor, Financial Planning. According to FE-5, Mason was one or two levels below Brennan. FE-5's responsibilities included managing portfolio studies, working with different teams to manage how well they were sticking to the project budgets, and conferring with the project managers to fine-tune budgets. FE-5 worked on over 20 studies, mostly biotech with some large pharma. The budgets for his studies averaged between $1 million and $3 million but he had one study with a $15 million budget. According to FE-5, based on personal knowledge:

i. **Through "Cost Not Loaded," ICON Omitted Certain Project Costs to "Hold the Margins":** FE-5 explained that on a monthly basis, he entered information into ICON's "Revenue" platform, used for financial reporting. He stated that he was instructed by his managers Mason and Doran (Supervisor, Financial Planning) not to "load" certain project costs to prevent margins from declining. ICON internally referred to this practice as "cost not loaded," or "CNL."

   a. Specifically, FE-5 explained that Mason and Doran indicated that they wanted no change in margins. Thus, whenever additional project costs caused margins to decline, even by 0.2%, Mason and Doran instructed FE-5 to apply a "CNL" entry in ICON's Revenue software to prevent the increased costs from impacting margins.

   b. These instructions were typically given to FE-5 via Teams chat. Mason also held Teams meetings and explained that the "CNL" practice came from Mason's supervisor or ICON's CFO, explaining that the "instructions from above" were that "we need to hold margin for the studies."

   c. FE-5 reported that the use of CNL was discussed in meetings, and he was taught how to calculate the CNL as a part of his training. According to FE-5, this was a standardized practice. FE-5's friends at ICON worked on large pharma studies, including for Janssen and Pfizer, and reported that the CNL practice was also applied on their studies.

ii. **Identifying "Costs Not Loaded" to "Hold the Margins" in ICON's Revenue Software:** FE-5 explained that the CNL process had three steps:

   a. First, FE-5 used an Excel workbook with a "CNL" tab that calculated the dollar amount of costs that had to be omitted to hold the margins.

   b. Second, ICON's Revenue software had a button to add costs to a study, with a drop-down menu that allowed the user to select "Costs Not Loaded." FE-5 selected the "Costs Not Loaded" option and entered the dollar amount from the Excel workbook. The software also required a mandatory text comment, which FE-5 entered as "CNL to hold the margins."

c. Finally, FE-5 submitted the Revenue entry for approval. FE-5 explained that if the entry showed even a small drop in margin, Mason rejected it and instructed FE-5 to add a CNL entry.

iii. **"Costs Not Loaded" Significantly Impacted Margin:** FE-5 confirmed that the CNL practice substantially impacted ICON's current margin on studies.

a. FE-5 stated that the use of CNL greatly impacted at least half of his studies, resulting in up to a 10% to 20% difference in margin. FE-5 further stated that for one study, without CNL, the margin was negative.

b. FE-5 noted that margins declined over time for most projects; as a result, the amount of CNL grew to keep the margins the same. Several of FE-5's studies had margins that worsened by a few percent each month, so applying CNL to hold the margins had a large impact over a year.

iv. **The "Costs Not Loaded" Practice Was Used for at Least Two Years:** FE-5 was uncomfortable with ICON's use of CNL. The explanation provided by FE-5's supervisors was that they would "fix it next month," which never happened. Instead, FE-5 was provided with the same CNL and "hold the margins" instruction the next month. The CNL practice continued until FE-5 left ICON in August 2024.

v. **ICON Overstated Percentage of Completion on Studies:** FE-5 noted that five or six of his studies were still ongoing but reported 100% completion in ICON's Revenue software (which calculated percentage of completion from a forecast in Salesforce). FE-5 explained that the studies were ongoing and still incurring costs, but ICON was not forecasting them out. The Revenue software's "100%" completion was significantly different than the studies' actual status at the time. For example, one study marked as 100% complete was only 75% complete, while another marked as 100% complete was subject to repeated change orders and months of additional work.

vi. **Layoffs Quickly Followed CFO Brennan's Abrupt Departure:** FE-5 learned of CFO Brennan's departure when Brennan abruptly sent an internal email announcing it. Cutler responded to the email. FE-5 indicated that the CFO's sudden departure raised concerns internally. Shortly after that email exchange, FE-5 learned during a Teams meeting in April 2024 that he would be let go in August 2024.

### 6. FE-6

642. FE-6 worked as a Finance Manager at ICON from 2021 to November 2023. In this role, FE-6 reported to Justin Mason (Director, Finance Business Partnering) and then to Bridget Hennessy (Senior Finance Director). FE-6's day to day responsibilities included leading a team of 9 to 12 analysts. FE-6 reviewed and approved the analysts' revenue entries before submitting the entries for the month, and reviewed cost change orders. FE-6 also discussed forecasts and

budgets with project sponsors. FE-6 worked on ICON's Janssen partnership. According to FE-6, based on personal knowledge:

i. **Using "Costs Not Loaded" to Hold ICON's Margins:** FE-6 was instructed to hold the margins for different projects by using the cost not loaded, or CNL, procedure. FE-6 stated that the instruction to hold the margins was communicated by Bridget Hennessy (via email or phone), although FE-6 believed that Hennessy was new to the role and inexperienced, so the actual instruction came from the person above her, Ronan Flood (Director of Finance).

  a. FE-6 explained that ICON used a "reserve workbook" to calculate the amount of costs that were necessary to remove to keep the margin the same. The calculation was based on hours and an average rate. For example, the spreadsheet included an average hourly rate for North America-based workers to facilitate calculation of how many hours needed to be removed to preserve the study's margin. The workbook was saved in ICON's Revenue system as audit support.

  b. Finally, FE-6 entered the CNL amount into the Revenue system and inserted comments that "per Bridget [Hennessy]," he was adding a reserve to hold the margins.

  c. FE-6 explained that the "CNL" treatment applied to most or all Janssen studies and noted that ICON had at least five to six large Janssen studies, which totaled about $150 to $300 million and averaged about $1.5 to $2 million in revenue per month. The reserves on these studies fluctuated in size, but could be as large as $1 million for a given study.

ii. **"Costs Not Loaded" Instructions Increased in Late 2023:** FE-6 explained that the number of CNL instructions increased towards the end of his tenure in October and November 2023, and he became uncomfortable that ICON was "pushing the line." As a result, FE-6 decided to add comments indicating the source of the CNL instruction so more junior team members would not get into trouble.

iii. **"Costs Not Loaded" Impacted ICON's Financial Reporting:** FE-6 confirmed that the CNL procedure impacted ICON's financial reporting: ICON's revenue team used the results of the "CNL" for ICON's financial reporting and also had access to the reserves and comments indicating to hold the margin, including the workbook showing the calculation of the "CNL" amount.

iv. **ICON Used a "Management Reserve" for Overburn:** FE-6 explained that in addition to the "CNL" process, ICON consistently included a "management reserve" to account for an assumption of 2% overburn at the beginning of each study. Specifically, because ICON consistently bid studies too low, ICON included a reserve to accommodate 2% overburn through the end of the study startup phase (when the last site was activated). This reserve prevented overburn from reducing margin in the early stages of the study. FE-6 explained

that this 2% management reserve was "company standard" and affected each study FE-6 worked on.

7. FE-7

643. FE-7 worked as a Senior Proposal Manager at ICON from April 2018 to November 2023. He reported to Joseph Luke, a Senior Director in Proposals, who reported to Heather Carter Castleberry, VP of Global Proposals. FE-7 was part of the team responsible for large pharma from April 2022 until his departure. In this role, FE-7 was involved in responding to RFPs from large pharma sponsors, preparing budgets for the proposals, and drafting the text document that explained the proposals. According to FE-7, based on personal knowledge:

i. **Cutler Directed ICON to Book Inflated "Awards":** FE-7 stated that Cutler directed ICON to book awards at larger dollar amounts than sponsors had actually approved. FE-7 knows this because he was copied on emails from Cutler, and sometimes was standing in Cutler's office, when Cutler gave the direction to book the awards at the larger value in ICON's system. FE-7 believed that the awards were booked in Salesforce and in internal Excel-based financial systems.

a. FE-7 explained that sponsors often gave ICON awards with caveats about reducing the size or scope of a study before a contract was signed. For example, if ICON bid for a $100 million study with 500 patients, the sponsor might award the study with the caveat that the sponsor was only approving a $60 million study with 300 patients. At Cutler's direction, ICON would book the $100 million award reflected in its bid.

b. When booking the larger award amounts, ICON knew the award amounts would decrease because ICON had agreed to the reductions during the bid defense phase, or because the award itself referenced a reduction in costs.

c. FE-7 explained that ICON engaged in this practice regularly, especially near the end of the quarter, when ICON would "creatively get there" to hit the numbers. FE-7 confirmed that ICON used this practice in the second and third quarters of 2023.

d. FE-7 noted that within the subset of ICON's awards that he personally observed, this practice occurred with respect to one or two opportunities per quarter. These awards tended to be larger opportunities and raised ICON's claimed award numbers by $20 to $30 million for the quarter.

e. FE-7 noted that Cutler and McMillan were also aware of the practice because of the large dollar amounts involved. Cutler's sign-off was required for opportunities

of $30 million and above, while McMillan's sign-off was required for opportunities of $15-$20 million and above.

ii. **ICON's Overall Decline in RFPs Was Known to Cutler in 2023:** FE-7 described internal emails, sent consistently toward the end of each quarter in 2023, to call out a decline in ICON's customer RFPs. FE-7 indicated that the emails usually came from the head of sales, consistently copied Cutler and McMillan, and sometimes came from Cutler or McMillan themselves. The emails stated that ICON's RFPs and awards were declining across the board. At the time of receiving these emails in 2023, FE-7 questioned why Cutler publicly stated that ICON's RFPs were increasing when they were actually decreasing. FE-7 described the emails as "calls to action" that urged employees' full attention to each RFP given the diminishing number. FE-7 further stated that the emails described the gap between ICON's current numbers and target, indicating that ICON needed to "book X amount more."

iii. **Price Discovery RFPs:** FE-7 stated that up to 40% of the large pharma RFPs ICON received in 2023 were just "testing the waters"—*i.e.*, intended merely for price discovery. He stated that in about one-third of these cases, sponsors actually told ICON that the RFPs were just for price discovery purposes. In other cases, the sponsors sent three RFPs, reflecting three scenarios for the same study, which indicated to FE-7 and ICON that the sponsors were just "fishing" to discover ICON's pricing. FE-7 confirmed that the price discovery RFPs happened throughout 2022 and 2023 and increased towards the end of his tenure. FE-7 believed that Cutler and McMillan were both aware of the price discovery RFPs given their prevalence and because Cutler and McMillan were both "very hands on."

#### 8. FE-8

644. FE-8 was employed as a Clinical Trial Manager in ICON's Pfizer Strategic Business Unit (PSBU) from March 2022 until September 2024. FE-8 reported to Greg Homentaler. FE-8's role as a Clinical Trial Manager involved managing trial sites and ICON CRAs who visited the sites, including issues like ensuring site compliance, confirming that patients were enrolled, and ensuring proper data entry. According to FE-8, based on personal knowledge:

i. **The Pfizer Strategic Business Unit:** ICON's PSBU was "huge," with hundreds of employees in the Clinical Trial Manager position alone. Employees in the PSBU used Pfizer computers and email addresses but received their benefits and pay from ICON.

ii. **ICON Dissolves the PSBU as Pfizer Moves Work In-House:** FE-8 explained that the PSBU was initially handling several large Phase 3 trials for Pfizer, with at least four or five Pfizer trials active. During FE-8's tenure, however, the PSBU continuously decreased in size.

a. FE-8's first supervisor, Cecilia Gomez de la Torre, left ICON in October 2022.

b. By early 2024, ICON was "dissolving" the PSBU because Pfizer was moving the work in-house. In February or March 2024, FE-8's supervisor encouraged FE-8 to apply to Pfizer in-house positions.

c. CEO Cutler and CFO Brennan were aware that ICON was dissolving the PSBU. For one thing, in March 2024, ICON made significant layoffs, including from the PSBU.

d. Cutler and Brennan also participated in periodic town halls, conducted by Zoom, where they answered questions from ICON employees submitted by Zoom chat. FE-8 explained that by early 2024, these questions expressed concern about bonuses and why ICON was laying off employees.

i. FE-8 noted that the Zoom town hall meetings were recorded. FE-8 watched the recorded versions to learn as much as possible about the situation at ICON given FE-8's concern for his job.

ii. The PSBU itself also held separate Zoom town hall meetings, which FE-8 attended.

e. FE-8 confirmed that there wasn't much work within the PSBU in the first half of 2024 and emphasized, "Everyone was applying for jobs outside of the PSBU."

f. FE-8 applied for a new job (outside ICON) in June 2024 and began interviewing in early August 2024. FE-8 noted that he joined ICON with three friends, and all four left ICON within two years.

iii. **Pfizer's Key COVID-Flu Vaccine Trial Fails:** FE-8 had been hired into the PSBU to work on COVID trials and specifically worked on Pfizer's COVID/flu "combo" vaccine and RSV vaccine studies. The COVID/flu "combo" vaccine study was a large Phase 3 trial that involved about 8,800 participants; FE-8 supervised 15 trial sites that collectively enrolled about 1,000 patients.

a. FE-8 noted that over 50 ICON personnel within the PSBU worked on the trial, which had an estimated contract value of at least $60 million.

b. By early August 2024, however, FE-8 and ICON learned that the Pfizer COVID-flu vaccine had failed its Phase 3 trial. FE-8 recalls learning of the trial failure by early August 2024 from discussing it in connection with his job interviews at the time.

c. FE-8 noted that under its contract with Pfizer, ICON would lose a significant amount of money from the COVID-flu vaccine trial's failure. Further, once a trial fails, enrollment stops immediately and Pfizer's staffing needs decrease.

d. FE-8 explained that there was "nowhere for me to go" in terms of another study with Pfizer. FE-8 saw that there were no Pfizer jobs posted on ICON's job board

and no more active studies with Pfizer. The absence of other Pfizer studies to work on confirmed the dry spell with Pfizer in the first half of 2024.

iv. **Overburn on Pfizer Studies:** FE-8 confirmed that ICON's studies for Pfizer experienced overburn on the CRA monitoring component, which is among the most expensive aspects of any trial. FE-8 noted that ICON closely tracked this cost and that Pfizer was not happy with the overburn, requiring ICON to reduce monitoring visits by lengthening the duration between visits.

**9. FE-9**

645. FE-9 was a department head of one of ICON's clinical research divisions within the full-service segment from prior to the Class Period until late 2024. In this role, FE-9's team supported studies, including providing support operations, monitoring clinical research onsite, developing protocols, and writing up reports. FE-9 reported to two successive Senior Vice Presidents during his employment; in turn, the Senior Vice Presidents reported to Ute Berger, who reported to Cutler. According to FE-9, based on personal knowledge:

i. **CEO Cutler's Bullying Brought ICON Personnel to Tears:** FE-9 indicated that Cutler is a bully. On internal calls, Cutler regularly reviewed internal projects, and his comments and behavior often left ICON personnel in tears. FE-9 recalled that very senior ICON personnel resigned after interacting with Cutler, and FE-9 was also subjected to Cutler's behavior at times.

ii. **In Late 2023, ICON's Failing Biotech Business Required a $350 Million Bailout:** According to FE-9, ICON's biotech business was performing very poorly in 2023 and 2024. During the fourth quarter of 2023, $350 million in revenue was transferred to ICON's biotech business from another business unit within ICON. FE-9's supervising SVP explained that ICON's biotech business was "doing miserably" and "dying," requiring a transfer of $350 million in revenue to prop biotech up and make it appear to be doing better than it actually was. FE-9 understood that the transfer was communicated to the SVP from a more senior level, and the revenue was moved in ICON's Oracle system. The significant decline in ICON's biotech business also continued into 2024.

iii. **ICON's Unusual Financial Practices:** FE-9 indicated that ICON's financial practices were unusual. For example, ICON management was constantly shifting revenue between divisions to make one department look better than it actually was. FE-9 personally experienced this when P&L was taken from his own division, in addition to the $350 million transfer to biotech in late 2023.

a. FE-9 also stated that ICON's financial functions, which had been outsourced to India, were inept. Customers paid for work that was never performed, while in

other cases, large amounts were never collected. One of FE-9's clients owed $1.6 million, but the India team never advised FE-9, who had to discover it and collect the debt on his own.

b. After repeatedly complaining about the problems, in mid- to late 2023, FE-9's supervising SVP indicated that an ICON employee, internally called an "accounting rockstar," had been assigned to resolve the issues. FE-9 spoke to the "accounting rockstar," but after this individual conducted an initial review of the problems, he gave up and announced that he would retire.

iv. **ICON's Slowdown in Business from Large Customers and Eroding Profit Margins:** FE-9 learned from his supervising SVP that large customers like Pfizer, Janssen/Johnson & Johnson, Eli Lilly, and Roche were reducing their business with ICON, including in the full-service area, from late 2023 and onward.

a. In late 2023, around the time of the $350 million revenue transfer to ICON biotech, FE-9's supervising SVP explained that "FSP was keeping us afloat."

b. To FE-9, that was a major concern, since the margins on the FSP business were significantly lower than those of the full-service segment. Specifically, ICON's full-service projects had margins of 40% to 50% (or higher), while FSP margins were closer to 15%. As FE-9 put it, "FSP was much lower profitability, so FSP keeping us afloat means your core business is in real, serious trouble."

v. **ICON's Inflated Book-to-Bill Ratios:** FE-9 learned from an ICON employee that ICON has publicly reported inflated book-to-bill ratios for at least three years based on ICON sales representatives entering "wins" into Salesforce that they knew were highly unlikely to materialize, and were later canceled. Without these "wins," ICON's actual book-to-bill ratios for 2023 and 2024 were 0.9 or lower. FE-9 noted that any book-to-bill ratio below 1 is a serious problem and means ICON's pipeline is below the level necessary to sustain the business in the medium term.

a. FE-9 explained that ICON's sales representatives are paid a percentage of the contract value for their "wins" as a commission. They are also given sales targets: (1) the dollar value of new contracts, and (2) the dollar value of change orders (called "upselling" at ICON).

b. As a result of this compensation structure, the sales representatives are incentivized to record "wins," even without a signed contract. FE-9 noted that ICON's Salesforce system shows whether a given "win" has a signed contract and recalled seeing many "wins" recorded in Salesforce, without signed contracts, during FE-9's tenure at ICON.

vi. **Cutler's Offshoring Strategy Failed:** ICON extensively offshored its services to places like India and Mexico in an attempt to improve margins and profitability. ICON had a program where countries were classified as "high," "medium" or "low" based on worker cost, and new hires had to be made from "low" countries (including Mexico and Tunisia).

a. FE-9 understood from discussions with his supervising SVPs and human resources that this offshoring strategy came from Cutler. Hiring employees with low hourly wages allowed ICON to charge much higher rates to clients, with flexibility for ICON to reduce rates if necessary to satisfy large customers.

b. However, the strategy backfired. The "low" cost countries lacked the necessary skill set to perform CRO work. As a result, FE-9 explained, customers hated it. They went from having experienced, English-speaking ICON personnel to new workers who lacked English comprehension and relevant training, knowledge, and experience.

**10. FE-10**

646. FE-10 worked for ICON from July 2021 until November 2024 as a director of operations for real world solutions. At the end of FE-10's tenure, he reported to Senior Director of Operations Ray Kaczmarek, who reported to Senior Director, Project Operations Kay Price. In turn, Price reported to Vice President RWS Project Management Harpreet Gill. Gill reported to Chief Medical Officer and President of ICON Development Solutions Ute Berger, who reported to CEO Cutler. FE-10 provided oversight to late-stage trials, functioned as a "line manager" who provided support for proposals, and oversaw studies across multiple therapeutic areas in ICON's delivery of full-service trial management. According to FE-10, based on personal knowledge:

i. **ICON Regularly Underbid Projects:** At the direction of senior management, ICON regularly made "lean" bids for projects that were "not enough to get the work done." FE-10 explained that ICON's senior leadership was involved in directing lower bids to win business; senior leadership, including senior financial personnel, held "bid review meetings" to review bid proposals over a certain dollar amount.

ii. **ICON's Low Bids Yield "Overburn":** Given ICON's low bids, it was relatively common for projects to exceed the budgets ICON had agreed to with sponsors. This scenario—where ICON's actual costs exceeded ICON's budget—was called "overburn." About 60% of the studies that FE-10 "inherited" (*i.e.*, trials that were already underway) had "budget challenges," including studies for Teva, Ionis Pharmaceuticals, and Tenaya Therapeutics. These studies were "way under our margin" due in part to ICON's low bids.

a. For example, the Tenaya study—an $8 to $10 million project—suffered from additional costs due to high turnover among ICON employees and technical database issues in late 2023 and the first half of 2024. The sponsor Tenaya did not pay ICON additional money for the first issue, and covered less than half of the cost of the second issue, reducing ICON's margins.

iii. **ICON Tracked Overburn and Other Financial Metrics in Tableau:** ICON used the Tableau tool within Salesforce to track and manage overburn. Specifically, ICON tracked the actual hours for each project, as well as "units" based on the number of hours for a given task, and compared these figures to ICON's budget to assess overburn. Further, the Tableau tool provided dashboard reports, including a "finance" report and a report that flagged each study as being in "red," "amber" or "green" status. Red and amber meant the project was underperforming.

a. For example, underperforming studies like Tenaya were constantly in the red in the Tableau dashboard. Tableau also indicated each study's current margin, and ICON's finance team provided the variance to the margin in ICON's bid.

iv. **ICON Closely Reviewed Underperforming Studies:** When a study's margin changed in excess of a certain amount, ICON required director-level review, and the reviewing director was required to enter a comment in Tableau about why the actual margin was different than ICON's expected margin. ICON's finance team also reviewed underperforming studies and reached out to project managers (including FE-10) with questions, then escalated the inquiry to directors when necessary.

a. In addition, FE-10 believes that Kaczmarek and other managers had access to a Tableau report showing all studies in red or amber status, since they contacted FE-10 with questions and appeared to know which studies were underperforming and required explanations for their status. Each project also had an assigned financial analyst who contacted FE-10 with questions.

v. **ICON Tracked Contracts, Change Orders, and Bids:** FE-10 explained that ICON continuously and regularly tracked contracts, change orders, and new bids. For example, FE-10 updated a "contracts tracker" maintained on ICON's SharePoint site with any "change orders and new bids." By early 2024, ICON formed a new "contracts group" that checked with FE-10 and his colleagues to provide updates about the status of bids, change orders, and new contracts, paying especially close attention to larger projects.

vi. **ICON Lost Business from Large Customer Johnson & Johnson in Early 2023:** FE-10 explained that Johnson & Johnson (J&J) is among ICON's largest customers. FE-10 had insight into the J&J business because one of his direct reports, Senior Project Manager, Clinical Operations Nadia Longo, was assigned to J&J. FE-10 reported that Longo managed two J&J studies where ICON was overburning and requested "more and more money" from J&J. By January 2023, however, J&J objected to ICON's excessive costs and stated that it would only pay for approximately half of the work. For example, where J&J was previously paying for six hours for a site visit, J&J was only willing to pay for three hours going forward. FE-10 was informed that CFO Brennan approved for ICON to continue performing the same amount of work for J&J without having the full budget.

vii. **Quarterly Employee Updates:** FE-10 explained that Cutler, Brennan and other ICON executives provided "quarterly updates" to employees, including updates on ICON's performance, "the target and where we were trending based on close of the quarter." At the October 2024 quarterly meeting, the executives were "not excited" and informed

employees that they had to "reforecast the sales target" from around "$8.6 billion" to "closer to $8.2 billion."

**11. FE-11**

647. FE-11 worked at PRA in its FSP group from 2011 to 2013; his role included FSP and M&A work. After leaving in 2013, FE-11 returned to PRA in 2014. ICON acquired PRA in 2021 and FE-11 became Vice President and General Partner in ICON's FSP (Functional Service Provider) division, reporting to Samir Shah (former President of ICON Strategic Solutions (previously defined as "ISS"). Shah reported to Cutler. FE-11 left ICON in February 2023. According to FE-11, based on personal knowledge:

i. Within FSP, FE-11 represented Novartis, which was one of ICON's five largest accounts, with over 2,000 ICON employees embedded. The last award FE-11 obtained from Novartis was for three years and $780 million.

   a. In addition to Novartis, ICON's largest FSP customers included Janssen/Johnson & Johnson (a relationship that involved 3,000 ICON employees and generated about $500 million per year); Merck; and Sanofi.

ii. **Cutler Was Central to the Pfizer Relationship:** CEO Cutler has always managed the Pfizer account given its prominence and size. Barry Balfe, Debbie Gilmore, and other senior ICON executives have also been intimately involved with the Pfizer relationship. FE-11 described Pfizer as their "baby."

iii. **Cutler Personally Interacted with Pfizer Executives:** Cutler personally led "Partner of Choice" meetings where ICON invited senior executives from Pfizer, Novartis and other large accounts to ICON's US headquarters in Blue Bell, PA. FE-11 attended these POC meetings together with Cutler, Samir Shah, and others.

   a. The POC meetings' goal was to create a think tank or whiteboard session to discuss challenges in the industry and issues related to ICON's business—including Pfizer's move from FSO to FSP, which threatened ICON's margins because the FSP work was less profitable for ICON.

iv. **Artificially Boosting ICON's Margins:** At ICON, FE-11 saw a sustained focus on financials and driving numbers up. While Samir Shah was a mouthpiece for these instructions, FE-11 added that the underlying direction was coming from ICON's most senior leadership. Tony Southers, who now runs ICON FSP, would have sent emails directing the improvements. There was a push to improve margins artificially. For example:

a. FE-11 described ICON's practice of overbilling Sanofi by using CRAs from ICON's FSP business but charging Sanofi ICON's higher full-service rates – a 13-14% markup. As FE-11 explained, a 13-14% rate increase for over 2,000 employees makes a big difference in the financials.

b. FE-11 was told to reduce G&A labor by 5% or otherwise find 5% improvement.

v. **Customers Pressure ICON's Margins After the PRA Merger:** FE-11 noted that ICON's FSO and FSP businesses cannibalize each other. FE-11 cited Janssen, where the PRA merger led to Janssen's overconcentration with ICON. FE-11 confirmed that Janssen was unhappy with the concentration and ultimately used it as leverage to demand lower pricing, reducing ICON's margins.

vi. **QBR Meetings Highlighted the Risk of Losing Business from ICON's Key Customers:** FE-11 described Quarterly Business Review (QBR) meetings where ICON's senior leadership discussed business performance and risks, including issues with large contracts, in detail.

a. The QBR meetings were very structured, two-and-a-half-day meetings. FE-11 attended the QBR meetings with Balfe, Shah and other executives. FE-11 recalled that CEO Cutler attended once during FE's tenure.

b. FE-11 explained that the QBR meetings were intended to identify issues ahead of time and serve as a barometer of the state of the business, its financial health, and where it is going. The QBR meetings focused on ICON's FSP business and covered issues like headcount, G&A expenses, and business opportunities.

c. The QBR meetings were coordinated by ICON administrative assistants with calendar invites.

i. FE-11 had to submit draft QBR materials a week in advance of the meetings for review.

ii. In advance of the meetings, the administrative assistants transmitted the final PowerPoint presentations by email; Cutler received these presentations and was copied on the same emails FE-11 received.

d. The QBR meetings primarily focused on 7 to 8 key accounts. At the QBR meetings, FE-11 presented for approximately 90 minutes on the Novartis account, together with a business development person who covered contract-related issues. FE-11 recalled that Maria DiPietro presented the Pfizer account at the QBR meetings during FE-11's tenure, while Karen Tormey and Hope Fitzsimmons currently cover Pfizer.

e. FE-11 confirmed that the prospect of a large customer significantly reducing headcount with ICON would be flagged in the QBR presentations. For example, FE-11 explained that Novartis reduced its headcount at ICON by about 200 people,

or about 10% of the total. FE-11 started to discuss these possible reductions with Novartis in May and flagged the issue in at least two QBRs before Novartis implemented the reductions at year-end—seven months after FE-11 raised the issue at ICON.

f. FE-11 explained that the QBR presentation included detailed operational metrics for each key account, including:

i. ICON's actual performance, down to the gross profit per FTE (full-time equivalent), accounts receivable, accounts payable, days sales outstanding (DSO), revenue, and margin to date. These figures were reported as actuals for the prior quarter and as forecasts for the next two quarters.

ii. The status of the customer's contract and renewals. For example, the presentations identified a given contract as three years and that ICON was 1.5 years through the performance period.

iii. A "Risk Factors" slide that identified the customer's contract as red, yellow, or green based on potential threats to the relationship. The risks identified in the presentations included contract termination, other material threats like significantly reducing headcount, and issues like having excessive staffing in a given area.

iv. Key Performance Indicators under ICON's Service-Level Agreements, classified as red, yellow or green. These metrics were tracked because ICON was penalized for falling short on quality metrics like retention and time to fill, triggering payments to the sponsor. FE-11 recounted that ICON had paid Novartis in some years.

g. The QBR presentations also covered sales, including RFPs and ICON's efforts to expand in geographies and existing markets.

i. Finally, the QBR presentations also included slides on ICON's financial health and the implications of potential changes in headcount and other issues, covering downside scenarios for the year, such as a scenario where ICON's expenses increased by more than 100 basis points a year.

vii. FE-11 rejects Defendants' public explanation that ICON's issues with two large customers arose suddenly late in the third quarter of 2024. In particular, FE-11 described the notion that CEO Cutler only learned about Pfizer's cuts in September 2024 as "bullshit."

a. FE-11 explained that a business reduction of that magnitude was known to Cutler and ICON's other executives 12 to 18 months ahead of time, and they simply decided to delay public disclosure in an effort to generate other business to make up for the known loss.

b. FE-11 added that it is the GP's job to report whether ICON was at risk and to proactively identify issues or changes that could have a material impact on ICON

and to review the financial implications at QBRs. FE-11 again cited Novartis' 10% headcount reduction, which was extensively discussed internally starting seven months before it happened.

**12. FE-12**

648. FE-12 was employed by ICON as a Resource Manager from June 2022 to August 2023. FE-12 was assigned to ICON Strategic Solutions (previously defined as "ISS"), which represented the legacy PRA business and provided embedded employees to study sponsors, similar to ICON's FSP business. FE-12 responded to RFPs and executed study plans in the vaccine area for Sanofi Pasteur. His responsibilities included building study budgets, managing change orders and study staffing, and negotiating contracts, including working with Sanofi's legal counsel to finalize study contracts. FE-12 reported to Tim Saxton and Sue Stefko, both of whom reported to SVP, Business Development Maria DiPietro. In turn, DiPietro reported to ISS President Samir Shah. According to FE-12, based on personal knowledge:

i. **ICON ISS's Significant Relationship with Sanofi:** FE-12 explained that ICON ISS provided embedded solutions to Sanofi: ISS employees had access to Sanofi's systems, but were paid via ICON. As of August 2023, FE-12 estimated that ISS had between $900 million and $1 billion in committed multi-year contracts with Sanofi. These contracts ranged between one-and-a-half and five years in duration, with an average duration of about three years. FE-12 confirmed that Sanofi was one of ICON's top 10 customers, and potentially among the top five.

ii. **ICON FSP Loses Business to ISS:** FE-12 explained that the PRA Merger left ICON ISS and FSP to compete for similar business from the same sponsors, including Sanofi. FE-12 noted that ICON ISS and FSP "were constantly bidding against" each other. FE-12 knew this because Sanofi would allocate a yearly study budget and sent FE-12 a list of approximately 40 studies for ICON ISS to bid on each quarter. Based on that list and discussions with FSP and Sanofi staff, FE-12 estimated that ICON bid against itself on roughly half of Sanofi's RFPs, or approximately 20 RFPs per quarter.

   a. Further, ICON FSP consistently lost awards to ISS because ISS was cheaper for Sanofi. FE-12 said this trend continued throughout his employment at ICON. FE-12 knew ISS was winning the awards because he interacted with ICON FSP personnel who were "really mad that we were bidding on the same projects," and he received weekly updates that identified every award FSS won.

iii. **Despite Being Warned in Writing Not to Commit "Fraud," Cutler Misled Sanofi About ICON FSP Pricing:** In early 2023, CEO Cutler tried to mislead Sanofi by falsely indicating that ICON FSP and ISS had similar pricing, even though FSP was 25% more expensive—even after FE-12 warned Cutler that doing so was "essentially fraud."

a. The issue arose in fall 2022, when Sanofi executives asked ICON to compare FSP and ISS pricing for a hypothetical vaccine study. FE-12 recalled that the request originated from Sanofi VP, Global Head of Clinical Development Sanjay Gurunathan; Tim Saxton at ICON asked FE-12 via email to perform the analysis.

b. FE-12's pricing analysis showed that ICON FSP was about 25% more expensive than ISS. FE-12's price comparison for the ISS and FSP bids included salaries per position, different bill rates for the five different countries involved in the study, hours required by the study protocol, and other key data points.

c. In late December 2022, FE-12 emailed his analysis to Saxton, and it ultimately reached Cutler and Brennan. FE-12 knew Cutler and Brennan received the analysis because Cutler responded by email, and Saxton forwarded Cutler's response to FE-12. Cutler stated, in substance, that the report "cannot leave the Company" and that the ISS and FSP pricing needed to look "more even," such that the bids were within 5% of each other.

d. FE-12 warned that Cutler's request was "essentially fraud" and unethical, and his warning was forwarded to Cutler and Brennan. Specifically, in January or early February 2023, FE-12 sent Saxton a lengthy email refusing to modify the analysis because Cutler's request was "essentially fraud," unethical, and would cause problems if ICON were ever investigated. FE-12 confirmed that his email used the term "fraud." Saxton then forwarded FE-12's email to Cutler and Brennan. FE-12 knows that Cutler saw the email, because two to three weeks later, Saxton told FE-12 during a weekly one-on-one call that Cutler had mentioned it to Saxton and said he "was not amused."

e. Nonetheless, shortly thereafter, ICON presented Sanofi with a misleading PowerPoint slide that "fudged" the pricing analysis to show that ISS's and FSP's pricing appeared to be within five percent of each other. FE-12 learned about the presentation from either Saxton or Stefko, who attended the meeting with Sanofi and described it to FE-12, and provided FE-12 with a PowerPoint slide presented to Sanofi. The numbers on the slide had been "fudged" by reducing the hours for clinical research associates (CRAs) at ICON FSP (but not ISS) until ISS's and FSP's overall pricing appeared to be within five percent of each other, which was not true. FE-12 explained that the study would require double the CRA hours indicated in ICON's presentation to Sanofi. FE-12 confirmed that the analysis had been altered at Cutler's direction based on Cutler's email he received.

iv. **The Drop in Vaccine Spending Was Foreseeable:** FE-12 said that he noticed two business trends during his tenure that indicated that ICON would lose vaccine-related revenue.

a. First, as discussed above, Sanofi was alienated by the competition between ICON's ISS and FSP units. Sanofi's revenue was concentrated in COVID and flu vaccines, so less Sanofi business meant less vaccine-related revenue.

b. Second, Sanofi lost significant funding from BARDA. BARDA reduced its funding for COVID-related vaccine research six months before FE-12 departed in August 2023. Accordingly, Sanofi lost approximately $150–$200 million in COVID vaccine funding from BARDA across two major studies, which involved thousands of patients in 15-25 countries. As FE-12 said, ICON "was not going to get $300 to $400 million per year" in vaccine revenue after the COVID vaccine funding cuts began.

v. **ICON's Heavy Offshoring of Labor:** FE-12 confirmed that ICON attempted to cut costs by offshoring study staff and administrative roles to countries with lower labor costs, such as India and Bulgaria. For example, FE-12 stated that in approximately 2022, ICON eliminated its entire U.S. "invoicing team," which was previously based in Virginia, and moved the invoicing function to India.

a. Despite ICON's heavy offshoring, FE-12 explained that ICON FSP told customers, such as Sanofi, that their project staff were U.S.-based, even as the personnel were actually located in India or other low-cost countries.

b. To make matters worse, ICON FSP billed customers for these non-U.S. employees at U.S. rates. FE-12 knew this because he saw proposals to customers where ICON would bill the India staff at the rates charged for U.S. staff.

### 13. FE-13

649. FE-13 was ICON's Vice President, Scientific Affairs from spring 2019 to September 2023. In this role, FE-13 organized a team that supported sales to laboratory services clients and supervised management of ICON's specialty testing labs. FE-13 reported to Jim Miskel, President of Laboratory Services, who reported directly to CEO Cutler for most of FE-13's tenure. From approximately September 2022, Miskel reported to Chief Medical Officer and President of ICON Development Solutions Ute Berger, who reported to Cutler. FE-13 worked in the same Blue Bell, PA office as Cutler and saw him regularly in the office. According to FE-13, based on personal knowledge:

i. **By Early 2023, ICON Saw Declining RFPs in Lab Services:** On the laboratory services side, RFPs to ICON from biotech and large pharma customers were noticeably down, by at least 20%, starting from January 2023.

a. FE-13 explained that ICON struggled to integrate PRA's business on the laboratory services side. The ICON and PRA sales representatives were paid on a transactional basis, leading to an "us vs. them" mentality and a lack of coordination. For example, PRA and ICON bioanalytical labs salespeople would talk over each other on calls with potential clients.

b. Customers found the situation confusing and didn't want to deal with it, leading to lost business for ICON. While these concerns were communicated to Miskel, the situation did not improve, as ICON's sales compensation model remained unchanged.

ii. **CEO Cutler Personally Reviewed ICON's Expenses:** Cutler was a "micro-manager CEO" whose "approval was required for everything." For example, FE-13 explained that Cutler was heavily involved in approving even relatively small expenses, such as purchases over $10,000, which required Cutler's approval via email. FE-13 found CEO Cutler's detailed involvement in expense approvals to be unusual for a company of ICON's size.

a. Further, larger expenses, such as all laboratory equipment purchases over $100,000, had to be approved by Cutler in expense review meetings. These meetings occurred approximately quarterly and were held via Zoom. Cutler, Brennan, FE-13 and others participated, and Balfe sometimes attended.

b. The meetings covered expenses in multiple areas of ICON, such as full-service, IT, and laboratory services.

c. FE-13 covered the laboratory services area. In advance of each meeting, FE-13 prepared an extensive slide deck that identified each proposed equipment purchase, listed what customers would be using it, and provided a detailed financial analysis, including how much revenue the equipment would generate in the first five years.

d. The slides were due two weeks before the meetings. FE-13 emailed the slides to Cutler's administrative assistant, who organized the meetings, prepared agendas, and distributed the materials to Cutler, Brennan, and other executives.

e. During the meetings, FE-13 personally presented the lab equipment purchases to Cutler and Brennan, continuing into the last year of his employment (September 2022 to September 2023). It was clear to FE-13 that Cutler had reviewed the presentations in advance because he was ready with questions for FE-13 about the proposed equipment purchases.

f. Cutler approved the expenses verbally during the meetings; afterward, his administrative assistant sent an official approval number that had to be used for any requisition.

iii. **Cutler Personally Approved Hiring Decisions:** FE-13 explained that in addition to expenses, Cutler's approval was required to add headcount or replace employees who departed. This process involved Miskel raising the issue with Ute Berger, who obtained Cutler's approval. Further, in the last year of FE-13's employment (September 2022 to

September 2023), any departing employees had to be replaced with workers in low-salary areas like India and Mexico.

iv. **Cutler's Detailed Meetings with His Direct Reports:** FE-13 noted that in the period when Miskel reported directly to Cutler, Miskel and Cutler held weekly meetings that were very detailed. Despite Miskel's title, FE-13 explained that he had no freedom to operate.

**14. FE-14**

650. FE-14 was a Director of Business Development for ICON's clinical trial services from 2021 through early 2023. In this role, FE-14 handled ICON's external relationships with pharmaceutical companies, also called sponsors, and was responsible for forging new partnerships and maintaining existing relationships with sponsors. On a day-to-day basis, FE-14 managed accounts, handled proposals and bids, met with customers to support their needs and forecast their pipelines, and engaged in remediation for projects that were not going well. FE-14 worked with three large pharmaceutical companies—Eli Lilly, Daiichi Sankyo, and Teva Pharmaceuticals—and 30 to 40 small biotech companies. FE-14 reported to Beth Moeller, Vice President of Finance, and then to Wendy Bulgrin, Executive Director, Global Business Development Lead. According to FE-14, based on personal knowledge:

i. **Senior Management Was Directly Involved with ICON's Large Customer Relationships and Reviewed Large Revenue Opportunities:** FE-14 explained that senior ICON executives, including Cutler and McMillan, had direct involvement in ICON's business dealings with Pfizer and other large sponsors because they were the "bread and butter" that kept ICON's revenue rolling. FE-14 confirmed Pfizer, Janssen, and Eli Lilly were among ICON's largest customers.

a. FE-14 recalled that ICON senior leadership reviewed any revenue opportunity worth approximately $30 million or more.

i. First, revenue opportunities were entered into Salesforce, and revenue opportunities of $30 million or more generated an email to ICON senior leadership to alert them and trigger their involvement in the process; FE-14 was copied on these emails sent to McMillan. FE-14 also knows that some of ICON's target deals with Eli Lilly were presented to Cutler based on seeing email threads that went to Cutler.

ii. Second, ICON senior leadership had calls with the account representatives to "grill" them on strategy and discuss the budget to ensure that it was competitive. Further, it was common for ICON senior leadership to green-light discounts on $30 million-plus deals to get the work. FE-14 recalled that a member of ICON's senior leadership said ICON would never lose a deal due to pricing.

iii. Third, when ICON "pitched" to customers, McMillan attended as an executive presence to speak to customers, such as Eli Lilly. McMillan also sometimes met with customers by himself, even flying to meet customers for dinner and in-person meetings to win the deals. ICON senior leadership also participated in bid defense meetings with customers.

b. FE-14 expressed skepticism about ICON's claim that two large customers suddenly reduced their business in 3Q24. He said that as a large CRO, ICON's management should be well entrenched with two large key customers and have executive steering committees and governance in place to make forecasts and ensure visibility of issues with the business.

ii. **The PRA Merger Was a Failure:** FE-14 characterized the merger with PRA as a "terrible merger" and a "failure." FE-14 explained that following the Merger, ICON continued to promise strong biotech partnerships, but in reality, ICON was losing ground with its biotech customers.

a. FE-14 stated that ICON acquired PRA because it was a leader in biotech—meaning that everything at PRA was built for biotech. PRA was also known for its culture, while ICON was very numbers-driven. ICON had a minimal biotech business before the Merger, so ICON saw the acquisition as a way to build out its biotech arm.

b. After the PRA Merger, although ICON tried to "spruce it up," customers eventually began to "see through the façade" and realize that ICON did not have biotech solutions. For example, ICON's Standard Operating Procedures were not always built for biotech, and ICON team members were not well-versed in biotech. PRA's customers began providing FE-14 with feedback that the work PRA was performing under ICON was inconsistent with its prior work as a freestanding company. He said that this led to legacy PRA customers leaving ICON "in droves" and not providing ICON with additional work.

c. FE-14 estimated that at least 30% of his biotech customers did not want to conduct business with ICON at all after the Merger. These customers told FE-14 that ICON's biotech "solution" was not impressive.

d. As a result, it became increasingly difficult for FE-14 to develop business from his biotech customers, so he had to rely more on his large pharmaceutical customers to meet sales targets.

iii. **ICON's "Skeleton" Representations:** FE-14 believes that ICON executives sometimes publicly announced "partnerships" with large pharmaceutical companies to raise ICON's share price by implying that ICON's business with large pharmaceutical companies was bigger than it actually was. In reality, the contracts were low revenue, low dollar engagements, such as regulatory consulting work, which FE-14 called "skeleton" representations.

**15. FE-15**

651. FE-15 worked as a Regional Lead, Business Development from early 2023 to November 2024. FE-15 reported first to Perry Peck, Executive Director, Business Development, and then to Lloyd Harris, Sales Head, Business Development. FE-15's unit covered the territory from the Mississippi to the Pacific Ocean and focused on driving meetings with companies that did not currently have relationships with ICON to land RFP opportunities. FE-15 managed a team of inside sales representatives, who were each assigned to two outside sales representatives (called directors of account development). FE-15's group focused on biotech, or non-top 50, pharma companies and targeted companies with recent news about funding, new studies, or other "trigger events" to set up meetings and obtain RFPs. He noted that the average deal on his team was worth $3.5 million. According to FE-15, based on personal knowledge:

i. **The PRA Merger Led to Lost Business:** FE-15 reported that after the PRA Merger, smaller biotech companies that had previously worked with PRA were not getting the attention and resources they needed. FE-15 explained that ICON was simply buying a book of business through the Merger and did not know how to properly execute. According to FE-15, by 2024, ICON was experiencing PRA business loss.

a. FE-15 reported that the PRA Merger also caused issues with ICON's large pharma customers because some of these companies had business with both PRA and ICON before the Merger and they "didn't want to put all of their eggs in one basket." FE-15 further explained that CROs need to be conscious not to take on all of the studies for a given indication because they might have trouble finding enough patients through their networks.

ii. **ICON Terminated Employees as Business Slowed:** FE-15 observed terminations at ICON starting in 2022, with an effort to offshore various functions to reduce costs. He recalled that in 2023 and 2024, he began receiving calls from employees in other ICON units who were facing termination and inquiring about opportunities on the sales teams.

iii. **ICON's Business Slowed Through 2023 and 2024:** FE-15 reported that in 2023 and 2024 he was hearing from both internal and external sales representatives that sponsors were shopping around their business and not reupping with ICON as much as in previous years. Further, while sponsors had generally gone to three to four CROs for RFPs, in 2024, they started going to as many as six to eight.

a. FE-15 stated that the narrative among teams at ICON in 2024 was that RFPs were not turning into awards at higher rates and customers were not ready to spend.

iv. **Salesforce Tracked ICON's RFPs:** FE-15 reported that he and all managers had access to Salesforce. He recalled that Salesforce contained managers' dashboards that showed RFP wins and losses, the win/loss reasons, and a year-over-year report. FE-15 stated that Salesforce tracked both "outstanding" and "anticipated" RFPs.

**16. FE-16**

652. FE-16 worked at ICON from before the Class Period until December 2023 as Senior Manager, Finance Business Partnering. FE-16 reported to Laura Watkins. Watkins reported to James Edkins (Executive Director of Operations Finance - EAPA), who reported to Sheehan (Senior Vice President of Finance) until August 2023, when Vice President Patrick O'Grady joined ICON and Edkins began to report to O'Grady (who reported to Sheehan). Sheehan reported to CFO Brennan. According to FE-16, based on personal knowledge:

i. FE-16 supervised a team of 5-7 ICON project analysts who handled project finances, including monthly revenue recognition based on U.S. GAAP. FE-16 oversaw all of his team's revenue calculations and was responsible for a portfolio of studies, largely for biotech customers, that generated about $5-6 million in monthly revenue. This was part of a larger European portfolio that generated about $40 million in monthly revenue.

a. With respect to revenue recognition, FE-16 explained that his team performed a monthly process to evaluate the hours worked on their portfolio of studies and determine the amount of revenue to be recognized based on those hours and ICON's estimated cost to complete the studies.

b. This data was captured in ICON's Rev software, which was software originally written for PRA that ICON continued to use after the acquisition. FE-16 confirmed that ICON used Rev through the conclusion of his employment in December 2023.

ii. **ICON Prematurely Recognized 100% of Revenue Before Study Completion:** FE-16 was uncomfortable with certain revenue recognition practices at ICON. For example, FE-16 identified an incident in the second half of 2023 where ICON recognized 100% of the revenue for a clinical trial when the project was only 88-90% complete.

a. FE-16 explained that this clinical trial involved MAPI Pharma, a customer based in Israel. ICON had not yet completed various close-out tasks, which amounted to about $500,000 in revenue, or 10-12% of the trial's total revenue. Nonetheless, ICON's Rev software indicated that ICON had already recognized the full 100% of revenue from the trial. Edkins conveyed instructions from Sheehan for FE-16 to approve ICON's recognition of revenue on the remaining 10-12% of the MAPI Pharma study—despite the fact that ICON had yet to perform that work.

b. FE-16 refused to approve this premature revenue recognition and stated that he wouldn't put his name to it. However, Rev continued to show the revenue from the remaining 10-12% of the MAPI Pharma study.

iii. **ICON Prematurely Recognized Revenue by Manipulating Cost Reserves:** FE-16 also described two means by which ICON recognized revenue earlier by shrinking the denominator of the percentage-of-completion formula. FE-16 estimated that these practices boosted revenue by 1-2% across FE-16's portfolio.

a. FE-16 described instructions from Sheehan (conveyed via Edkins) in the second half of 2023 not to load certain cost reserves. As FE-16 explained, when completing trial tasks took longer than ICON's budget, instead of increasing the denominator to reflect the updated cost to complete the study—which would slow down revenue recognition—ICON kept the denominator the same.

b. Where ICON did enter cost reserves, FE-16 explained that there was internal pressure to release the reserves—and thereby shrink the percentage-of-completion denominator—to recognize revenue more quickly than the facts warranted.

iv. FE-16's colleagues experienced the same issues with premature revenue recognition and not loading cost reserves, confirming that these issues were not unique to his projects.

v. **ICON's Premature Billing:** FE-16 stated that in 2023, ICON held billing periods open by 8-10 days, which lowered ICON's unbilled revenue figure and impacted its cash generated from operating activities. FE-16 recalled that because this practice shortened the next billing period, ICON employees called it "kicking the can down the road" internally.

a. FE-16 explained that certain ICON projects were billed based on contractual milestones, while others were billed based on monthly units of work completed.

b. FE-16 stated that in 2023, based on instructions from Sheehan's level, ICON billed two months of units in a single month across all of the unit-billed projects in FE-16's portfolio. This accelerated one month of revenue on the affected projects, which FE-16 estimated as up to $3 million.

c. FE-16 noted that Sheehan gave instructions to bill clients prematurely in advance of contractual billing milestones. For example, even where a milestone was still 45 days away, Sheehan instructed ICON personnel to bill it now. FE-16 described internal, management-level billing calls where Sheehan used swearing and colorful language.

vi. **ICON's Disregard for SOX and GAAP Requirements:** FE-16 observed that ICON was governed by SOX and U.S. GAAP, but it never seemed to register with ICON's leadership that the Company had to comply with these requirements. For example, FE-16 indicated that Sheehan was "hell-bent" on hitting financial targets rather than ensuring accuracy. Based on incidents like ICON's premature revenue recognition on the MAPI Pharma study, FE-16 noted that Sheehan didn't seem to care about process deviations or SOX requirements. Even where employees like FE-16 tried to report accurately on their studies, someone else overrode them and manipulated the results (as with the MAPI Pharma study), which led FE-16 to state that ICON did not have the most sophisticated control environment.

vii. In December 2023, FE-16 resigned from ICON to protect his professional integrity.

**17. FE-17**

653. FE-17 worked at ICON from before the Class Period until July 2024 as a Senior Manager of Operations Finance. FE-17 reported to Watkins and Edkins, who reported to Sheehan. In approximately August 2023, O'Grady joined ICON and Edkins began to report to O'Grady (who reported to Sheehan). According to FE-17, based on personal knowledge:

i. FE-17 oversaw seven to eight analysts, who were responsible for contract management, revenue forecasts, and revenue calculations for a full-service portfolio with a total contract value of over $200 million. FE-17's portfolio generated $1-2 million in monthly revenue and included studies for sponsors like Roche and MedImmune (an AstraZeneca company).

ii. **As Actual Revenues Fall Short of Targets, ICON Resorts to "Creative Accounting" to Close the Gap:** FE-17 explained that starting in mid-2022, ICON's actual revenue gradually began to fall short of the Company's targets. This revenue gap persisted and widened from mid-2022 through FE-17's departure in July 2024. In response, ICON used "creative accounting" to increase revenue and close the gap between ICON's actual revenue and the targets set by senior management, as detailed below. These manipulations were effected in ICON's Rev system, which FE-17 confirmed was the source of truth for revenue calculations on FE-17's portfolio.

iii. **ICON Understated Pass-Through Costs to Accelerate Revenue Recognition:** As FE-17 explained, ICON understated its forecast of total pass-through costs to increase its percentage of completion and boost revenue and margin.

a. FE-17 stated that the reductions to ICON's pass-through costs were arbitrary and became more aggressive over time as the gap between ICON's actual revenue and its targets widened. For example, at the outset of studies, ICON regularly reduced its forecast of pass-through costs below its budget by a set percentage, such as 15 percent. As studies progressed, ICON further reduced its forecast using whatever metric would yield the most revenue, such as a six or nine-month run rate

(*i.e.*, the last six or nine months of pass-through costs). ICON further reduced total project costs by using "CNL" entries, which were negative values entered in Rev to reduce ICON's estimate of cost to complete the study.

b. FE-17 personally experienced these improper revenue recognition practices when Edkins, conveying instructions from Sheehan, asked FE-17 to approve the manipulations in the Rev system on FE-17's studies. While FE-17 pushed back on many of these requests, he later saw that the inflated revenue numbers were nonetheless approved by someone else in Rev.

c. The improper revenue recognition compounded over time. As FE-17 explained, once a particular manipulation was entered into Rev, Sheehan and other senior executives looked for new opportunities to recognize more revenue the next month; as a result, inputs like forecasted pass-through costs were reduced again and again.

iv. **ICON Issued Premature Invoices to Pull Forward Revenue:** FE-17 noted that ICON prematurely issued invoices—in advance of contractual milestones—to pull revenue forward from future periods, with invoices pulled forward by six weeks or more at times. FE-17 noted that these premature invoices tended to be forced before the close of quarters to bump up ICON's numbers.

a. At Sheehan's direction, the premature invoicing affected ICON's revenue recognition. FE-17 stated that one of Sheehan's ideas to manipulate revenue was to start recognizing revenue for the amounts that ICON had prematurely invoiced. Thus, ICON manually updated the Rev system to reflect the revenue that ICON had pulled forward based on the premature invoices. FE-17 noted that this approach amounted to ICON following a cash accounting method to recognize revenue, which was contrary to the ASC 606 methodology that ICON supposedly followed.

b. This practice led to a "spiral" when ICON sometimes had to credit clients for the prematurely issued invoices in the following month, then had to pull more invoices forward—and accelerate the recognition of more revenue—to cover the shortfall.

v. **The Significant Impact of ICON's Revenue Manipulation:** FE-17's portfolio was part of a broader European portfolio; FE-17 explained that this European portfolio had revenue gaps of up to $5 million per month, and the revenue gap was repeatedly filled, including from July 2023 to July 2024. FE-17 knew the revenue gaps were filled from seeing reports with revenue for the overall European portfolio.

vi. **ICON Held Periods Open:** FE-17 explained that ICON held periods open for up to three weeks until the revenue gaps could be filled using the types of manipulation described above. FE-17 confirmed that Sheehan directed Edkins to hold periods open and provided a list of studies that were being targeted for additional revenue recognition.

vii. **Sheehan's Role in ICON's Revenue Manipulation:** FE-17 explained that Sheehan was central to the manipulation. Edkins himself explained to FE-17 that he was merely conveying instructions from Sheehan. FE-17 described Sheehan's instructions as "rash"

and "aggressive" directives to boost revenue by specific amounts, such as stating that "we need to increase service revenue by 'x' or increase pass-through revenue by 'y.'"

viii. **ICON's Deficient Controls:** FE-17 noted there should have been controls in place at ICON to prevent the revenue manipulations. FE-17 explained that Rev originally had controls that prevented the same person from both submitting and approving revenue tasks. After ICON acquired PRA in 2021, however, the process quickly changed, such that the same person could both submit and approve revenue tasks—a so-called "double approval."

ix. FE-17 decided to leave ICON in July 2024 based on his concerns that ICON's aggressive accounting practices led to the Company publicly reporting inflated revenue numbers.

**18. FE-18**

654. FE-18 was a manager of operations finance at ICON from before the Class Period until July 2024. Since the PRA acquisition in 2021, FE-18 reported to Executive Director, Operations Finance Philip Tomkinson. Tomkinson reported to Sheehan until August 2023; thereafter, Tomkinson reported to O'Grady (who reported to Sheehan). Sheehan reported to Brennan. According to FE-18, based on personal knowledge:

i. FE-18's full-service portfolio generated annual revenue of about $210 million from services, plus annual revenue of $210 million or more from pass-through costs. Some of the individual projects in FE-18's portfolio were valued at up to $400 million, and FE-18 estimated the total value of the portfolio to be several billion dollars. The portfolio consisted of biotech clients, including Neumora, Amgen, UCB, Ionis Pharmaceuticals, Eli Lilly, and others.

ii. FE-18 handled project finances, including working with the operations team to recognize revenue and forecast revenue. FE-18 and his team calculated and submitted the revenue for projects in their portfolio. FE-18 managed 11 analysts who performed these revenue functions for full-service projects, all of whom worked in the United States.

   a. ICON used Rev to record and estimate project costs and calculate revenue. FE-18 believed that the revenue numbers he and his team calculated using Rev were then used in ICON's Oracle system to prepare ICON's financial statements.

iii. As detailed below, FE-18 observed several types of improper revenue recognition and manipulation at ICON. Based on FE-18's own portfolio and conversations with other managers, FE-18 indicated that ICON applied these practices across the entire legacy PRA business.

iv. **ICON Used Negative Management Reserves to Prematurely Recognize Revenue and Inflate Margins:** ICON applied negative management reserves to artificially reduce the total costs of studies, including by at least $10 million on FE-18's portfolio alone. When

FE-18 refused to approve these manipulations, Aidan Jameson submitted and approved the negative management reserves anyway—over FE-18's objection. By understating total project costs, this practice boosted ICON's percentage of completion, accelerated revenue recognition, and increased margins. Specifically:

a. FE-18 explained that putting in a negative reserve was akin to saying that ICON was not expecting to incur all the originally forecasted costs of the study because the rest of the study was expected to be more efficient.

b. FE-18 described a study in his portfolio where the trial had just started and ICON did not have all the sites activated, yet was already overburning by 2,000 hours per month. Despite this significant overburn, O'Grady (via Tomkinson) instructed FE-18 to apply negative management reserves to the study.

   i. FE-18 explained that there was no way, given ICON's large overburn and the current status of the study, that the purported efficiencies could materialize. As a result, FE-18 objected and refused to take a negative management reserve, and informed the analysts who reported to him at the time that they would not put their names on any of this.

   ii. Nonetheless, FE-18 saw that Jameson had both submitted and approved the negative management reserves in Rev. When FE-18 warned Jameson that ICON's external auditors would be able to track the manipulation, Jameson denied that ICON's external auditors would be able to see the negative management reserves.

c. FE-18 indicated that negative management reserves were used on a large number of projects. FE-18 knew from conversations with other managers that ICON applied the negative management reserve practice broadly across the entire legacy PRA business.

d. On FE-18's studies alone, the negative management reserves amounted to at least $10 million in the first half of 2024, including $1.85 million for Neumora studies and $750,000 for Ionis studies as of May 2024. FE-18 noted that the practice involved the largest studies in his portfolio.

e. ICON's use of negative management reserves was directed by the Company's senior financial leadership in Ireland. FE-18 understood that the direction to use the negative management reserves was coming from CFO Brennan, since the directions were typically communicated to FE-18 just after Brennan met with ICON's VPs.

f. When FE-18 asked Tomkinson why ICON was taking the negative reserves, Tomkinson informed FE-18 that he had already brought up concerns about the practice to ICON's more senior leadership. FE-18 described constant battles in which Tomkinson and other U.S.-based personnel told the finance leaders in Ireland that the negative management reserves were improper, and the Irish personnel

directed them to do it anyway. Tomkinson agreed with FE-18 that the use of negative management reserves was improper.

v. **ICON Understated Pass-Through Costs to Accelerate Revenue Recognition and Increase Margins:** ICON also accelerated revenue recognition by understating pass-through costs in the second half of 2023. As FE-18 explained, a portion of ICON's revenue comes from pass-through costs, such as vendor costs, where ICON earns zero margin. ICON artificially understated its forecasts of pass-through costs to boost its percentage of completion on studies and increase margins. Specifically:

a. FE-18 stated that where ICON's percentage of completion on the services portion of the contract (*i.e.*, ICON's billable, profit-generating work) was higher than on the pass-through portion of the contract, ICON reduced its forecast of total pass-through costs to increase the pass-through percentage of completion until it aligned with the service portion. This increased ICON's overall percentage of completion on the contract and led to premature revenue recognition.

b. Understating forecasted pass-through costs also boosted ICON's margins. FE-18 explained that removing pass-through costs—where ICON earned zero margin—made them a lower proportion of total study revenue and reduced ICON's overall project costs, both of which boosted ICON's margins.

c. FE-18 participated in a call with Tomkinson, O'Grady, Sheehan, and others where the Irish executives conveyed an instruction to reduce forecasted pass-through costs by 15 percent. During the call, as FE-18 explained, ICON's U.S.-based personnel explained to Sheehan and the other Irish attendees that it was improper to remove millions of dollars of pass-through costs on a study that was just starting.

d. After this call, FE-18 refused to reduce the pass-through costs on his own large studies. However, FE-18 confirmed that Sheehan and O'Grady successfully directed other ICON employees to remove pass-through costs on numerous other studies. FE-18 heard from other managers that they were instructed to remove and under-forecast pass-through costs on their own studies.

vi. **ICON Initiated Recurring Revenue Sweeps and Used an Alternative System to Hide This Manipulation from ICON's Auditors:** FE-18 described recurring revenue sweeps initiated by Sheehan or O'Grady. FE-18 stated that starting in the second half of 2023, the sweeps occurred with increasing frequency, ultimately occurring every month in the period before FE-18's departure in July 2024.

a. The revenue sweeps typically started in one of two ways: either in calls that Tomkinson had with O'Grady or Sheehan, or via emails from Sheehan or O'Grady. FE-18 received the emails and explained that all of the North American finance team received similar emails, which directed the specific amount of costs that should be removed from studies to increase revenue. Removing forecasted costs increased ICON's percentage of completion and accelerated its recognition of revenue.

b. FE-18 noted that the emails detailed schemes to remove costs from studies and attached spreadsheets that described the specific number of hours and costs to be removed from various studies. The amounts FE-18 was told to remove often did not match reality. For example, FE-18 recalled representatives from the operations team asking how it was possible to remove 3,000 hours from a study. Nonetheless, the operations team complied, while warning that it was not realistic and that the study would remain in overburn for its entire duration.

c. FE-18 explained that when the sweeps started in the second half of 2023, he was instructed to remove hours from ICON's P&F system. The impact of removing hours from P&F was essentially the same as entering negative management reserves in Rev (described above), but removing hours from the P&F system was less visible to ICON's external auditors. As FE-18 explained, ICON's auditors at KPMG did not review or test the P&F system.

vii. **ICON Regularly Held Periods Open to Inflate Revenue and Margins:** FE-18 confirmed that ICON repeatedly held periods open to create the appearance of better performance, including every month from late 2023 through the end of his employment in July 2024.

a. FE-18 stated that the directions to hold periods open came from O'Grady to Tomkinson; they indicated that revenue was not finalized yet and remained subject to further "updates." As a result, periods were held open by up to three weeks. FE-18 recalled that closing the books for 2023 was delayed by three weeks. Thus, FE-18 and his team regularly spent almost the entire month calculating revenue, since they spent several weeks finishing revenue for the prior month, then had to start the revenue cycle for the next month a week later.

b. Holding periods open increased ICON's revenue, billing and profit. Indeed, ICON selectively delayed the revenue closing, even as it closed accounts payable on time. FE-18 explained that this was achieved by keeping the Rev system open and adding revenue for the prior month, while closing accounts payable in the Oracle system.

viii. **ICON Issued Premature, Fake Invoices:** FE-18 stated that in late 2023 or early 2024, ICON generated "pro-forma" invoices.

a. FE-18 explained that ICON invoiced work based on draft change orders that had not yet been agreed to by ICON and its customers. ICON created these "pro-forma" invoices to increase the amount that ICON had purportedly invoiced for the month. These invoices were also too large because they typically reflected the full amount of draft change orders, even though the final change orders were often significantly smaller.

b. The premature pro-forma invoicing was led by Sheehan. FE-18 said the direction to issue the pro-forma invoices came from Sheehan (via O'Grady) and was conveyed to FE-18 via his manager, Tomkinson. Because FE-18 was not

comfortable with these practices, he regularly made notes in the Rev system—"per Pat O'Grady"—to indicate that the invoicing was done at O'Grady's direction.

c. FE-18 stated that the pro-forma invoices were issued to all clients with large change orders in progress. FE-18 specifically recalled about $1 million in pro-forma invoicing on one of his own studies, for Ionis, in late 2023 or early 2024. While the premature pro-forma invoices were not supposed to be sent to clients, ICON accidentally sent them to clients, including Ionis, anyway.

ix. **ICON's Internal Control Deficiencies:** FE-18 indicated that allowing the same person (*e.g.*, Jameson) to both submit and approve negative management reserves represented a lack of internal controls because companies are supposed to have a secondary review between the submission and approval processes.

a. In addition, FE-18 heard from former colleagues that ICON's internal audit team reported to Sheehan—the same person who also led finance—indicating a lack of separation of duties.

x. **ICON Offshores the Finance Function to India:** FE-18 confirmed that in the first half of 2024, ICON moved the finance function to India after complaints by the U.S.-based personnel about ICON's approach to managing revenue. Finally, after the majority of FE-18's U.S.-based team was laid off and FE-18 was asked to manage a finance team in India, FE-18 decided to leave ICON.

**19. FE-19**

655. FE-19 was a Financial Analyst at ICON from July 2023 to December 2024. He reported to FE-18 (and, after FE-18's departure, to Manager, Operations Finance Keith Cline), both of whom reported to Tomkinson. According to FE-19, based on personal knowledge:

i. FE-19's responsibilities included monthly revenue calculations for studies and other financial analysis. FE-19's full-service portfolio consisted of studies for 8 to 10 sponsors and generated about $1 million in monthly revenue.

ii. **Deleting Costs to Increase Revenue and Margins:** FE-19 described an incident around summer 2024 when ICON deleted costs to improve financial performance. Aidan Jameson, a finance executive based in Ireland, instructed FE-19 and other analysts to remove specific amounts of costs from their studies. Jameson sent an Excel file that showed the amounts of costs to remove and identified ICON's revenue target for the month.

a. Jameson asked the analysts to include a note indicating that the costs were removed to reflect "efficiency by management." However, FE-19 emphasized that the claimed "efficiencies" did not make sense and that Jameson's instructions lacked any supporting analysis. Instead, Jameson simply demanded that the analysts remove certain costs and sign off.

b. FE-19 explained that he and the other 40 U.S.-based analysts refused to participate because they believed deleting the costs was in violation of GAAP. FE-19's managers told the U.S.-based analysts not to remove the costs. FE-19 compared the situation to a mutiny.

c. Jameson removed the costs anyway over these objections. FE-19 learned about this when he entered Rev to review his studies and saw that Rev indicated Jameson had removed the costs.

i. FE-19 explained that revenue on FE-19's studies normally had three signatures in Rev: FE-19, FE-19's manager, and Tomkinson. However, Rev indicated that Jameson had both submitted and approved the removal of costs on FE-19's studies. No other approvers were listed.

d. The deleted costs significantly affected FE-19's studies; up to $100,000 in costs were deleted on one study alone.

e. FE-19 stated that Jameson deleted costs on all of the analysts' studies. FE-19 explained that there were approximately 40 analysts, and some had portfolios that generated up to $20 million in monthly revenue. When FE-19 logged in to Rev, he could see the studies assigned to his group of analysts.

iii. **Monthly Reports Showed Studies' Financial Performance:** On a monthly basis, FE-19 generated Excel reports from Rev that showed metrics such as revenue, costs, margin, and percentage of completion for each study in FE-19's portfolio. FE-19 sent these reports to Cline, either by email or by uploading them to a shared folder.

**20. FE-20**

656. FE-20 was a Project Finance Analyst at ICON from before the Class Period until September 2024. FE-20 originally reported to Senior Manager, Finance Business Partnering Jim Miller, then starting in fall 2022, reported to Manager, Operations Finance David Talbot. In turn, Talbot reported to Senior Director, Finance Nicholas Bateman. According to FE-20, based on personal knowledge:

i. As a Project Finance Analyst, FE-20's role included revenue recognition and forecasting for a portfolio of large, full-service projects with contract value of about $500 million. This portfolio generated $6 to $10 million in quarterly revenue. FE-20 also built Excel-based tools that incorporated billing data from ICON's Oracle system.

ii. **ICON's Aggressive Revenue Recognition:** FE-20 identified two revenue recognition practices that overstated ICON's percentage of completion by increasing the numerator, and shrinking the denominator, of ASC 606's formula.

iii. **ICON Overstated Percentage of Completion by Including Work Not Yet Performed:** Under ASC 606, ICON recognized revenue based on time billed to projects. However, FE-20 explained that the amount of time ICON employees were entering did not correlate with the work that ICON had actually performed. This disconnect arose from two sources:

a. First, ICON employees routinely overstated their hours and billed more hours than they had actually worked. FE-20 quantified this overbilling as 10-15% and explained that it also generated overburn of 10-15% compared to ICON's project budgets. FE-20 noted that ICON employees were under tremendous pressure to meet billable hour requirements—including a requirement to have 80% billable time—that impacted their reviews and compensation.

b. Second, ICON employees had not completed as many "units" as ICON's project budgets and forecasts called for. FE-20 identified this discrepancy from working with Miller to compare the hours ICON billed to the units that project managers reported as complete. FE-20 noted that he had built and used an Excel-based tool to analyze employees' hours, while Miller built a separate Excel-based tool for revenue recognition and forecasting, known as the FTE revenue recognition tool.

c. The disconnect between ICON's (a) time billed and (b) actual work performed meant that ICON overstated its percentage of completion and prematurely recognized revenue for work that ICON had not yet completed. FE-20 explained that the overbilling allowed ICON's management to recognize more revenue than they should have recognized, which forced ICON to later attempt to seek a change order from customers to make them pay for the overburn.

d. FE-20 added that because ICON was recognizing revenue prematurely based on work it had not yet performed, ICON sometimes reached 100% completion and recognized all revenue on studies before they were finished.

iv. **ICON Used "Blue Sky" Forecasts to Understate Total Project Costs:** As noted above, ICON regularly experienced 10-15% overburn on FE-20's studies, while ICON's actual work performed—in units—lagged behind. However, FE-20 explained that ICON did not account for this overburn in its cost forecasts for the remainder of the studies.

a. Instead, ICON used overly optimistic "blue sky" forecasts that ignored ICON's actual overburn and assumed everything would go perfectly—despite the historical experience to the contrary. FE-20 confirmed that these forecasts were consistently inaccurate and remained the same regardless of what was happening in the studies.

b. FE-20 noted that internally, ICON personnel regularly made oral statements to the effect of "let's use the blue sky forecast." The instructions to use these "blue sky" forecasts were conveyed to FE-20 by David Talbot and Nicholas Bateman, who expressed reluctance and made clear that the directive came from more senior levels of the Company (*i.e.*, executives in Ireland).

v. **The Impact of ICON's Premature Revenue Recognition:** FE-20 confirmed that the premature revenue recognition described above occurred in 2023 and 2024, with increasing

impact over that period. Overall, FE-20 estimated ICON's overstatement of revenue as about 2% across his portfolio.

vi. **ICON's Management Dictated the Aggressive Revenue Recognition:** FE-20 described intense pressure—originating from ICON's finance executives in Ireland—to implement the aggressive revenue recognition practices described above. Based on participating in quarterly calls with personnel in Ireland, including Sheehan, FE-20 explained that ICON management pushed very hard for larger numbers.

a. FE-20 stated that he was constantly questioning ICON's revenue recognition and that the Company's practices did not make sense. FE-20 discussed the disconnect between ICON's hours and units with Jim Miller, who raised it with Sheehan, but their concerns were not heeded and the issues worsened.

vii. **ICON's Internal Reporting:** FE-20 described two types of internal reporting related to ICON's premature revenue recognition.

a. Jim Miller used his FTE revenue recognition tool to prepare Excel reports that showed ICON's contracted budget, the number of units for each task in the budget, and the history of ICON's actual work performed. FE-20 explained that Miller initially prepared these reports each month, then shifted to quarterly. FE-20 believed the information from Miller's reports was extracted and delivered to more senior executives.

b. FE-20 also prepared timesheet reports, using the Excel-based tool he developed, that showed the hours ICON employees billed on studies. FE-20 sent these reports, which reflected overburn on the studies, to Talbot and project managers on the studies. FE-20 noted that he saw the same level of overburn on a continuing basis, so it was clear that nothing was being done in response to his reports.

**21. FE-21**

657. FE-21 was a Financial Analyst at ICON from before the Class Period until September 2024. During the Class Period, FE-21 reported to Talbot, who reported to Bateman. According to FE-21, based on personal knowledge:

i. FE-21's role included financial analysis for a portfolio of 10-15 medical device studies, which ranged from a few million to a few hundred thousand dollars each in contract value.

ii. **ICON's Backlog Included Stale, Years-Old Awards:** FE-21 learned from ICON's Salesforce system that the Company's backlog included significantly aged awards that had never advanced to revenue-generating work. ICON did not remove these stale awards—including awards that were several years old—from its backlog. Specifically:

a. In approximately August 2024, FE-21 analyzed ICON's medical device awards by filtering them by date in Salesforce. FE-21's analysis revealed about $10 million

in awards that were years old, with no recent activity, yet remained in ICON's backlog at the award value. These stale awards were about double the amount of backlog that was active, which was only about $5 million. FE-21 also understood that the stale awards in backlog extended beyond the medical device area.

b. FE-21 explained that the dollar amount of ICON's backlog does not reflect how aged it is. FE-21 noted that ICON did not have a formal process on removing stale awards from backlog, so they just sat there.

c. FE-21 recalled that multiple levels above him, including Bateman, discussed the stale awards in backlog. FE-21 heard from other employees that it was CEO Cutler's policy to keep all awards in backlog.

d. FE-21 noted that reporting on ICON's backlog was available from Salesforce, which indicated each award's date and the number of days it had been outstanding.

**22. FE-22**

658. FE-22 was a Financial Analyst II at ICON from before the Class Period until September 2025. During the Class Period, FE-22 reported to Kelly Morgan, who reported to Carmen Bernat (based in Ireland). Bernat reported to O'Grady, who reported to Sheehan. According to FE-22, based on personal knowledge:

i. FE-22 was in charge of revenue calculations for a portfolio of about 30 early phase studies with $2-3 million in monthly revenue.

ii. **ICON Prematurely Billed and Double-Billed Clients, Then Kept the Cash:** From mid-2022 until at least summer 2025, ICON prematurely billed and double-billed large customers, including Eli Lilly. ICON's total improper billing to Eli Lilly was $40-60 million, including $8-10 million in FE-22's area alone. ICON invoiced Eli Lilly millions of dollars in investigator fees before the studies were complete (billing too early), then billed it again (double billing).

a. Large customers like Eli Lilly, Novartis, and Vertex began to complain, prompting "governance" calls (held via Teams) between these customers and ICON's senior financial leadership—including CFO Brennan.

b. FE-22 explained that the governance calls with Eli Lilly started in fall 2022 and were held monthly (and twice a month at one point).

c. At the end of 2022 or early 2023, FE-22 participated in an Eli Lilly governance call with Brennan and other members of ICON's financial leadership. Brennan did most of the speaking during the call. ICON's premature billing was a major topic of discussion, as was ICON's refusal to refund the amounts Eli Lilly had overpaid.

i. At the time, FE-22 feared that ICON was recognizing additional revenue based on the overbilling to Eli Lilly.

ii. After the call, the billing issues continued to the point where by summer 2025, ICON had started to discuss resuming the governance calls.

**23. FE-23**

659. FE-23 was a Financial Accountant I at ICON from January 2024 to March 2025, based in ICON's Dublin office. FE-23 reported to Finance Manager Méabh O'Dwyer and then to Senior Manager of Finance Phil Doak. O'Dwyer and Doak reported to Finance Director Clare Cahill. According to FE-23, based on personal knowledge:

i. FE-23 worked in-office and sat next to Senior Director of Finance Róisín Bedford. As a result, FE-23 heard Bedford's statements on calls.

ii. **Irish Finance Leadership Pushed to Increase Revenue:** FE-23 explained that Bedford had monthly and quarterly calls (via Teams) where Bedford pushed her team to increase revenue. These calls primarily occurred during the first six months of FE-23's employment, as Bedford left on maternity leave around summer 2024. Other participants in the calls included Alan Sheehan, Carmen Bernat, and Tracy Brown in the UK.

a. FE-23 recalled that Bedford mentioned revenue, management reserves, and reducing pass-through costs during the calls. Based on Bedford's statements, FE-23 understood that Bedford was reviewing a reporting package (circulated by email to Sheehan, Bernat, and Brown) and directing changes. FE-23 believed this package was related to ICON's revenue sweeps.

b. FE-23 noted that Bedford was very manipulative and aggressive during the calls. When colleagues pushed back on Bedford's demands, Bedford used hostile language until the colleagues submitted.

c. FE-23 described Bedford's comments as unusual and indicated that they raised red flags, which prompted FE-23 to make contemporaneous notes of what he heard.

iii. **Premature Pro-Forma Invoices:** FE-23 saw ICON's pro-forma invoices (marked with asterisks) and confirmed that they were issued prematurely for future periods. FE-23 recalled seeing the asterisk and questioning whether the pro-forma invoices represented actual sales.

iv. **ICON's Restructuring List:** ICON maintained a "restructuring list" of employees scheduled for termination, which was openly discussed, circulated among management, and updated weekly. FE-23's perception was that employees who did not comply with demands from ICON management (including Bedford) would be placed on the list and terminated.

### C. Defendants' Own Admissions Underscore Scienter

660. The Individual Defendants' own admissions confirm their prior knowledge of the decreasing demand from ICON's largest customers, ICON's failure to account for known risks, ICON's inflated RFP flow, and ICON's misstated backlog and cancellations.

661. As detailed above, in February 2024, Cutler internally admitted at a Company-wide town hall that ICON had lost the "Pfizer opportunity" and was no longer a preferred partner of Pfizer. Standing alone, this internal admission establishes Cutler's knowledge that his public statements were false or misleading.

662. Moreover, an October 25, 2024 Truist report disclosed that ICON executives had known that its two largest customers were diversifying CRO providers away from ICON—management described this as "***not a new development***"—and that the overconcentration resulting from the PRA Merger "***was flagged internally at the pharma customers***" at the time of the Merger (*i.e.*, in 2021) and it was known within ICON that the customers wanted to "balance potential risk in how much work is being sent to one particular provider." Thus, competitors taking work from ICON admittedly "***did not come as a surprise to ICON***."

663. In addition, Cutler admitted at the November 21, 2024 Jefferies London Healthcare Conference that one of the two large customers that contributed to ICON's disastrous 3Q24 results "***had been falling over the last 12, 24 months***," confirming Cutler's knowledge of a deteriorating relationship for the last two years. And on ICON's 3Q24 earnings call, Brennan admitted that "***we certainly anticipated a decline [in] revenues from a certain part of their business in terms of the full-service work***" for the two large customers.

664. Further, the fact that many of ICON's customer RFPs never resulted in awards was admittedly known to the Individual Defendants. On November 21, 2024, Cutler admitted that "around 20% to 30% of the RFP dollars that we put out don't come to a decision. We call it close

cancel. In other words, they're canceled before they even get to a contracting point." And on ICON's May 1, 2025 earnings call, Defendant Balfe conceded that "the quality of that RFP flow isn't always as strong as we might wish."

665. In May 2026, Balfe admitted that ICON "had a long-standing policy of only taking cancels out of backlog when there was a written notification of cancellation or termination." As indicated above, former employees indicated that ICON's policy of keeping stale awards in backlog originated from Cutler. (FE-21.)

### D. The Individual Defendants' Access to Information Concerning ICON's RFPs, Backlog, and Relationships with Large Pharmaceutical Customers

666. Before and during the Class Period, the Individual Defendants received or had access to data and information concerning ICON's revenue, backlog, contracts, and deteriorating relationships with large pharmaceutical customers, such as Pfizer, and worsening key business metrics—such as RFPs, win rates, and cancellations—that contradicted their public statements.

667. For example, ICON's Salesforce system tracked the status of Pfizer's backlog, awards, pipeline, all open RFPs, and ICON's chance of winning those RFPs. (FE-1.) Salesforce also tracked win rates, total awards and cancellations, and the status of individual awards—including whether they materialized into work and revenue or were canceled—and generated automatic email notifications when cancellations or other changes were made to studies. (FE-1.) FE-21 noted that reporting on ICON's backlog was available from Salesforce, which indicated each award's date and the number of days it had been outstanding; as of August 2024, two-thirds of ICON's medical device awards were years old, with no recent activity.

668. These metrics from Salesforce were accessible to the Individual Defendants. During quarterly business development meetings, Defendants Brennan and Balfe saw ICON's decreasing biotech RFPs through 2023 and 2024. (FE-1.)

669. Further, during the quarterly business development meetings, Brennan and Balfe personally presented a company-wide dashboard in Salesforce that contained 10 or 15 datapoints—including cancellations, a "fixed piece" that was always presented—and showed "very high" and increasing biotech cancellations from mid-2023 onward, a trend that Brennan and Balfe complained was hurting ICON's numbers. (FE-1.) Cutler was also aware of ICON's increasing biotech cancellations because they were discussed at an annual sales meeting he attended in April 2024 in Tampa, Florida. (FE-1.)

670. Defendant Cutler was also aware that ICON's overall customer RFPs were declining in 2023 because he was consistently copied on quarterly internal emails stating that ICON's RFPs and awards were declining across the board. (FE-7.)

671. As detailed above, Cutler was aware of major developments with respect to Pfizer and other large customers. Before Christmas 2023, Cutler learned that Pfizer would award all of its Phase 1 business—and 85% of its Phase 2 and 3 business—to other CROs. (FE-2.)

672. By January 2024, Cutler knew that Pfizer had advised ICON that it was moving to FSP to reduce costs. Cutler headed a special Pfizer "liaison team" at ICON, reviewed and approved ICON's internal email announcing the change, and participated extensively in working out the structure of the transition, including meeting with Pfizer regularly. (FE-2.)

673. In February 2024, during a Company-wide quarterly town hall, Cutler announced that ICON had lost its contract with Pfizer, lost the "Pfizer opportunity," and was no longer a preferred partner of Pfizer. (FE-3.)

674. Cutler also approved requests from top 10 customers to reduce ICON's project budgets, including approving a $50 million budget cut for Pfizer in January 2024. The frequency of these emails increased towards the end of FE-2's tenure in February 2024. And in 2Q24,

ICON's slowing business with large pharma drove Cutler to personally meet with the CEO of ICON's tenth-largest customer and accept unfavorable terms. (FE-4.)

675. Further, Defendant Balfe, Defendant Cutler, and other ICON executives participated in Quarterly Business Review (QBR) meetings where senior leadership discussed business performance and risks, including issues with large contracts, in detail. (FE-11.) The structured, two-and-a-half-day QBR meetings focused on ICON's FSP business and served as a barometer for the state of the business and its financial health.

676. The QBR meetings primarily focused on 7 to 8 key accounts, with ninety-minute presentations given on specific large pharma customers such as Pfizer and Novartis. The presentations—which were emailed to Balfe, Cutler and other attendees in advance—included detailed operational metrics for all key accounts, including:

- ICON's actual performance, down to the gross profit per FTE, accounts payable and receivable, revenue, and margins (including actuals for the prior quarter and forecasts for the next two quarters);
- The status of customer contracts and renewals, including when the contract would expire;
- Risk factors to customer relationships, identified through red, yellow, and green indicators, such as contract termination and significant headcount reductions;
- Key performance indicators, also classified as red, yellow, and green; and
- Sales, including efforts to expand to new geographic regions.

677. As FE-11 confirmed, the prospect of a large customer significantly reducing headcount with ICON would be flagged in the QBR presentations months in advance. For example, FE-11 explained that Novartis reduced its headcount at ICON by about 200 people, or about 10% of the total. FE-11 started to discuss these possible reductions with Novartis in May and flagged the issue in at least two QBRs before Novartis implemented the reductions at year-end—***seven months*** after FE-11 raised the issue at ICON.

678. In addition, Defendants Cutler, Brennan and Balfe attended monthly VP meetings (scheduled through a standing calendar invite) where they received and reviewed detailed presentations on studies' financial performance and problems, including revenue and margins, wins and losses, the studies' needs and problems, and upcoming deadlines and milestones. (FE-2.) In advance of the meetings, Cutler and the other executives received slide decks and reviewed the materials, since they came to the meetings with questions about specific studies. FE-2 knows this because Lachs sent FE-2 instant messages during the meetings with specific questions, such as "Steve [Cutler] wants to know what the problem is with study startup."

679. Cutler, Brennan, Balfe, McMillan and other senior executives also attended "end gate" meetings for underperforming studies, where they asked difficult questions about why the study numbers were not where they were supposed to be and whether more resources were required. (FE-2.) FE-2 personally presented at two "end gate" meetings around October and December 2023; Cutler attended the October 2023 meeting, which related to a study for Pfizer. FE-2 emphasized that the attendees "would run you through the wringer about why you were not where you needed to be."

680. The Individual Defendants also interacted directly with Pfizer executives. Defendant Cutler was assigned as Pfizer's executive sponsor (FE-1) and personally led "Partner of Choice" meetings where ICON invited senior executives from Pfizer, Novartis, and other large accounts to ICON's headquarters in Blue Bell, Pennsylvania. (FE-11.) The goal of these meetings was to discuss challenges in the industry and issues related to ICON's business—including Pfizer's move from FSO to FSP, threatening ICON's margins. (FE-11.) Defendant Balfe and other senior ICON executives were also intimately involved with the Pfizer relationship, which was their "baby." (FE-11.)

681. Further, the Individual Defendants were aware of headcount changes at ICON. Specifically, as to Pfizer, after ICON made significant layoffs, including from the dedicated PSBU, Cutler and Brennan participated in periodic Zoom town halls where employees expressed concern about why ICON was laying off employees. (FE-8.) Notably, Cutler's personal approval was required to add headcount or replace employees who departed (FE-13), so Cutler was necessarily aware that ICON's declining PSBU headcount was not being replenished. And on the FSP side—where Pfizer shifted nearly 100% of its work at ICON—ICON's standard contracts generally required 90 days advance notice for staffing changes (FE-1), confirming that ICON and the Individual Defendants were aware of Pfizer's declining staffing needs well in advance.

682. ICON's senior management was also directly involved with revenue opportunities tied to large customer relationships. For example, ICON senior leadership reviewed any revenue opportunity worth approximately $30 million or more (often green-lighting discounts to get the work). (FE-14.) When such opportunities arose, Salesforce generated emails to ICON senior leadership to alert them and trigger their involvement in the process. (FE-14.) And ICON executives personally reviewed target deals with large customers; for example, Cutler viewed target deals with Eli Lilly. (FE-14.)

683. ICON's senior executives also closely tracked project margins and costs. For example, at the March 13, 2025 Barclays Global Healthcare Conference, Cutler stated that "we track our margins, not just the margins that we operate on as we run the project, but what the theoretical margins are when we sell the business."

684. Finally, underscoring Cutler's access to information, Cutler—an Australian ex-rugby player—was a notorious bully and "micro-manager CEO" whose "approval was required for everything"; Cutler was personally involved in hiring decisions and personally approved even

relatively small expenses above $10,000 via email. (FE-9, FE-13.) For larger expenses, such as all laboratory equipment purchases over $100,000, Cutler demanded detailed presentations and expense review meetings to justify the proposed purchases. (FE-13.) Cutler received and reviewed the materials in advance of the meetings, since he was ready with questions about the proposed purchases. (FE-13.) Cutler's unusually detailed involvement in the minutiae of ICON's operations confirms his knowledge and access to the true facts concerning issues worth hundreds of millions of dollars (or more), such as ICON's contracts and relationships with large pharmaceutical customers; key business metrics, including RFPs and cancellations; and revenue recognition, internal controls over financial reporting, and disclosure controls and procedures.

### E. Defendants Claimed to Have Specific Personal Knowledge and Insight into ICON's Customer RFPs and Relationships with Large Pharma Customers

685. During the Class Period, analysts focused intensely on ICON's customer RFPs as a key leading indicator of demand for its services, as well as any issues with ICON's relationships with large pharma customers, such as Pfizer. In response, the Individual Defendants repeatedly spoke about these topics in detail and confirmed their personal knowledge of these issues. These statements support a strong inference that the Individual Defendants knew or had access to material facts that were misrepresented or concealed from investors, or that Defendants were reckless in failing to investigate the issues they repeatedly spoke about in detail.

686. For example, Cutler repeatedly touted his knowledge of and personal involvement with ICON's large pharma customer relationships. On ICON's October 26, 2023 earnings call, Defendant Cutler explicitly rejected the idea that Pfizer's budget cuts would negatively affect ICON, emphasizing his "close contact" and personal role in "working closely" with Pfizer.

687. Similarly, on ICON's February 22, 2024 earnings call, Cutler specifically highlighted his "visibility" into ICON's large pharma relationships and involvement "in steering committee meetings" so "we're able to work out where we need to be as a partnership."

688. Cutler confirmed his direct involvement in large pharma relationships on ICON's July 25, 2024 earnings call, where he stated that "***you tend to get involved in some of these more strategic meetings.*** And ***I'm aware of some of the requests and the asks that our larger pharma partners are looking for***, particularly for these more strategic relationships." Cutler also stated that "I've been to one or two strategic partnership meetings recently."

689. At the November 21, 2024 Jefferies London Healthcare Conference, Cutler stated with respect to ICON's large customers that "***we talk to them on a regular basis.*** We understand what their challenges are, and we're helping them to work through them."

690. The Individual Defendants also spoke extensively about ICON's RFPs. For example, during the October 26, 2023 earnings call, Cutler stated in his prepared remarks that "[o]verall, RFP activity continued to improve in quarter [three] with growth in the high single digits . . . ." At the November 14, 2023 Jefferies London Healthcare Conference, Defendant Brennan claimed that ICON had seen "a significant kind of uptick [in RFPs] from our biotech customers." On the February 22, 2024 earnings call, Cutler asserted that "we've probably seen the RFPs tick up and the environment sort of move up a notch. So overall, in terms of RFPs in the first quarter . . . we're seeing sort of mid-teens growth on the RFP opportunity."

691. Defendant Cutler also emphasized his personal involvement with ICON's biotech customers. For example, during the April 25, 2024 earnings call, Cutler stated, "I've had a couple of discussions with [our biotech customers] myself, and they understand what we bring now to the

biotech space, that dedicated resource and that financial stability and ability to bring innovation and creativity and agility to their projects."

**F. Defendants' Knowledge and Recklessness as to ICON's GAAP Violations**

692. The Individual Defendants knew or recklessly disregarded that ICON's financial statements materially misstated the Company's financial performance in violation of GAAP.

693. Defendants' Knowledge of GAAP Violations: Defendants Cutler, Brennan, Clerkin and Sheehan (1) knew about and directed multiple fraudulent accounting practices that violated GAAP and rendered ICON's financial statements materially false, and (2) received regular reporting that reflected the results of their manipulation.

694. CEO Cutler presided over ICON's "revenue sweeps"—directions to artificially inflate revenue when actual performance fell short of targets. FE-3 explained that ICON employees widely understood that the sweeps were directed by Cutler—and they began with emails signed by Chris Smyth, who reported directly to Cutler. The revenue sweeps' size and artificial nature were obvious red flags that revenue was being improperly recognized.

695. FE-3 further reported that ICON's instructions to recognize revenue from draft, unsigned change orders were communicated by Aine McGill, VP Client Contract Services (located in Ireland), who reported to Brennan or Cutler. McGill consulted with Cutler or Brennan and returned each week with new marching orders, and during weekly meetings, FE-3 and others updated McGill about what they were able to achieve in accordance with the directive.

696. CFO Brennan directed multiple accounting practices that violated GAAP. As detailed above, Brennan was intensely focused on improving the Company's purported cash position, and, through Sheehan, communicated a directive to hold ICON's books open by 10 to 14 days after month- or quarter-end to increase its billing and cash numbers. (FE-4.) Brennan also directed ICON's use of negative management reserves; the directions were typically

communicated to FE-18 just after Brennan met with ICON's VPs. Further, Brennan knew that ICON was prematurely billing its customers. FE-22 participated in a call at the end of 2022 or early 2023 with Brennan, other members of ICON's financial leadership, and Eli Lilly where ICON's premature billing was a major topic of discussion.

697. Defendant Sheehan—who reported directly to Brennan (and later Clerkin)—personally directed multiple revenue recognition practices in violation of GAAP and knew that these improper practices were inflating ICON's financial performance.

698. Sheehan was directly involved in ICON's manipulation of the ASC 606 percentage-of-completion formula to accelerate revenue recognition. For example, FE-18 described a call with Sheehan where the instruction to reduce forecasted pass-through costs by 15 percent was conveyed, and ICON's U.S.-based personnel explained to Sheehan and the other Irish attendees that it was improper to remove millions of dollars of pass-through costs on a study that was just starting. Nonetheless, Sheehan and O'Grady successfully directed other ICON employees to remove pass-through costs on numerous other studies anyway. (FE-18.)

699. FE-16 also described (1) instructions from Sheehan in 2023 to accelerate revenue recognition by not loading certain cost reserves on studies, and (2) instructions from Sheehan's level to bill two months of units in a single month across all of FE-16's unit-billed projects.

700. Sheehan personally communicated Brennan's directive to hold ICON's books open to FE-4. FE-17 explained that the delayed closings allowed ICON to manipulate and increase revenue, and that Sheehan directed Edkins to hold periods open and provided a list of studies that were being targeted for additional revenue recognition. FE-17 described Sheehan's instructions as "rash" and "aggressive" directives to boost revenue by specific amounts, such as stating that "we need to increase service revenue by 'x' or increase pass-through revenue by 'y.'"

701. Sheehan also initiated revenue sweeps directed to the entire North American finance team. (FE-18.) These sweeps started with emails—sometimes ***sent by Sheehan himself***—that detailed schemes to remove the costs from studies and increase revenue, and attached spreadsheets that described the specific number of hours and costs to be removed. (FE-18.)

702. FE-16 recounted Sheehan's instructions to bill clients prematurely before contractual billing milestones. Sheehan also led an effort in late 2023 or early 2024 to generate fake, premature "pro-forma" invoices to pull revenue forward. FE-4, FE-17 and FE-18 confirmed that the premature invoicing occurred under Sheehan's direction. Further, it was Sheehan's idea to recognize revenue for the amounts that ICON had prematurely invoiced. (FE-17.)

703. Sheehan knew that the aggressive accounting practices he directed were improper. FE-16 indicated that Sheehan was "hell-bent" on hitting financial targets rather than ensuring accuracy. FE-18 described constant battles in which Tomkinson and other U.S.-based personnel told the Irish executives that the negative management reserves were improper, and the Irish personnel directed them to do it anyway. Similarly, FE-20 described intense pressure—originating from ICON's finance executives in Ireland—to implement aggressive revenue recognition practices. Based on participating in quarterly calls with Sheehan and others in Ireland, FE-20 explained that ICON management pushed very hard for larger numbers. According to FE-20, Miller raised the disconnect between ICON's hours and units with Sheehan, but the concerns were not heeded and the issues worsened.

704. Sheehan also knew that ICON's material weaknesses in internal controls enabled the manipulation of the Company's financial reporting. Sheehan himself was a key controls weakness, since he both led ICON's finance function and supervised ICON's internal audit team (FE-18)—a lack of separation of duties that allowed pervasive manipulation to occur and persist.

Based on incidents like ICON's premature revenue recognition on the MAPI Pharma study, FE-16 noted that Sheehan didn't seem to care about process deviations or SOX requirements.

705. Further, Defendants received extensive internal reporting that reflected the results of their manipulation. As detailed above, Cutler and Balfe attended quarterly QBR meetings and received written presentations showing ICON's actual performance for key accounts, including their actual revenue and margins for the prior quarter and forecasts for the next two quarters.

706. On a monthly basis, Cutler, Brennan and Balfe attended VP meetings where they reviewed detailed presentations on studies' financial performance and problems, including revenue and margins, as well as "end gate" meetings for underperforming studies. ICON personnel have also indicated that around month-end, management receives daily updates on division performance.[23] And as noted above, Cutler has admitted that "we track our margins."

707. Finally, as CEO and CFO, Cutler, Brennan and Clerkin reviewed ICON's financial statements, which they certified pursuant to SOX as being accurate and in compliance with GAAP.

708. Defendants' Access to Information Reflecting GAAP Violations: Defendants also had access to extensive data showing the manipulation of studies' financial performance.

709. For example, ICON's Rev system contained study-specific data on revenue, costs, margin, and percentage of completion, reflected in Excel reports that FE-19 generated from Rev on a monthly basis. FE-20 noted that Jim Miller generated Excel-based reporting that showed ICON's contracted budget, the number of units for each task in the budget, and the history of actual work performed; FE-20 believed the information from these reports was extracted and delivered to more senior executives. All of this information was available to the Individual Defendants.

---

[23] https://www.youtube.com/watch?v=YTwW78kd8Fc

710. Defendants also had access to reporting on overburn (where ICON's actual costs exceeded ICON's budget) through Salesforce. As FE-10 reported, ICON used Tableau within Salesforce to track the actual hours and units for each project and calculate overburn. Tableau provided dashboard reports, including a "finance" report and a report that flagged each study as "red," "amber" or "green," with red and amber indicating that the project was underperforming. (FE-10.) FE-20 also prepared Excel-based reports showing overburn on studies.

711. The Magnitude of the GAAP Violations Supports Scienter: The magnitude of ICON's admitted GAAP violations supports scienter, since Defendants' financial manipulation led to fabricating over $150 million in revenue that did not exist. The manipulation occurred over multiple years and was widely known inside ICON. For example, FE-19 described the situation in summer 2024 when 40 U.S.-based analysts refused to comply with Jameson's instruction to remove costs in violation of GAAP, yet Jameson deleted the costs anyway. It is not plausible—much less compelling—that this widespread, material manipulation of ICON's financial results occurred without any knowledge or recklessness by the Individual Defendants.

712. Defendants' GAAP Violations Allowed ICON to Meet Analysts' Consensus: Confirming scienter, Defendants' GAAP violations repeatedly allowed the Company to meet analysts' earnings expectations. As detailed above, the misstatements drove ***every*** revenue, adjusted EBITDA, and adjusted EPS "beat" during 2023 and the first two quarters of 2024.

713. Defendants were intensely focused on ICON's EBITDA, EPS, and revenue and personally touted these metrics in ICON's SEC filings and earnings calls. For example, on July 26, 2023, Cutler touted "excellent adjusted EBITDA performance resulting in 17% year over year growth," and on July 27, 2023, Brennan emphasized ICON's "adjusted earnings per share of $3.11, an increase of 8.7% year-over-year." On April 24, 2024, Cutler cited "revenue growth of 6% year

over year" and claimed that "[a]djusted earnings per share grew a robust 20% on a year over year basis." And on July 24, 2024, Cutler cited "revenue growth of 5.3%" and boasted that "[a]djusted earnings per share grew an impressive 21% year over year" to $3.75. As ICON has now admitted, all of these metrics were inflated.

714. The fact that Defendants' GAAP violations allowed ICON to meet analysts' consensus for EBITDA, EPS, and revenue—metrics that Defendants were intensely focused on and personally spoke about—supports the strong inference of scienter. It is not plausible, much less compelling, that ICON's CEO and CFOs had no knowledge of pervasive financial manipulation that determined whether the Company met earnings expectations.

715. <u>Defendants' SOX Certifications Support Scienter</u>: While knowing about multiple fraudulent accounting practices that inflated ICON's financial statements, Defendants Cutler, Brennan and Clerkin falsely certified that (1) ICON's financial statements were prepared in accordance with GAAP and "fairly present[ed], in all material respects, the financial condition and result of operations of the Company," and (2) ICON had "effective" ICFR and DCP.

716. These false SOX certifications strengthen the inference of scienter as to Cutler, Brennan and Clerkin, since the certifications establish that they are "responsible for establishing and maintaining" DCP and ICFR for ICON, and each officer certified that they had (a) designed DCP to "ensure that material information" is "made known" to them and "provide reasonable assurance" that the financial statements are reliable and GAAP-compliant; (b) evaluated the effectiveness of those DCP and disclosed any deficiencies or changes that are reasonably likely to affect ICON's ICFR; and (c) disclosed all significant deficiencies and material weaknesses in ICFR, as well as any fraud, to ICON's auditors and Audit Committee. Cutler, Brennan and Clerkin further affirmed that ICON's DCP "are effective to ensure that information required to be disclosed

by the Company in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to the Company's management, including its" CEO and CFO.

717. Thus, Cutler, Brennan and Clerkin personally certified that ICON's financial statements complied with GAAP, that they had designed and evaluated ICON's controls, and that those controls were effective to ensure that material information was disclosed to them. Having done so, these Defendants necessarily knew (or recklessly failed to check whether) (1) ICON's controls suffered from multiple material weaknesses, and (2) ICON's financial statements were materially misstated in violation of GAAP.

718. <u>Defendants' Final Misstatements Support Scienter</u>: As explained above, by October 21, 2025, "Company management" had reported "concerns" about ICON's "accounting practices and controls" to the Audit Committee, and the Audit Committee had started an internal investigation. ICON's senior leadership (including Defendant Clerkin) was aware of the Audit Committee investigation from inception, given that (1) the "concerns" that launched the investigation were reported by "Company management," and (2) ICON's annual reports indicate that the "Chief Financial Officer . . . normally attend[s] all meetings of the Audit Committee."

719. However, ***after*** the Audit Committee investigation started, on October 23, 2025, Defendants falsely assured analysts that "[a]s a public company, ICLR [ICON] has ***strong internal controls in place***." That Defendants continued to deceive investors about ICON's deficient controls—even after Plaintiffs' prior complaint alleged material weaknesses and "Company management" internally reported "concerns" about ICON's "accounting practices and controls" to the Audit Committee—further supports scienter. The proximity between Defendants' October 23, 2025 statement of "strong internal controls" and ICON's February 12, 2026 admission that it expected "to report one or more material weaknesses" in internal controls further supports scienter.

**G. ICON's Improper Tone at the Top Reinforces Scienter**

720. ICON's improper tone at the top—set by Cutler as CEO—reinforces the strong inference of scienter. As detailed above, ICON has admitted that the "tone from management" contributed to the Company's material weaknesses in internal controls and "material accounting errors." That is unsurprising: Cutler was a notorious bully whose comments and behavior during meetings often left ICON personnel in tears and caused very senior personnel to resign. (FE-9.)

721. Cutler's disregard for the truth pervaded ICON's business practices. He personally inflated ICON's book-to-bill ratio and business wins at least $20 to $30 million per quarter by directing ICON to book awards at larger dollar amounts than sponsors had approved. (FE-7.)

722. Cutler's fraudulent practices included lying to ICON's customers. In early 2023, Cutler falsely told a large customer, Sanofi, that ICON FSP and ISS had similar pricing—even though in reality FSP was 25% more expensive. (FE-12.) FE-12 warned that Cutler's request to portray the pricing as "more even" was "***essentially fraud***" and unethical, and his warning was forwarded to Cutler and Brennan. Nonetheless, shortly thereafter, ICON presented Sanofi with a misleading PowerPoint slide that "fudged" the analysis to show that ISS's and FSP's pricing appeared to be within five percent of each other. (FE-12.)

723. Demonstrating ICON's improper tone at the top, ICON has admitted that its internal controls failed "to hold individuals accountable for their internal control responsibilities in the pursuit of business objectives" and failed to enforce "the expected standards of conduct."

724. These failures encompassed ICON's Irish finance leadership, including Brennan and Sheehan, and the aggressive accounting practices they forced on employees. FE-16 observed that ICON was governed by SOX and U.S. GAAP, but it never seemed to register with ICON's leadership that the Company had to comply with these requirements. For example, FE-16 indicated that Sheehan was "hell-bent" on hitting financial targets rather than ensuring accuracy,

and didn't seem to care about process deviations or SOX requirements. Senior Director of Finance Bedford used aggressive and hostile language to push for higher revenue. (FE-23.) And ICON openly discussed a "restructuring list" of employees scheduled for termination (FE-23), fostering a climate of fear that drove compliance with management's demands.

725. As detailed above, ICON personnel repeatedly voiced objections and explicitly refused to approve improper revenue recognition, yet ICON's senior executives approved the manipulations anyway. (FE-16, FE-17, FE-18, FE-19.) For example, FE-18 saw that Aidan Jameson (in ICON's Irish headquarters) had submitted and approved the negative management reserves—a so-called "double approval" that reflected deficient internal controls. Similarly, after approximately 40 U.S.-based analysts refused to delete costs because they believed it was in violation of GAAP—a situation FE-19 compared to a mutiny—Jameson removed the costs anyway. FE-17 observed that someone else had approved the manipulation of ICON's percentage of completion in Rev after he refused to do so. And FE-16 saw that Rev included 10-12% of prematurely recognized revenue on the MAPI Pharma study even after he refused to approve it.

726. FE-16 and FE-17 left ICON based on their concerns about its improper accounting practices. To make matters worse, instead of stopping those practices, after U.S. personnel complained and began asking more questions about why revenue was being recognized, ICON laid off the vast majority of U.S. finance personnel and replaced them with low-cost employees in countries like India. (FE-3, FE-18.)

727. ICON's improper tone at the top also included efforts to deceive ICON's auditors. For example, when FE-18 warned Aidan Jameson that ICON's external auditors would be able to track the manipulation via negative management reserves, Jameson denied that ICON's external auditors would be able to see the negative management reserves. During ICON's revenue sweeps

in the second half of 2023, FE-18 was also instructed to remove hours from ICON's P&F system, which was not reviewed or tested by ICON's external auditors.

### H. Core Operations: Large Pharmaceutical Customers Were ICON's Most Significant Client Base and Revenue Source

728. The strong inference of scienter is further supported by the fact that the alleged false and misleading statements concern the core of ICON's business—its clinical trial services for large pharma and biotech customers, which provided ***over 95%*** of ICON's revenue.

729. Further, ICON's business was dependent on a relatively small number of its largest customers. Indeed, ICON admitted that it "depend[s] on a limited number of customers" and that "[t]he loss of, or a significant decrease in, business from one or more of these key customers could have a material adverse impact on our results of operations and financial results." ICON's largest customers comprised a disproportionately large amount of revenue. For example, in fiscal year 2023, ICON earned approximately 41% of its revenues from its top ten customers.

730. ICON's relationships with large pharmaceutical companies, such as Pfizer, Janssen, Roche, Merck, and Eli Lilly, were the "bread and butter" that kept revenue at ICON flowing. (FE-14.) Cutler inserted himself into those financially significant relationships. For example, in late 2022, Cutler personally intervened to manipulate a pricing analysis for a large customer, Sanofi, to falsely show that ICON ISS and FSP pricing were similar. (FE-12.)

731. ICON's largest pharmaceutical customer, Pfizer, accounted for nearly 9% of its revenues. Defendant Cutler was formally assigned as the executive sponsor for Pfizer and certain other customers. (FE-1.) FE-11 corroborated that Cutler was central to the Pfizer relationship and managed it due to its prominence at ICON. And as detailed above, Cutler publicly praised "ICON's long-standing relationship with Pfizer" and "***close collaboration with Pfizer***." In a September 2021 presentation with a Pfizer executive, Rob Goodwin (VP, Operations Center of

Excellence, Global Product Development), Cutler stated that ICON and Pfizer have "shared history" and "a network of people and a network of relationships that ***know each other very well***."[24] Defendant Balfe was also intimately involved with the Pfizer account. (FE-11.)

732. The Individual Defendants also confirmed the significance of large pharmaceutical customers, such as Pfizer, in their statements during industry conferences and earnings calls. For example, during the November 14, 2023 call, Brennan stated that ICON has a "big embedded relationship[] with these large pharma companies." On January 10, 2024, at the J.P. Morgan Healthcare Conference, Cutler emphasized the strength of ICON's long-standing relationships with large pharma, as well as the Company's collective knowledge of this space, asserting that ICON has a "strong franchise in the large pharma space" because "we grew up with that, and it's an area we know well" based on ICON's work with these companies for "30 years."

**I. Additional Indicia of Scienter**

733. The following facts further support a strong inference of Defendants' scienter.

734. Temporal Proximity Between Misstatements and Corrective Disclosure: On September 10, 2024, Cutler delivered positive statements, asserting that "the percentage of RFPs that are coming through, the dollar amounts that are coming through remain strong, remain good" and twice stating that there had been "***no material changes***" in ICON's business. Cutler further affirmed ICON's 2024 earnings guidance and assured that "we're seeing what we thought we'd see" and "***there's nothing that's fundamentally changed that we hadn't already thought about or included in our guidance***."

[24] https://theconferenceforum.org/webinars/learnings-from-the-leadership-of-the-collaboration-that-delivered-a-covid-vaccine-in-record-time

735. Just over a month later, on October 23, 2024, ICON revealed a shocking "revenue shortfall" of $100 million for the quarter and reduced its 2024 revenue guidance by $220 million—despite claiming business as usual just a few weeks prior. Cutler cited "lower than anticipated revenue contribution from two of our largest customers," "slower than expected activity in our biotech segment," and "an outsized level of vaccine related cancellations [in] quarter three."

736. ICON's abrupt reversal in just six weeks underscores scienter, since none of these issues suddenly arose between September 10, 2024 and October 23, 2024. Instead, as detailed above, ICON's business with Pfizer and other large customers had declined for years; ICON's biotech customer RFPs had continuously decreased since late 2022, making clear to Defendants that ICON's biotech business was dying; and Pfizer's large COVID-flu vaccine trial had failed by early August 2024.

737. <u>Defendants' Misleading Explanations</u>: Further supporting scienter, Defendants offered misleading explanations for ICON's disastrous October 2024 disclosures. On November 21, 2024, Cutler blamed a "confluence of circumstances that hit us ***rather hard and rather late in quarter three*** [2024] leading to us reducing our guidance." As detailed above, that was false; Cutler had long known about those "circumstances." (*Supra* Sections IV-V.)

738. <u>Analyst Commentary Supports Scienter</u>: Further strengthening the inference of scienter, analysts called out the surprising disparity between Defendants' prior, consistently positive statements and the truth. After ICON's sudden earnings miss and guidance reduction in October 2024, Deutsche Bank highlighted that "***the market was not expecting coincident (3%) / (8%) revisions to 2024 Revenue / EPS guidance, especially after the company reiterated guidance at a September 10 conference***." Truist called the revenue miss a "***major surprise***." J.P. Morgan reiterated that "***the magnitude of the miss was surprising***." After ICON revealed its

financial overstatements and controls failures, Bank of America stated that "***Questions on overstatements of revenues by this degree will completely shake any [ICON] investment thesis***," while William Blair called out "***a meaningful hit to the company's credibility***."

739. Executive Departures and Auditor Resignation: Brennan's sudden resignation in the middle of the Class Period, ICON's termination of its auditor KPMG, Cutler's abrupt departure in September 2025, and Sheehan's termination as a director of ICON subsidiaries near the conclusion of the Audit Committee investigation strengthen the strong inference of scienter.

740. On April 3, 2024, ICON abruptly announced Brennan's impending departure as CFO after twelve years in the position. ICON simultaneously announced that it would commence a search to find a new CFO, indicating that the resignation was not planned well in advance.

741. Brennan's resignation announcement—about a month after ICON reported 2023 financial results—was suspiciously timed in light of the extensive manipulation of ICON's financial statements, in violation of GAAP, under Brennan's tenure. Notably, at the end of 2023, ICON had fallen significantly short of its targets, prompting a $350 million transfer to prop up its failing biotech business (FE-9) and a "mad scramble" to find cash around Christmas 2023 (FE-4). At the time, Finance Department personnel suspected that Brennan was about to leave ICON and wanted to "jack up" its share price. (FE-4.) Indeed, ICON's financial overstatements peaked in the quarter of Brennan's departure announcement.

742. Brennan's resignation announcement also occurred when he knew about key metrics showing that ICON's business was in decline. For example, Brennan knew that ICON's biotech customer RFPs had consistently decreased through 2023; he had personally presented quarterly Salesforce dashboards showing that ICON's biotech cancellations had consistently

increased since mid-2023 (FE-1); and he was aware from Zoom town halls that ICON was laying off employees by early 2024 (FE-8).

743. Additionally, during the Class Period, ICON ended its decades-long auditor-client relationship with KPMG. KPMG had served as ICON's auditor since the Company's founding in 1990. However, in 2024, ICON suddenly decided to terminate KPMG and appoint Ernst & Young as its principal accountant for the fiscal year 2025. Thus, the auditor-client relationship with KPMG ceased following the completion of the audit of ICON's financial statements for the fiscal year 2024 as of December 31, 2024. KPMG's abrupt resignation at the end of 2024 supports scienter, particularly given (1) the admitted material falsity of ICON's 2023 and 2024 financial statements, and (2) the fact that ICON was forced to restate its 2023 and 2024 financial statements before Ernst & Young completed the audit for the 2025 fiscal year.

744. On September 4, 2025, ICON announced that CEO Cutler would "retire" on October 1, 2025, to be replaced by Defendant Balfe as CEO. Cutler's sudden departure from ICON—with less than one month notice—strongly indicates that Cutler was forced to resign. Cutler's sudden departure is especially suspicious because (1) immediately after Cutler's departure (if not earlier), ICON's Audit Committee commenced an internal investigation of the Company's accounting and controls, (2) ICON has admitted materially misstated financial results during Cutler's tenure and stated that the "tone from management" contributed to the "material accounting errors"; and (3) in announcing the investigation results on May 27, 2026, ICON reported that Cutler had "resigned" from the Board "effective May 21, 2026." These circumstances strongly indicate that Cutler had directed and enabled ICON's financial manipulation, such that his departure precipitated the scheme's final collapse.

745. Finally, on April 8, 2026—shortly before ICON reported that the Audit Committee investigation was completed—Sheehan was terminated as a director of ICON Clinical Research Limited, ICON Global Treasury Unlimited Company, and ICON Clinical Research (UK) No. 2 (Irish and UK subsidiaries of ICON). Sheehan's termination from these directorships near the conclusion of the Audit Committee investigation underscores his direct involvement in the financial manipulation and further supports a strong inference of scienter.

746. Defendants' High-Level Positions Support Scienter: The Individual Defendants held high-level executive positions at ICON during the Class Period. As CEO, CFO, and President of Pharma Development Solutions (and current CEO), respectively, Defendants Cutler, Brennan, Clerkin and Balfe controlled ICON's daily operations, directly participated in the Company's management, and regularly received material nonpublic information about ICON's core operations, including demand for its offerings, RFP activity, and the status of its largest pharma customers, as detailed above. Defendant Sheehan—a senior financial executive who reported directly to ICON's CFO—was intimately involved in ICON's financial reporting, personally directed multiple GAAP violations, and signed ICON's April 26, 2024 registration statement.

747. Based on their roles as ICON's highest-ranking officers, the Individual Defendants controlled the contents of, drafted, reviewed, and/or disseminated the material misstatements, and directed the deceptive acts in furtherance of the fraudulent scheme, alleged herein. Further, they were provided with, or had access to, the material misstatements prior to or upon their issuance, and they had the power and authority to prevent or correct the issuance of such misstatements. Accordingly, the Individual Defendants knew, or were deliberately reckless in not knowing, that the adverse facts alleged herein were being actively concealed from investors, and that Defendants' positive representations made to investors were materially false, misleading, and incomplete.

### J. Corporate Scienter

748. ICON possessed scienter because the Individual Defendants, who acted with scienter as set forth above, had binding authority over the Company. In addition, certain allegations herein establish ICON's corporate scienter based on (i) the state of mind of employees whose intent can be imputed to ICON, and/or (ii) the knowledge of employees who approved the statements alleged herein despite knowing the statements' false and misleading nature.

749. It can be inferred that senior corporate executives at ICON possessed scienter such that their intent can be imputed to the Company. Given the significance of ICON's RFP flow, large pharma customers, and financial reporting, and the necessary involvement of numerous ICON departments and personnel—including sales and operations personnel who reviewed ICON's RFP data and key customer accounts, and accounting and finance personnel who approved the improper accounting—additional unknown executives sufficiently senior to impute their scienter to ICON were also aware of the materially misstated information and violations of GAAP.

750. As-yet-unidentified employees also approved the false statements despite knowing of their false and misleading nature. As alleged above, ICON executives were aware of ICON's inflated RFP flow, declining RFPs, collapsing relationships with Pfizer and other large customers, premature revenue recognition and other violations of GAAP, material weaknesses in internal control over financial reporting, and ineffective disclosure controls and procedures. From this, it can be inferred that someone at ICON approved of the false and misleading statements in ICON's SEC filings concerning RFPs, large customers, financial performance, GAAP compliance, and controls, while knowing that these statements were materially false or misleading and violated applicable accounting standards and disclosure requirements.

751. Indeed, ICON has conceded that "Company management" had reported "concerns" about ICON's "accounting practices and controls" to the Audit Committee by October 2025,

indicating that management-level personnel knew about these issues when ICON falsely assured analysts that "[a]s a public company, ICLR [ICON] has strong internal controls in place."

## IX. LOSS CAUSATION

752. Defendants' materially false and misleading statements and fraudulent scheme directly and proximately caused Plaintiffs and the Class to suffer substantial losses as a result of purchasing or otherwise acquiring ICON ordinary shares at artificially inflated prices during the Class Period.

753. Defendants' fraudulent statements and scheme artificially inflated and/or maintained the price of ICON ordinary shares and operated as a fraud or deceit on the Class. Relying on the integrity of the market price for ICON ordinary shares, Plaintiffs and other Class members purchased or acquired ICON ordinary shares at prices that incorporated and reflected Defendants' misstatements alleged herein.

754. However, Defendants' false and misleading statements concealed the truth, including about ICON's materially inflated key business metrics, ICON's declining business from biotech customers and large customers (including Pfizer), and ICON's materially inflated financial performance and violations of GAAP. It was foreseeable to Defendants that these concealed facts would negatively affect ICON's financial performance, reduce ICON's share price, and cause losses to Plaintiffs and the Class when revealed.

755. As the false and misleading nature of Defendants' misstatements became known to the market in piecemeal fashion through a series of partially corrective events and/or materializations of concealed risk, the price of ICON ordinary shares fell precipitously. Specifically:

**A. October 23–24, 2024**

756. On October 23, 2024, after market close, ICON reported 3Q24 financial results in a press release filed on Form 6-K with the SEC. In the press release, ICON revealed a surprise "revenue shortfall" of $100 million for 3Q24 and reduced 2024 guidance from a range of $8.45 billion to $8.55 billion to a range of $8.26 billion to $8.3 billion, a $220 million cut at the midpoint.

757. In the press release, ICON also revealed that leading indicators of underlying demand had significantly deteriorated. For instance, ICON's quarterly gross business wins were $2.83 billion and cancellations were $504 million, resulting in net new business wins of $2.33 billion during the quarter, down from $2.58 billion the previous quarter, and the Company's book-to-bill ratio declined to 1.15 from 1.22 the previous quarter.

758. Further, ICON's 3Q24 financial results were substantially below analysts' consensus, with a 4.9% (or $104 million) revenue miss; a 9% (or $51.5 million) Adjusted EBITDA miss; a 13% (or $0.50) miss on Adjusted EPS; and a book-to-bill ratio 8% below consensus.

759. In the press release, Defendant Cutler acknowledged that "ICON's results for the third quarter did not meet the expectations we had previously provided," citing "more material headwinds from two large customers" and "ongoing cautiousness from biotech customers resulting in award and study delays." During ICON's October 24, 2024 earnings call, held before market open, Defendant Cutler purported to explain the drivers of the poor financial results and reduced guidance, citing "lower-than-anticipated revenue contribution from two of our largest customers," "slower than expected activity in our biotech segment," and "an outsized level of vaccine related cancellations."

760. ICON's poor 3Q24 results and guidance cut were driven by the facts Defendants had misstated and concealed, including with respect to ICON's declining biotech business and declining business from Pfizer and other large customers. They also reflected the partial collapse

of Defendants' accounting scheme and GAAP violations, which were increasingly unable to offset the declines in ICON's underlying business.

761. On this news, the price of ICON ordinary shares declined $59.03 per share, or 21%, from $280.76 per share on October 23, 2024, to $221.73 per share on October 24, 2024.

762. After Defendants' repeated assurances about the purported strength of ICON's business—including affirming guidance on September 10, 2024, just six weeks earlier—analysts were shocked by ICON's sudden disclosure of materially weaker financial results. For example, J.P. Morgan's October 24, 2024 report stated that "***the magnitude of the miss was surprising***" and the "***incrementally new dynamic flagged in the quarter was the drop-off in spending from the two large pharma customers***." UBS's October 24, 2024 report added that ICON management admitted "that the [two large customers'] relative customer concentration and heightened magnitude of their decline had a ***material, outsized impact*** on ICON's performance." Analysts also significantly reduced their price targets. For example, J.P. Morgan and UBS lowered their price targets by 25.3% and 23.7%, respectively.

**B. January 14, 2025**

763. On January 14, 2025, before market open, ICON issued financial guidance for 2025 in a press release filed on Form 6-K with the SEC. ICON announced revenue guidance for 2025 in the range of $8.05 billion to $8.65 billion, below analysts' expectations.

764. In ICON's press release, Defendant Cutler stated that "trial activity has been impacted by cautious spending from biopharma customers, in both the biotech and large pharma businesses," and "[o]ur outlook for this year reflects an expected transition period which includes a headwind from our top two customers on a combined basis, coupled with an inconsistent recovery in biotech." These disclosures confirmed that ICON's trial activity had declined and that

ICON's 2025 guidance reflected the sustained impact of cuts by ICON's largest customers—both of which were driven by the facts Defendants had misstated and concealed.

765. Also on January 14, 2025, ICON participated in an industry conference call hosted by J.P. Morgan. During the call, Cutler revealed, "we believe '25 will be a transition period" for ICON before "normal growth will be resumed." In response to analyst questions, Cutler admitted "softening of the backlog" and higher cancellations "on the biotech side," as well as an expectation of only "lower single digits [growth] outside of [its] top 2" customers.

766. On the January 14, 2025 news, the price of ICON ordinary shares declined $17.75 per share, or 8.1%, from $217.99 per share on January 13, 2025, to $200.24 per share on January 14, 2025.

767. Again, analysts were disappointed. J.P. Morgan flagged ICON's lower-than-expected revenue and Adjusted EPS guidance, while TD Cowen wrote that ICON's 2025 outlook was "worse than expected."

**C. October 22‑23, 2025**

768. On October 22, 2025, after market close, ICON reported elevated cancellations of $901 million in 3Q25. These elevated cancellations were the delayed result of ICON's failure to timely recognize cancellations of stale awards. During ICON's October 23, 2025 earnings call, Balfe revealed that the "elevated cancellations" were the result of older, long-delayed studies that ICON had kept in backlog even though the studies had yet to begin enrollment.

769. Specifically, Balfe stated that the cancellations had "a bias towards previously awarded studies that were canceled prior to commencing enrollment," emphasizing that "the awards that are coming in now and in the last number of quarters" are not the awards "driving us above historical norms for cancel." Barclays tied these high cancellations to "an intended backlog

flush," stating on October 23, 2025 that "we do not understand why they remain so elevated for so long, especially since mgmt said in 2Q that we should see them start to normalize. We struggle to ID what the issue is other than an intended backlog flush over a period of time . . . ."

770. On the October 23, 2025 news, the price of ICON ordinary shares declined by $12.60 per share, or 6.5%, from $192.60 per share on October 22, 2025, to $180.00 per share on October 23, 2025.

**D. January 7, 2026**

771. On January 7, 2026, after market close, ICON announced that it would not release 2026 guidance in January, contrary to its historical practice, and instead stated that "it intends to issue full-year 2026 guidance alongside the release of our fourth quarter and full-year 2025 results"—a delay driven by ICON's ongoing (but not yet publicly disclosed) internal investigation of the Company's accounting and controls.

772. Analysts later attributed the guidance delay to ICON's internal investigation: on February 12, 2026, in summarizing ICON's disclosure of the investigation, Deutsche Bank noted that ICON "withdrew from the JPM Healthcare Conference in early January and had yet to issue its 4Q25 earnings date . . . we now know the 'why' behind the events and it's on the negative side of the fence."

773. As the market digested this negative news, ICON's share price dropped by $14.70, or 7.2%, from $202.92 per share on January 7, 2026 to $188.22 per share on January 8, 2026, and dropped a further $6.84, or 3.6%, to $181.38 per share on January 9, 2026.

**E. February 12, 2026**

774. On February 12, 2026, before market open, ICON issued a press release that revealed "preliminary indications" that ICON's revenue was overstated, that ICON "expects" to report material weaknesses in internal controls, that ICON's Audit Committee had launched an

internal investigation months earlier, and that ICON was withdrawing its 2025 financial guidance and delaying the release of its 4Q25 and FY25 earnings results. In relevant part, ICON's press release stated:

> ICON plc, (NASDAQ: ICLR) today announced that it intends to release its fourth quarter and full year 2025 earnings results on or prior to April 30, 2026. ***The Company also announced an ongoing internal investigation initiated by the Audit Committee of the Board of Directors in late October 2025 into certain of the Company's accounting practices and controls, following concerns reported to the Audit Committee through Company management. Outside legal counsel is conducting the investigation with the support of forensic and technical accounting firms.***
>
> ***The investigation primarily focuses on revenue recognition in fiscal years 2023 through 2025.*** The Company is in the process of ***evaluating the design and operation of certain internal controls over financial reporting and expects to report one or more material weaknesses as a result***. While the investigation is continuing, at this time, ***preliminary indications are that the Company's revenue in 2023 and 2024 may have been overstated*** by less than two percent for each fiscal year. Due to the ongoing investigation, including a delay of normal quarter and year-end reporting processes, ***the Company is not yet able to communicate its 2025 financial performance and is withdrawing its previously issued 2025 full year financial guidance***.

775. On this news, the price of ICON ordinary shares declined $53.06 per share, or 39.9%, from $133.14 per share on February 11, 2026, to $80.08 per share on February 12, 2026. ICON's share price traded as low as $66.57 during the day on February 12, 2026.

776. Analysts were stunned by ICON's admissions. For example, on February 12, 2026, Bank of America lowered its rating of ICON from Neutral to Underperform and slashed its price target from $195 to $75, stating that: "***Questions on overstatements of revenues by this degree will completely shake any [ICON] investment thesis***," and that the newly revealed information "***makes us doubt [ICON]'s true underlying performance***, and the realistic growth rate going forward," such that "***accounting and financial report concerns remove any real valuation support***." On February 12, 2026, William Blair stated that the situation "***represents a meaningful hit to the company's credibility***."

## X. A PRESUMPTION OF RELIANCE APPLIES

777. At all relevant times, the market for ICON's ordinary shares was an efficient market for the following reasons, among others:

(a) The Company's shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, ICON filed periodic public reports with the SEC;

(c) ICON regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) ICON was followed by securities analysts employed by major brokerage firms who wrote reports that were published, distributed, and entered the public domain.

778. As a result of the foregoing, the market for ICON ordinary shares promptly digested current information regarding ICON from all publicly available sources and reflected such information in the market price. Under these circumstances, all purchasers of ICON ordinary shares during the Class Period suffered similar injury through their purchase of ICON ordinary shares at artificially inflated prices and the presumption of reliance applies.

779. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.

## XI. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY

780. The statutory safe harbor and the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances does not apply to any of the materially false and/or misleading statements alleged herein. None of the statements complained of herein was a forward-looking statement. Instead, each challenged statement relates to then-existing facts and conditions. ICON's "Safe Harbor" warnings during the Class Period thus cannot shield the statements at issue from liability.

781. To the extent there were any forward-looking statements, they were not sufficiently identified as such at the time they were made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by ICON were not sufficient to insulate Defendants from liability for their materially false and/or misleading statements.

782. Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was made by or authorized and/or approved by an executive officer of ICON who knew that the statement was false.

## XII. CLASS ACTION ALLEGATIONS

783. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who or which purchased or otherwise acquired the publicly traded ordinary shares of ICON during the Class Period, and were damaged thereby.

784. Excluded from the Class are: (i) Defendants and any affiliates or subsidiaries thereof; (ii) members of the immediate family of any Individual Defendant; (iii) present and former officers, directors, and/or control persons of ICON, and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (vi) ICON's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vii) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any person or entity in the preceding six categories, in their capacities as such.

785. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ICON's ordinary shares were actively traded on the NASDAQ. As of December 31, 2024, there were more than 80 million ICON ordinary shares outstanding, owned by at least thousands of investors. Although the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are at least thousands of members of the proposed Class. Members of the Class can be identified from records maintained by ICON or its transfer agent(s) and may be notified of the pendency of this action by publication using a form of notice similar to that customarily used in securities class actions.

786. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

787. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs

have no interests antagonistic to or in conflict with those of the Class.

788. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether Defendants violated the Exchange Act;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and/or misleading;

(e) Whether the price of ICON's ordinary shares was artificially inflated;

(f) Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g) The extent of damage sustained by Class members and the appropriate measure of damages.

789. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since the joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII. CAUSES OF ACTION

**COUNT I**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**
**Against All Defendants**

790. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein. This Count is brought against Defendants ICON, Cutler, Brennan, Balfe, Clerkin, and Sheehan pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. § 240.10b-5(b), on behalf of Plaintiffs and all other members of the Class.

791. During the Class Period, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) in that they made the false statements specified in Section VI above, which they knew or recklessly disregarded were false or misleading in that the statements contained material misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Defendants' misstatements: (i) deceived the investing public, including Plaintiffs and the Class; (ii) artificially inflated and maintained the market price of ICON ordinary shares; and (iii) caused Plaintiffs and the Class to purchase or otherwise acquire ICON ordinary shares at artificially inflated prices.

792. As described above, Defendants had actual knowledge of the false and misleading statements of material fact, or recklessly disregarded the true facts that were available to them.

793. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased or otherwise acquired ICON ordinary shares at artificially inflated prices. Plaintiffs and the Class would not have purchased or otherwise acquired ICON ordinary

shares at such prices, or at all, had they been aware that the market prices for ICON ordinary shares had been artificially inflated by Defendants' fraudulent statements.

794. As a direct and proximate result of Defendants' misstatements, Plaintiffs and the Class suffered damages in connection with their purchases or acquisitions of ICON ordinary shares during the Class Period.

795. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

## COUNT II
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Against Defendant Sheehan**

796. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein. This Count is brought against Defendant Sheehan pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) promulgated thereunder, 17 C.F.R. § 240.10b-5(a) and (c), on behalf of Plaintiffs and all other members of the Class.

797. During the Class Period, Defendant Sheehan violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) in that he (i) employed devices, schemes, and artifices to defraud; and (ii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers or acquirers of ICON ordinary shares. Sheehan's actions: (i) deceived the investing public, including Plaintiffs and the Class; (ii) artificially inflated and maintained the market price of ICON ordinary shares; and (iii) caused Plaintiffs and the Class to purchase or otherwise acquire ICON ordinary shares at artificially inflated prices. Defendant Sheehan is sued as a primary participant in the wrongful and illegal conduct charged herein.

798. In furtherance of his unlawful scheme, during the Class Period, Defendant Sheehan took the actions set forth herein, including the following inherently deceptive and fraudulent acts:

(a) Manipulating ICON's financial statements to accelerate revenue recognition and inflate margins;

(b) Creating fake and premature invoices to deceive ICON's customers and boost revenue and other metrics;

(c) Holding periods open to record additional billing and cash and manipulate revenue, resulting in false records and false financial statements; and

(d) Conducting "revenue sweeps" to artificially inflate ICON's revenue.

799. These deceptive acts constituted devices, schemes, and artifices to defraud, and acts, practices and a course of business that operated as a fraud or deceit upon, Plaintiffs and the Class.

800. As described above, Defendant Sheehan acted with scienter, in that he either had actual knowledge that his acts were deceptive and fraudulent or recklessly disregarded the true facts that were available to him.

801. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased or otherwise acquired ICON ordinary shares at artificially inflated prices. Plaintiffs and the Class would not have purchased or otherwise acquired ICON ordinary shares at such prices, or at all, had they been aware that the market prices for ICON ordinary shares had been artificially inflated by Defendant Sheehan's fraudulent conduct.

802. As a direct and proximate result of Defendant Sheehan's wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchases or acquisitions of ICON ordinary shares during the Class Period.

**COUNT III**
**Violations of Section 20(a) of the Exchange Act**
**Against Defendants Cutler, Brennan, Balfe, and Clerkin**

803. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein. This Count is asserted against Defendants Cutler, Brennan, Balfe, and Clerkin pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Plaintiffs and all other members of the Class.

804. Defendants Cutler, Brennan, Balfe, and Clerkin acted as controlling persons of ICON within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, these Individual Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the false and/or misleading statements alleged herein. These Individual Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued or had the ability to prevent the issuance of the statements or cause the statements to be corrected.

805. In particular, each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the activities giving rise to the securities violations as alleged herein, and exercised the same.

806. As described above, the Company and these Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged herein.

By virtue of their positions as controlling persons, Defendants Cutler, Brennan, Balfe, and Clerkin are also liable under Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Plaintiffs and other Class members suffered damages in connection with their purchases or acquisitions of the Company's ordinary shares during the Class Period.

## XIV. PRAYER FOR RELIEF

807. **WHEREFORE**, Plaintiffs pray for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such other further relief as the Court may deem just and proper.

## XV. JURY DEMAND

808. Plaintiffs demand a jury trial.

Dated: June 26, 2026

Respectfully submitted,

**KESSLER TOPAZ MELTZER & CHECK, LLP**

/s/ Matthew L. Mustokoff
Matthew L. Mustokoff
Margaret E. Mazzeo*
Richard A. Russo*
Lyndsey Campbell*
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
mmustokoff@ktmc.com
mmazzeo@ktmc.com
rrusso@ktmc.com

**BLEICHMAR FONTI & AULD LLP**

/s/ Joseph A. Fonti
Joseph A. Fonti
Nancy A. Kulesa (*pro hac vice*)
Evan A. Kubota
Brandon A. Slotkin
300 Park Avenue, Suite 1301
New York, New York 10022
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jfonti@bfalaw.com
nkulesa@bfalaw.com
ekubota@bfalaw.com

lcampbell@ktmc.com

*Counsel for Lead Plaintiffs and Named Plaintiff Plumbers Local Union No. 690 Pension Fund and Lead Counsel for the Putative Class*

* *pro hac vice*

bslotkin@bfalaw.com

*Counsel for Lead Plaintiffs and Named Plaintiff Macomb County Retiree Health Care Fund and Lead Counsel for the Putative Class*

**CLARK HILL**
Ronald A. King*
215 South Washington Square, Suite 200
Lansing, Michigan 48933
Telephone: (517) 318-3015 (office)
Telephone: (517) 449-2860 (mobile)
rking@clarkhill.com

*Additional Counsel for Plaintiff Police and Fire Retirement System of the City of Detroit*

# CERTIFICATION

I, David Cetlinski, on behalf of Police & Fire Retirement System of the City of Detroit ("PFRSD"), as Executive Director of PFRSD, hereby certify as follows:

1. I am fully authorized to enter into and execute this Certification on behalf of PFRSD.

2. I have reviewed the Second Amended Class Action Complaint (the "Complaint") against ICON plc ("ICON") and others alleging violations of the federal securities laws and have authorized its filing.

3. PFRSD did not purchase or sell securities of ICON at the direction of counsel, or in order to participate in any private action under the federal securities laws.

4. PFRSD is willing to serve as a representative party on behalf of the Class in this matter, including providing testimony at deposition and trial, if necessary.

5. PFRSD's transactions in the ICON securities that are the subject of the Complaint during the Class Period specified therein are reflected in Schedule A, attached hereto.

6. For securities retained, PFRSD owns and holds legal title to the securities that are the subject of this litigation. For securities sold, PFRSD owned and held legal title to the securities that are the subject of this litigation at all relevant times.

7. PFRSD has sought to serve as a representative party in a class action filed under the federal securities laws during the last three years, in the following:

- *Manchin v. PACS Grp., Inc.*, No. 1:24-cv-08636-LJL (S.D.N.Y.)
- *In re ASML Holding N.V. Securities Litigation*, No. 1:24-cv-08664 (S.D.N.Y.)
- *In Re F45 Training Holdings, Inc. Securities Litigation*, No. 1:22-cv-01291 (W.D. Tex.)

8. Beyond its *pro rata* share of any recovery, PFRSD will not accept payment for serving as a representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

Dated: 06-18-26

David Cetliński
Executive Director
*Police & Fire Retirement System of the City of Detroit*

**SCHEDULE A**

PFRSD TRANSACTIONS IN ICON PLC

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 9/15/2023 | 4.00 | $261.71 | ($1,046.84) |
| Sale | 9/15/2023 | -4.00 | $261.71 | $1,046.84 |
| Purchase | 1/18/2024 | 1,200.00 | $251.12 | ($301,338.60) |
| Purchase | 3/13/2024 | 3,141.00 | $335.16 | ($1,052,731.91) |
| Sale | 3/13/2024 | -250.00 | $336.68 | $84,169.50 |
| Sale | 3/22/2024 | -100.00 | $331.49 | $33,148.68 |
| Purchase | 4/15/2024 | 921.00 | $304.22 | ($280,183.76) |
| Purchase | 4/19/2024 | 656.00 | $288.65 | ($189,353.35) |
| Purchase | 4/26/2024 | 583.00 | $306.51 | ($178,695.85) |
| Sale | 6/28/2024 | -334.00 | $313.47 | $104,698.98 |
| Sale | 6/28/2024 | -39.00 | $313.47 | $12,225.33 |
| Purchase | 9/11/2024 | 293.00 | $283.51 | ($83,068.34) |
| Purchase | 9/13/2024 | 348.00 | $300.75 | ($104,661.00) |
| Purchase | 9/18/2024 | 500.00 | $296.81 | ($148,404.30) |
| Purchase | 9/27/2024 | 673.00 | $285.50 | ($192,141.70) |
| Purchase | 9/30/2024 | 100.00 | $284.89 | ($28,489.21) |
| Purchase | 10/24/2024 | 1,301.00 | $237.99 | ($309,624.60) |
| Sale | 11/07/2024 | -980.00 | $218.86 | $214,485.05 |
| Sale | 11/21/2024 | -649.00 | $208.34 | $135,211.82 |
| Purchase | 12/03/2024 | 1,448.00 | $211.66 | ($306,483.68) |
| Sale | 12/24/2024 | -200.00 | $210.39 | $42,077.54 |
| Sale | 12/27/2024 | -750.00 | $212.20 | $159,153.08 |
| Sale | 05/01/2025 | -1,373.00 | 142.94 | $196,255.25 |
| Sale | 05/01/2025 | -914.00 | 142.78 | $130,503.48 |
| Sale | 05/14/2025 | -5,948.00 | 134.07 | $797,446.58 |

**CERTIFICATION**

The Trustees of the Local 464A United Food & Commercial Workers' Union Welfare Service Benefit Fund and the Trustees of the Welfare and Pension Funds of Local 464A – Pension Fund (collectively, "Local 464A") declare, as to the claims asserted under the federal securities laws, that:

1. Local 464A did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any private action.

2. Local 464A has been serving and will continue to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3. Local 464A's Class Period transactions in the ICON plc securities that are the subject of this action are reflected in the attached Schedule A.

4. Local 464A has full power and authority to bring suit to recover for its investment losses.

5. Local 464A has reviewed the Second Amended Complaint for Violations of the Federal Securities Laws and authorizes its filing.

6. Local 464A intends to actively monitor and vigorously pursue this action for the benefit of the class.

7. Local 464A will endeavor to provide fair and adequate representation and work directly with class counsel to ensure that the largest recovery for the class consistent with good faith and meritorious judgment is obtained.

8. Local 464A is currently only serving as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification in this action, *In re ICON plc Securities Litigation*, No. 25-cv-00763 (E.D.N.Y.).

9. The Trustees of the Welfare and Pension Funds of Local 464A – Pension Fund have sought to serve, but were not appointed as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification in *Trustees of the Welfare & Pension Funds of Local 464A – Pension Fund v. Enphase Energy, Inc.*, No. 24-cv-09038 (N.D. Cal.) (filed initial complaint; did not move for appointment as lead plaintiff).

10. Local 464A will not accept any payment for serving as a representative party on behalf of the class beyond Local 464A's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

11. I, Richard Whalen, as Secretary-Treasurer of the Local 464A United Food & Commercial Workers' Union Welfare Service Benefit Fund and the Welfare and Pension Funds of Local 464A – Pension Fund, am authorized to make legal decisions, and execute this certification, on behalf of Local 464A.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17 day of June 2026.

By: [signature]

Richard Whalen, Secretary-Treasurer of the Local 464A United Food & Commercial Workers' Union Welfare Service Benefit Fund and the Welfare and Pension Funds of Local 464A – Pension Fund

# SCHEDULE A

**The Trustees of the Local 464A United Food & Commercial Workers Union Welfare Service Benefit Fund**

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Ordinary Shares | Buy | 6/10/2024 | 525 | $318.5255 |
| Ordinary Shares | Buy | 6/11/2024 | 1,156 | $317.1157 |
| Ordinary Shares | Buy | 6/12/2024 | 39 | $321.1700 |
| Ordinary Shares | Buy | 6/17/2024 | 801 | $316.4582 |
| Ordinary Shares | Buy | 6/28/2024 | 652 | $318.7332 |
| Ordinary Shares | Buy | 9/16/2024 | 95 | $294.9963 |
| Ordinary Shares | Buy | 9/17/2024 | 664 | $297.4255 |
| Ordinary Shares | Buy | 10/22/2024 | 113 | $289.1813 |
| Ordinary Shares | Buy | 11/15/2024 | 191 | $189.2200 |
| Ordinary Shares | Sell | 11/18/2024 | 4,236 | $185.9314 |

**The Trustees of the Welfare and Pension Funds of Local 464A**

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Ordinary Shares | Buy | 6/10/2024 | 860 | $318.5255 |
| Ordinary Shares | Buy | 6/11/2024 | 1,894 | $317.1157 |
| Ordinary Shares | Buy | 6/12/2024 | 63 | $321.1700 |
| Ordinary Shares | Buy | 6/17/2024 | 1,311 | $316.4582 |
| Ordinary Shares | Buy | 6/28/2024 | 1,068 | $318.7332 |
| Ordinary Shares | Buy | 9/16/2024 | 156 | $294.9963 |
| Ordinary Shares | Buy | 9/17/2024 | 1,087 | $297.4255 |
| Ordinary Shares | Buy | 10/22/2024 | 190 | $286.0097 |
| Ordinary Shares | Sell | 11/18/2024 | 6,629 | $185.9314 |

# CERTIFICATION

I, Harold Haugh, on behalf of Macomb County Retiree Health Care Fund ("MCRHC"), as Chairman of MCRHC, hereby certify as follows:

1. I am fully authorized to enter into and execute this Certification on behalf of MCRHC.

2. I have reviewed the Second Amended Class Action Complaint (the "Complaint") against ICON plc ("ICON") and others alleging violations of the federal securities laws and have authorized its filing.

3. MCRHC did not purchase or sell securities of ICON at the direction of counsel, or in order to participate in any private action under the federal securities laws.

4. MCRHC is willing to serve as a representative party on behalf of the Class in this matter, including providing testimony at deposition and trial, if necessary.

5. MCRHC's transactions in the ICON securities that are the subject of the Complaint during the Class Period specified therein are reflected in Schedule A, attached hereto.

6. For securities retained, MCRHC owns and holds legal title to the securities that are the subject of this litigation. For securities sold, MCRHC owned and held legal title to the securities that are the subject of this litigation at all relevant times.

7. MCRHC has sought to serve as a representative party in a class action filed under the federal securities laws during the last three years, and was appointed, in the following:

- *In re: PayPal Branded Checkout Securities Litigation*, No. 3:26-cv-01589 (N.D. Cal.)
- *In re FMC Corp. Securities Litigation*, No. 2:25-cv-00771 (E.D. Pa.)
- *Patel v. Lululemon Athletica Inc.*, No. 1:24-cv-06033 (S.D.N.Y.)
- *McAlice v. The Estee Lauder Companies, Inc.*, No. 1:23-cv-10669 (S.D.N.Y.)

8. MCRHC has sought to serve as a representative party in a class action filed under

the federal securities laws during the last three years, and was not appointed or its motion remains pending, in the following:

- *City of Miami General Employees' & Sanitation Employees' Retirement Trust v. LKQ Corp.*, No. 3:26-cv-00498 (M.D. Tenn.)
- *In re The Trade Desk, Inc. Securities Litigation*, No. 2:25-cv-01396 (C.D. Cal.)
- *Cleveland Bakers and Teamsters Pension Fund v. Lamb Weston Holdings, Inc.*, No. 1:24-cv-00282 (D. Idaho)
- *Macomb County Retiree Health Care Fund v. PDD Holdings Inc.*, No. 1:24-cv-06881 (E.D.N.Y.)
- *In re Illumina, Inc. Securities Litigation*, No. 3:23-cv-02082 (S.D. Cal.)

9. Beyond its *pro rata* share of any recovery, MCRHC will not accept payment for serving as a representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

Dated: June 24, 2026

Harold L. Haugh
Chairman
Macomb County Retiree Health Care Fund

**SCHEDULE A**

MCRHC TRANSACTIONS IN ICON PLC

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 03/01/2024 | 20.00 | 322.72 | ($6,454.37) |
| Sale | 10/29/2024 | -117.00 | 230.37 | $26,953.55 |
| Purchase | 11/26/2025 | 2,714.00 | 181.26 | ($491,929.87) |
| Sale | 01/12/2026 | -124.00 | 179.91 | $22,308.54 |
| Purchase | 02/05/2026 | 58.00 | 153.53 | ($8,904.86) |

# CERTIFICATION

The Trustees of the Plumbers Local Union No. 690 Pension Fund ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1. Plaintiff did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any private action.

2. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

3. Plaintiff's Class Period transactions in the ICON plc securities that are the subject of this action are reflected in the attached Schedule A.

4. Plaintiff has full power and authority to bring suit to recover for its investment losses.

5. Plaintiff has reviewed the Second Amended Complaint for Violations of the Federal Securities Laws and authorizes its filing.

6. Plaintiff intends to actively monitor and vigorously pursue this action for the benefit of the class.

7. Plaintiff will endeavor to provide fair and adequate representation and work directly with class counsel to ensure that the largest recovery for the class consistent with good faith and meritorious judgment is obtained.

8. Aside from this action, *In re ICON plc Securities Litigation*, No. 25-cv-00763 (E.D.N.Y.), Plaintiff has not otherwise sought to serve as a representative party for a class action filed under the federal securities laws during the three years prior to the date of this Certification.

9. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and

expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

10. I, Kevin Dean, as Fund Administrator of the Plumbers Local Union No. 690 Pension Fund, am authorized to make legal decisions, and execute this certification, on behalf of Plaintiff.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23_______ day of June 2026.

Signed by:

By: Kevin Dean

2309E42EEFF6434...

Kevin Dean, Fund Administrator of the Plumbers Local Union No. 690 Pension Fund

## SCHEDULE A

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| Ordinary Shares | Buy | 5/8/2024 | 391 | $312.0803 |
| Ordinary Shares | Buy | 9/3/2025 | 96 | $179.3940 |
| Ordinary Shares | Sell | 8/2/2023 | 46 | $248.1500 |
| Ordinary Shares | Sell | 5/22/2024 | 138 | $316.6208 |
| Ordinary Shares | Sell | 11/6/2024 | 34 | $222.3188 |
| Ordinary Shares | Sell | 11/12/2024 | 102 | $213.4445 |
| Ordinary Shares | Sell | 1/8/2026 | 34 | $186.4400 |
| Ordinary Shares | Sell | 1/29/2026 | 31 | $181.9652 |